## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAUREEN E. DELORETO and<br>DIANE E. HORTON,<br>　　　　　Plaintiffs,<br>　　v.<br><br>SOVEREIGN BANK,<br>　　　　　Defendant | )<br>)<br>)<br>)<br>)<br>)<br>) |

C. A. NO. 05-CV-10712 RCL

### DEFENDANT SOVEREIGN BANK'S MEMORANDUM OF LAW
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, Sovereign Bank ("Sovereign") operates automated teller machines ("ATMs")
throughout Massachusetts, Rhode Island and several other states. In most – but not all –
instances, Sovereign charges a convenience fee to non-Sovereign domestic consumers who use
Sovereign ATMs. The Electronic Funds Transfer Act, 15 U.S.C. §1693 *et seq.* ("EFTA" or "the
Act") and the implementing regulations adopted by the Federal Reserve Board pursuant to the
Act, 12 C.F.R. §205, govern the right of financial institutions to charge such fees. The Act
requires two types of notices – one exterior, general placard notice posted on or at the ATM (the
"Placard Notice") as well as a second notice to appear on the ATM screen (the "Screen Notice").
*See* 15 U.S.C. §§1693b (d)(3)(B)(i) and 1693b (d)(3)(B)(ii). In their Third Amended Complaint,
plaintiffs challenge the sufficiency of the Placard Notices at Sovereign's Plainville and Seekonk
locations. Plaintiffs do not challenge the sufficiency of Sovereign's Screen Notice.

The Placard Notices at Sovereign's Plainville and Seekonk branches state:

Sovereign Bank may charge a fee to U.S. cardholders for withdrawing
cash. This fee is added to the amount of your withdrawal by Sovereign
Bank and is in addition to any fees that may be charged by your financial
institution. This Convenience Fee does not apply to Sovereign Bank
cardholders.

*See* Complaint[1] ¶ 16(c)[2] and Appendix Exs. C, G, K, and O.[3]

In addition to this Placard Notice, before completing a cash withdrawal transaction, a non-Sovereign cardholder receives an additional notice on the ATM screen, which informs those cardholders who will be a charged a fee, that a fee of $1.50 will be charged on the transaction (the " Convenience Fee").  *See* Statement ¶ 8.  Significantly, this notice appears on the ATM screen before the consumer completes any transaction.  *Id.* ¶ 9.  In order to proceed to complete a transaction, the consumer must affirmatively elect to accept the Convenience Fee.  *Id.* ¶ 10 and 66..

After affirmatively choosing to proceed with their transactions, plaintiffs brought this putative class action for the sole purpose of quibbling over the wording, typeface and location of the Placard Notices.  However, as an analysis of the EFTA discloses, plaintiffs ground their claims on a fundamental misreading and/or a misconstruction of the Act.  First, as a matter of law, Sovereign's use of the word "may" rather than "will" in its Placard Notice fully complies with the requirements of the Act and the operative regulations.  Second, the Act's "prominent and conspicuous" requirement applies only to the location of the Placard Notices not to the style of presentation or content.  Other provisions of the Act govern the style and content of notices

---

[1]     All citations to the Complaint refer to the Third Amended Complaint.

[2]     Paragraph 16(c) of the Third Amended Complaint contains a typographical error that has been omitted from the quoted language.  In the Third Amended Complaint, as in each of its predecessor complaints, the second sentence of the quotation reads as follows:  "This fee is **in** added to the amount of your withdrawal by Sovereign Bank and is in addition to any fees that may be charged to your financial institution."  *See* Complaint ¶16(c) (emphasis added).  However, the bolded word "in" does not appear in Sovereign's Placard Notice. *Compare* Appendix Exs. C, G, K, and O.

[3]     Citations to "Appendix" refer to the Appendix of Exhibits while citations to "Statement" refer to the statement of undisputed facts, both of which were submitted in conjunction with this memorandum.

and the plaintiffs do not – and cannot – allege any violation of those provisions.  Finally, as the video and photographic record before this Court conclusively establishes, no reasonable fact finder could conclude that the Placard Notices at Sovereign's Seekonk and Plainville branches were not prominent and conspicuous within the meaning of the EFTA.  In short, as a matter of law, Sovereign fully complied with all applicable statutory and regulatory requirements relating to its Placard Notices.

## I.     PLAINTIFFS' ALLEGATIONS

On April 4, 2005, plaintiff Maureen E. Deloreto completed an electronic funds transfer at a Sovereign ATM in Seekonk, *See* Statement ¶ 50.  Two days later, on April 6, 2005, plaintiff Diane E. Horton conducted an electronic funds transfer at a Sovereign ATM in Plainville.  *Id.*, ¶ 51.  Neither Deloreto nor Horton state whether they employed the drive-up or the walk-up ATM.  However, the receipts attached to the Complaint as Exhibits A and B indicate that both plaintiffs used the drive-up ATMs. Statement ¶¶ 54-58.  Since neither plaintiff was a Sovereign customer at the time of the transaction, Sovereign charged each of them a Convenience Fee of $1.50 in connection with their cash withdrawal transaction.  Statement ¶¶ 52-53.

Notably, plaintiffs do not assert that they did not observe the Placard Notices prior to initiating their ATM transactions, nor do they allege that they were unable to read the notices.  Statement ¶¶ 59-61.  They do not even claim to have been surprised upon receipt of the Screen Notice informing them that Sovereign would charge a fee of $1.50 if they chose to proceed with their transaction.  Statement ¶ 62.  Finally, plaintiffs do not claim to have suffered any specific harm, loss or damage as a result of the alleged wrongdoing.  Statement ¶ 65.

## II.     ARGUMENT

### A.  Standard Of Review

Summary judgment must enter "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see generally*, *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  A fact is "material if it carries with it the potential to affect the outcome of the suit," and "an issue is genuine if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party." *St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 379 F. Supp.2d 183, 188 (D. Mass. 2005) (quotations omitted).  A moving party must point to the "absence of adequate evidence supporting the nonmoving party's case." *Michelson v. Digital Fin. Serv.*, 167 F.3d 715, 720 (1st Cir. 1999).  Once this occurs, "the onus is on the non-moving party to present facts that show a genuine issue for trial." *Id.*  The non-moving party may not rest upon mere allegations or denials.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  Nor will the court consider "conclusory allegations, improbable inferences, and unsupported speculation." *Galloza v. Foy*, 389 F.3d 26, 28 (1st Cir. 2004).  To defeat a motion for summary judgment, the non-moving party must establish a trial worthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993).

### B.  Sovereign's Use Of The Word "May" Comports With The EFTA.

Plaintiffs' efforts to import into the EFTA statutory framework a requirement that Sovereign employ the word "will" in its Placard Notice are pure fabrication and should be rejected.  The Act contains no such requirement.  Moreover, in a recent clarification of

Regulation E, the Federal Review Board reiterated its pre-existing view that use of the word

"may" in EFTA disclosures fulfills the statutory mandate so long as circumstances exist – as they

do in this case – where an ATM operator does not charge a convenience fee.

"In a case that requires construction of a federal statute, the first question a court must ask

is whether the statute's meaning is plainly stated in its words.  If the words are a clear expression

of congressional intent, the inquiry need go no further." *Chatman v. Gentle Dental Ctr. of*

*Waltham*, 973 F.Supp. 228, 238 (D. Mass. 1997) (Lindsay, J.); *see also Stein v. Smith*, 270

F.Supp.2d 157, 170 (D. Mass. 2003) (Lindsay, J.) (applying the "plain language" of ERISA).  In

this case, the plain language of the EFTA requires:  "any [ATM] operator who imposes a fee on

any consumer for providing host transfer services to such consumer to provide notice  ...  to the

consumer (at the time the service is provided) of  ...  the fact that a fee is imposed by such

operator for providing the service." 15 U.S.C. §1693b (d)(3)(A).  Nothing in the EFTA mandates

use of the word "will" in connection with ATM Placard Notice disclosures, nor does the

language of the Act prohibit use of the word "may."

Under the statutory framework established by Congress, the consumer encounters two

notices in the process of completing an ATM transaction.  The first notice – the Placard Notice –

notifies consumers of the possibility of a Convenience Fee *before* an ATM operator provides any

service to the consumer.  The second notice – the Screen Notice – appears almost simultaneously

with the consumer's request for services.  When appropriate, *i.e.*, accurate, this notice includes a

statement that a specific fee will be charged, and the consumer may either accept the fee and

proceed or cancel the requested transaction.  Thus, in conformance with the requirements of the

Act, at "the time the service is provided," *i.e.,* when the consumer requests and immediately

before she receives a transfer of funds, Sovereign provides the required information in the Screen Notice.

Even assuming for the sake of argument that the consumer confronted the Placard Notice at the time that service was provided, plaintiffs' argument still fails. Reduced to simplest terms, plaintiffs seek to convert the EFTA's use of the word "is" into a statutory imperative. However, the argument implicit in the Complaint suffers from a fundamental flaw. As employed in the Act, the word "is" does not constitute an instruction; it simply references the state of affairs, as they exist. As the Supreme Court of Rhode Island explained in *Interstate Navigation Co. v. Div. of Pub. Util. and Carriers of the State of R.I.*, 824 A.2d 1282, 1289 (R.I. 2003), "[t]he word 'is' is defined as '[t]he third person singular present indicative of the verb be. * * * In its present state; as it stands.'" *Id.* (citing American Heritage Dictionary of the English Language 693 (10th ed. 1981)).

Interpreting the Act's use of the word "is" to mandate notice when the specified condition exists yields this simple proposition: If the fee *is* charged, then notice must be given. Conversely, though, if the fee *is not* charged, notice need not be provided. Indeed, giving consumers notice that a fee will be charged when it will not, would be inaccurate and misleading. In short, plaintiffs interpret the EFTA to require Sovereign to lie to consumers – telling them that a fee *will* be charged when, in fact, it *may* not be. This Court should not interpret an act of Congress to yield such an illogical and irrational conclusion. *See U.S. v. Meyer*, 808 F.2d 912, 919 (1st Cir. 1987) ("it is settled beyond peradventure that legislation should be interpreted to avoid unreasonable results whenever possible") (quotations omitted); *Wagenmann v. Adams*, 829 F.2d 196, 223 (1st Cir. 1987) ("we honor the rule that a statute should be construed so as to avoid unjust or absurd results").

Even if the text of the Act was not sufficiently clear – and it is – the agency responsible for enforcing the EFTA, the Federal Reserve, interprets the Act precisely as Sovereign does.  As explained in the Federal Reserve's recent staff interpretation of the Act, the Placard Notice is not intended to be a complete disclosure:

> The first disclosure, on ATM signage posted on or at the ATM, allows consumers to identify quickly ATMs that generally charge a fee for use. This disclosure is not intended to provide a complete disclosure of the fees associated with the particular type of transaction the consumer seeks to conduct.  Until a consumer uses his or her card at an ATM, the ATM operator does not know whether a surcharge will be imposed for that particular consumer.  Rather, it is the second, more specific disclosure made either on the AMT screen or on an ATM receipt that informs the consumer before he or she is committed to the transaction whether, in fact, a fee will be imposed for the transaction and the amount of the fee.

71 Fed. Reg. 1638, 1656 (Jan. 10, 2006) (to be codified at 12 C.F.R. § 205).  Moreover, as the Federal Reserve correctly pointed out, a requirement that ATM operators use the word "will" and then list the exceptions where a fee is not imposed would be unnecessarily cumbersome and defeat the purpose of the Placard Notice:

> The Board further believes that an alternative rule requiring institutions to provide a general disclosure that a fee "will" be imposed, while also specifying the circumstances under which a fee will not be imposed, would impose significant costs on ATM operators without corresponding benefit to consumers.  Commentators indicated at least ten different circumstances in which a waiver may apply for a given ATM transaction, including surcharge-free networks, other contractual relationships, cards issued by foreign financial institutions, cards delivering government benefits, corporate affiliations with the ATM operator, and in response to special circumstances, such as to provide disaster relief.  Thus, consumers could be confused or discouraged by signage containing potentially lengthy disclosures listing the many circumstances under which a fee would not be imposed.  Such a rule could also require ATM operators to modify all the signs each time they revised their surcharge practices, at considerable costs.

*Id*.  Accordingly, the Federal Reserve explicitly approved use of the word "may" on Placard Notices, provided that "there are circumstances under which some consumers would not be

charged a fee." *Id.*  Significantly, the Federal Reserve does not view its new regulation as a

change in policy, but simply as a clarification of the existing rule. *Id.*  ("Accordingly, for the

reasons discussed above, § 205.16(b) is revised to explicitly clarify that …").

The regulation itself now makes clear that the word "may" can be used if there are

circumstances where a fee is not charged:

> (c) *Notice requirement.*  To meet the requirements of paragraph (b) of this
> section, an automated teller machine operator must comply with the
> following:
>> (1) *On the machine.*  Post in a prominent and conspicuous
>> location on or at the automated teller machine a notice that:
>>> (i) A fee will be imposed for providing electronic
>>> fund transfer services or for a balance inquiry; or
>>> (ii) A fee may be imposed for providing electronic
>>> fund transfer services or for a balance inquiry, but
>>> the notice in this paragraph (c)(1)(ii) may be
>>> substituted for the notice in paragraph (c)(1)(i) only
>>> if there are circumstances under which a fee will not
>>> be imposed for such services.

*Id*, at 1659.

The Federal Reserve's official staff interpretation to the regulation further clarifies that so

long as there exist ***any*** circumstances where a fee is not imposed, use of the word "may" is

appropriate:

> 1. *Specific notices.*  An ATM operator that imposes a fee for a specific
> type of transaction – such as for a cash withdrawal, but not for a balance
> inquiry, or for some cash withdrawals, but not for others (such as where
> the card was issued by a foreign bank or by a card issuer that has entered
> into a special contractual relationship with the ATM operator regarding
> surcharges) – may provide a notice on or at the ATM that a fee will be
> imposed or a notice that a fee may be imposed for providing EFT services
> or may specify the type of EFT for which a fee is imposed.  If, however, a
> fee will be imposed in all instances, the notice must state that a fee will be
> imposed.

*Id.* at 1664.

BOS_520196_7/JGARDNER

Court's customarily defer to an agency's interpretation of a statute that the agency is charged with administering. *See Regions Hosp. v. Shalala,* 522 U.S. 448, 457 (1998); ("If the agency's reading fills a gap or defines a term in a reasonable way in light of the Legislature's design, we give that reading controlling weight, even if it is not the answer 'the court would have reached if the question initially had arisen in a judicial proceeding'").  Indeed, courts afford an agency's interpretation of its own regulation an even higher degree of deference. *See Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1135 (1st Cir. 1995), ("the respect usually accorded an agency's interpretation of a statute is magnified since the agency is interpreting its own regulation"); *Mass. Inst. of Tech. v. Mass. Dept. of Pub. Util.*, 941 F.Supp. 233, 237 n.2 (D. Mass. 1996) (Lindsay, J.) (an agency's interpretation of its own regulations should be accorded deference unless clearly erroneous even where the court is not in the usual *Chevron* posture of reviewing the reasonableness of an agency determination on appeal).  Accordingly, this Court should defer to the Federal Reserve Board's interpretation of 15 U.S.C. §1693b (d)(3) and 12 C.F.R. § 205.

In their response to Sovereign's motion to dismiss, plaintiffs abandoned their earlier argument that the Act requires ATM operators to employ the word "will" in their Placard Notices in all circumstances.  Instead plaintiffs advanced a narrower proposition to the effect that Sovereign's use of the word "may" was improper *because* Sovereign always charges a convenience fee.

> Contrary to Sovereign's suggestion, plaintiffs do not maintain that Sovereign must 'lie' to consumers and tell them that a fee will be charged when it is not.  What plaintiffs do maintain is that if Sovereign chooses to refer to cash withdrawals in its notices, **and Sovereign always imposes a fee on non-customers for cash withdrawals**, Sovereign's notice must inform consumers of the fact that a fee will be imposed.

Plaintiffs' Response to Defendant's Motion to Dismiss (Docket No. 17), at 5 (emphasis added). Thus, plaintiffs grounded their argument on the erroneous proposition that Sovereign always imposes a Convenience Fee on non-Sovereign customers who use Sovereign ATMs for cash withdrawal transactions. However, as Phase I discovery clearly established, several situations exist in which Sovereign elects not to impose a Convenience Fee on non-Sovereign customers who use Sovereign ATMs for cash withdrawal transactions.

For example, Sovereign does not charge a fee "where the cardholder is accessing … governmental benefits through a card that is typically referred to as an EBT card." Statement ¶ 67. Likewise, for a three to ten day period of time immediately before the legal date of an acquisition of another bank, Sovereign does not charge a Convenience Fee to customers of the target bank. Statement ¶ 68. Sovereign also customarily waives Convenience Fees for customers of acquired banks in connection with cash transactions that take place after the legal acquisition of the customer's bank but before the acquired bank is actually merged into, and becomes a part of, Sovereign. Statement ¶ 69. In addition, in connection with the Fleet/Bank Boston divestiture, Sovereign waived Convenience Fees for all Fleet and Bank Boston customers for a period of time.[4] Statement ¶ 70. In addition, in connection with a Red Cross and FEMA initiative, Sovereign participated in a plan to waive Convenience Fees for cards issued to people dislocated by Hurricane Katrina. Statement ¶ 71. Finally, on occasion Sovereign enters into special arrangements with certain entities that involve the waiver of Convenience Fees. For example, in a currently outstanding agreement with a landlord, Sovereign waived all Convenience Fees for transactions conducted at a specific ATM located on the leased premises. Statement ¶ 72.

---

[4]    Although Sovereign's acquisition of customer accounts and other assets in connection with the Fleet/Bank Boston divestiture occurred outside of the time period relevant to this action, it nevertheless illustrates a type of circumstance under which Sovereign will not charge a Convenience Fee.

BOS_520196_7/JGARDNER

In short, under a variety of different circumstances Sovereign does not charge a

Convenience Fee to non-Sovereign domestic customers who use Sovereign's ATMs for cash

withdrawal transactions.  It necessarily follows that given the plain language of the Act and the

unequivocal interpretation and regulations of the Federal Reserve, Sovereign's use of the word

"may" in the Placard Notice comports with the EFTA because there exist circumstances under

which Sovereign does not charge a fee to non-Sovereign domestic customers for cash

withdrawals.  Accordingly, summary judgment should enter with respect to plaintiffs "may

versus will" argument.

### C.  The Content Of Sovereign's Placard Notices
### Complies with the Requirements of the EFTA.

Plaintiffs misconstrue the Act's "prominent and conspicuous" requirement.  The Placard

Notice need only be placed "in a prominent and conspicuous *location* on or at the automated

teller machine ... " 15 U.S.C. §1993b (d)(3)(B)(i) (emphasis added); *see* 12 C.F.R.

§205.16 (c)(1).  The conspicuousness requirement thus regulates the notice's location, not its

content.  As such, plaintiffs' allegations as to the type size, color, and language employed on the

Placard Notice are of no legal moment.  Matters relating to typeface, color, or even the language

employed are not implicated by the "conspicuous location" standard, and plaintiffs have made no

allegations – nor could they – that Sovereign violated the standard that actually governs the

language used in its notices.

The Act states that notices "shall be in readily understandable language." 15 U.S.C.

§1693c(a).  Nowhere in the Complaint do plaintiffs allege that the language employed in the

notice was not "readily understandable," nor do they ever reference the statutory or regulatory

provisions that govern the content of notices.  Indeed, as previously mentioned, Plaintiffs do not

even allege that they experienced any difficulty whatsoever in reading or understanding the

language employed on the Placard Notice. However, even if plaintiffs properly challenged the language and type employed in the Placard Notices, their phantom claim would nonetheless fail because the language Sovereign used in its Placard Notices is undeniably clear and readily understandable under any reasonable interpretation of that phrase.

Under § 1693b of the Act, the issue, pure and simple, is whether Sovereign posted the Placard Notices in a prominent and conspicuous *location*. Accordingly, plaintiffs' allegations concerning the content of the Placard Notices cannot support a claim under the conspicuousness requirement. Therefore, to the extent that plaintiff's base their Complaint on such claims, this Court should grant Sovereign's motion and enter summary judgment in favor of Sovereign.

### D. As a Matter of Law, Sovereign Posted the Placard Notices At Issue At Conspicuous Locations.

Photographs and the video recording of the Seekonk and Plainville Placard Notices and their surroundings are included in the Appendix of Exhibits as Exhibits A through P. Even the most cursory view of this undisputed evidence reveals that Sovereign posted the Placard Notices in prominent and conspicuous locations. The Placard Notice at the drive up ATM in both Seekonk and Plainville is directly to the left of the ATM such that a customer driving up to the ATM must necessarily confront the notice before beginning a transaction. Statement ¶¶ 15, 16, 34, 35, and 41. Moreover, the Placard Notices are visible to consumers who access Sovereign's Seekonk and Plainville drive-up ATMs while the consumers are seated in their automobiles. Statement ¶¶ 21 and 40.

Plaintiffs lack standing to contest the Placard Notices at ATMs that they did not use. *See, Lewis v. Casey*, 518 U.S. 343, 357 (1996); *In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525, 1531 (D. Mass. 1991); *In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. 38, 41 (D. Mass. 2003); *Stegall v. Ladner*, 394 F. Supp.2d 358, 362 (D. Mass. 2005). In this case, plaintiffs' own

BOS_520196_7/JGARDNER

evidence demonstrates that each plaintiff conducted her single transaction at the drive-up ATMs located outside each of the two bank locations. *See* Statement ¶¶ 50 through 58. Since neither plaintiff used the walk-up ATMs, neither plaintiff could have suffered any injury based on Sovereign's placement of the Placard Notices at the walk-up ATMs. Accordingly, neither of the named plaintiffs have standing to question the placement of Sovereign's placards at the walk-up ATMs.

Moreover, even if plaintiffs possessed standing to challenge the walk-in Placard Notices, they would survive judicial scrutiny. At the walk-up location at the Seekonk branch, the Placard Notice is located directly to the left of the ATM where no reasonable person could fail to observe it before using the ATM. Statement ¶¶ 23 through 29. The room in which the Plainville walkup ATM is located is quite small so Sovereign placed the Placard Notice on the wall opposite the ATM. Statement ¶¶ 42 through 49. Given the small size of the room in which the Plainville ATM is located, no reasonable person could enter the room without observing the Placard Notice posted on the wall.

Plaintiffs allege that the Placard Notices "… are not in a prominent and conspicuous location." Complaint ¶16(a). However, such "conclusory allegations" carry no weight. *Galloza,* 389 F.3d at 28; *Anderson,* 477 U.S. 248-49. Plaintiffs must come forward with some evidence to support their assertion. In reviewing any such evidence this Court should ask whether the notice's placement was reasonably calculated to impart the information in question. The Fifth Circuit developed this test in *U.S. v. Strakoff*, 719 F.2d 1307, 1309 (5th Cir. 1983), a case in which the Court considered whether notices of the rules forbidding the carrying of weapons onto federal property were "posted and kept posted in a conspicuous place." In formulating a definition for "conspicuous" the court relied on Black's Law Dictionary: "Looking to the sage of

jurisprudential definition, we find that, 'Within the meaning of a statute relating to the posting of notices, a 'conspicuous place' means one which is reasonably calculated to impart the information in question.'" [5] *Id.* (quoting Black's Law Dictionary 382 (rev. 5th ed. 1979).

In this case, plaintiffs do not allege, nor could they, that the locations of the notices at issue are not reasonably calculated to impart their information.  Statement ¶¶ 59 through 64.  In fact, the plaintiffs do not even allege that they experienced any difficulty whatsoever locating the notices.  *Id.*  Plaintiffs' do correctly note that the Placard Notices "… appear underneath several advertisements and notices." *See* Complaint, ¶ 16(a).  However, the fact that Sovereign's Placard Notices may appear along with other advertisements or disclosures is inconsequential.  The EFTA requires only that notices be placed in a **location** that is conspicuous, and as the applicable regulations expressly provide, banks "may include additional information and may combine disclosures required by other laws" with the disclosures required by the *EFTA*. 12 C.F.R. § 205.4. *See also, Nicolai v. Trustmark Ins. Co.*, No. 97 C 5659, 1998 WL 292384, at *3-4 (N.D. Ill. May 20, 1998) (employee notice placed alongside other notices behind glass on a bulletin board ruled to be in a conspicuous location).  Moreover, the fact that the Placard Notices appear in close proximity to private advertising supports the conclusion that Sovereign placed the Placard Notices in conspicuous locations.  After all, private advertising would be of little or no value if it was placed at an inconspicuous location.

Finally, the observation that Sovereign posted the Placard Notices on a wall, rather than on the ATM machine itself, cannot support an alleged violation of the Act because the EFTA

---

[5]     The court ultimately found the notice not to have been conspicuously placed for the purposes of telling the criminal defendant that firearms were not allowed in the building, because the defendant would have had to enter the building, go through the metal detector, and take an elevator to a different floor in order to have actually seen the notice telling him that he was not allowed to bring a weapon into the building in the first place. *Strakoff*, 719 F.2d at 1309.

BOS_520196_7/JGARDNER

clearly allows for the posting of notices "at" rather than "on" the ATM machine. *See* 15 U.S.C. § 1693b(d)(3)(B)(i).  Plaintiffs assert that the vast majority of ATM operators attach their notices directly to the machine and that Sovereign could have placed its Placard Notices on its machines. *See* Plaintiffs' Response to Sovereign's Motion to Dismiss (Docket No. 17), at 8.  Even if true and supported by appropriate evidence, this "fact" is in no way determinative.  Indeed, even if every other bank attached Placard Notices to their ATM machines and the parties' respective experts all agreed that Sovereign could attach Placard Notices to its machines, plaintiffs' argument would still fail because §1693b(d)(3)(B)(i) of the Act states that the Placard Notice "shall be posted in a prominent and conspicuous location on *or at* the automated teller machine." 15 U.S.C. 1693b(d)(3)(B)(i) (emphasis added).  The word "at" must mean something more than "on."  Otherwise, it becomes redundant and entirely superfluous, and Courts will not interpret a statute in a manner that yields redundant or superfluous text. *See e.g., In re Grand Jury Proceedings*, 158 F. Supp.2d 96, 107 (D. Mass. 2001) ("all words and provisions of statutes are intended to have meaning and are to be given effect, and . . .  no construction should be adopted which would render statutory words or phrases meaningless, redundant, or superfluous").  Employing the plain meaning of "at" yields the common sense conclusion that banks may post Placard Notices at prominent and conspicuous locations "on" or "near by" their ATM machines.  Plaintiffs do not and cannot allege that Sovereign did not post its Placard Notices "nearby" its ATMs.

    In this case, the Placard Notices are clearly posted in places reasonably calculated to impart their information.  *See* Appendix Exs. A through P.  The law requires no more.  Therefore, this Court should not hesitate to conclude that Sovereign posted the Seekonk and Plainville Placard Notices at "conspicuous" locations in the context of a motion for summary

BOS_520196_7/JGARDNER

judgment. Indeed, several federal courts have considered similar requirements under analogous federal statutes and have entered summary judgment where – as here – the notices were placed at locations that were reasonably calculated to impart the information in question.

For example, in *Nicolai v. Trustmark Ins. Co.*, 97 C 5659, 1998 WL 292384, at *3 (N.D. Ill. May 20, 1998), the plaintiff argued that the notices required by the Age Discrimination in Employment Act ("ADEA") were not conspicuous because a wall blocked a person waiting in the Human Resources' reception area from seeing the notices, which could only be observed in the back room of the human resources department. *Id.* The *Nicolai* court resolved the conspicuousness issue on the defendant's motion for summary judgment, noting that on "a motion for summary judgment, an employee's assertion that she did not see any notices posted will not raise a genuine issue of material fact when the employer has unequivocally stated that the notices can be readily seen." *Id.,* at *4. The court found the notice sufficiently conspicuous because "the notice was placed where those employees in need, *i.e.*, employees who are getting fired, could see it." *Id.*

Like the *Nicolai* court, the court in *Keitz v. Lever Bros. Co.*, 563 F. Supp. 230, 235 (N.D. Ind. 1983) also determined that a notice was "was in a conspicuous, prominent and accessible place" on a motion for summary judgment. In *Keitz*, the defendant posted an ADEA notice in a glass-enclosed bulletin board that contained several other postings. *Id.* The plaintiff claimed not to have seen the notice, but the Court focused on the reasonable placement of the bulletin board:

> The fact that plaintiff did not see the notice or *that there were other prominent places to post a notice* does not require a court to find that a notice was not conspicuously posted. The defendant in this case posted the notice in a conspicuous, prominent and accessible place which provided employees with a meaningful opportunity to learn of their ADEA rights.

*Id.* (emphasis added).

Here the uncontested facts and visual evidence presents an even more compelling case for the entry of summary judgment.  Unlike the plaintiffs in *Nicolai* and *Keitz*, plaintiffs here do not even allege that they failed to see the Placard Notices, and even if they amended their Complaint yet again to make such an allegation, it would not advance their position because like the defendants in *Nicolai* and *Keitz*, Sovereign posted the relevant notices where they could be readily seen by customers contemplating using the ATM.  The Act requires nothing more.  Therefore, like the *Nicolai* and *Keitz* courts, this Court should enter summary judgment dismissing plaintiffs' claims to the extent that they are grounded on the allegation that Sovereign neglected to post the Placard Notices in conspicuous locations.

**E.    As a Matter of Law, Sovereign Is Entitled to Judgment Dismissing the Plaintiffs' Claim that Sovereign's Actions Constitute a Violation of Mass. Gen Laws ch. 93A.**

Sovereign is entitled to judgment dismissing the Plaintiffs' claim that Sovereign's actions constitute a violation of Mass. Gen. Laws ch. 93A §9 for at least three reasons.  First, as explained above, Sovereign's Placard Notices fully comply with the governing statutes and regulations.  Plaintiffs' ch. 93A claim rests solely on the allegation that Sovereign's alleged EFTA violation constitutes a *de facto* violation of ch. 93A.  *See* Complaint, ¶ 26 ("Defendant's violation of the EFTA also constitutes a violation of Mass. G.L., ch. 93A").  It necessarily follows that because Sovereign has not violated the EFTA, summary judgment should enter with respect to plaintiffs' ch. 93A claim. *See Peckham v. Cont'l Cas. Ins. Co.*, 997 F. Supp. 73, 83 (D. Mass. 1989); *Brunella v. W.E. Aubuchon Co.*, 60 Mass. App. Ct. 626, 628, 804 N.E.2d 955, 958 (2004).

Plaintiffs' ch. 93A claim should also be dismissed for the additional reason that plaintiffs' statutory demand letter was legally deficient.  For claims under Mass. Gen. Laws ch. 93A, § 9, an adequate demand letter "is a prerequisite to suit and as a special element must be alleged and

proved." *Entrialgo v. Twin City Dodge, Inc.*, 368 Mass. 812, 813, 333 N.E.2d 202, 204 (1975);

*see also, Cassano v. Gogos*, 20 Mass. App. Ct. 348, 349, 480 N.E.2d 649, 650 (1985). A

claimant must send the defendant, at "least thirty days prior to filing of any action, a written

demand for relief, identifying the claimant and **reasonably describi**ng the unfair or deceptive act

or practice relied upon and t**he injury suffered.**" Mass. Gen. Laws. ch. 93A, § 9(3) (emphasis

added); *see also Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 288, 475 N.E.2d 727, 735-

36 (1985). A pre-suit demand letter "must be specific" in order to fulfill the dual statutory

purposes of encouraging negotiation and settlement and operating as a control on the amount of

damages that the complainant may ultimately recover. *Halper v. Demeter*, 34 Mass. App. Ct.

299, 302 n. 5, 610 N.E.2d 332, 334 n. 5 (1993); *see Thorpe v. Mutual of Omaha Ins. Co.,* 984

F.2d 541, 544 (1st Cir. 1993) (demand letter must be detailed enough to provide the defendant an

"adequate basis … to appraise the value of the claim or frame a settlement offer"); *Spring*, 394

Mass at 288 (plaintiff's demand letter failed to "reasonably describe the injury suffered" as a

result of defendant's actions).

In this case, Plaintiffs purported demand letter makes a mockery of ch. 93A. The demand

letter itself contains no factual allegations. Aside from its quotations from the EFTA, the letter

contains only three sentences:

> Enclosed is a complaint filed recently. Mss. Deloreto and Horton contend
> that the same matters complained of also violate Mass. G.L., ch. 93A, and
> hereby give notice as required by that statute. Mss. Deloreto and Horton
> contend that a reasonable resolution of the 93A claim would be payment
> of $20 per class member.

Appendix Ex. X.

BOS_520196_7/JGARDNER

The Demand Letter's reference to the Original Complaint was doubly unhelpful because the complaint to which it refers[6] itself lacked any details as to what plaintiffs' claim that Sovereign did wrong or how plaintiffs were injured. Indeed, plaintiffs' Original Complaint, dated April 11, 2005, contained only one conclusory paragraph relating to Sovereign's alleged wrongdoing; and with respect to the alleged injury suffered, the so-called Demand Letter and each of plaintiffs' complaints have been entirely silent. Thus, to this day, neither Sovereign nor this Court knows how plaintiffs claim to have been harmed by Sovereign's conduct. Given that plaintiffs' Demand Letter fails to reasonably describe Sovereign's supposedly illegal conduct or the injuries plaintiffs suffered, and improperly forced Sovereign to frame a settlement offer based on inadequate information, plaintiffs cannot establish the necessary predicate to a ch. 93A §9 claim.

Finally, plaintiffs' ch. 93A claim also fails because plaintiffs did not suffer any harm or loss as a result of Sovereign's conduct. As the Supreme Judicial Court recently held in *Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*, 445 Mass. 790, 791, 840 N.E.2d 526, 528 (2006) a plaintiff lacks standing to assert a claim under ch. 93A §9 unless she alleges both an actual injury and a causal connection between the allegedly deceptive act and some adverse consequence or loss. Significantly, the court specifically ruled that mere non-compliance with a statute, rule or regulation does not automatically constitute an injury within the meaning of ch. 93A. *Id.*, at 799 n. 17. In this case, plaintiffs have not and cannot allege that they suffered any actual loss or harm as a result of Sovereign's conduct. Therefore, as a matter of law they cannot maintain a claim under ch. 93A §9.

---

[6]      Plaintiffs have since filed three amended complaints.

### III.  CONCLUSION

After confronting all of the notices required by the Act, choosing to proceed with their respective transactions, receiving the benefit of Sovereign's service, and suffering no discernable harm or even inconvenience in the process, plaintiffs brought this action in an effort to reap a windfall benefit.  Given the plain meaning of the EFTA and the equally plain presentation of the Placard Notices, this Court simply cannot permit such opportunistic quibbling. For the reasons more fully explained in this memorandum, this Court should grant Sovereign's motion and enter summary judgment against plaintiffs on all of their claims.

<div style="text-align:right">

**SOVEREIGN BANK**
By its attorneys,

/s/ John A. Houlihan
/s/ Donald E. Frechette
/s/ Joshua W. Gardner
John A. Houlihan (B.B.O. #542038)
Donald E. Frechette (B.B.O. #547293)
Joshua W. Gardner (B.B.O. #657347)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199-7613
(617) 439-4444  Telephone
(617) 439-4170  Telecopy

</div>

Dated: January 31, 2006

### <u>CERTIFICATE OF SERVICE</u>

I, John A. Houlihan, certify that on this 31st day of January, 2006, I caused a copy of this document to be served, via first class mail, postage prepaid, on the following counsel of record:

Christopher M. Lefebvre, Esq.
Claude Lefebvre, P.C.
Two Dexter Street
Pawtucket, RI  02860

Daniel A. Edelman
Edelman, Combs,
Latturner & Goodwin, LLC
120 S. LaSalle St., 18th Floor
Chicago, IL  60603

<div style="text-align:right">

John A. Houlihan
John A. Houlihan

</div>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MAUREEN E. DELORETO and    )
DIANE E. HORTON,    )    C. A. NO. 05-CV-10712 RCL
    )
         Plaintiffs,    )
   v.    )
    )
SOVEREIGN BANK,    )
    )
         Defendant.    )

## **APPENDIX OF EXHIBITS**

| | |
|---|---|
| Photograph of Seekonk Walk-Up ATM | A. |
| Photograph of Seekonk Walk-Up Placard Notice | B. |
| Photograph of Seekonk Walk-Up Placard Notice Text | C. |
| Photograph of Seekonk Drive-Up ATM | D. |
| Photograph of Seekonk Drive-Up ATM | E. |
| Photograph of Seekonk Drive-Up Placard Notice | F. |
| Photograph of Seekonk Drive Up Placard Notice Text | G. |
| Photograph of Plainville Walk-Up ATM | H. |
| Photograph of Plainville Walk-Up ATM | I. |
| Photograph of Plainville Walk-Up Placard Notice | J. |
| Photograph of Plainville Walk-Up Placard Notice Text | K. |
| Photograph of Plainville Drive-Up ATM | L. |
| Photograph of Plainville Drive-Up ATM | M. |
| Photograph of Plainville Drive-Up Placard Notice | N. |
| Photograph of Plainville Drive Up Placard Notice Text | O. |

| | |
|---|---|
| Video CD of Seekonk and Plainville ATMs | P. |
| Third Amended Complaint | Q. |
| Answer | R. |
| Charles M. Begley Deposition Transcript | S. |
| Affidavit of Rodney A. Simmons | T. |
| Affidavit of Rhiannon E. Hernandez | U. |
| Affidavit of Stephanie K. Comeau | V. |
| Affidavit of Aaron Usher | W. |
| Plaintiffs ch. 93A demand letter dated April 15, 2005 | X. |

BOS_521500_1/JHOULIHAN

**EXHIBITS A THROUGH O**          ORIGINAL PHOTOGRAPHS FILED WITH COURT

**EXHIBIT P**          ORIGINAL MEDIA (CD) FILED WITH COURT

**EXHIBIT Q**

**THIRD AMENDED COMPLAINT**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

MAUREEN E. DELORETO and    )
DIANE E. HORTON,    )
   )
       Plaintiffs,    )
   )   C.A. No. 05 CV 10712 RCL
     v.    )
   )
SOVEREIGN BANK,    )
   )
       Defendant.    )

## THIRD AMENDED COMPLAINT – CLASS ACTION

## INTRODUCTION

1.     Plaintiffs Diane E. Horton and Maureen DeLoreto bring this action to secure

redress for defendant's violations of the Electronic Funds Transfer Act, 15 U.S.C. §1693 et seq.

("EFTA") and Mass. G.L., ch. 93A, and implementing Federal Reserve Board Regulation E, 12

C.F.R. part 205.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 and 15 U.S.C.

§1693m (EFTA).

3.     Venue in this District is proper in that defendant does business in this District

and the events complained of occurred in this District.

## PARTIES

4.     Plaintiff Maureen E. DeLoreto is an individual who resides in Pawtucket R.I.

She is not a customer of defendant Sovereign Bank

5.     Plaintiff Diane E. Horton is an individual who resides in North Attleboro,

Case 1:05-cv-10712-RCL    Document 20    Filed 09/20/2005    Page 3 of 15

MA. She is not a customer of defendant Sovereign Bank.

6.    Defendant Sovereign Bank is a corporation with its principal offices at 1500 Market Street, Philadelphia, PA. It does business in Massachusetts. It maintains offices at 75 State Street, Boston, MA and many other locations throughout Massachusetts and Rhode Island.

7.    Among other business activities in Massachusetts, Sovereign Bank maintains automated teller machines ("ATMs") at various locations in Massachusetts, including in Seekonk and Plainville, MA.

## FACTS

8.    Within one year prior to the filing of this action, on or about April 4, 2005, plaintiff DeLoreto conducted an electronic funds transfer at an automated teller machine ("ATM") maintained by defendant in Seekonk, MA. A copy of the receipt she received is attached as <u>Exhibit A</u>.

9.    Within one year prior to the filing of this action, on or about April 6, 2005, plaintiff Horton conducted an electronic funds transfer at an automated teller machine ("ATM") maintained by defendant in Plainville, MA. A copy of the receipt she received is attached as <u>Exhibit B</u>.

10.    Any transaction carried out through an ATM is governed by EFTA. The EFTA, 15 U.S.C. §1693a, provides:

> . . . (6) the term "electronic fund transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions . . . .

11.    Each plaintiff was charged a $1.50 fee by the ATM.

Case 1:05-cv-10712-RCL    Document 28    Filed 09/20/2005    Page 4 of 15

## VIOLATION ALLEGED

## COUNT I - EFTA

12.    Plaintiffs incorporate ¶¶ 1-11.

13.    Defendant Sovereign Bank failed to notify the public, as required by law, that they will be required to pay a fee each time they use an ATM maintained by Sovereign Bank with certain exceptions.

14.    The EFTA, 15 U.S.C. §1693b, provides:

Regulations

(a) Prescription by Board.  The Board shall prescribe regulations to carry out the purposes of this title *[15 USCS § § 1693* et seq.]. . . .

(d) Applicability to service providers other than certain financial institutions.

(1) In general.  If electronic fund transfer services are made available to consumers by a person other than a financial institution holding a consumer's account, the Board shall by regulation assure that the disclosures, protections, responsibilities, and remedies created by this title *[15 USCS § § 1693* et seq.] are made applicable to such persons and services. . . .

(3) Fee disclosures at automated teller machines.

(A) In general. The regulations prescribed under paragraph (1) shall require any automated teller machine operator who imposes a fee on any consumer for providing host transfer services to such consumer to provide notice in accordance with subparagraph (B) to the consumer (at the time the service is provided) of --

(i) the fact that a fee is imposed by such operator for providing the service; and

(ii) the amount of any such fee.

(B) Notice requirements.

(i) On the machine. The notice required under clause (i)

J:\Case\sovereign14.324\pleading\third.cmplt.wpd                3                                ek

Case 1:05-cv-10712-RCL     Document 28     Filed 09/20/2005     Page 5 of 15

of subparagraph (A) with respect to any fee described in such subparagraph shall be posted in a prominent and conspicuous location on or at the automated teller machine at which the electronic fund transfer is initiated by the consumer.

(ii) On the screen. The notice required under clauses (i) and (ii) of subparagraph (A) with respect to any fee described in such subparagraph shall appear on the screen of the automated teller machine, or on a paper notice issued from such machine, after the transaction is initiated and before the consumer is irrevocably committed to completing the transaction, except that during the period beginning on the date of the enactment of the Gramm-Leach-Bliley Act [enacted Nov. 12, 1999] and ending on December 31, 2004, this clause shall not apply to any automated teller machine that lacks the technical capability to disclose the notice on the screen or to issue a paper notice after the transaction is initiated and before the consumer is irrevocably committed to completing the transaction.

(C) Prohibition on fees not properly disclosed and explicitly assumed by consumer. No fee may be imposed by any automated teller machine operator in connection with any electronic fund transfer initiated by a consumer for which a notice is required under subparagraph (A), unless--

(i) the consumer receives such notice in accordance with subparagraph (B); and

(ii) the consumer elects to continue in the manner necessary to effect the transaction after receiving such notice.

(D) Definitions. For purposes of this paragraph, the following definitions shall apply:

(i) Automated teller machine operator. The term "automated teller machine operator" means any person who--

(I) operates an automated teller machine at which consumers initiate electronic fund transfers; and

(II) is not the financial institution that holds

Case 1:05-cv-10712-RCL    Document 20    Filed 09/20/2005    Page 6 of 15

the account of such consumer from which the transfer is made.

(ii) Electronic fund transfer. The term "electronic fund transfer" includes a transaction that involves a balance inquiry initiated by a consumer in the same manner as an electronic fund transfer, whether or not the consumer initiates a transfer of funds in the course of the transaction.

(iii) Host transfer services. The term "host transfer services" means any electronic fund transfer made by an automated teller machine operator in connection with a transaction initiated by a consumer at an automated teller machine operated by such operator.

15.    Regulation E, 12 C.F.R. § 205.16, provides:

Disclosures at automated teller machines.

(a) Definition. Automated teller machine operator means any person that operates an automated teller machine at which a consumer initiates an electronic fund transfer or a balance inquiry and that does not hold the account to or from which the transfer is made, or about which an inquiry is made.

(b) General. An automated teller machine operator that imposes a fee on a consumer for initiating an electronic fund transfer or a balance inquiry shall:

(1) Provide notice that a fee will be imposed for providing electronic fund transfer services or a balance inquiry; and

(2) Disclose the amount of the fee.

(c) Notice requirement. An automated teller machine operator must comply with the following:

(1) On the machine. Post the notice required by paragraph (b)(l) of this section in a prominent and conspicuous location on or at the automated teller machine; and

(2) Screen or paper notice. Provide the notice required by paragraphs (b)(1) and (b)(2) of this section either by showing it on the screen of the automated teller machine or by providing it on paper, before the consumer is committed to paying a fee.

(d) Temporary exemption. Through December 31, 2004, the notice requirement in paragraph (c)(2) of this section does not apply to any automated teller machine that lacks the technical capability to provide such information.

Case 1:05-cv-10712-RCL    Document 20    Filed 09/30/2005    Page 7 of 15

(e) Imposition of fee. An automated teller machine operator may impose a fee on a consumer for initiating an electronic fund transfer or a balance inquiry only if

(1) The consumer is provided the notices required under paragraph (c) of this section, and

(2) The consumer elects to continue the transaction or inquiry after receiving such notices.

16.    Defendant Sovereign Bank did not post a notice on its ATMs that complied with 15 U.S.C. §1693b and 12 C.F.R. §205.16. Specifically, the notices are not prominent and conspicuous for the following reasons, among others:

a.    The notices are not in a prominent and conspicuous location. On most machines they appear underneath several advertisements and notices. In addition, the numerous notices and advertisements are often located on a wall off to the side of the machine.

b.    The typeface used on the notices is too small to be easily read by the average consumer, and it is a lighter color and smaller print than used in the surrounding notices.

c.    The notices do not state that a fee will definitely be charged. Instead they provide: "Sovereign Bank may charge a fee to US cardholders for withdrawing cash. This fee is in added to the amount of your withdrawal by Sovereign Bank and is in addition to any fees that may be charged by your financial institution. This Convenience Fee does not apply to Sovereign Bank Cardholders." On information and belief, Sovereign Bank always charges a fee under ascertainable circumstances.

17.    The imposition of the charge without proper notice is unlawful.

18.    The EFTA, 15 U.S.C. §1693m, provides:

Civil liability

(a) Individual or class action for damages; amount of award. Except as otherwise provided by this section and section 910 *[15 USCS § 1693h]*, any person who fails to comply with any provision of this title *[15 USCS § § 1693 et seq.]* with respect to any consumer, except for an error resolved in accordance with section 908 *[15 USCS § 1693f]*, is liable to such consumer in an amount equal to the sum of--

(1) any actual damage sustained by such consumer as a result of such failure;

(2) (A) in the case of an individual action, an amount not less than $ 100 nor greater than $ 1,000; or

(B) in the case of a class action, such amount as the court may allow, except that (i) as to each member of the class no minimum recovery shall be applicable, and (ii) the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same person shall not be more than the lesser of $ 500,000 or 1 per centum of the net worth of the defendant; and

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

(b) Factors determining amount of award. In determining the amount of liability in any action under subsection (a), the court shall consider, among other relevant factors--

(1) in any individual action under subsection (a)(2)(A), the frequency and persistence of noncompliance, the nature of such noncompliance, and the extent to which the noncompliance was intentional; or

(2) in any class action under subsection (a)(2)(B), the frequency and persistence of noncompliance, the nature of such noncompliance, the resources of the defendant, the number of persons adversely affected, and the extent to which the noncompliance was intentional.

. . . (g) Jurisdiction of courts; time for maintenance of action. Without regard to the amount in controversy, any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.

## CLASS ALLEGATIONS

Case 1:05-cv-10712-RCL    Document 28    Filed 09/20/2005    Page 9 of 15

19.    This claim is brought on behalf of a class, consisting of (a) all persons who do not have an ATM or debit card issued by Sovereign Bank, (b) who used an ATM maintained by Sovereign Bank in Massachusetts or Rhode Island,  (c) and who were charged a fee (d) during a period beginning one year prior to the filing of this action and ending 20 days after the filing of this action.

20.    The class is so numerous that joinder of all members is impracticable.  There are more than 50 members of the class.

21.    There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members. The predominant common question is whether defendant's ATMs were posted with the notices required by law.

22.    Plaintiffs' claims are typical of the claims of the class members. All are based on the same legal and factual issues.

23.    Plaintiffs will fairly and adequately represent the members of the class. Plaintiffs have retained counsel experienced in the prosecution of consumer credit claims and class actions.

24.    A class action is superior for the fair and efficient prosecution of this litigation. Classwide liability is essential to cause defendant to stop its improper conduct. Many class members may be unaware that they have been victims of illegal conduct.

## COUNT II - MASS. G.L., CH. 93A

25.    Plaintiffs incorporate ¶¶ 1-18.

26.    Defendant's violation of the EFTA also constitutes a violation of Mass. G.L., ch. 93A.

Case 1:05-cv-10712-RCL     Document 28     Filed 09/30/2005     Page 10 of 15

27.     An appropriate demand for relief was made on April 15, 2005.

### CLASS ALLEGATIONS

28.     This claim is brought on behalf of a class, consisting of (a) all persons who do not have an ATM or debit card issued by Sovereign Bank, (b) who used an ATM maintained by Sovereign Bank in Massachusetts, (c) and who were charged a fee, (d) during a period beginning one year prior to the filing of this action and ending 20 days after the filing of this action.

29.     The class is so numerous that joinder of all members is impracticable. There are more than 50 members of the class.

30.     There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members. The predominant common question is whether defendant's ATMs were posted with the notices required by law.

31.     Plaintiffs' claims are typical of the claims of the class members. All are based on the same legal and factual issues.

32.     Plaintiffs will fairly and adequately represent the members of the class. Plaintiffs have retained counsel experienced in the prosecution of consumer credit claims and class actions.

33.     A class action is superior for the fair and efficient prosecution of this litigation. Classwide liability is essential to cause defendant to stop its improper conduct. Many class members may be unaware that they have been victims of illegal conduct.

WHEREFORE, plaintiffs request that the Court enter judgment in plaintiffs' favor and in favor of the class for:

a.    Appropriate compensatory and statutory damages;

b.    Attorney's fees, litigation expenses and costs of suit;

c.    Such other or further relief as is appropriate.

s/Christopher M. Lefebvre
Christopher M. Lefebvre
CLAUDE LEFEBVRE, P.C.
P.O. Box 479
Pawtucket, RI  02862
(401) 728-6060
(401) 728-6534 (FAX)
B.B.O. # 629056

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

## JURY DEMAND

Plaintiffs demand trial by jury.

s/Christopher M. Lefebvre
Christopher M. Lefebvre

# EXHIBIT A

CARD
*********7015
SOVEREIGN BANK

LOC            OF253
21 CENTRAL AVENUE
SEEKONK        MA
                  RE
040405  6:54PM  9743

$40 CASH WITHDRAWAL
+$1.50 TERMINAL FEE
TOTAL $41.50
FROM-
CI  :*********9130

HAVE A NICE DAY!



Sovereign Bank

All transactions, including deposits, are subject to proof and verification.

# EXHIBIT B

Sovereign Bank

CARD
************2444
SOVEREIGN BANK

LOC 0F239
62 MESSENGER ST
PLAINVILLE MA
RE
040605 7:43PM 6953

$100 CASH WITHDRAWAL
+$1.50 TERMINAL FEE
TOTAL $101.50
FROM-
CK :*****8854

HAVE A NICE DAY!

All transactions, including deposits, are subject to proof and verification.

SYSTEMAX

EXHIBIT R

ANSWER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MAUREEN E. DELORETO and )    C. A. NO. 05-CV-10712 RCL
DIANE E. HORTON, )
                  )
            Plaintiffs, )
                  )
      v. )
                  )
SOVEREIGN BANK, )
                  )
            Defendant. )
                  )

### SOVEREIGN BANK'S ANSWER TO THE THIRD AMENDED COMPLAINT

Defendant Sovereign Bank ("Sovereign") answers the Third Amended Complaint of

Maureen E. Deloreto and Diane E. Horton (collectively the "Plaintiffs") as follows:

### Introduction

1.      Sovereign denies the allegations in Paragraph 1 of the Third Amended Complaint.

### Jurisdiction and Venue

2.      The allegations in Paragraph 2 constitute conclusions of law as to which no

response is required.  To the extent that a response is required, Sovereign denies the allegations

in Paragraph 2 of the Third Amended Complaint.

3.      Sovereign admits that is does business in Massachusetts, but denies the remaining

allegations in Paragraph 3 of the Third Amended Complaint.

### Parties

4.      Sovereign lacks knowledge or information sufficient to form a belief as to the

truth of the allegations contained in the first sentence of Paragraph 4.  Sovereign admits the

allegations contained in the second sentence of Paragraph 4 of the Third Amended Complaint.

5.    Sovereign lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 5. Sovereign admits the allegations contained in the second sentence of Paragraph 5 of the Third Amended Complaint.

6.    Sovereign admits that it does business in Massachusetts and that it maintains offices in Massachusetts and Rhode Island. Sovereign denies the remaining allegations in Paragraph 6 of the Third Amended Complaint.

7.    Sovereign admits the allegations in Paragraph 7 of the Third Amended Complaint.

### Facts

8.    Sovereign lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8 of the Third Amended Complaint.

9.    Sovereign lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 of the Third Amended Complaint.

10.    The allegations contained in the first sentence of Paragraph 10 constitute conclusions of law as to which no response is required. To the extent that a response is required, Sovereign denies the allegations contained in the first sentence of Paragraph 10. Further answering, Sovereign states that the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.* ("EFTA") speaks for itself. Sovereign denies the allegations in the second sentence of Paragraph 10 to the extent that they are inconsistent with the EFTA.

11.    Sovereign admits that it charged a Convenience Fee of $1.50 in connection with the transactions evidenced by Exhibits A and B to the Third Amended Complaint. Sovereign denies the remaining allegations in Paragraph 11 of the Third Amended Complaint.

BOS_491485_2/JGARDNER

## Violations Alleged

### Count I - EFTA

12.    Sovereign incorporates its answers to Paragraphs 1 through 11 of the Third Amended Complaint.

13.    Sovereign admits that it did not notify the general public with the specific statement that they "will be required to pay a fee each time they use an ATM maintained by Sovereign Bank with certain exceptions." Sovereign denies the remaining allegations in Paragraph 13 of the Third Amended Complaint.

14.    Sovereign states that the EFTA speaks for itself and denies the allegations in Paragraph 14 of the Third Amended Complaint to the extent that they are inconsistent with that statute.

15.    Sovereign states that Regulation E, 12 C.F.R. § 205.16, speaks for itself and denies the allegations in Paragraph 15 of the Third Amended Complaint to the extent that they are inconsistent with that regulation.

16.    Sovereign admits that the machine notices at the two locations mentioned in the Third Amended Complaint read: "Sovereign Bank may charge a fee to US cardholders for withdrawing cash. This fee is added to the amount of your withdrawal by Sovereign Bank and is in addition to any fees that may be charged by your financial institution. This Convenience Fee does not apply to Sovereign Bank Cardholders." Sovereign admits that some of its machine notices are located on walls next to Sovereign ATM machines. Sovereign denies the remaining allegations in Paragraph 16 of the Third Amended Complaint.

BOS_491485_2/JGARDNER

17.    The allegations in Paragraph 17 state a conclusion of law to which no response is required. To the extent that a response is required, Sovereign denies the allegations in Paragraph 17 of the Third Amended Complaint.

18.    Sovereign states that the EFTA speaks for itself and denies the allegations in Paragraph 18 of the Third Amended Complaint to the extent that they are inconsistent with that statute.

## Class Allegations

19.    Sovereign denies the allegations in Paragraph 19 of the Third Amended Complaint and specifically denies that any class should be certified in this case.

20.    Sovereign denies the allegations in Paragraph 20 of the Third Amended Complaint and specifically denies that any class should be certified in this case.

21.    Sovereign denies the allegations in Paragraph 21 of the Third Amended Complaint and specifically denies that any class should be certified in this case.

22.    Sovereign denies the allegations in Paragraph 22 of the Third Amended Complaint and specifically denies that any class should be certified in this case.

23.    Sovereign denies the allegations in Paragraph 23 of the Third Amended Complaint and specifically denies that any class should be certified in this case.

24.    Sovereign denies the allegations in Paragraph 24 of the Third Amended Complaint and specifically denies that any class should be certified in this case.

## Count II – Mass. G.L., Ch. 93A

25.    Sovereign incorporates its answers to Paragraphs 1 through 18.

BOS_491485_2/JGARDNER

26.    The allegations in Paragraph 26 constitute conclusions of law as to which no response is required. To the extent that a response is required, Sovereign denies the allegations in Paragraph 26 of the Third Amended Complaint.

27.    The allegations in Paragraph 27 constitute conclusions of law as to which no response is required. To the extent that a response is required, Sovereign denies the allegations in Paragraph 27 of the Third Amended Complaint.

### Class Allegations

28.    Sovereign denies the allegations in Paragraph 28 of the Third Amended Complaint and specifically denies that any class should be certified in this case.

29.    Sovereign denies the allegations in Paragraph 29 of the Third Amended Complaint and specifically denies that any class should be certified in this case.

30.    Sovereign denies the allegations in Paragraph 30 of the Third Amended Complaint and specifically denies that any class should be certified in this case.

31.    Sovereign denies the allegations in Paragraph 31 of the Third Amended Complaint and specifically denies that any class should be certified in this case.

32.    Sovereign denies the allegations in Paragraph 32 of the Third Amended Complaint and specifically denies that any class should be certified in this case.

33.    Sovereign denies the allegations in Paragraph 33 of the Third Amended Complaint and specifically denies that any class should be certified in this case.

34.    In response to the unnumbered paragraph constituting the prayer for relief, Sovereign denies that the Plaintiffs or the putative class are entitled to any relief whatsoever in this case.

BOS_491485_2/JGARDNER

## SOVEREIGN'S AFFIRMATIVE DEFENSES

### First Affirmative Defense

35.     The Third Amended Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

36.     Upon information and belief, the Plaintiffs lack standing to bring some or all of the claims in this case.

### Third Affirmative Defense

37.     The Third Amended Complaint is barred in whole or in part by the doctrines of waiver, estoppel, consent, and ratification.

### Fourth Affirmative Defense

38.     Upon information and belief, Plaintiffs and the putative class have failed to take reasonable steps to protect themselves from the damage alleged in the Third Amended Complaint and have failed to mitigate any such alleged damage.

### Fifth Affirmative Defense

39.     Plaintiffs' claims and the claims of the putative class members are barred because Sovereign acted in good faith in conformity with the EFTA and Regulation E.

### Sixth Affirmative Defense

40.     Plaintiffs' claims and the claims of the putative class members are barred because Sovereign maintained reasonable procedures, and to the extent that not withstanding Sovereign's denial of any violation of the EFTA and Regulation E, this Court ultimately determines that a violation occurred, any violation of the EFTA and Regulation E was de minimus in nature and unintentional.

- 6 -

### Seventh Affirmative Defense

41.     To the extent that they are grounded on alleged violations of state law, Plaintiffs'

claims and the claims of the putative class members are barred by the doctrine of preemption.

### Eighth Affirmative Defense

42.     To the extent that Plaintiffs assert claims with respect to ATM machines located

outside of Massachusetts or pursuant to laws of any state other than Massachusetts, Plaintiffs

lack standing to assert such claims.

### Ninth Affirmative Defense

43.     Plaintiffs failed to comply with the requirements of § 9 of M.G.L. ch. 93A.

### Tenth Affirmative Defense

44.     Any injury to the Plaintiffs, and/or putative class members, is a result of their own

conduct, the conduct of their agents, or the conduct of third parties, and not the responsibility of

Sovereign.

### Eleventh Affirmative Defense

45.     No action or omission of Sovereign was a substantial cause of the occurrence

referred to in the Third Amended Complaint, or any injury, damage, or loss to the Plaintiffs, nor

was any act or omission of Sovereign a contributing cause thereof, and any act or omission of

Sovereign was superseded by the acts or omissions of other persons, and those acts or omissions

were the independent, superseding, intervening and proximate cause of the accident and damage

alleged in this action.

BOS_491485_2/JGARDNER

### Twelfth Affirmative Defense

46.     Plaintiffs and/or putative class members have consented to, approved of and/or ratified the conduct, which forms the basis for their claims.

### Thirteenth Affirmative Defense

47.     This case is not appropriate for certification as a class action, and all class allegations and class claims should be stricken or dismissed.

### Fourteenth Affirmative Defense

48.     Upon information and belief, the claims of some putative class members are barred by the doctrines of accord and satisfaction, estoppel, *res judicata*, and/or release.

### Fifteenth Affirmative Defense

48.     Sovereign is entitled to all defenses permitted under the governing statutes, including all exemptions and exceptions to liability contained in the EFTA and Regulation E.

### Sixteenth Affirmative Defense

49.     Pursuant to 15 U.S.C. § 1693m(c), Sovereign may not be held liable to the Plaintiffs because its actions were not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

### Seventeenth Affirmative Defense

50.     Pursuant to 15 U.S.C. § 1693m(d), Sovereign may not be held liable to the Plaintiffs because its actions were done in good faith compliance with rules, regulations, and interpretations of the Federal Reserve Board.

BOS_491485_2/JGARDNER

### Eighteenth Affirmative Defense

51.    In accordance with the provisions of 15 U.S.C. § 1693h(d) Sovereign may not be held liable to the extent that Sovereign's notices were properly posted but subsequently removed, damaged, or altered by a person other than Sovereign.

### Nineteenth Affirmative Defense

52.    Sovereign intends to and will rely upon such other and further defenses as may become apparent during the course of this action and gives notice that it reserves and will rely upon all defenses it may have as to any of the absent members of the putative class if a class is certified. Sovereign further reserves the right to assert counterclaims against such person to the extent required in order to preserve its rights.

### Twentieth Affirmative Defense

53.    Plaintiffs' cause of action against Sovereign was brought in bad faith or for purposes of harassment. Accordingly, pursuant to 15 U.S.C. § 1693m(f), Sovereign is entitled to its costs, including a reasonable attorney's fee.

WHEREFORE, Sovereign requests that this Court enter judgment in favor of Sovereign and against Plaintiffs on all claims, dismiss the Third Amended Complaint with prejudice, award Sovereign its costs, including a reasonable attorney's fee, and provide such other relief and awards that this Court deems just and appropriate.

BOS_491485_2/JGARDNER

Respectfully submitted,

**SOVEREIGN BANK**
By its attorneys,


Dated: November 22, 2005

 /s/ John A. Houlihan
John A. Houlihan (B.B.O. #542038)
Donald E. Frechette (B.B.O. #547293)
Joshua W. Gardner (B.B.O. #657347)
EDWARDS ANGELL PALMER & DODGE
   LLP
101 Federal Street
Boston, MA 02110-1800
(617) 439-4444 Telephone
(617) 439-4170 Telecopy

BOS_491485_2/JGARDNER

CHARLES M. BEGLEY DEPOSITION TRANSCRIPT

EXHIBIT S

Sovereign Bank by Begley

1                                        VOL. 1, PAGES 1 - 67

2              IN THE UNITED STATES DISTRICT COURT

3              FOR THE DISTRICT OF MASSACHUSETTS

4    C.A. No. 05 CV 10712 RCL

5    ------------------------------------------

6    MAUREEN E. DELORETO and DIANE E.          )

7    HORTON,                                   )

8                        Plaintiffs            )

9    v.                                        )

10   SOVEREIGN BANK,                           )

11                       Defendant             )

12   ------------------------------------------

13

14    RULE 30(b)(6) DEPOSITION OF SOVEREIGN BANK BY AND

15          THROUGH CHARLES M. BEGLEY, JR.

16          Wednesday, December 21, 2005

17              9:40 a.m. to 11:23 a.m.

18       Edwards Angell Palmer & Dodge, LLP

19              101 Federal Street

20          Boston, Massachusetts 02110

21

22                    *********

23

24   Reporter: Lauren M. Mitchell, CSR, RPR, CRR

2

1   APPEARANCES:

2        Law Offices of Claude Lefebvre & Sons

3        Christopher M. Lefebvre, Esq.

4        2 Dexter Street

5        Pawtucket, Rhode Island   02860

6        (401) 728-6060

7        Counsel for the Plaintiffs

8

9        Edwards, Angell, Palmer & Dodge, LLP

10       John A. Houlihan, Esq.

11       101 Federal Street

12       Boston, Massachusetts   02110

13       (617) 439-4444

14       jhoulihan@eapdlaw.com

15       Counsel for the Defendant

16

17  APPEARANCES VIA TELEPHONE:

18       Edelman, Combs, Latturner & Goodwin, LLC

19       Tara Goodwin, Esq.

20       120 A. LaSalle, 18th Floor

21       Chicago, Illinois 60603

22       (312) 739-4200

23

24

Sovereign Bank by Begley

3

1                          I N D E X

2

3    WITNESS                                        PAGE

4    CHARLES M. BEGLEY, JR.

5    BY MR. LEFEBVRE:                                4

6

7                        E X H I B I T S

8     Exhibit 1, notice of deposition              4

9

10

11

12

13

14

15

16

17

18    ***EXHIBITS MARKED DURING THIS DEPOSITION

19       ARE ATTACHED TO THE DEPOSITION TRANSCRIPT.

20

21

22

23

24

Sovereign Bank by Begley

4

| 1 | PROCEEDINGS |
|---|---|

1                PROCEEDINGS

2         (Marked, Exhibit 1, notice of

3   deposition.)

4         CHARLES M. BEGLEY, JR.,

5   a witness called for examination by counsel for the

6   Plaintiffs, MAUREEN DELORETO, et al., and having

7   been satisfactorily identified by the production of

8   his Massachusetts driver's license, was duly sworn

9   by the Notary Public and testified as follows:

10  EXAMINATION BY MR. LEFEBVRE:

11    Q.  Good morning, Mr. Begley.

12       I'm Christopher Lefebvre, and I

13  represent Maureen Deloreto and Diane Horton in a

14  class action lawsuit that they filed in the U.S.

15  District Court, here in Boston.

16       It's my understanding that you have been

17  designated as a representative to give testimony

18  here pursuant to a notice of deposition, which has

19  been marked subject to some modification that we're

20  going to put on the record.

21       It's my understanding that you are being

22  designated as the person for Sovereign Bank who will

23  testify with respect to the following topic, quote,

24  Those categories or types of circumstances in which

Sovereign Bank by Begley

5

1    Sovereign Bank does not charge a convenience fee to

2    non-Sovereign U.S. cardholders who utilize Sovereign

3    ATM machines for cash withdrawal transactions.

           Is that a fair statement?

4

5    A.  Yes.

6    Q.  Okay.  And in fact, that's per an agreement

7    that myself and Mr. Houlihan reached to modify the

8    notice of deposition, which has been marked as

9    Exhibit 1.

10           Is that right?

11    A.  Yes.

12    Q.  Okay.  First of all, can you spell your last

13    name for me?

14    A.  B-e-g-l-e-y.

15    Q.  Now, what is your present history at

16    Sovereign Bank?

17           What do you do at Sovereign Bank?

18    A.  I am responsible for a series of support

19    functions for what we call local markets, which are

20    the branches and small business and commercial

21    lending business teams out in the field.

22    Q.  Can you just briefly tell me what you mean

23    by support functions?

24    A.  Support functions including communications,

6

1    operations, training, distribution support, meaning

2    support for things having to do with the physical

3    aspects of the branch itself, sales management and

4    reporting.

5            That's not exhaustive, but those are the

6    types of things.

7        Q.  How long have you held this position at

8    Sovereign Bank?

9        A.  I've been in this particular position for

10   just about a year.

11       Q.  And what did you do prior to holding this

12   position?

13       A.  Before that, I was responsible for the

14   branch business line and the branches in New

15   England.

16       Q.  So, when you say business line, does that

17   mean business-related services?

18       A.  That means that we had been organized by

19   business line, and the branches were a business

20   line.  And I had that responsibility.

21           We, the bank, reorganized to a different

22   internal structure.

23           So, that position doesn't exist any

24   longer, and I have a different set of

7

1    responsibilities.

2        Q.   And how long were you in that position?

3        A.   Four and a half years.

4        Q.   Okay.  And just finally, relative to some

5    background, did you work at Sovereign prior and have

6    another position prior to that four-and-a-half-year

7    term?

8        A.   No.

9            The positions I have held at Sovereign

10   are those two.

11       Q.   Okay.  Have you worked at any other bank

12   prior to that?

13       A.   I have.

14            I worked at Fleet Bank.

15       Q.   And how long did you work there?

16       A.   I worked at Fleet Bank from 1998 until 2000,

17   in Fleet Bank, the entity Fleet Bank.

18            I previously had worked at a different

19   Fleet Bank from 1991 to 1993.

20       Q.   Did you have similar responsibilities at

21   Fleet?

22       A.   I had retail banking, similar retail banking

23   responsibilities in the 1998 to 2000 time frame.

24       Q.   Okay.  Now, based on your answers, I assume

Sovereign Bank by Begley

8

1  that you understand how this is going to work.  I'm

2  going to ask you some questions, and I'm going to

3  assume that if you answer the question, two

4  assumptions, number one that you understood the

5  question, and number two, that your answer is

6  truthful to the best of your ability.

7              Okay?

8     A.   Okay.

9     Q.   Have you ever been deposed before?

10    A.   I have not.

11    Q.   This is the first time?

12    A.   (Witness nods head.)

13    Q.   Okay.  Can you tell me, what did you do in

14  preparation for this deposition?

15    A.   I spoke with --

16           MR. HOULIHAN:  Let me instruct the

17  witness on that topic.

18           In connection with any communications

19  you had with counsel, you may identify the fact that

20  you had the communication, but I don't want you to

21  discuss the substance of any communications that you

22  had with counsel.

23           Is that understood?

24           THE WITNESS:  Understood.

Sovereign Bank by Begley

9

1     A.  I did speak with counsel, Mr. Houlihan, in

2   preparation.

3          I did speak with a number of employees

4   of Sovereign Bank.

5     Q.  Okay.  Now, without getting into -- well, a

6   number of employees, can you be a little bit more

7   specific?

8          Did you speak to people who are your

9   bosses or -- just so I get an idea of who you spoke

10  with.

11    A.  I spoke with two individuals who report to

12  me on the org. chart.

13    Q.  Okay.  What are their names?

14    A.  Steven Mantelli, M-a-n-t-e-l-l-i.

15    Q.  Thank you.

16    A.  And Robert Ames.

17    Q.  Ames?

18    A.  Ames, A-m-e-s.

19          And they report to me.

20          And I spoke with two gentlemen in our

21  operations and automation group who do not report to

22  me.

23          They have responsibilities for ATMs and

24  ATM network.

10

1          One is John Walsh, W-a-l-s-h.  And

2   another is Rodney Simmons, S-i-m-m-o-n-s.

3          And I also spoke to two in-house

4   attorneys for Sovereign Bank.

5   Q.  Anyone else other than those six individuals

6   that you've identified?

7   A.  No.

8   Q.  Now, just so I understand, this Mr. Walsh

9   and Mr. Simmons, they're operation and automation

10  individuals in relation to ATM functions?

11  A.  Yes.

12  Q.  And what is -- what do, rather, Mr. Mantelli

13  and Mr. Ames do?

14          What are their positions at Sovereign?

15  A.  Mr. Mantelli is responsible for support

16  functions for the branches and local markets.  Local

17  markets refers to our business units.  And the

18  support functions he's responsible for include

19  communications, training, compliance and

20  distribution.

21  Q.  Okay.  Now, what makes you, in your opinion,

22  the most qualified person to testify on behalf of

23  Sovereign per the area of designation that we placed

24  on the record?

Sovereign Bank by Begley

11

1           MR. HOULIHAN:  Objection.

2    A.  I don't know if I'm most the qualified, but

3  I think I am qualified and an appropriate person to

4  be here representing the bank.

5    Q.  Now, you said you may not be the most

6  qualified.  And I'm not trying to be difficult.

7          Who other than yourself, in your

8  opinion, might be more qualified?

9           MR. HOULIHAN:  Objection.

10    Q.  If there is such a person.

11    A.  I was not trying to suggest that there is

12  necessarily a person who is more qualified, but that

13  there are several people who might be appropriate to

14  speak to these topics, of which I am one.

15    Q.  Okay.  And how many other people might

16  there be at Sovereign other than yourself that might

17  be appropriate to respond to the notice of

18  deposition, as modified?

19    A.  There would be several others.

20    Q.  Three, four, five, if you know?

21    A.  The people that I'm aware of who could speak

22  knowledgeably to these topics would include

23  Mr. Mantelli, Mr. Ames, Mr. Walsh, and to certain

24  aspects of, to certain aspects of it, Mr. Simmons as

Sovereign Bank by Begley

12

1   well.

2       Q.   Okay.   Now, can you walk me through -- I'm

3   going to get right to the jugular, the meat and

4   potatoes of the deposition.

5            Can you walk me through the categories

6   and the type of circumstances in which Sovereign

7   does not charge convenience fee to non-U.S.

8   cardholders?

9            I know that's kind of a broad question,

10  but I figure it's a segue to getting right to the

11  real issues.

12               MR. HOULIHAN:   Objection.

13               Just so the record is clear, I think you

14  mean U.S. non-Sovereign cardholders.

15               MR. LEFEBVRE:   That's exactly what I

16  meant.   Thank you.

17               That's not fair.   Are you tied in --

18  you've got the instantaneous record.

19      A.   So, the question is the circumstances under

20  which Sovereign does not charge a convenience fee to

21  non-Sovereign U.S. cardholders?

22      Q.   Right.

23      A.   The first category would be where the

24  cardholder is accessing benefits, governmental

Sovereign Bank by Begley

13

1   benefits through a card that is typically referred

2   to as an EBT card, electronic benefits transfer

3   card.

4       Q.   Okay.  Now, I saw that issue in some of the

5   documents that were produced.

6               EBT benefit, is that some type of

7   federal or state grant?

8       A.   Yes.

9       Q.   Like welfare assistance?

10      A.   It includes federal or state assistance and

11  benefit programs.

12      Q.   Anything else, that you're aware of?

13      A.   That I'm aware of, the term is used to refer

14  to benefits from the government, from federal or

15  state government, that I'm aware of.

16      Q.   Now, just so I understand, these EBT type of

17  benefits, is there like a special card that a

18  recipient might have which would allow them to go to

19  an ATM and withdraw money?

20              Is that how it works, if you know?

21      A.   My understanding --

22      Q.   Okay.

23      A.   My understanding is that the governmental

24  entity that is providing benefits will make an

Sovereign Bank by Begley

14

1    arrangement with a bank to issue cards to the

2    benefit recipients.  And the government will, the

3    governmental entity will fund accounts at the bank

4    that the benefit recipients access through the card

5    that was issued by the bank.

6        Q.  So, in this particular case, would, just so

7    I'm clear, Sovereign would recognize any of these

8    EBT cards from other banks, non-customers could come

9    to a Sovereign ATM, withdraw from the account and

10   not be charged a fee?

11       A.  If the card contains a code that makes it

12   recognized as an EBT card, then Sovereign would not

13   assess a convenience fee.

14       Q.  Now, are there many, quote, codes for EBT

15   cards, or is it pretty much a standard code that's

16   used, if you know?

17                MR. HOULIHAN:  Objection.

18                Beyond the scope of the deposition.

19                You may answer, if you know.

20       A.  ATM networks read cards for -- and one of

21   the key pieces of information on there is referred

22   to as a BIN, which I believe means bank

23   identification number, I believe, but I know that

24   the common reference is BIN.

Sovereign Bank by Begley

15

1          And it is a code that identifies the

2    bank and other attributes about the card.

3          And in that code would be, somewhere in

4    there would be a mechanism to identify it as an EBT

5    card.

6    Q.   Okay.   Which would, I assume, trigger some

7    type of function so no charge is deducted for taking

8    out cash from a Sovereign ATM, if they use that type

9    of card?

10   A.   Yes.

11   Q.   Okay.   And I didn't mean to interrupt.

12          So, are you finished with the EBT

13   benefits?

14          That's the first category.   I just

15   didn't want to interrupt.

16          And I'm not trying to be tricky.   It's

17   just I don't know this stuff.

18          So, sometimes you start a question, I'm

19   probably going to interrupt just so I understand

20   your response.

21   A.   That is the first category.

22   Q.   Category?

23   A.   Yes.

24   Q.   Okay.   Next category.

Sovereign Bank by Begley

16

1    A.   Next category would be in the case of

2    acquisitions where Sovereign is acquiring other

3    banks.

4    Q.   Okay.  Would that be -- I noticed when I was

5    looking at some documents, I saw there was a bank,

6    Abington Savings Bank and also Compass Bank, and

7    there were several documents talking about waiver of

8    fees during a particular time frame.

9            Is that pretty much what those documents

10   were referring to?

11   A.   Yes.

12   Q.   And I assume in preparation for the

13   deposition, you did review the documents that were

14   provided to me by your attorney?

15           I think there was 70 or 75 documents.

16           Are you familiar with them?

17   A.   I did look through those documents.

18   Q.   Okay.  Now, can you just -- when you say

19   acquisitions, can you just be a little bit more

20   specific of how the waiver of fees in an acquisition

21   type of scenario works?

22   A.   In the first scenario, it's the time that

23   immediately predates the legal closing of the

24   acquisition.

Sovereign Bank by Begley

17

1       And by that, I mean, the legal closing

2   is the event in which Sovereign's holding company

3   will be acquiring -- the bank that is being acquired

4   will acquire the holding company and all of the

5   subsidiary holdings.  And there may be different

6   legal treatment of the subs from that time forward,

7   but it's the closing event at which Sovereign is

8   legally acquiring the bank holding company and other

9   assets to be acquired.  And the financial part of

10  the deal is closed.

11       And immediately preceding that event,

12  our practice is that we will instruct our ATM

13  network provider to add the BINs of the acquired

14  bank to the table that determines that those BINs

15  ought not be charged a convenience fee.

16       And there typically is a window of a few

17  days before the actual closing in which the

18  cardholders of the bank to be acquired will not be

19  assessed a convenience fee.

20       And the reason for that timing is that

21  we have to give the instruction to the ATM service

22  provider with enough lead time that they can effect

23  the change in the window of time that works for

24  them.

Sovereign Bank by Begley

18

1          They can't necessarily effect the change

2    precisely when we might want it done.  They have

3    intervals during the course of a week in which they

4    can accomplish computer-programming changes.

5          So, we must give them enough lead time

6    so that they can have it done before the legal

7    closing date.

8    Q.  Okay.  Just to follow up on that issue.

9          When you're talking about they, are you

10   referring to the Sovereign tech people or the tech

11   people of the bank that you're about to acquire?

12          I just got a little confused.

13          MR. HOULIHAN:  Objection.

14   A.  I'm sorry.

15          When I was saying they, I was referring

16   to a third-party service provider who manages the

17   ATM network on our behalf.

18          We contract out the management and the

19   driving of our ATM network.

20   Q.  Okay.  So, the first category of the

21   acquisition, you were talking about predating.  And

22   I want to make sure I understand.

23          You're talking about the time frame in

24   which, we'll say Bank A, which is not Sovereign, is

Sovereign Bank by Begley

19

1  going to become a Sovereign Bank in the near future.

2           And you're talking about the time frame

3  before Bank A actually becomes a Sovereign Bank is

4  what you just testified to?

5      A.  Yes.

6      Q.  Okay.  That there's a period where there

7  will be no fees assessed by the Bank A customers if

8  they were to use a Sovereign ATM, is that what I

9  understood you to say?

10     A.  Assessed to the Bank A customers.

11     Q.  Right.

12     A.  Yes.

13     Q.  So, a Bank A that's soon going to become a

14  Sovereign Bank after all the paperwork and

15  everything is done, there's a period of time where

16  that customer could go to one of the Sovereign ATM

17  machines, that says Sovereign on it, insert their

18  card, make a cash withdrawal, and there would be no

19  convenience fee charged by Sovereign for using a

20  Sovereign machine?

21     A.  Yes.

22     Q.  Okay.  Now, I assume, based on how you were

23  answering the questions, there were other intervals

24  as the process takes place.  That is the process

Sovereign Bank by Begley

20

1    from Bank A becoming a Sovereign Bank.  Okay.

2                Can you tell me the next series when a

3    fee might be assessed?

4                MR. HOULIHAN:  Objection.

5                A fee might not be assessed.

6                MR. LEFEBVRE:  Right.  I know we're

7    looking at it from the same perspective.

8                Hopefully, when all the dust settles, we

9    get to the bottom line.

10               Go ahead.  I didn't mean to interrupt

11   you.

12       A.   That's all right.

13               On legal closing day, when Sovereign is

14   acquiring the new entity and the legal closing and

15   financial closing takes place, the bank entity, the

16   corporate bank entity being acquired, as distinct

17   from the holding company being acquired, might or

18   might not, at that time, be merged into Sovereign

19   Bank.

20       Q.   Okay.

21       A.   That entity might remain for a period of

22   time as a separate subsidiary of Sovereign Bank

23   Corp. or might be merged into Sovereign Bank.

24       Q.   Now, I don't mean to interrupt.

Sovereign Bank by Begley

21

1            I was using my analysis of Bank A?

2            When you were talking about the legal

3     closing day, will Bank A, you know, will it still

4     have signs that it's Bank A, or from that point

5     forward, will it be a Sovereign Bank?

6            I was a little confused.

7        A.   And what happens to Bank A, and in what

8     sequence varies from circumstance to circumstance.

9            In some instances, on the legal closing

10    date, Bank A will be merged into Sovereign Bank and

11    the signs changed over that weekend, all of the

12    computers converted and all of the operations

13    switched over to Sovereign Bank.

14           In another case, Bank A might remain as

15    Bank A, as the Bank A corporate entity and operating

16    as they had been operating for a window of time

17    before Bank A is converted into and operating as

18    Sovereign Bank.

19       Q.   Okay.  And now, I assume that during this

20    period in a situation, the second scenario, where

21    Bank A is going to be operating for a period of time

22    until it finally transforms into, quote, a Sovereign

23    branch, that the Bank A customers could go to a

24    Sovereign ATM machine -- when I say a Sovereign, a

Sovereign Bank by Begley

22

1    Sovereign branch with the Sovereign notices, etc. --

2    put their card in, withdraw money and would not be

3    charged a convenience fee?

4        A.   Correct.

5            I want to be clear that I'm talking in

6    this instance about, Bank A has not been merged into

7    Sovereign Bank.  Bank A still is, as a corporate

8    entity Bank A, now owned by Sovereign Bank Corp.,

9    but still Bank A.

10           So, Bank A is a separate entity from

11   Sovereign Bank.

12           And during that window of time from the

13   legal closing until Bank A is merged into Sovereign

14   Bank and converted operationally to Sovereign Bank,

15   during that window of time, those customers will not

16   be charged a convenience fee for using Sovereign

17   ATMs.

18       Q.   Okay.  Are there any other subcategories

19   under the acquisition series of events where a

20   non-Sovereign customer might not be charged a fee

21   for using a Sovereign network?

22       A.   I think we've covered it, but let me give

23   you one more scenario.

24       Q.   Okay.

Sovereign Bank by Begley

23

1    A.   To be clear.

2         The other scenario is on legal closing

3    day, the bank entity, Bank A, to use your example,

4    is, in fact, legally merged into Sovereign Bank, but

5    for a window of time, continues to operate as Bank A

6    because the conversion of systems and operations is

7    not going to occur until a later date.

8    Q.   So, if I can interrupt you, that would mean,

9    let's say Bank A has 15 or 20 branches, those ATMs

10   still has the Bank A logos.

11        They're not converted to look like a

12   Sovereign ATM or a Sovereign branch?

13   A.   The legal merger has occurred.

14        And we will do a number of steps in

15   terms of making sure that we represent that that

16   bank, while operating as Bank A, is a division of

17   Sovereign Bank, but the legal merger has occurred,

18   but it continues to operate until a later conversion

19   date.

20        So, in that scenario, the customers

21   approaching the Sovereign machine are Sovereign Bank

22   customers, but a goodly number of them will not be

23   aware they are Sovereign Bank customers.

24   Q.   That was going to be my next question.

Sovereign Bank by Begley

24

1          I assume somewhere during this process

2    of an acquisition, these Bank A customers no longer

3    become non-Sovereign customers?

4          A.   (Witness nods head.)

5               MR. HOULIHAN:  Mr. Begley, you have to

6    respond yes or no.

7          A.   Yes.

8               Which is why I was trying to be clear in

9    the distinction between whether the banks merge at

10   legal closing or not, because where they have not,

11   those customers are not Sovereign Bank customers

12   during that interval.

13              And the where the banks did merge at

14   legal Day 1, those customers are Sovereign Bank

15   customers, but may not be aware they are.

16        Q.   But if I understand -- if I can summarize,

17   during this continuum from the acquisition when

18   someone is a non-Sovereign customer to the final day

19   when they are a Sovereign customer, the Bank A

20   customers are allowed to use your Sovereign network

21   free of charge, they're not going to be charged a

22   fee?

23        A.   In both of those scenarios, the Bank A

24   customer is not charged a convenience fee for using

25

1     a Sovereign ATM.

2         Q.  And would obviously be -- strike that

3     question.

4               Anything else about acquisitions?

5               Are there any other subcategories, or

6     have we pretty much covered the acquisition

7     scenarios where there is no fee assessed?

8         A.  There's one other scenario we've had that

9     relates to acquisitions, but it is unusual enough I

10    would put it into a third category, which is special

11    circumstances.

12        Q.  Okay.  Before we get to the special

13    circumstances, just a general question about

14    acquisitions.

15              During the one-year period prior to this

16    complaint which was filed, I believe, in April of

17    '05, this class action lawsuit, do you know how many

18    acquisitions Sovereign was involved in either in

19    Rhode Island or in Massachusetts?

20              That is, how many Bank A's were to

21    become part of Sovereign in Rhode Island or

22    Massachusetts during the one-year period prior to

23    the filing of this case, if you know?

24              MR. HOULIHAN:  Objection.

26

1         You may answer.

2    A.   Starting in April of '05?

3    Q.   Right.

4    A.   Starting in April of '05, from that date

5    forward, there have not been and are not announced

6    and pending acquisitions by Sovereign of other

7    banks.

8    Q.   Okay.

9    A.   I'm sorry.  In Massachusetts and Rhode

10   Island.

11   Q.   Right.

12   A.   In Massachusetts and Rhode Island, that's

13   the case, since April of '05.

14   Q.   Now, how about from April of '04 to April of

15   '05, if you know, same question, but during that

16   time period.

17         MR. HOULIHAN:  Objection.

18         You may answer.

19   A.   In the summer of '04 --

20   Q.   Okay.

21   A.   -- and previously announced earlier in '04,

22   but in the summer of '04, we did execute and

23   complete an acquisition of Seacoast Financial, which

24   included Abington Bank, Compass Bank and Nantucket

Sovereign Bank by Begley

27

1    Bank.

2         Q.   Abington, Compass, and what was the other

3    bank?

4         A.   Nantucket.

5              To be very precise, I don't remember the

6    exact sequence on Abington.

7              Seacoast was in the process of acquiring

8    Abington, and it ultimately flowed through, and we

9    acquired and brought in Abington, but I don't

10   remember the exact sequence of legally how that was

11   accomplished.

12        Q.   And Abington is what, a savings bank, if you

13   know?

14             MR. HOULIHAN:  Objection.

15        A.   My recollection is they were a savings bank

16   based in Abington, Massachusetts.

17        Q.   Okay.  And that occurred some time in the

18   summer of '04?

19        A.   Yes.

20        Q.   And Compass also in the summer of '04?

21        A.   I'm sorry.

22             The legal closing occurred in the summer

23   of '04.

24             The operating conversion of Abington

Sovereign Bank by Begley

28

 1   occurred in the summer of '04.

 2              The operating conversion of Compass Bank

 3   occurred in October of '04.

 4       Q.   Okay.  Now, you were about to tell me about

 5   the, what I'll call the next category, Category 3,

 6   special circumstances.

 7       A.   Special circumstances, starting first with

 8   the one that is an acquisition scenario is, in the

 9   year 2000, Fleet and Bank Boston had a merger.   In

10   the process of completing their merger, they

11   divested or sold a package of assets to Sovereign

12   Bank.

13              That transaction was completed in three

14   stages, one in March, one in June and one in July.

15              In March --

16       Q.   Of 2000?

17              I don't mean to interrupt.

18       A.   In March of 2000.

19              Fleet, by then -- and I don't recall

20   exactly, but I believe by then, Fleet Boston, the

21   combined entity, sold a package of assets in

22   Connecticut and Rhode Island to Sovereign Bank.

23              In two separate events, one in June and

24   one in July of 2000, Fleet Boston sold a package of

Sovereign Bank by Begley

29

1    assets in Massachusetts and New Hampshire to

2    Sovereign Bank.

3             It was done -- the Massachusetts and New

4    Hampshire portions were done in two installments

5    because of their size and the complexity of

6    accomplishing that transition and that transfer.

7             So, it was broken into two pieces, which

8    meant that during that interval of time from June

9    16, I believe, but in the middle of June, to July

10   21, I believe, but, you know, a little later in

11   July, during that interval of time, there were a lot

12   of moving parts.

13            There were Bank Boston branchs that were

14   becoming Fleet.  There were Fleet branchs that were

15   becoming Sovereign.

16            And because of all those moving parts,

17   during that interval of time, the surcharge for the

18   customers was disabled.

19            So, there was during that window of

20   time, the customers in both installments would not

21   be surcharged for using what had become a Sovereign

22   ATM.

23   Q.   And when you say the customers, you're

24   talking about the Bank Boston or Fleet, depending

30

1   on --

2       A.   The Fleet customers to become Sovereign

3   customers.

4       Q.   Okay.

5       A.   It might be -- I don't recall.  I would have

6   to go back and check.

7            It might be that all convenience fee

8   surcharge was disabled in all directions because of

9   the amount of what was going on, but I know -- I

10  understand and am told during that interval of time

11  that the Fleet branches which became Sovereign in

12  June -- so, those were now Sovereign machines --

13  would not assess a surcharge against Fleet

14  customers, you know, to become Sovereign, at least,

15  and possibly a broader range of customers.

16      Q.   And this all occurred in 2000, June, July of

17  2000, I think?

18      A.   Yes.

19      Q.   Okay.  And that is pretty much the, quote,

20  special circumstance situation?

21      A.   There is one other special circumstance that

22  occurred in 2005.

23           As a result of Hurricane Katrina and the

24  fallout of that, FEMA and Red Cross decided that

31

1    they would try to get some of their assistance to

2    people who were dislocated by the hurricane through

3    cards.  And there was a request to the banking

4    network and the banking community to honor these

5    cards.

6              And that was broad-based.  It didn't

7    apply only to Sovereign.  And we were participating

8    in that.

9              It so happened that FEMA and Red Cross

10   started that program and my understanding is then

11   took a different tact and didn't fully implement

12   their card strategy, although they did issue some

13   cards, but in that case, if the BIN had identified

14   the card as a FEMA or a Red Cross card associated

15   with this disaster relief, we would have and were

16   planning to give instruction that no -- and I

17   believe we did give instruction that no convenience

18   fee would be assessed for cards carrying the BINs

19   that associated them with FEMA and Red Cross relief.

20      Q.  Okay.  And that was in -- after the

21   hurricane?

22      A.  Uh-huh.

23      Q.  If you know, do you know if any Katrina

24   victims actually used a FEMA or Red Cross card in

Sovereign Bank by Begley

32

1    either a Rhode Island or Massachusetts Sovereign

2    ATM, if you know?

3                    MR. HOULIHAN:  Objection.

4        A.   I don't know.

5        Q.   But it's your testimony that that program,

6    the implementation of the appropriate BIN was

7    actually done by Sovereign so that if a, quote,

8    Katrina victim were to go to a Sovereign ATM with

9    one of these benefit cards, no charge would be

10   assessed?

11       A.   Yes.

12            My understanding is the program had

13   progressed to where we were expecting

14   implementation, and so, had instructed our vendors

15   who drives the ATM networks for us to program our

16   tables so that FEMA and Red Cross cards would not be

17   assessed, as we discussed.

18            I don't know whether there were

19   transactions.

20       Q.   Now, just -- you had mentioned very early on

21   about Mr. Walsh and Mr. Simmons who were people you

22   spoke to prior to the deposition.

23            And I thought you told me they were in

24   the operational or automation department of

Sovereign Bank by Begley

33

1    Sovereign?

2        A.   Yes.

3        Q.   Okay.   And you've said a couple of times

4    that Sovereign has a vendor who actually runs the

5    network.

6             Just so I understand, when you're

7    talking about programming and changing BINs, is that

8    something that Sovereign does, or is that part of

9    something that the vendor, the third-party vendor

10   does?

11       A.   Actually maintaining the tables and

12   processing the transactions is done by the vendor.

13       Q.   Okay.   And do you know the name of the

14   vendor?

15       A.   I'm not sure of the exact subsidiary title,

16   but it is a service provided by Fifth Third Bank,

17   which is based out of Ohio.   And they have a

18   subsidiary that provides these ATM driving and

19   management services to other banks for a fee.

20            I have seen Fifth Third Payment

21   Solutions.   I'm not sure if that is the proper

22   title, but I have seen that name.

23       Q.   So, when you were talking about the

24   acquisitions during that time period of when Bank A

34

1    actually becomes a Sovereign branch, a Sovereign

2    customer, a Bank A customer becomes a Sovereign

3    customer, when you were talking about the BINs not

4    to charge, that was all something that this

5    third-party vendor would actually be working on, is

6    that right?

7        A.   Yes.

8            To be precise in time, our relationship

9    with that particular vendor is fairly recent, within

10   the last couple of years.

11           So, before that, we had other vendors,

12   but doing the same function.

13       Q.   Same type of work, okay.

14           So, other than the EBT benefits, which I

15   think was Category 1, acquisitions, Category 2,

16   special circumstances we were talking about,

17   Category 3, is there any other, quote, special

18   circumstance, other than what you testified to?

19       A.   I believe that's it.

20       Q.   Okay.  Is there any other category other

21   than those three categories where Sovereign does not

22   charge a convenience fee to non-Sovereign U.S.

23   cardholders who utilize a Sovereign ATM?

24       A.   There are not other categories for cash

Sovereign Bank by Begley

35

1    withdrawals, for cash withdrawals to non-Sovereign

2    cardholders, non-Sovereign U.S. cardholders.

3        Q.    Okay.    If you know, does Sovereign charge

4    non-customers a fee for a balance inquiry, if you

5    know?

6        A.    My understanding is we do not.

7        Q.    How about for a balance transfer?

8        A.    We do not.

9        Q.    Okay.    When you were talking about the

10    special circumstances, for example, the hurricane,

11    Hurricane Katrina issue, if you know, was Hurricane

12    Katrina the first hurricane where there was this

13    request that banks waive the fee for recipients of

14    this federal card, we'll call it, either FEMA or Red

15    Cross, if you know?

16                MR. HOULIHAN:    Objection.

17                You may answer.

18        A.    I don't know.

19        Q.    Had there been any other circumstances that

20    you're aware of within the last, let's say, three

21    years from today, wherein Sovereign was requested by

22    some federal or state agency other than the EBT

23    transactions that you talked about, to waive fees in

24    light of some, let's call it a public, either

Sovereign Bank by Begley

36

1   catastrophe, disaster or something like that?

2          MR. HOULIHAN:  Objection.

3          You may answer.

4      A.  Not that I'm aware of.

5          I don't know whether, I don't know

6   whether others at the bank would have had any

7   awareness, but not that I'm aware of.

8      Q.  Okay.  Can you tell me what your

9   understanding is about the SUM network?

10          What is that, if you know?

11          MR. HOULIHAN:  S-U-M?

12          MR. LEFEBVRE:  SUM network.

13          Forgive my pronunciation.

14      A.  My understanding of the SUM network is a

15   network which was formed and began in Massachusetts,

16   but is now broader.

17          And it is a network that banks can

18   choose to join in which there is a mutual agreement

19   not to charge each other's customers a convenience

20   fee for use of the ATMs.

21      Q.  Is Sovereign a member of the SUM network?

22      A.  Sovereign is not.

23      Q.  Okay.  Are there certain networks that

24   Sovereign participates in?

Sovereign Bank by Begley

37

1          And I'm talking about in relation to

2   ATMs.

3          MR. HOULIHAN:  Objection.

4          You may answer.

5    Q.   If you know.

6    A.   Yes.

7          ATM -- my understanding of it is that

8   ATM transactions are processed by networks.

9          So, we participate in networks in order

10  to facilitate the flow.

11   Q.   I guess what I'm asking, we've all used an

12  ATM machine.  And I won't pick on a particular bank.

13          You go to Bank A, you put your card in,

14  and you see off to the side there's things like the

15  CIRRUS network and various networks.

16          I just wondered how that relates to this

17  whole issue of charging and not charging, if you

18  know.

19          MR. HOULIHAN:  Objection.

20   Q.   And I think that's what I was referring to

21  when I was talking about networks.

22   A.   Yes.

23          Our two primary networks are STAR and

24  NYCE, N-Y-C-E.

Sovereign Bank by Begley

38

1    Q.   N-Y-C-E?

2    A.   N-Y-C-E.

3            And we are members of other networks as

4    well.

5            ATM transactions, my understanding is

6    ATM transactions are processed through networks.

7    These are networks, which is why I would say I don't

8    know whether those who are expert in network work

9    all the time would consider SUM to be a network.

10            SUM might be an association or a

11    collaboration of banks for that purpose.

12    Q.   Okay.

13    A.   It is not a transaction processing network.

14            It is a collaboration for the purposes

15    of providing services, mutual services to one

16    another's customers under agreement as to whether

17    fees will or will not be assessed.

18    Q.   Okay.  But if I understand your testimony,

19    if someone uses -- strike that.

20            Other than the three areas that you

21    testified to, if someone uses an ATM card from the

22    STAR network or the NYCE, N-Y-C-E, network, who is a

23    non-customer of Sovereign, they're going to be

24    charged a fee, U.S. cardholder?

Sovereign Bank by Begley

39

1       A.   U.S. cardholder, making a cash withdrawal,

2    making a cash withdrawal at a Sovereign machine,

3    where the BIN does not identify it as a Sovereign

4    customer or an EBT card, then that person who is not

5    a customer, U.S. cardholder making a cash

6    withdrawal, will be charged a convenience fee.

7       Q.   Okay.  So, for purposes, I think, for my

8    initial inquiry, the fact that a particular bank

9    might have a sign at an ATM about the various

10   networks, NYCE, STAR or SUM, that becomes irrelevant

11   to whether or not a charge is to be assessed at a

12   Sovereign ATM for a non-U.S. cardholder?

13            MR. HOULIHAN:  Objection.

14       A.   My understanding is that the signage there

15   is serving a different purpose.

16            It's not attempting to get into the

17   issue of what fees will or will not be assessed.

18            The signage is letting people know what

19   type of cards will be accepted and will work in the

20   machine.

21       Q.   Okay.

22       A.   So, if you have one of these cards, or if

23   you flip your card over and it has one of these

24   network logos on it, it will work in this machine.

Sovereign Bank by Begley

40

1    Q.   And whether or not a fee is going to be

2    assessed depends on, as you testified to, if it's

3    got one of the BINs for either some type of disaster

4    program, if it's an acquisition or it's an EBT BIN?

5    A.   Or, in our case, if it is a Sovereign card,

6    a Sovereign customer with a Sovereign card.

7    Q.   I stand corrected, and my question was not

8    clear.

9              I was assuming a non-Sovereign.

10   A.   The one exception to that panel of logos,

11   not getting into the issue of fees, likely would be

12   SUM.   The purpose of posting the SUM sign is to

13   convey information about the fees.

14             The purpose of posting the other logos,

15   I understand and believe, is to convey information

16   about which cards will work in this machine.

17   Q.   Now, are you familiar about the

18   transactions, the actual transaction, ATM

19   transactions of the Plaintiffs, Maureen Deloreto and

20   Diane Horton?

21   A.   I am not.

22   Q.   Okay.

23             MR. HOULIHAN:  Let me post an objection

24   to that question.

Sovereign Bank by Begley

41

 1          It's beyond the scope of the notice.

 2     Q.   And it's not -- I don't want to belabor this

 3    issue, but I want to make sure I understand.

 4          If a Citizens Bank -- you're aware of

 5    Citizens Bank in Rhode Island and Massachusetts, I

 6    assume?

 7     A.   I am.

 8     Q.   Okay.  In a general sense.

 9          If a Citizens Bank customer goes to a

10    Mass. or Rhode Island Sovereign ATM for a cash

11    withdrawal, they will always be charged a fee, is

12    that a fair statement, for a cash withdrawal?

13     A.   If a person holding a Citizens Bank card

14    goes to a Sovereign Bank ATM in Massachusetts or

15    Rhode Island, will they be assessed a convenience

16    fee, is that the question?

17     Q.   Yes.

18     A.   If a person holding a Citizens Bank card

19    goes to a Sovereign machine in Rhode Island or

20    Massachusetts for a cash withdrawal and that card

21    does not have an EBT code on it, then they will be

22    assessed a convenience fee.

23     Q.   Okay.  And I assume that answer would be

24    the same for a Bank of America customer going to a

Sovereign Bank by Begley

42

1    Sovereign ATM machine without an EBT code in their

2    Bank of America card?

3        A.   Yes.   Same answer.

4              With a card, cash withdrawal, Sovereign

5    machine, no EBT code, a convenience fee would be

6    assessed.

7        Q.   And in fact, not to belabor the point, we

8    could use any other bank, customers of any other

9    bank, who went to a Sovereign ATM machine in Mass.

10   or Rhode Island that did not have that special EBT

11   code, which you testified is one of the exclusions,

12   if they went to a Sovereign ATM to withdraw cash,

13   they would be charged a convenience fee, is that

14   right?

15             MR. HOULIHAN:   Objection.

16       A.   Narrowing the answer to this time, because

17   the answer might vary if we had an acquisition

18   pending or --

19       Q.   Excluding acquisitions.

20       A.   -- or if there was some other time in which

21   we had made some other arrangement by agreement, but

22   at this time, the only exception I'm aware of is, we

23   might have, and I understand we do have at least one

24   machine in which we have turned off the surcharge

Sovereign Bank by Begley

43

1    altogether.  And that one machine was as a result of

2    a negotiation and request from the owner of the site

3    of the ATM.

4                By arrangements, business arrangements

5    between us and that landlord, there was an agreement

6    to place a machine, and that the machine would not

7    surcharge is my understanding.

8        Q.   Would not surcharge anyone?

9        A.   That's my understanding.

10       Q.   And how many of those machines were in

11   existence in either Rhode Island or Massachusetts

12   from April of '04 to April '05?

13               And when I'm talking about those

14   machines, I'm referring to the machines where

15   there's some special arrangement by the landlord or

16   the location of where the machine is not to charge

17   anyone a fee.

18       A.   I'm aware of just the one.

19               And I don't know the timing.  I mean, I

20   don't know the timing of when that machine was

21   installed and when the arrangement was made, but

22   that's the one exception that I'm aware of to your

23   summary of whether Sovereign will assess a

24   convenience fee to non-Sovereign U.S. cardholders

Sovereign Bank by Begley

44

1  for a cash withdrawal not involving an EBT code.

2      Q.  Now, I just want to go back, because --

3  about the EBT codes.

4          So I'm clear, when we're talking about

5  the EBT codes, the person who would be,

6  hypothetically, I'm referring now to the

7  hypothetical person who has this special EBT code on

8  their card.

9          Just so I understand, are recipients of

10  these EBT benefits, do they get a special card, or

11  is it some type of -- I'm having a hard time

12  visually understanding how the withdrawal process

13  works for an EBT non-Sovereign customer.

14          MR. HOULIHAN:  Objection.

15          You may answer.

16      Q.  If you can help me out.

17      A.  I should say, I am not familiar with the

18  particulars of how the EBT cards are issued and

19  whether they look different or have any designation

20  on them that would be visible to the cardholder or

21  anyone else that identifies them as an EBT card.

22      Q.  Okay.  Who at the bank would be most

23  familiar about those issues, about what the EBT

24  cards look like?

Sovereign Bank by Begley

45

1              First of all, do you know, is it a

2      separate card identified as an EBT card?

3              MR. HOULIHAN:  Objection.

4          A.   That I'm aware of, I don't believe that we

5      are issuing EBT cards, that we are a bank for

6      federal or state agencies that are issuing EBT

7      cards.

8              So, we could be, but I am not aware of

9      that.

10             So, it may be, to my awareness, we are

11     not, today, issuing EBT cards.

12             So, we likely would have people who are

13     familiar enough with card issuance and the

14     marketplace and the networks that they would have

15     some knowledge about how other banks issue EBT

16     cards.

17         Q.   Okay.  Who would that person be at

18     Sovereign, if you know?

19             MR. HOULIHAN:  Objection.

20         A.   My surmise would be that the people who work

21     closest to the issues of cards and networks would

22     have some awareness of these issues, including

23     Mr. Walsh and Mr. Simmons.

24         Q.   Okay.

Sovereign Bank by Begley

46

1          MR. LEFEBVRE:  Tara, you didn't fall

2     asleep on me?

3          MS. GOODWIN:  No.

4     Q.  Does Sovereign own all of its ATMs, if you

5     know?

6          MR. HOULIHAN:  Objection.

7          You may answer.

8     A.  We do own our ATMs.

9     Q.  Do you know who is responsible -- okay.

10    Strike that.

11          Just so I'm clear, any ATM in Mass. or

12    Rhode Island, I was referring to, that has some type

13    of Sovereign logo or some indication that it's a

14    Sovereign machine is actually owned by some

15    Sovereign entity?

16          MR. HOULIHAN:  Objection.

17          You may answer.

18    A.  My understanding is that today, the ATMs

19    that you see that have a Sovereign sign on them,

20    that we own the machine.

21          I say today and want to be clear on

22    that, because industries evolve.  And there are

23    arrangements generally in the industry in which

24    sometimes independent owners of machines will

Sovereign Bank by Begley

47

1  collaborate with banks or others for the signage and

2  branding and services that are provided through that

3  machine, but my understanding today is that we own

4  our machines.

5      Q.  Now, just to clarify.

6          When you say today, would that also mean

7  since April of '04, if you know?

8          MR. HOULIHAN:  Objection.

9          You may answer.

10     A.  My understanding would be that in that time

11 period, we have owned our machines.

12     Q.  And is it fair for me to assume that from

13 April of '04 to April of '05, that Sovereign was

14 also, Sovereign also maintained the various signage

15 at the ATM machines?

16         MR. HOULIHAN:  Objection.

17     A.  For the signage at the ATMs, Sovereign

18 determines what the signage will be.

19         We may accomplish the posting and the

20 maintenance of that signage through third-party

21 vendors.

22     Q.  Do you know if there were third-party

23 vendors in relation to, utilized in relation to the

24 signage of Sovereign ATMs from April of '04 to April

Sovereign Bank by Begley

48

1    of '05, if you know?

2                MR. HOULIHAN:  Objection.

3        A.  I don't know the particulars.

4        Q.  Who at the bank would know that?

5        A.  The people who work and are responsible for

6    the ATM, our own ATM network would know that.

7        Q.  The two individuals you talked about?

8        A.  The two individuals, and probably others on

9    their team.

10                And the people who work on our

11   facilities issues, branch and ATM issues, would have

12   some understanding and awareness of physically who

13   has done the work to post and maintain the signs,

14   whether Sovereign employees or vendors, and if

15   vendors, who.

16       Q.  Do you know how many Sovereign ATM machines

17   there are or there were in Mass. and Rhode Island

18   from April of '04 to April of '05, if you know?

19                MR. HOULIHAN:  Objection.

20       A.  I know how many there were in New England,

21   which would include Connecticut and New Hampshire.

22                And there was something in excess of 600

23   ATMs.

24       Q.  And that would include, when I'm using the

Sovereign Bank by Begley

49

1    word ATM, I'm not just referring to an individual

2    machine, but that could include machines in a

3    branch, machines in a drive-through?

4        A.   That would include machines at a branch and

5    remote machines.

6        Q.   Do you think it's possible to, for Sovereign

7    to create a notice that would actually tell people,

8    non-customers when they're not going to charge a fee

9    for a cash withdrawal?

10                MR. HOULIHAN:   Objection.

11                That's beyond the scope of the

12   designated topic, well beyond the scope of the

13   designated topic.

14                It is also opinion testimony.

15                I'm going to instruct the witness not to

16   answer that question.

17                MR. LEFEBVRE:   Okay.   I can appreciate

18   your concerns.

19                Can I just have the stenographer read

20   back the question?

21                (Last question read back by Reporter.)

22       Q.   And it's my understanding that your attorney

23   has instructed you not to answer that question.

24       A.   That was my understanding as well.

Sovereign Bank by Begley

50

1    Q.   Good.   So, both of our hearing is working

2    well.

3              Do you know how many actual -- let me

4    rephrase the question.

5              Do you know either on a weekly, daily or

6    monthly, whatever is easiest to compile the data

7    necessary to answer this question, how many non-U.S.

8    cardholders actually utilize a Sovereign ATM for a

9    cash withdrawal, either on a daily basis, weekly

10   basis, if you know?

11             MR. HOULIHAN:  One second.

12             Non-U.S. cardholders?

13             MR. LEFEBVRE:  Non-Sovereign customers.

14   You can understand the -- let me make it clear.

15   Q.   I'm talking about a U.S. person, who is a

16   non-Sovereign customer, who goes to a Sovereign ATM

17   -- I think you told me there's 600 in New England;

18   I'm going to assume there's less than that for Mass.

19   and Rhode Island -- who takes a withdrawal out of a

20   Sovereign machine for cash.

21             How many of those transactions occur

22   either on a, if you can give me a daily figure,

23   monthly figure or yearly figure, if you know?

24             MR. HOULIHAN:  Objection.

Sovereign Bank by Begley

51

1          You may answer the question.

2          It is still unclear to me whether you're

3   asking that question to include the sort of entire

4   universe of Sovereign ATMs or simply those in

5   Massachusetts and Rhode Island.

6          MR. LEFEBVRE:  I think that's a fair

7   comment to my question.

8   Q.  I'm looking at Rhode Island and Mass., and

9   I'm also looking at not the people that would be

10  excluded in the three categories that you testified.

11         I want to know how many non-customers

12  take out cash a day at Sovereign and are charged a

13  fee.

14         That's the bottom line.

15         MR. HOULIHAN:  Objection.

16         You may answer.

17  A.  I have seen some numbers, but the numbers I

18  recall were for the entirety of Sovereign's network,

19  all of Sovereign's ATMs, all of Sovereign's network,

20  which is from New Hampshire through Maryland.  We

21  operate in several states.

22         And my recollection is that the

23  non-Sovereign U.S. cardholder transactions are in

24  the range of five to 700,000 per month.

Sovereign Bank by Begley

52

1    Q.  500 to 700,000?

2    A.  I'm sorry.

3         500,000 to 700,000 per month.

4    Q.  So, if I understand it, that would mean that

5    somewhere between 500,000 people and 700,000 people

6    over that much broader territory on a monthly basis

7    are taking out cash from a Sovereign ATM and are

8    being charged a convenience fee for doing that?

9    A.  That's my understanding.

10   Q.  Now, you mentioned about --

11   A.  I'm sorry.  That's a transaction count.

12   It's not people.

13   Q.  Right, right.

14   A.  It's not people or cards.

15        It's a transaction count.

16   Q.  In theory, one person in a matter of 10

17   minutes could actually go to Sovereign four times if

18   they wanted to pay a convenience fee four times.

19   Okay.

20        MR. LEFEBVRE:  Why don't we do this.  If

21   we take a 10-minute break, believe it or not, I'm

22   not going to have much longer.

23        What I'd like to be able to do is talk

24   to Tara briefly.

53

1        And everyone might be able to go do

2    their Christmas shopping or holiday shopping early.

3            (Brief recess.)

4            MR. LEFEBVRE:  We can go back on the

5    record.

6        Q.  I just had a couple of follow-up questions.

7    And I'm going to stay firm to my promise to be real

8    quick.

9            You were talking about that one branch,

10   I think a unique branch, where you don't charge

11   anyone who uses the ATM.  When I say branch, ATM

12   location.

13           Do you know where that location actually

14   is?

15       A.  I don't.  I personally don't.

16           I mean, one of the people that I work

17   with had mentioned to me that they understood there

18   was one machine.

19       Q.  The next question, I wanted to go back.

20           The SUM, S-U-M, network, is it my

21   understanding that during 2004 and 2005, April of

22   2004 to April of 2005, that Sovereign was not a

23   participant of this network, S-U-M?

24           MR. HOULIHAN:  Objection.

Sovereign Bank by Begley

54

1      A.   From April of 2004 to April of 2005,

2   Sovereign was not a participant, correct.  Sovereign

3   was not a participant of the SUM network during that

4   time.

5      Q.   Okay.  Was Sovereign ever a member of the

6   SUM network?

7                MR. HOULIHAN:  Objection.

8      A.   No.

9                Sovereign has not been a member of the

10  SUM network.

11     Q.   Now, in the documents that were produced to

12  me -- I'm not going to mark them, but I'll show you,

13  it's Documents 12 and 13, which talks about the SUM

14  network and, I think, Compass Bank.

15                And there's a chart on the second page,

16  which I think is Document 13, SOV-P1-000013.  And

17  there's a chart.

18                I was just confused.

19                Could you kind of tell me what those

20  documents purport to be, the two documents in front

21  of you?

22                MR. HOULIHAN:  Objection.

23     A.   Could I --

24     Q.   Do you need another one?

Sovereign Bank by Begley

55

1      A.   Could I please see the beginning of the

2   document?

3                  MR. HOULIHAN:   I'd just like the record

4   to reflect that we've been handed two pages.

5                  MR. LEFEBVRE:   The record should reflect

6   I'm not trying to intentionally leave something out.

7   Maybe I did.

8                  See, I had the E-mails ended at 11.

9   Maybe we're missing a page.  I'm sorry.  It could be

10   the copy machine.

11      Q.   What pages do you have?

12      A.   I have two pages.

13      Q.   12 --

14      A.   12 and 13, yes.

15                  MR. LEFEBVRE:   There's nothing before

16   it.  And this is the actual hard copy you gave me.

17                  MS. GOODWIN:   And it says Page 1 of 2 at

18   the bottom.

19      A.   The reason for my request, I was just

20   looking for an indication of the date of the

21   document and the author.  That's all I was looking

22   for.

23                  MR. HOULIHAN:   I'm wondering if Page 11

24   is a cover memo or something of that --

Sovereign Bank by Begley

56

1           MR. LEFEBVRE:  I didn't think so.

2   That's why I didn't give it to you.

3           MS. GOODWIN:  There's an E-mail that

4   started on Page 9.

5           MR. LEFEBVRE:  I'll take those back and

6   give you the full set of documents.  You can tell by

7   the paper color that those were the actual originals

8   received from your attorney.

9           (Pause.)

10   A.   Okay.  I've found what I was looking for on

11   Page 10 and 11, which is an E-mail intro to the

12   Pages 12 and 13 you had shown me.

13   Q.   I apologize for not giving that to you.  It

14   wasn't intentional.  I just assumed it was --

15   A.   That's quite all right.

16           I was just clarifying what I was looking

17   for.

18   Q.   Great.

19   A.   And going back to your question about

20   whether Sovereign has been, my understanding is that

21   we have never participated in the SUM networks, but

22   some of the banks that we acquired were

23   participating in the SUM network.

24           So, some of this documentation talks

Sovereign Bank by Begley

57

1    about trying to sort that out, what are we going to

2    do in the interim phase, as the acquired bank is

3    coming in and we're making the transition, and then,

4    you know, would any of this alter our overall

5    position about participating in SUM or not.

6        Q.  And is it fair to say that the Documents 12

7    and 13, SOV-P1-000012 and the subsequent document,

8    13, talk about those issues in relation to the

9    acquisition of Compass Bank?

10       A.  Yes.

11       Q.  So, is it fair to say that the chart on Page

12   13, when it talks about revenues, it's talking about

13   the SUM network and it's relation to Compass Bank

14   during the period of acquisition by Sovereign?

15       A.  I would have to review the entire document,

16   again, to be sure I was responding accurately to the

17   question about these numbers.

18           At first glance, these numbers look to

19   me that they probably relate to more than simply the

20   Compass, more than simply the Compass machines or

21   networks or convenience fee issues.

22       Q.  If you took a couple of minutes just to read

23   Page 12 and 13, if that might assist you in

24   answering my inquiry, you can take a couple of

Sovereign Bank by Begley

58

1   minutes.

2                (Pause.)

3      Q.   Okay.   I guess -- let me ask a couple of

4   questions now that you've had an opportunity to

5   review the two pages.

6                Can you try to explain to me what your

7   understanding is of this chart relative to the

8   annual impact to Sovereign's revenue?

9                I was having a difficult time

10  understanding what these figures mean.   If you can.

11               MR. HOULIHAN:   Objection.

12               You may answer.

13     A.   My understanding from reading the document

14  is that this was an analysis to decide whether we

15  could continue to provide some access to the Compass

16  customers.   It then gets into talking about the

17  rules and requirements of the SUM network in order

18  to participate.

19               And from that, the person concluded that

20  we would need to convert a big portion of our New

21  England ATM network to join the SUM network and

22  thereby give up the surcharge convenience fee

23  revenue on those machines to the extent of the

24  volume that was coming from SUM participants, other

Sovereign Bank by Begley

59

1   banks that participate in SUM, and that the author's

2   estimate of the amount of, starting with, my read is

3   that the left-hand column on Page 13 in the

4   financial table is, as of that time, the New England

5   surcharge revenue in the New England ATM that

6   Sovereign was experiencing, and that the right-hand

7   column is that person's estimate of the amount by

8   which that surcharge revenue would be reduced were

9   we to convert over and participate in the SUM

10  network in a way that their rules required

11  throughout our New England franchise.

12      Q.  Okay.  Thank you very much.

13          So I'm clear, so, this author's

14  estimates were, for example, in January, is it fair

15  to say that that $440,359.05 would be a revenue

16  figure this author believed Sovereign was receiving

17  in fees from its Sovereign ATM surcharges for

18  non-customers withdrawing cash?

19          MR. HOULIHAN:  Objection.

20      A.  My understanding is that, yes, this is

21  representing either an actual of a past year or a

22  projection of a current year for the amount of

23  surcharge revenue expected from the New England ATMs

24  for non-Sovereign U.S. cardholder cash withdrawals.

Sovereign Bank by Begley

60

1    Q.   Okay.   And that same analysis applies to

2  the figures contained in this chart for January to

3  December.

4              And this author believed the total

5  revenue during this one-year period was about, what,

6  6.3 million dollars in fees?

7              MR. HOULIHAN:  Objection.

8    A.   That's the way I read this.

9    Q.   Okay.  Do you know who the author of this

10 report was?

11             Is it contained in the E-mail?

12   A.   My understanding is that the author was

13 Randy Gearhart, G-e-a-r-h-a-r-t.

14   Q.   And what does Mr. Gearhart, what is his

15 capacity for Sovereign, if any?

16   A.   Mr. Gearhart is not with the bank today.

17             At this time, he was responsible for

18 working on ATM and debit card issues in the

19 marketing department.

20   Q.   And he left the bank?

21   A.   Yes.

22   Q.   And he was replaced by whom, if you know?

23   A.   The person today in the marketing department

24 who has responsibility for the debit card and the

Sovereign Bank by Begley

61

1    ATM issues that we're discussing here, that portion

2    which falls to the marketing department is Dawn

3    Hammond, H-a-m-m-o-n-d.

4        Q.   And where is Mr. Hammond located?

5        A.   I'm sorry.  Dawn is D-a-w-n.

6             And she sits down in Wyomissing,

7    Pennsylvania.

8        Q.   And just one final question.

9             When you were talking about the

10   third-party vendor who I believe maintains the

11   network for Sovereign, who -- let me strike that.

12            Would Sovereign or this third-party

13   company, which of the two would be most

14   knowledgeable about the, I'm going to call it,

15   forgive my characterization, the real nitty-gritty

16   bottom-line workings of the ATM and how the BIN

17   numbers are interpreted and the computerization and

18   those type of issues, the real technical issues

19   involving an ATM transaction for Sovereign?

20            MR. HOULIHAN:  Objection.

21       Q.   If you know.

22       A.   I don't think that I'm close enough to make

23   a distinction, because it would be both a matter of

24   what's the intended organizational expertise and

62

1   what's the background and expertise of the

2   individuals involved.

3           My belief would be that both

4   organizations would have people with considerable

5   experience and expertise about the technical

6   workings of the machines, the network, the

7   information that's on the cards and how the

8   transactions are processed.

9   Q.   I misspoke.  It wasn't my last question, but

10  winding down --

11          MR. LEFEBVRE:  I think you were right,

12  John.

13  Q.   One final area.

14          When we were talking about the

15  electronic benefit transfer category where

16  non-Sovereign U.S. cardholders are not charged a

17  fee, if I understood your testimony, there's a

18  certain BIN code contained on the card.

19          And I thought you were pretty clear that

20  you weren't sure what the card looks like, whether

21  it's actually an ATM card or some separate card with

22  some -- I'm stumbling here.

23          MR. HOULIHAN:  Objection.

24          Your question also assumes, Chris, quite

Sovereign Bank by Begley

63

1    unfairly, frankly, that all banks other than

2    Sovereign are going to issue EBT cards that look

3    exactly alike.

4              So, it's entirely possible that -- and

5    you're asking a witness from Sovereign what other

6    banks' cards look like.

7              I honestly think that is not only well

8    beyond the scope of what we agreed to testify to,

9    but frankly, it's pushing the envelope what's fair

10   to ask this witness to respond to.

11             MR. LEFEBVRE:  I guess my question was

12   not narrowly tailored.

13   Q.   Whatever this EBT card looks like, I think

14   you were clear, you are not the person who knows all

15   about the EBT cards.

16   A.   Correct.

17   Q.   That's what I understood.

18             I guess my question is, someone puts

19   that EBT card, non-Sovereign customer, whatever that

20   card looks like, puts it into a Sovereign ATM.

21   There's some BIN number on it.

22             The computer does its thing.  And that

23   ATM knows to spit out 20 bucks, 40 bucks, whatever

24   the case may be.

Sovereign Bank by Begley

64

1          And there's no charge, correct?

2     A.   (Witness nods head.)

3     Q.   I guess my question is, could Sovereign,

4    through its tech department, whether it's this

5    third-party vendor or the Sovereign individuals,

6    have access to compile a list of all the people who

7    have used an EBT card at a Sovereign ATM over a

8    particular time period?

9               Is that available?

10               Is that something that's done?

11               MR. HOULIHAN:   Objection.

12               That's well beyond the scope of this.

13               What Mr. Lefebvre is asking, does

14    Sovereign have the ability to identity the customers

15    of other banks that utilize its ATMs when those

16    customers are EBT cardholders.

17     A.   The limits of my understanding are, between

18    Sovereign and our ATM manager vendor --

19     Q.   The third party?

20     A.   The third party, Fifth Third.

21               -- that we would have information about

22    the volume of transactions with cards coded as an

23    EBT card and the BIN code, and that -- I'm at the

24    limit of what I know.

Sovereign Bank by Begley

65

1          I would doubt that we would have

2  customer-specific information about -- I would doubt

3  we would have customer-specific information about

4  the individuals behind those cards.  I would doubt

5  that, but I need to stop, because I'm at the limit

6  of my experience about exactly what information is

7  encoded, transmitted, stored, reported, etc.

8      Q.  And I can appreciate that.  I assume there's

9  someone either at Sovereign or at the third-party

10  vendor who could answer my specific question, but

11  you're not the person.

12          And I would agree it's going a little

13  far from the deposition notice, but the good news is

14  that I'm done.

15          MR. LEFEBVRE:  Tara, you don't have any

16  questions, do you?

17          MS. GOODWIN:  No.

18          MR. LEFEBVRE:  Great.  We're done.

19          (11:23 a.m.)

20

21

22

23

24

Sovereign Bank by Begley

67

1    Commonwealth of Massachusetts)

2    Suffolk, ss.                    )

3         I, Lauren M. Mitchell, Registered

4    Professional Reporter and Notary Public in and

5    for the Commonwealth of Massachusetts, do hereby

6    certify that CHARLES M. BEGLEY, JR. came before me

7    on Wednesday, December 21, 2005, the deponent

8    herein, who was duly sworn; the examination was

9    reduced to printing under my direction and control;

10   and the within transcript is a true record of the

11   testimony given at said deposition.

12        I FURTHER CERTIFY that I am neither attorney

13   or counsel for, nor related to or employed by any of

14   the parties to the action in which this deposition

15   is taken; and, further, that I am not a relative or

16   employee of any attorney or counsel employed by the

17   parties hereto, or financially interested in the

18   outcome of the action.

19        IN WITNESS WHEREOF I have hereunto set my

20   hand and affixed my seal of office this 3rd day of

21   January, 2006, at Boston.

22                    *Lauren M. Mitchell*

23                    Lauren M. Mitchell, Notary Public

24                    My Commission expires:  6/25/2010

EXHIBIT 1

bayley
12/21/05 LMM

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

MAUREEN E. DELORETO and )
DIANE E. HORTON, )
                          )
               Plaintiffs, )
                          )    C.A. No. 05 CV 10712 RCL
         v. )
                           )
SOVEREIGN BANK, )
                           )
             Defendant. )

## NOTICE OF DEPOSITION

**TO:**    John A. Houlihan
           Donald E. Frechette
           Joshua W. Gardner
           Edwards & Angell, LLP
           101 Federal Street
           Boston, MA 02110-1800

       **PLEASE TAKE NOTICE** that, pursuant to Fed. R. Civ. P. 30(b)(6), Sovereign Bank is
to produce the individual(s) below for deposition. The deposition(s) will be taken at the Law
Offices of Claude Lefebvre, or at some other mutually agreeable location, depending on the
location of the designated deponents, on the dates and at the times listed below. The depositions
will be taken before a person authorized to administer oaths and will continue until completed.

| Deponent | Date | Time |
|---|---|---|
| Person(s) most knowledgeable regarding the circumstances under which Sovereign Bank imposes a charge on non-Sovereign customers for using a Sovereign automatic teller machine. | December 16, 2005 | 10:00 a.m. |

_Cathleen M. Combs (pro hac vice)_
Cathleen M. Combs (pro hac vice)
Tara L. Goodwin
EDELMAN COMBS, LATTURNER, LLC
120 South LaSalle Street, 18th Floor
Chicago, Illinois 6603

(312) 739-4200
(312) 419-0379 (FAX)


Christopher M. Lefebvre
LAW OFFICES OF CLAUDE
    LEFEBVRE & SONS
P.O. Box 479
Pawtucket, RI 02862
(401) 728-6060
(401) 728-6534 (FAX)
B.B.O. # 629056


## CERTIFICATE OF SERVICE

    I, Cathleen M. Combs, certify that on November 28, 2005, copies of the attached document were served by United States mail and fax upon the persons listed above.

_____
Cathleen M. Combs

EXHIBIT T

AFFIDAVIT OF RODNEY A. SIMMONS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAUREEN E. DELORETO and DIANE E. HORTON,<br><br>            Plaintiffs,<br><br>    v.<br><br>SOVEREIGN BANK,<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)  C. A. NO. 05-CV-10712 RCL<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF RODNEY A. SIMMONS

I, Rodney A. Simmons, on oath depose and state as follows:

1.    I am over eighteen (18) years of age, am competent to testify, and have personal knowledge of the facts set forth in this Affidavit.

2.    I am employed at Sovereign Bank as ATM Network Services Manager. My duties include responsibility for the day to day operations of Sovereign's ATM equipment.

3.    In my capacity as ATM Network Services Manager, I am familiar with the Automated Teller Machines ("ATMs") operated by Sovereign Bank, the paper receipts generated by those ATMs and the meaning of the notations on these receipts.

4.    I have read the Third Amended Complaint filed by the plaintiffs in this case, and have reviewed the two exhibits attached to the Third Amended Complaint.

5.    At Paragraph 8 of the Third Amended Complaint, plaintiffs allege that "on or about April 4, 2005, plaintiff Deloreto conducted an electronic funds transfer at an automated teller machine ('ATM') maintained by defendant in Seekonk, MA. A copy of the receipt she received is attached as Exhibit A."

6.    At Paragraph 9 of the Third Amended Complaint, plaintiffs allege that "on or about April 6, 2005 plaintiff Horton conducted an electronic funds transfer at an automated teller machine ("ATM") maintained by defendant in Plainville, MA.  A copy of the receipt she received is attached as Exhibit B."

7.    The Seekonk, Massachusetts Sovereign Bank branch mentioned in the Third Amended Complaint has one walk-up ATM and one drive-up ATM.

8.    The Plainville, Massachusetts Sovereign Bank branch mentioned in the Third Amended Complaint has one walk-up ATM and one drive-up ATM.

9.    Both receipts attached as exhibits to the Third Amended Complaint bear the number of the individual ATM used in the transaction recorded by the receipt.

10.    The receipt marked Exhibit A bears the ATM identifier "F253," which indicates that plaintiff Deloreto used the drive-up ATM at Sovereign's Seekonk branch to complete the transaction referenced in the receipt.

11.    The receipt marked Exhibit B bears the ATM identifier "F239," which indicates that plaintiff Horton used the drive-up ATM at Sovereign's Plainville branch to complete the transaction referenced in the receipt.

12.    Based on Exhibit A, I concluded that plaintiff Deloreto used the drive-up ATM at the Sovereign Bank branch in Seekonk Massachusetts to complete the transaction referenced in Exhibit A.

13.    Based on Exhibit B, I concluded that plaintiff Horton used the drive-up ATM at the Sovereign Bank branch in Plainville, Massachusetts to compete the transaction referenced in Exhibit B.

BOS_519884_2/JGARDNER

14.     Before completing a transaction at a Sovereign ATM, a non-Sovereign cardholder receives a notice on the ATM screen, which informs those cardholders who will be charged a Convenience Fee, that a fee of $1.50 will be charged on the transaction. This notice appears on the ATM screen before the consumer completes any transaction for which a Convenience Fee will be accessed.

15.     In order to proceed to complete the transaction, the consumer must affirmatively elect to accept this Convenience Fee. The consumer has the option to decline the fee and cancel the transaction.

**SWORN AND SUBSCRIBED TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS 30th DAY OF JANUARY 2006.**

_____
Rodney A. Simmons

## CERTIFICATE OF SERVICE

I, John A. Houlihan, certify that on this 31st day of January, 2006, I caused a copy of this document to be served, via first class mail, postage prepaid, on the following counsel of record:

Christopher M. Lefebvre, Esq.
Claude Lefebvre, P.C.
Two Dexter Street
Pawtucket, RI  02860

Daniel A. Edelman
Edelman, Combs,
Latturner & Goodwin, LLC
120 S. LaSalle St., 18th Floor
Chicago, IL  60603

_____
John A. Houlihan

- 3 -

**EXHIBIT U**

**AFFIDAVIT OF RHIANNON E. HERNANDEZ**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MAUREEN E. DELORETO and )
DIANE E. HORTON, )
                     )
             Plaintiffs, )
        v.                )    C. A. NO. 05-CV-10712 RCL
                     )
SOVEREIGN BANK, )
                     )
            Defendant. )
                     )

## AFFIDAVIT OF RHIANNON E. HERNANDEZ

I, Rhiannon E. Hernandez, on oath depose and state as follows:

1.      I am over eighteen (18) years of age, am competent to testify, and have personal knowledge of the facts set forth in this Affidavit.

2.      I am employed by Sovereign Bank as the Community Banking Manager at the Sovereign Bank branch located at 21 Central Avenue, Seekonk, Massachusetts ("the Seekonk Branch").

3.      In my capacity as Community Banking Manager I am familiar with the Automated Teller Machines ("ATMs") located at the Seekonk Branch.

4.      Sovereign operates two ATMs at its Seekonk Branch: a drive-up ATM located on the south side of the building, and a walk-up ATM located in an entry vestibule on the west side of the building.

5.      The drive-up ATM consists of a large dark-colored protective metal unit that houses the machine, and a smaller, lighter-colored metal façade that contains the computer screen, keypad and cash dispenser.

6.     The photograph included in the Appendix of Exhibits as Exhibit Ď is a true and accurate depiction of the drive-up ATM at the Seekonk Branch.

7.     The large protective metal unit is 6 feet high, and 5 feet wide. The inner façade is 28 inches high, and 32 inches wide. The center of the keypad located on the façade is 36 inches from the curb and 42 inches from the ground.

8.     There is a notice panel directly to the left of this ATM machine. The notice panel measures 18 inches high, and 10 inches wide. The notice panel is only 10.5 inches from the edge of the protective metal portion of the ATM. The notice panel is located only 30 inches from the edge of the façade, and only 48 inches from the center of the screen. The notice panel is 32 inches above the curb and 38 inches from the ground.

9.     The photograph included in the Appendix of Exhibits as Exhibit E is a true and accurate depiction of the notice panel and the drive up ATM at Sovereign's Seekonk Branch.

10.    The notice panel contains the logos for several ATM networks, cards from which are accepted at the ATM. The notice panel also contains a notice regarding the availability of funds, a notice regarding personal safety at the ATM, and a notice regarding ATM Convenience Fees.

11.    The Convenience Fee notice measures 2 inches high, and 4 inches wide. The type-font in the Convenience Fee notice appears to be of the same general style, color and clarity as the type-font in the other notices.

12.    The photograph included in the Appendix of Exhibits as Exhibit F is a true and accurate depiction of the Convenience Fee Notice, together with the other notices and advertisements that are directly adjacent to it, at the drive-up ATM at the Seekonk Branch.

13.    The center of the Convenience Fee notice is located only 8.5 inches from the edge of the protective metal portion of the ATM.  The center of the Convenience Fee notice is only 28 inches from the edge of the ATM façade, and only 46 inches from the center of the ATM screen. It is 35 inches above the curb and 41 inches above the ground.

14.    I have used the drive-up ATM at the Seekonk Branch while sitting in my automobile.  When my automobile is parked so that the driver is directly in front of the ATM screen, I can see and read the Convenience Fee notice while sitting in the driver's seat in my car. I have noticed and read the fee notice when using the ATM.  When approaching the ATM in my vehicle, the Convenience Fee notice appears at roughly the same level as the ATM façade.

15.    Based upon my own personal experience using the drive-up ATM at the Seekonk Branch, I believe that the Convenience Fee notice is placed in a location reasonably calculated to impart its information to non-Sovereign customers who might use the drive-up ATM at Sovereign's Seekonk Branch.

16.    The walk-up ATM at the Seekonk Branch is located in a vestibule room in the south-west corner of the building.  This ATM machine is 39 inches high and 34.5 inches wide. The center of the screen on the ATM is located 52 inches above the floor.  There is a notice panel directly to the left of the ATM.

17.    The photograph included in the Appendix of Exhibits as Exhibit _A_  is a true and accurate depiction of the vestibule at the Seekonk Branch that contains the walk-up ATM and the notice panel.

18.    The notice panel contains ATM logos for several ATM networks, cards from which are accepted at the ATM.  The notice panel also contains a notice regarding the

availability of funds, a notice regarding personal safety at the ATM, and a notice regarding ATM Convenience Fees.

19.    The Convenience Fee notice measures 2 inches high, and 4 inches wide. The type-font in the Convenience Fee notice appears to be of the same general style, color and clarity as the type-font in the other notices.

20.    The Convenience Fee notice is located only 6 inches from the edge of the ATM, and only 16 inches from the center of the ATM screen. The Convenience Fee notice is 49 inches above the floor. The Convenience Fee notice is placed at approximately the same height as the ATM screen.

21.    The photograph included in the Appendix of Exhibits as Exhibit B_ is a true and accurate depiction of the Convenience Fee notice, together with the other notices and advertisements that are adjacent to it, at the walk-up ATM at Sovereign's Seekonk Branch.

22.    I have used the walk-up ATM at Sovereign's Seekonk Branch. I have seen and read the Convenience Fee notice while approaching the ATM, and have seen and read the Convenience Fee notice while using the ATM.

23.    Based on my own personal experience using the walk-up ATM at the Seekonk Branch, I believe that the Convenience Fee notice is placed in a location reasonably calculated to impart its information to non-Sovereign customers who might use the walk-up ATM at Sovereign's Seekonk Branch.

**SWORN AND SUBSCRIBED TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS 27th DAY OF JANUARY, 2006**

Rhiannon E. Hernandez

## CERTIFICATE OF SERVICE

I, John A. Houlihan, certify that on this 31st day of January, 2006, I caused a copy of this document to be served, via first class mail, postage prepaid, on the following counsel of record:

Christopher M. Lefebvre, Esq.
Claude Lefebvre, P.C.
Two Dexter Street
Pawtucket, RI  02860

Daniel A. Edelman
Edelman, Combs,
Latturner & Goodwin, LLC
120 S. LaSalle St., 18th Floor
Chicago, IL  60603

John A. Houlihan

**EXHIBIT V**

**AFFIDAVIT OF STEPHANIE K. COMEAU**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MAUREEN E. DELORETO and )
DIANE E. HORTON, )
       )
            Plaintiffs, )
       )
     v. )     C. A. NO. 05-CV-10712 RCL
       )
SOVEREIGN BANK, )
       )
            Defendant. )
       )

## AFFIDAVIT OF STEPHANIE K COMEAU

I, Stephanie K Comeau on oath depose and state as follows:

1.       I am over eighteen (18) years of age, am competent to testify, and have personal knowledge of the facts set forth in this Affidavit.

2.       I am employed by Sovereign Bank as the Community Branch Manager at the Sovereign Bank branch located at 62 Messenger Street, Plainville, Massachusetts ("the Plainville Branch").

3.       In my capacity as Community Branch Manager, I am familiar with the Automated Teller Machines ("ATMs") located at the Plainville Branch.

4.       Sovereign operates two ATMs at its Plainville Branch: a drive-up ATM located on the north side of the building, and a walk-up ATM located in an entry vestibule on the south-east side of the building.

5.       The drive-up ATM consists of a large dark-colored protective metal unit that houses the ATM, and a smaller, lighter-colored metal façade that contains the computer screen, keypad and cash dispenser.

6.    The photograph included in the Appendix of Exhibits as Exhibit L is a true and accurate depiction of the drive-up ATM at the Plainville Branch.

7.    The large protective metal unit is 7 feet 3 inches high, and 5 feet 7 inches wide. The inner facade is 27.5 inches high, and 32.5 inches wide. The center of the keypad located on the facade is 36 inches above the curb and 41 inches from the ground.

8.    A notice panel containing several notices is located on the protective outer portion of the ATM machine to the left of the metal facade that contains the ATM screen. The notice panel measures 20 inches high, and 10 inches wide. It is located 13.5 inches from the edge of the facade, and only 32 inches from the center of the screen. The center of the notice panel is 40 inches above the curb and 45 inches from the ground.

9.    The photograph included in the Appendix of Exhibits as Exhibit M is a true and accurate depiction of the notice panel and the drive-up ATM at Sovereign's Plainville Branch.

10.    The notice panel contains the logos for several ATM networks, cards from which are accepted at the ATM. The notice panel also contains a notice regarding the availability of funds, a notice regarding personal safety at the ATM, and a notice regarding ATM Convenience Fees.

11.    The Convenience Fee notice measures 2 inches high, and 4 inches wide. The type-font in the Convenience Fee notice appears to be of the same general style, color and clarity as the type-font in the other notices.

12.    The photograph included in the Appendix of Exhibits as Exhibit N is a true and accurate depiction of the Convenience Fee Notice, together with the other notices and advertisements that are directly adjacent to it, at the drive-up ATM at the Plainville Branch.

BOS_BOS_520002_3 (2).DOC/JGARDNER

13.    The center of the Convenience Fee notice is only 12 inches from the edge of the ATM facade, and only 30 inches from the center of the ATM screen. It is 41 inches above the curb and 46 inches above the ground.

14.    I have used the drive-up ATM at the Plainville Branch while sitting in my automobile. When my automobile is parked so that the driver is directly in front of the ATM screen, I can see and read the Convenience Fee notice while sitting in the driver's seat in my car. When approaching the ATM in my vehicle, the Convenience Fee notice appears at roughly the same level as the ATM keypad.

15.    Based on my own personal experience using the drive-up ATM at the Plainville Branch, I believe that the Convenience Fee notice is placed in a location reasonably calculated to impart its information to non-Sovereign customers who might use the drive-up ATM at Sovereign's Plainville Branch.

16.    The walk-up ATM at the Plainville Branch is located in a small vestibule room in the south-east corner of the building.

17.    The room has only 112 square feet of wall space. Of that wall space, 20 square feet is taken up by the casing unit housing the ATM.

18.    As a person enters the room from outside the Plainville Branch, a notice panel housed in a casing unit is on the outer wall of the facility directly to the person's left. The notice panel is 33 inches high by 15 inches wide. It is located 3 feet from the door, and 4 feet 6 inches above the floor.

19.    The photograph included in the Appendix of Exhibits as Exhibit H-I is a true and accurate depiction of the vestibule at the Plainville Branch that contains the walk-up ATM and the notice panel.

BOS_BOS_520002_3 (2).DOC/JGARDNER

20.    The notice panel contains ATM logos for several ATM networks, cards from which are accepted at the ATM.  The notice panel also contains a notice regarding the availability of funds, a notice regarding personal safety at the ATM, and a notice regarding ATM Convenience Fees.

21.    The Convenience Fee notice measures 2 inches high and 4 inches wide.  The type-font in the fee notice appears to be of the same general style, color and clarity as the type-font in the other notices.

22.    The photograph included in the Appendix of Exhibits as Exhibit _5_ is a true and accurate depiction of the Convenience Fee notice, together with the other notices and advertisements that are adjacent to it, at the walk-up ATM at Sovereign's Plainville Branch.

23.    The walk-up ATM at Sovereign's Plainville Branch is located on the opposite wall from the notice panel in the small vestibule.

24.    I have used the walk-up ATM at Sovereign's Plainville Branch.  It is difficult to enter the small vestibule without noticing the notice panel, and I have seen and read the Convenience Fee notice prior to using the Plainville walk-up ATM.

25.    Based on my own personal experience using the walk-up ATM at the Plainville Branch, I believe that the Convenience Fee notice is placed in a location reasonably calculated to impart its information to non-Sovereign customers who might use the walk-up ATM at Sovereign's Plainville Branch.

**SWORN AND SUBSCRIBED TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS 28 DAY OF JANUARY, 2006.**

Stephanie K Comeau

## CERTIFICATE OF SERVICE

I, John A. Houlihan, certify that on this 31st day of January, 2006, I caused a copy of this document to be served, via first class mail, postage prepaid, on the following counsel of record:

Christopher M. Lefebvre, Esq.
Claude Lefebvre, P.C.
Two Dexter Street
Pawtucket, RI 02860

Daniel A. Edelman
Edelman, Combs,
Latturner & Goodwin, LLC
120 S. LaSalle St., 18th Floor
Chicago, IL 60603

John A. Houlihan

BOS_BOS_520002_3 (2).DOC/JGARDNER

**EXHIBIT W**

**AFFIDAVIT OF AARON USHER**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAUREEN E. DELORETO and<br>DIANE E. HORTON,<br><br>    Plaintiffs,<br><br> v.<br><br>SOVEREIGN BANK,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)  C. A. NO. 05-CV-10712 RCL<br>)<br>)<br>)<br>)<br>) |

# **Affidavit Of Aaron Usher**

C. A. NO. 05-CV-10712 RCL

Affidavit Of Aaron Usher

I, Aaron Usher, hereby depose and state that:

1. I am over 18 years of age, am competent to testify, and have personal knowledge of the facts set forth herein.

2. I am a professional photographer and the owner of Aaron Usher III Photography, located at 1080 Newport Ave., Pawtucket, RI. 02861

3. On June 28, 2005, I personally photographed the two Automated Teller Machines ("ATMs") at the Sovereign Bank branch located at 62 Messenger St., Plainville, MA, and the two ATMs at the Sovereign Bank branch located at 21 Central Ave., Seekonk, MA.

4. Based on my experience observing and photographing these four ATMs (the Plainville walk up ATM, the Plainville drive up ATM, the Seekonk walk up ATM, and the Seekonk drive up ATM), I am familiar with the ATMs and their immediate surroundings.

5. Exhibits A through O of Sovereign Bank's Memorandum In Support Of Its Motion To Dismiss are photographs I took of the ATMs at the two Sovereign locations. Each exhibit accurately reflects the location indicated on the back side of the photograph.

6. Exhibits A through O are accurate, fair, true, and good depictions of the four ATMs and their immediate surroundings as they appeared on June 28, 2005.

SIGNED THIS 29TH DAY OF JUNE, 2005, UNDER THE PAINS AND PENALTIES OF PERJURY.

_Aaron Usher_

Aaron Usher

CERTIFICATE OF SERVICE

I, John A. Houlihan, certify that on this 1st day of July, 2005, I caused a copy of this document to be served, via first class mail, postage prepaid, on the following counsel of record:

Christopher M. Lefebvre, Esq.
Claude Lefebvre, P.C.
Two Dexter Street
Pawtucket, RI 02860
Daniel A. Edelman
Edelman, Combs,
Latturner & Goodwin, LLC
120 S. LaSalle St., 18th Floor
Chicago, IL 60603

_John A. Houlihan_

John A. Houlihan

**EXHIBIT X**

**PLAINTIFFS CH. 93A DEMAND LETTER
DATED APRIL 15, 2005**

*Rwd by RiTsomy 4/22/05*

# EDELMAN, COMBS, LATTURNER & GOODWIN, LLC

120 S. LaSalle Street, 18th floor
Chicago, Illinois 60603-3403
(312) 739-4200
(800) 644-4673
(312) 419-0379 (FAX)
Email; edcombs@aol.com
www.edcombs.com

April 15, 2005

CERTIFIED MAIL

Sovereign Bank
75 State Street
Boston, MA

Re: Claims of Maureen DeLoreto and Diane E. Horton

Ladies/ Gentlemen:

Enclosed is a complaint filed recently.

Mss. DeLoreto and Horton contend that the same matters complained of also violate Mass. G.L., ch. 93A, and hereby give notice as required by that statute.

Mss. DeLoreto and Horton contend that a reasonable resolution of the 93A claim would be payment of $20 per class member.

". . . Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner. In all other cases, if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper. The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim or cross-claim, or if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth, but such respondent may otherwise employ the provisions of this section by making a written offer of relief and paying the rejected tender into court as soon as practicable after receiving notice of an action commenced under this section. . . ."

1

Case 1:05-cv-10712-RCL    Document 34-11    Filed 01/31/2006

Sincerely,

Daniel A. Edelman

cc:    Christopher M. Lefebvre
       LAW OFFICES OF CLAUDE LEFEBVRE & SONS
       Two Dexter Street
       Pawtucket, RI 02860

       clients

i:\case\citizens14.322\pleading\93ademand

2

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

| | |
|---|---|
| MAUREEN E. DELORETO and ) | |
| DIANE E. HORTON, ) | |
|        Plaintiffs, ) | |
|     v. ) | C. A. NO. 05-CV-10712 RCL |
| ) | |
| SOVEREIGN BANK, ) | |
|        Defendant ) | |

---

**DEFENDANT SOVEREIGN BANK'S STATEMENT OF UNDISPUTED MATERIAL**
**FACTS SUBMITTED IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

### I.  PARTIES

1.  Plaintiff Maureen E. Deloreto is a resident of Pawtucket, Rhode Island.  *See*
Complaint ¶1 and Answer ¶1, Appendix Exs. Q and R.

2.  Plaintiff Diane E. Horton is a resident of North Attleboro, Massachusetts.  *See*
Complaint ¶5; Answer ¶5, Appendix Exs. Q and R.

3.  Defendant Sovereign Bank ("Sovereign") is a federally chartered savings bank
with branches in Seekonk and Plainville, Massachusetts.  *See* Complaint ¶7 and Answer ¶7.
Appendix Exs. Q and R.

### II.  FACTS RELATING TO SOVEREIGN'S SEEKONK
### AND PLAINVILLE BRANCH ATM FACILITIES

4.  The video attached to the Appendix of Exhibits as Ex. P was taken pursuant to the
agreement of the parties and by agreement of the parties constitutes a true and accurate depiction
of the ATM facilities of Sovereign's Seekonk and Plainville branches.

5.  Sovereign operates automated teller machines ("ATMs") at its Seekonk and
Plainville, Massachusetts branches.  *See* Complaint ¶7 and Answer ¶7, Appendix Exs. Q and R.
*See also* Simmons Aff. ¶¶7 and 8, Appendix Ex. T.

6.      Sovereign posts exterior general placard notices ("Placard Notices") at the ATM machines at its Plainville and Seekonk branches.  *See* Complaint ¶16 and Answer ¶16, Appendix Exs. Q and R; *see also* Usher Aff. ¶¶2 through 6, Appendix Ex. W and Appendix Exs. A, D, E, H, I, L, M and P.

7.      In each instance the Placard Notice states:

Sovereign Bank may charge a fee to U.S. cardholders for withdrawing cash. This fee is added to the amount of your withdrawal by Sovereign Bank and is in addition to any fees that may be charged by your financial institution.  This convenience fee does not apply to Sovereign Bank cardholders.

Complaint ¶16(c) and Answer ¶16, Appendix Exs. Q and R;  *see also* Usher Aff. ¶¶2 through 6, Appendix Ex. W and Appendix Exs. B, C, E, F, G, J, K, O and P.

8.      Before completing any cash withdrawal transaction, a non-Sovereign cardholder receives an additional notice on the ATM screen, which informs those cardholders who will be a charged a fee, that a Convenience Fee of $1.50 will be charged on the transaction (the " Convenience Fee").  *See* Simmons Aff. ¶14, Appendix Ex. T.

9.      The on screen notice appears on the ATM screen before the consumer completes any transaction.  *Id.*

10.     In order to proceed to complete a transaction, the consumer must affirmatively elect to accept the specified fee.  *See* Simmons Aff. ¶15, Appendix Ex. T.

11.     Sovereign operates two ATMs at its Seekonk Branch: a drive-up ATM located on the south side of the building, and a walk-up ATM located in an entry vestibule on the west side of the building.  *See* Hernandez Aff. ¶ 4, Appendix Ex. U.

12.     The drive-up ATM consists of a large dark-colored protective metal unit that houses the machine, and a smaller, lighter-colored metal façade that contains the computer screen, keypad and cash dispenser.  *See* Hernandez Aff. ¶5, Appendix Ex. U.

13.    The photograph included in the Appendix of Exhibits as Exhibits D and E are true and accurate depictions of the drive-up ATM at the Seekonk Branch.  *See* Hernandez Aff. ¶ 6, Appendix Exs. U, D and E.

14.    The large protective metal unit is 6 feet high, and 5 feet wide.  The inner façade is 28 inches high, and 32 inches wide.  The center of the keypad located on the façade is 36 inches from the curb and 42 inches from the ground.  *See* Hernandez Aff. ¶7, Appendix Ex. U.

15.    There is a notice panel directly to the left of this ATM machine.  The notice panel measures 18 inches high, and 10 inches wide.  The notice panel is only 10.5 inches from the edge of the protective metal portion of the ATM.  The notice panel is located only 30 inches from the edge of the façade, and only 48 inches from the center of the screen.  The notice panel is 32 inches above the curb and 38 inches from the ground.  *See* Hernandez Aff. ¶8, Appendix Ex. U.

16.    The photograph included in the Appendix of Exhibits as Exhibit F is a true and accurate depiction of the notice panel and the drive up ATM at Sovereign's Seekonk Branch.  *See* Hernandez Aff. ¶9, Appendix Exs. U and F.

17.    The notice panel contains the logos for several ATM networks, cards from which are accepted at the ATM.  The notice panel also contains a notice regarding the availability of funds, a notice regarding personal safety at the ATM, and a notice regarding ATM Convenience Fees.  *See* Hernandez Aff. ¶10, Appendix Ex. U.

18.    The Convenience Fee notice measures 2 inches high, and 4 inches wide.  The type-font in the Convenience Fee notice appears to be of the same general style, color and clarity as the type-font in the other notices.  *See* Hernandez Aff. ¶11, Appendix Ex. U.

19.    The photograph included in the Appendix of Exhibits as Exhibit G is a true and accurate depiction of the Convenience Fee Notice, together with the other notices and

advertisements that are directly adjacent to it, at the drive-up ATM at the Seekonk Branch.  *See*

Hernandez Aff. ¶12, Appendix Exs. U and G.

20.     The center of the Convenience Fee notice is located only 8.5 inches from the edge

of the protective metal portion of the ATM.  The center of the Convenience Fee notice is only 28

inches from the edge of the ATM façade, and only 46 inches from the center of the ATM screen.

It is 35 inches above the curb and 41 inches above the ground.  *See* Hernandez Aff. ¶13,

Appendix Ex. U.

21.     When an automobile is parked so that the driver is directly in front of the ATM

screen, the driver can see and read the Convenience Fee notice while sitting in the driver's seat.

When approaching the ATM in a vehicle, the Convenience Fee notice appears at roughly the

same level as the ATM keypad.  *See* Hernandez Aff. ¶14, Appendix Ex. U.

22.     A customer driving up to the Seekonk drive-up ATM must necessarily pass by the

Convenience Fee Notice before beginning a transaction. *See* Appendix of Exs. D, E, P and W.

23.     The walk-up ATM at the Seekonk Branch is located in a vestibule room in the

south-west corner of the building.  This ATM machine is 39 inches high and 34.5 inches wide.

The center of the screen on the ATM is located 52 inches above the floor.  There is a notice

panel directly to the left of the ATM.  *See* Hernandez Aff. ¶16, Appendix Ex. U.

24.     The photograph included in the Appendix of Exhibits as Exhibit A is a true and

accurate depiction of the vestibule at the Seekonk Branch that contains the walk-up ATM and the

notice panel.  *See* Hernandez Aff. ¶17, Appendix Exs. U and A.

25.     The notice panel contains ATM logos for several ATM networks, cards from

which are accepted at the ATM.  The notice panel also contains a notice regarding the

availability of funds, a notice regarding personal safety at the ATM, and a notice regarding ATM Convenience Fees. *See* Hernandez Aff. ¶18, Appendix Ex. U.

26.     The Convenience Fee notice measures 2 inches high, and 4 inches wide. The type-font in the Convenience Fee notice appears to be of the same general style, color and clarity as the type-font in the other notices. *See* Hernandez Aff. ¶19, Appendix Ex. U.

27.     The Convenience Fee notice is located only 6 inches from the edge of the ATM, and only 16 inches from the center of the ATM screen. The Convenience Fee notice is 49 inches above the floor. The Convenience Fee notice is placed at approximately the same height as the ATM screen. *See* Hernandez Aff. ¶20, Appendix Ex. U.

28.     The photographs included in the Appendix of Exhibits as Exhibits B and C are true and accurate depictions of the Convenience Fee notice, together with the other notices and advertisements that are adjacent to it, at the walk-up ATM at Sovereign's Seekonk Branch. *See* Hernandez Aff. ¶21, Appendix Exs. U, B and C.

29.     The Convenience Fee notice is visible to consumers as they approach the walk-up ATM at Sovereign's Seekonk Branch. It is also visible to consumers while they are using the walk-up ATM at the Seekonk Branch. *See* Hernandez Aff. ¶22 and Appendix Exs. U and P.

30.     Sovereign operates two ATMs at its Plainville Branch: a drive-up ATM located on the north side of the building, and a walk-up ATM located in an entry vestibule on the south-east side of the building. *See* Comeau Aff. ¶4, Appendix Ex. V.

31.     The drive-up ATM consists of a large dark-colored protective metal unit that houses the ATM, and a smaller, lighter-colored metal façade that contains the computer screen, keypad and cash dispenser. *See* Comeau Aff. ¶5, Appendix Exs. V.

32.    The photograph included in the Appendix of Exhibits as Exhibits L and M are true and accurate depictions of the drive-up ATM at the Plainville Branch.  *See* Comeau Aff. ¶6, Appendix Exs. V, L and M.

33.    The large protective metal unit is 7 feet 3 inches high, and 5 feet 7 inches wide. The inner facade is 27.5 inches high, and 32.5 inches wide.  The center of the keypad located on the facade is 36 inches above the curb and 41 inches from the ground.  *See* Comeau Aff. ¶7, Appendix Ex. V.

34.    A notice panel containing several notices is located on the protective outer portion of the ATM machine to the left of the metal facade that contains the ATM screen.  The notice panel measures 20 inches high, and 10 inches wide.  It is located 13.5 inches from the edge of the facade, and only 32 inches from the center of the screen.  The center of the notice panel is 40 inches above the curb and 45 inches from the ground.  *See* Comeau Aff. ¶8, Appendix Ex. V.

35.    The photograph included in the Appendix of Exhibits as Exhibit N is a true and accurate depiction of the notice panel and the drive-up ATM at Sovereign's Plainville Branch. *See* Comeau Aff. ¶9, Appendix Exs. V and N.

36.    The notice panel contains the logos for several ATM networks, cards from which are accepted at the ATM.  The notice panel also contains a notice regarding the availability of funds, a notice regarding personal safety at the ATM, and a notice regarding ATM Convenience Fees.  *See* Comeau Aff. ¶10, Appendix Ex. V.

37.    The Convenience Fee notice measures 2 inches high, and 4 inches wide.  The type-font in the Convenience Fee notice appears to be of the same general style, color and clarity as the type-font in the other notices.  *See* Comeau Aff. ¶11, Appendix Ex. V.

BOS_518898_1/JGARDNER

38.    The photograph included in the Appendix of Exhibits as Exhibit O is a true and accurate depiction of the Convenience Fee Notice, together with the other notices and advertisements that are directly adjacent to it, at the drive-up ATM at the Plainville Branch.  *See* Comeau Aff. ¶12, Appendix Exs. V and O.

39.    The center of the Convenience Fee notice is only 12 inches from the edge of the ATM facade, and only 30 inches from the center of the ATM screen.  It is 41 inches above the curb and 46 inches above the ground.  *See* Comeau Aff. ¶13, Appendix Ex. V.

40.    When an automobile is parked so that the driver is directly in front of the ATM screen, the driver can see and read the Convenience Fee notice.  When approaching the ATM in a vehicle, the Convenience Fee notice appears at roughly the same level as the ATM keypad. *See* Comeau Aff. ¶14, Appendix Exs. V and P.

41.    A customer driving up to the Plainville drive-up ATM must necessarily pass by the notice before beginning a transaction. *See* Appendix Exs. L, M, P and W.

42.    The walk-up ATM at the Plainville Branch is located in a small vestibule room in the south-east corner of the building.  *See* Comeau Aff. ¶16, Appendix Ex. V.

43.    The room has only 112 square feet of wall space.  Of that wall space, 20 square feet is taken up by the casing unit housing the ATM.  *See* Comeau Aff. ¶17, Appendix Ex. V

44.    As a person enters the room from outside the Plainville Branch, a notice panel housed in a casing unit is on the outer wall of the facility directly to the person's left.  The notice panel is 33 inches high by 15 inches wide.  It is located 3 feet from the door, and 4 feet 6 inches above the floor.  *See* Comeau Aff. ¶18, Appendix Ex. V

45.     The photographs included in the Appendix of Exhibits as Exhibits H and I are true and accurate depictions of the vestibule at the Plainville Branch that contains the walk-up ATM and the notice panel.  *See* Comeau Aff. ¶19, Appendix Ex. V, H and I.

46.     The notice panel contains ATM logos for several ATM networks, cards from which are accepted at the ATM.  The notice panel also contains a notice regarding the availability of funds, a notice regarding personal safety at the ATM, and a notice regarding ATM Convenience Fees.  *See* Comeau Aff. ¶20, Appendix Ex. V

47.     The Convenience Fee notice measures 2 inches high and 4 inches wide.  The type-font in the fee notice appears to be of the same general style, color and clarity as the type-font in the other notices.  *See* Comeau Aff. ¶21, Appendix Ex. V

48.     The photograph included in the Appendix of Exhibits as Exhibit J is a true and accurate depiction of the Convenience Fee notice, together with the other notices and advertisements that are adjacent to it, at the walk-up ATM at Sovereign's Plainville Branch.  *See* Comeau Aff. ¶22, Appendix Ex. V

49.     The walk-up ATM at Sovereign's Plainville Branch is located on the opposite wall from the notice panel in the small vestibule.  *See* Comeau Aff. ¶23, Appendix Ex. V

### III.     FACTS RELATING TO PLAINTIFFS' TRANSACTIONS

50.     On April 4, 2005, plaintiff, Maureen E. Deloreto, completed an electronic funds transfer at the Sovereign drive-up ATM in Seekonk.  *See* Complaint ¶ 8 and Ex. A, Appendix Ex. Q; *see also* Simmons Aff. ¶¶5 and 10, Appendix Ex. T.

51.     On April 6, 2005, plaintiff, Diane E. Horton, conducted an electronic funds transfer at the Sovereign drive-up ATM in Plainville.  *See* Complaint ¶ 9 and Ex. B, Appendix Ex. Q; *see also* Simmons Aff. ¶¶6 and 11, Appendix Ex. T.

52.    Neither plaintiff was a Sovereign customers at the time of the transactions referenced in the Complaint.  *See* Complaint, ¶¶ 4 and 5, Appendix Ex. Q.

53.    Sovereign charged each plaintiff a Convenience Fee of $1.50 in connection with their cash withdrawal transaction.  *See* Complaint, ¶¶ 4, 5 and 11.

54.    Both receipts attached as exhibits to the Third Amended Complaint bear the number of the individual ATM used in the transaction recorded by the receipt.  *See* Simmons Aff. ¶9, Appendix Ex. T.

55.    The receipt marked Exhibit A bears the ATM identifier "F253," which indicates that plaintiff Deloreto used the drive-up ATM at Sovereign's Seekonk branch to complete the transaction referenced in the receipt.  *See* Simmons Aff. ¶10, Appendix Ext. T.

56.    Plaintiff Deloreto used the drive-up ATM at the Sovereign Bank branch in Seekonk Massachusetts to complete the transaction referenced in Exhibit A.  *See* Simmons Aff. ¶10, Appendix Ext. T.

57.    The receipt marked Exhibit B bears the ATM identifier "F239," which indicates that plaintiff Horton used the drive-up ATM at Sovereign's Plainville branch to complete the transaction referenced in the receipt.  *See* Simmons Aff. ¶11, Appendix Ext. T.

58.    Plaintiff Horton used the drive-up ATM at the Sovereign Bank branch in Plainville, Massachusetts to compete the transaction referenced in Exhibit B.  *See* Simmons Aff. ¶11, Appendix Ext. T.

59.    Plaintiffs do not allege that they did not observe the Placard Notices prior to initiating their ATM transactions.  *See generally*, Complaint, Appendix Ex. Q.

60.    Plaintiffs do not allege that they experienced any difficulty locating the notices. *Id.*

61.    Plaintiffs do not allege that they were unable to read the Placard Notices.  *Id.*

62.    Plaintiffs do not claim to have been surprised upon receipt of the Screen Notice informing them that Sovereign would charge a fee of $1.50 if they chose to proceed with their transaction.  *Id.*

63.    Plaintiffs do not allege that the language employed in the Placard Notice was not "readily understandable."  *Id.*

64.    Plaintiffs do not allege that they had any difficulty understanding the language on the Placard Notice.  *Id.*

65.    Plaintiffs do not allege that they suffered any specific harm, loss or damage as a result of Sovereign's alleged acts and omissions.  *Id.*

66.    After receiving the on screen notice, both plaintiffs chose to proceed with their respective transactions.  *See* Complaint, ¶¶8 and 9.  Appendix Ex. Q; *see also* Simmons Aff. ¶¶15 and 15.

### IV.    FACTS RELATING TO THE CIRCUMSTANCES IN WHICH SOVEREIGN DOES NOT CHARGE A CONVENIENCE FEE TO NON-SOVEREIGN CUSTOMERS WHO USE SOVEREIGN ATMS FOR CASH WITHDRAWAL TRANSACTIONS.

67.    Sovereign does not charge a fee "where the cardholder is accessing … governmental benefits through a card that is typically referred to as an EBT card."  *See* Begley Trans., at 12-13, Appendix Ex. S.

68.    For a three to ten day period of time immediately before the legal date of an acquisition of another bank, Sovereign does not charge a Convenience Fee to customers of the target bank. *See* Begley Trans., at 16-19, Appendix Ex. S.

69.    Sovereign also customarily waives Convenience Fees for customers of acquired banks in connection with cash transactions that take place after the legal acquisition of the

customer's bank but before the acquired bank is actually merged into and becomes a part of Sovereign. *See* Begley Trans., at 20-22, Appendix Ex. S.

70.    In connection with the Fleet/Bank Boston divestiture, Sovereign waived Convenience Fees for all Fleet and Bank Boston customers for a period of time. *See* Begley Trans., at 28-30, Appendix Ex. S.

71.    In connection with a Red Cross and FEMA initiative, Sovereign participated in a plan to waive Convenience Fees for cards issued to people dislocated by Hurricane Katrina. *See* Begley Trans., at 30-31, Appendix Ex. S.

72.    On occasion Sovereign enters into special arrangements with certain entities that involve the waiver of Convenience Fees. *See* Begley Trans., at 42-43, Appendix Ex. S.

73.    In a currently outstanding agreement with a landlord, Sovereign waived all Convenience Fees for transactions conducted at a specific ATM located on the leased premises. *Id.*

<div style="text-align:right">

**SOVEREIGN BANK**
By its attorneys,

/s/ John A. Houlihan
/s/ Donald E. Frechette
/s/ Joshua W. Gardner
John A. Houlihan (B.B.O. #542038)
Donald E. Frechette (B.B.O. #547293)
Joshua W. Gardner (B.B.O. #657347)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199-7613
(617) 239-0100  Telephone
(617) 227-4420  Telecopy

</div>

Dated: January 31, 2006

BOS_518898_1/JGARDNER