**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MAUREEN E. DELORETO and | ) |
| DIANE E. HORTON, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) C.A. No. 05 CV 10712 RCL |
| v. | ) |
| | ) |
| SOVEREIGN BANK, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT**
**OF UNDISPUTED MATERIAL FACTS SUBMITTED IN**
**SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, plaintiffs Maureen E. Deloreto and Diane E. Horton hereby respond as follows to Defendant's Statement of Undisputed Material Facts Submitted in support of its Motion for Summary Judgment.

**I.    PARTIES**

1. Plaintiff Maureen E. Deloreto is a resident of Pawtucket, Rhode Island. *See* Complaint ¶1 and Answer ¶1, Appendix Exs. Q and R.

**RESPONSE:** Admit

2. Plaintiff Diane E. Horton is a resident of North Attleboro, Massachusetts. *See* Complaint ¶5; Answer ¶5, Appendix Exs. Q and R.

**RESPONSE:** Admit.

3. Defendant Sovereign Bank ("Sovereign") is a federally chartered savings bank with branches in Seekonk and Plainville, Massachusetts. *See* Complaint ¶7 and Answer ¶7. Appendix Exs. Q and R.

**RESPONSE:** Admit.

**II.    FACTS RELATING TO SOVEREIGN'S SEEKONK**
**AND PLAINVILLE BRANCH ATM FACILITIES**

4. The video attached to the Appendix of Exhibits as Ex. P was taken pursuant to the

agreement of the parties and by agreement of the parties constitutes a true and accurate depiction of the ATM facilities of Sovereign's Seekonk and Plainville branches.

**RESPONSE:** Admit.

5. Sovereign operates automated teller machines ("ATMs") at its Seekonk and Plainville, Massachusetts branches. *See* Complaint ¶7 and Answer ¶7, Appendix Exs. Q and R. *See also* Simmons Aff. ¶¶7 and 8, Appendix Ex. T.

**RESPONSE:** Admit.

6. Sovereign posts exterior general placard notices ("Placard Notices") at the ATM machines at its Plainville and Seekonk branches. See Complaint ¶16 and Answer ¶16, Appendix Exs. Q and R; see also Usher Aff. ¶¶2 through 6, Appendix Ex. W and Appendix Exs. A, D, E, H, I, L, M and P.

**RESPONSE:** Admit.

7. In each instance the Placard Notice states:

> Sovereign Bank may charge a fee to U.S. cardholders for withdrawing cash. This fee is added to the amount of your withdrawal by Sovereign Bank and is in addition to any fees that may be charged by your financial institution. This convenience fee does not apply to Sovereign Bank cardholders.

Complaint ¶16(c) and Answer ¶16, Appendix Exs. Q and R; see also Usher Aff. ¶¶2 through 6, Appendix Ex. W and Appendix Exs. B, C, E, F, G, J, K, O and P.

**RESPONSE:** Admit.

8. Before completing any cash withdrawal transaction, a non-Sovereign cardholder receives an additional notice on the ATM screen, which informs those cardholders who will be a charged a fee, that a Convenience Fee of $1.50 will be charged

on the transaction (the " Convenience Fee"). See Simmons Aff. ¶14, Appendix Ex. T.

**RESPONSE:** Admit.

9. The on screen notice appears on the ATM screen before the consumer completes any transaction. Id.

**RESPONSE:** Admit.

10. In order to proceed to complete a transaction, the consumer must affirmatively elect to accept the specified fee. See Simmons Aff. ¶15, Appendix Ex. T.

**RESPONSE:** Admit.

11. Sovereign operates two ATMs at its Seekonk Branch: a drive-up ATM located on the south side of the building, and a walk-up ATM located in an entry vestibule on the west side of the building. See Hernandez Aff. ¶ 4, Appendix Ex. U.

**RESPONSE:** Admit.

12. The drive-up ATM consists of a large dark-colored protective metal unit that houses the machine, and a smaller, lighter-colored metal façade that contains the computer screen, keypad and cash dispenser. See Hernandez Aff. ¶5, Appendix Ex. U.

**RESPONSE:** Admit.

13. The photograph included in the Appendix of Exhibits as Exhibits D and E are true and accurate depictions of the drive-up ATM at the Seekonk Branch. See Hernandez Aff. ¶ 6, Appendix Exs. U, D and E.

**RESPONSE:** Admit.

14. The large protective metal unit is 6 feet high, and 5 feet wide. The inner façade is 28 inches high, and 32 inches wide. The center of the keypad located on the façade is 36 inches

from the curb and 42 inches from the ground. See Hernandez Aff. ¶7, Appendix Ex. U.

**RESPONSE:** Admit.

15. There is a notice panel directly to the left of this ATM machine. The notice panel measures 18 inches high, and 10 inches wide. The notice panel is only 10.5 inches from the edge of the protective metal portion of the ATM. The notice panel is located only 30 inches from the edge of the façade, and only 48 inches from the center of the screen. The notice panel is 32 inches above the curb and 38 inches from the ground. See Hernandez Aff. ¶8, Appendix Ex. U.

**RESPONSE:** Plaintiffs admit that the measurements are accurate, but dispute any implications which arise from the use of the term "only" in describing those measurements.

16. The photograph included in the Appendix of Exhibits as Exhibit F is a true and accurate depiction of the notice panel and the drive up ATM at Sovereign's Seekonk Branch. See Hernandez Aff. ¶9, Appendix Exs. U and F.

**RESPONSE:** Admit.

17. The notice panel contains the logos for several ATM networks, cards from which are accepted at the ATM. The notice panel also contains a notice regarding the availability of funds, a notice regarding personal safety at the ATM, and a notice regarding ATM Convenience Fees. See Hernandez Aff. ¶10, Appendix Ex. U.

**RESPONSE:** Admit.

18. The Convenience Fee notice measures 2 inches high, and 4 inches wide. The typefont in the Convenience Fee notice appears to be of the same general style, color and clarity as the type-font in the other notices. See Hernandez Aff. ¶11, Appendix Ex. U.

**RESPONSE:** Admit that the type-font in the Convenience Fee notice is the same general

style, color and clarity as the type-font in the other notices which appear at the bottom of the notice panel, but deny that they are the same as the items which appear above the Convenience Fee notice on the notice panel, which are color logos of well known credit cards and automatic teller networks.  Defendant's Appendix F

19. The photograph included in the Appendix of Exhibits as Exhibit G is a true and accurate depiction of the Convenience Fee Notice, together with the other notices and advertisements that are directly adjacent to it, at the drive-up ATM at the Seekonk Branch. See Hernandez Aff. ¶12, Appendix Exs. U and G.

**RESPONSE:** Admit.

20. The center of the Convenience Fee notice is located only 8.5 inches from the edge of the protective metal portion of the ATM. The center of the Convenience Fee notice is only 28 inches from the edge of the ATM façade, and only 46 inches from the center of the ATM screen. It is 35 inches above the curb and 41 inches above the ground. See Hernandez Aff. ¶13, Appendix Ex. U.

**RESPONSE:** Plaintiffs admit that the measurements are accurate, but dispute any implications which arise from the use of the term "only" in describing those measurements.

21. When an automobile is parked so that the driver is directly in front of the ATM screen, the driver can see and read the Convenience Fee notice while sitting in the driver's seat. When approaching the ATM in a vehicle, the Convenience Fee notice appears at roughly the same level as the ATM keypad. See Hernandez Aff. ¶14, Appendix Ex. U.

**RESPONSE:** Deny. Affidavit of Maureen Deloreto, ¶¶4-5 (Appendix 3). Deposition of Rhiannon Hernandez, p.  26 (Appendix 5).

22. A customer driving up to the Seekonk drive-up ATM must necessarily pass by the Convenience Fee Notice before beginning a transaction. See Appendix of Exs. D, E, P and W.

**RESPONSE:** Admit, that a customer must pass the sign, approximately 4 feet before they reach the ATM, but deny any implication that the customer actually notices the sign or is able to read it in its current location. Affidavit of Maureen Deloreto, ¶¶4-5 (Appendix 3); Report of Marc Green (Appendix 6)

23. The walk-up ATM at the Seekonk Branch is located in a vestibule room in the south-west corner of the building. This ATM machine is 39 inches high and 34.5 inches wide. The center of the screen on the ATM is located 52 inches above the floor. There is a notice panel directly to the left of the ATM. See Hernandez Aff. ¶16, Appendix Ex. U.

**RESPONSE:** Admit.

24. The photograph included in the Appendix of Exhibits as Exhibit A is a true and accurate depiction of the vestibule at the Seekonk Branch that contains the walk-up ATM and the notice panel. See Hernandez Aff. ¶17, Appendix Exs. U and A.

**RESPONSE:** Admit.

25. The notice panel contains ATM logos for several ATM networks, cards from which are accepted at the ATM. The notice panel also contains a notice regarding the availability of funds, a notice regarding personal safety at the ATM, and a notice regarding ATM Convenience Fees. See Hernandez Aff. ¶18, Appendix Ex. U.

**RESPONSE:** Admit.

26. The Convenience Fee notice measures 2 inches high, and 4 inches wide. The type-font in the Convenience Fee notice appears to be of the same general style, color and clarity as

the type-font in the other notices. See Hernandez Aff. ¶19, Appendix Ex. U.

**RESPONSE:** Admit that the type-font in the Convenience Fee notice is the same general style, color and clarity as the type-font in the other notices which appear at the bottom of the notice panel, but deny that they are the same as the items which appear above the Convenience Fee notice on the notice panel, which are color logos of well known credit cards and automatic teller networks.  Defendant's Appendix B

27. The Convenience Fee notice is located only 6 inches from the edge of the ATM, and only 16 inches from the center of the ATM screen. The Convenience Fee notice is 49 inches above the floor. The Convenience Fee notice is placed at approximately the same height as the ATM screen. See Hernandez Aff. ¶20, Appendix Ex. U.

**RESPONSE:** Plaintiffs admit that the measurements are accurate, but dispute any implications which arise from the use of the term "only" in describing those measurements.

28. The photographs included in the Appendix of Exhibits as Exhibits B and C are true and accurate depictions of the Convenience Fee notice, together with the other notices and advertisements that are adjacent to it, at the walk-up ATM at Sovereign's Seekonk Branch. See Hernandez Aff. ¶21, Appendix Exs. U, B and C.

**RESPONSE:** Admit.

29. The Convenience Fee notice is visible to consumers as they approach the walk-up ATM at Sovereign's Seekonk Branch. It is also visible to consumers while they are using the walk-up ATM at the Seekonk Branch. See Hernandez Aff. ¶22 and Appendix Exs. U and P.

**RESPONSE:** Admit that the sign may be visible to consumers as they approach the ATM, but deny that the sign can be seen by a customer standing directly in front of the ATM.

Affidavit of Maureen Deloreto, ¶4 (Appendix 3); Deposition of Rhiannon Hernandez, pp. 32-33 (Appendix 5)

30. Sovereign operates two ATMs at its Plainville Branch: a drive-up ATM located on the north side of the building, and a walk-up ATM located in an entry vestibule on the south-east side of the building. See Comeau Aff. ¶4, Appendix Ex. V.

**RESPONSE:** Admit.

31. The drive-up ATM consists of a large dark-colored protective metal unit that houses the ATM, and a smaller, lighter-colored metal façade that contains the computer screen, keypad and cash dispenser. See Comeau Aff. ¶5, Appendix Exs. V.

**RESPONSE:** Admit.

32. The photograph included in the Appendix of Exhibits as Exhibits L and M are true and accurate depictions of the drive-up ATM at the Plainville Branch. See Comeau Aff. ¶6, Appendix Exs. V, L and M.

**RESPONSE:** Admit.

33. The large protective metal unit is 7 feet 3 inches high, and 5 feet 7 inches wide. The inner facade is 27.5 inches high, and 32.5 inches wide. The center of the keypad located on the facade is 36 inches above the curb and 41 inches from the ground. See Comeau Aff. ¶7, Appendix Ex. V.

**RESPONSE:** Admit.

34. A notice panel containing several notices is located on the protective outer portion of the ATM machine to the left of the metal facade that contains the ATM screen. The notice panel measures 20 inches high, and 10 inches wide. It is located 13.5 inches from the edge of the

facade, and only 32 inches from the center of the screen. The center of the notice panel is 40 inches above the curb and 45 inches from the ground. See Comeau Aff. ¶8, Appendix Ex. V.

**RESPONSE:** Plaintiffs admit that the measurements are accurate, but dispute any implications which arise from the use of the term "only" in describing those measurements.

35. The photograph included in the Appendix of Exhibits as Exhibit N is a true and accurate depiction of the notice panel and the drive-up ATM at Sovereign's Plainville Branch. See Comeau Aff. ¶9, Appendix Exs. V and N.

**RESPONSE:** Admit.

36. The notice panel contains the logos for several ATM networks, cards from which are accepted at the ATM. The notice panel also contains a notice regarding the availability of funds, a notice regarding personal safety at the ATM, and a notice regarding ATM Convenience Fees. See Comeau Aff. ¶10, Appendix Ex. V.

**RESPONSE:** Admit.

37. The Convenience Fee notice measures 2 inches high, and 4 inches wide. The type-font in the Convenience Fee notice appears to be of the same general style, color and clarity as the type-font in the other notices. See Comeau Aff. ¶11, Appendix Ex. V.

**RESPONSE:** Admit that the type-font in the Convenience Fee notice is the same general style, color and clarity as the type-font in the other notices which appear at the bottom of the notice panel, but deny that they are the same as the items which appear above the Convenience Fee notice on the notice panel, which are color logos of well known credit cards and automatic teller networks.  Defendant's Appendix N

38. The photograph included in the Appendix of Exhibits as Exhibit O is a true and

accurate depiction of the Convenience Fee Notice, together with the other notices and advertisements that are directly adjacent to it, at the drive-up ATM at the Plainville Branch. See Comeau Aff. ¶12, Appendix Exs. V and O.

**RESPONSE:** Admit.

39. The center of the Convenience Fee notice is only 12 inches from the edge of the ATM facade, and only 30 inches from the center of the ATM screen. It is 41 inches above the curb and 46 inches above the ground. See Comeau Aff. ¶13, Appendix Ex. V.

**RESPONSE:** Plaintiffs admit that the measurements are accurate, but dispute any implications which arise from the use of the term "only" in describing those measurements.

40. When an automobile is parked so that the driver is directly in front of the ATM screen, the driver can see and read the Convenience Fee notice. When approaching the ATM in a vehicle, the Convenience Fee notice appears at roughly the same level as the ATM keypad. See Comeau Aff. ¶14, Appendix Exs. V and P.

**RESPONSE:** Deny that a driver can see and read the Convenience Fee notice when parked directly in front of the ATM.  Affidavit of Diane E. Horton, ¶5 (Appendix 2); Deposition of Diane Horton, pp. 34, 47-49 (Appendix 10).  Admit that the notice is roughly at the same level as the ATM keypad, but note that it is over 30 inches away from the screen which is directly above the keypad. Defendant's Statement of Material Facts, ¶39.

41. A customer driving up to the Plainville drive-up ATM must necessarily pass by the notice before beginning a transaction. See Appendix Exs. L, M, P and W.

**RESPONSE:** Admit only that a customer must pass the notice, but deny any implication that a customer will actually see the notice when driving past.  Report of Marc Green (Appendix

6)

42. The walk-up ATM at the Plainville Branch is located in a small vestibule room in the south-east corner of the building. See Comeau Aff. ¶16, Appendix Ex. V.

**RESPONSE:** Admit that it is located in a vestibule in the south-east corner, but object to the characterization of the vestibule as "small."

43. The room has only 112 square feet of wall space. Of that wall space, 20 square feet is taken up by the casing unit housing the ATM. See Comeau Aff. ¶17, Appendix Ex. V

**RESPONSE:** Plaintiffs admit that the measurements are accurate, but dispute any implications which arise from the use of the term "only" in describing those measurements. Moreover, plaintiffs dispute the suggestion that the casing unit housing the ATM is taking up so much wall space that the notice could not be placed near the machine. The pictures demonstrate that there is ample space both on the machine, and on the wall the machine is on for the convenience fee notice. Appendix I to Defendants Statement of Material Facts.

44. As a person enters the room from outside the Plainville Branch, a notice panel housed in a casing unit is on the outer wall of the facility directly to the person's left. The notice panel is 33 inches high by 15 inches wide. It is located 3 feet from the door, and 4 feet 6 inches above the floor. See Comeau Aff. ¶18, Appendix Ex. V

**RESPONSE:** Admit.

45. The photographs included in the Appendix of Exhibits as Exhibits H and I are true and accurate depictions of the vestibule at the Plainville Branch that contains the walk-up ATM and the notice panel. See Comeau Aff. ¶19, Appendix Ex. V, H and I.

**RESPONSE:** Admit.

46. The notice panel contains ATM logos for several ATM networks, cards from which are accepted at the ATM. The notice panel also contains a notice regarding the availability of funds, a notice regarding personal safety at the ATM, and a notice regarding ATM Convenience Fees. See Comeau Aff. ¶20, Appendix Ex. V

**RESPONSE:** Admit.

47. The Convenience Fee notice measures 2 inches high and 4 inches wide. The type-font in the fee notice appears to be of the same general style, color and clarity as the type-font in the other notices. See Comeau Aff. ¶21, Appendix Ex. V

**RESPONSE:** Admit that the type-font in the Convenience Fee notice is the same general style, color and clarity as the type-font in the other notices which appear at the bottom of the notice panel, but deny that they are the same as the items which appear above the Convenience Fee notice on the notice panel, which are color logos of well known credit cards and automatic teller networks.  Defendant's Appendix J

48. The photograph included in the Appendix of Exhibits as Exhibit J is a true and accurate depiction of the Convenience Fee notice, together with the other notices and advertisements that are adjacent to it, at the walk-up ATM at Sovereign's Plainville Branch. See Comeau Aff. ¶22, Appendix Ex. V

**RESPONSE:** Admit.

49. The walk-up ATM at Sovereign's Plainville Branch is located on the opposite wall from the notice panel in the small vestibule. See Comeau Aff. ¶23, Appendix Ex. V

**RESPONSE:** Admit that the notice panel is located on the opposite wall from the ATM, but object to the characterization of the vestibule as "small."

-12-

### III.   FACTS RELATING TO PLAINTIFFS' TRANSACTIONS

50. On April 4, 2005, plaintiff, Maureen E. Deloreto, completed an electronic funds transfer at the Sovereign drive-up ATM in Seekonk. See Complaint ¶ 8 and Ex. A, Appendix Ex. Q; see also Simmons Aff. ¶¶5 and 10, Appendix Ex. T.

**RESPONSE:** Admit.

51. On April 6, 2005, plaintiff, Diane E. Horton, conducted an electronic funds transfer at the Sovereign drive-up ATM in Plainville. See Complaint ¶ 9 and Ex. B, Appendix Ex. Q; see also Simmons Aff. ¶¶6 and 11, Appendix Ex. T.

**RESPONSE:** Admit.

52. Neither plaintiff was a Sovereign customers at the time of the transactions referenced in the Complaint. See Complaint, ¶¶ 4 and 5, Appendix Ex. Q.

**RESPONSE:** Admit.

53. Sovereign charged each plaintiff a Convenience Fee of $1.50 in connection with their cash withdrawal transaction. See Complaint, ¶¶ 4, 5 and 11.

**RESPONSE:** Admit.

54. Both receipts attached as exhibits to the Third Amended Complaint bear the number of the individual ATM used in the transaction recorded by the receipt. See Simmons Aff. ¶9, Appendix Ex. T.

**RESPONSE:** Admit.

55. The receipt marked Exhibit A bears the ATM identifier "F253," which indicates that plaintiff Deloreto used the drive-up ATM at Sovereign's Seekonk branch to complete the transaction referenced in the receipt. See Simmons Aff. ¶10, Appendix Ext. T.

-13-

**RESPONSE:** Admit.

56. Plaintiff Deloreto used the drive-up ATM at the Sovereign Bank branch in Seekonk Massachusetts to complete the transaction referenced in Exhibit A. See Simmons Aff. ¶10, Appendix Ext. T.

**RESPONSE:** Admit.

57. The receipt marked Exhibit B bears the ATM identifier "F239," which indicates that plaintiff Horton used the drive-up ATM at Sovereign's Plainville branch to complete the transaction referenced in the receipt. See Simmons Aff. ¶11, Appendix Ext. T.

**RESPONSE:** Admit.

58. Plaintiff Horton used the drive-up ATM at the Sovereign Bank branch in Plainville, Massachusetts to compete the transaction referenced in Exhibit B. See Simmons Aff. ¶11, Appendix Ext. T.

**RESPONSE:** Admit.

59. Plaintiffs do not allege that they did not observe the Placard Notices prior to initiating their ATM transactions. See generally, Complaint, Appendix Ex. Q.

**RESPONSE:** Deny. Horton Aff. ¶5 (Appendix 2); Deloreto Aff. ¶¶4-5 (Appendix 3)

60. Plaintiffs do not allege that they experienced any difficulty locating the notices. Id.

**RESPONSE:** Deny.  Horton Aff. ¶5; Deloreto Aff. ¶¶4-5

61. Plaintiffs do not allege that they were unable to read the Placard Notices. Id.

**RESPONSE:** Deny.  Deloreto Dep., pp. 40-44 (Appendix 4); Deloreto Aff.,  ¶¶5,6 (Appendix 3); Horton Aff., ¶¶5-6 (Appendix 2); Deposition of Rhiannon Hernandez ("Hernandez Dep."), 32-33, 36 (Appendix 5);  Report of Marc Green, pp. 3-5 (Appendix 6)

62. Plaintiffs do not claim to have been surprised upon receipt of the Screen Notice informing them that Sovereign would charge a fee of $1.50 if they chose to proceed with their transaction. Id.

**RESPONSE:** Deny. Deloreto Dep. p. 37 (Appendix 4).

63. Plaintiffs do not allege that the language employed in the Placard Notice was not "readily understandable." Id.

**RESPONSE:** Admit.

64. Plaintiffs do not allege that they had any difficulty understanding the language on the Placard Notice. Id.

**RESPONSE:** Admit.

65. Plaintiffs do not allege that they suffered any specific harm, loss or damage as a result of Sovereign's alleged acts and omissions. Id.

**RESPONSE:** Deny.  Plaintiffs have alleged that they incurred an ATM charge that they did not receive proper notice of as required by the EFTA. Third Amd. Cmpt. ¶¶11, 17

66. After receiving the on screen notice, both plaintiffs chose to proceed with their respective transactions. See Complaint, ¶¶8 and 9. Appendix Ex. Q; see also Simmons Aff. ¶¶15 and 15.

**RESPONSE:** Admit.

**IV.     FACTS RELATING TO THE CIRCUMSTANCES IN WHICH SOVEREIGN DOES NOT CHARGE A CONVENIENCE FEE TO NON-SOVEREIGN  CUSTOMERS WHO USE SOVEREIGN ATMS FOR CASH WITHDRAWAL TRANSACTIONS.**

67. Sovereign does not charge a fee "where the cardholder is accessing … governmental

benefits through a card that is typically referred to as an EBT card." See Begley Trans., at 12-13, Appendix Ex. S.

**RESPONSE:** Admit.

68. For a three to ten day period of time immediately before the legal date of an acquisition of another bank, Sovereign does not charge a Convenience Fee to customers of the target bank. See Begley Trans., at 16-19, Appendix Ex. S.

**RESPONSE**: Admit, but deny that these persons are non-customers of Sovereign.

69. Sovereign also customarily waives Convenience Fees for customers of acquired banks in connection with cash transactions that take place after the legal acquisition of the customer's bank but before the acquired bank is actually merged into and becomes a part of Sovereign. See Begley Trans., at 20-22, Appendix Ex. S.

**RESPONSE:** Admit, but deny that these persons are non-customers of Sovereign.

70. In connection with the Fleet/Bank Boston divestiture, Sovereign waived Convenience Fees for all Fleet and Bank Boston customers for a period of time. See Begley Trans., at 28-30, Appendix Ex. S.

**RESPONSE:** Admit.

71. In connection with a Red Cross and FEMA initiative, Sovereign participated in a plan to waive Convenience Fees for cards issued to people dislocated by Hurricane Katrina. See Begley Trans., at 30-31, Appendix Ex. S.

**RESPONSE:** Admit, but note that this situation occurred after the plaintiffs' transactions and the class period alleged in the complaint.

72. On occasion Sovereign enters into special arrangements with certain entities that

-16-

involve the waiver of Convenience Fees. See Begley Trans., at 42-43, Appendix Ex. S.

**RESPONSE:** Admit.

73. In a currently outstanding agreement with a landlord, Sovereign waived all
Convenience Fees for transactions conducted at a specific ATM located on the leased premises.
Id.

**RESPONSE:** Admit.

## PLAINTIFFS' ADDITIONAL FACTS IN OPPOSITION TO SUMMARY JUDGMENT

1.     The photos attached as Exhibits 1 - 6 to the Affidavit of Neville Bradford are true and
accurate depictions of plaintiffs using the Seekonk (Exhibits 4 - 6) and Plainville (Exhibits 1 - 3)
ATMs.  Appendix 1, Affidavit of Neville Bradford, and Exhibits 1-6 to same.

2.     Ms. Deloreto could not see or read the fee notice at the Seekonk drive-up ATM when
parked in a position where she could use the ATM. Deposition of Maureen Deloreto, pp. 40-41
(Appendix 4); Affidavit of Maureen Deloreto, ¶¶5, 6) (Appendix 3)

3.     Rhiannon Hernandez, the Seekonk Sovereign branch manager, admitted that a customer
parked in a position where they could use the Seekonk drive-up ATM cannot see the fee notice
from that position. (Deposition of Rhiannon Hernandez, p. 32-33, 26) (Appendix 5)

4.     Ms. Horton could not see or read the fee notice at the Plainville drive-up ATM when
parked in a position where she could use the Plainville drive-up ATM. Affidavit of Diane
Horton, ¶¶5-6 (Appendix 2), Deposition of Diane Horton, pp. 34, 47-49 (Appendix 11)

5.     The Seekonk ATM juts out from the wall a few inches, making it harder for a driver
attempting to see the placard containing the fee notice. Deloreto Dep. p. 43 (Appendix 4),
Exhibits 4-6 of the Affidavit of Neville Bradford (Appendix 1).

6.    The fee notice is not visible to a person standing in a position to use the Seekonk walk-up ATM.

7.    Ms. Deloreto did not see the fee notices until they were pointed out to her. Deloreto Aff. ¶4)

8.    Ms. Horton could not see the fee notice at the walk-up ATM when in a position to use the machine. (Horton Aff. ¶9)

9.    In 2005, Sovereign charged an average of 92.6% of non-customers  a convenience fee to withdraw cash from its ATMs. Appendix 8.

10.    In 2004, Sovereign charged an average of 93% of non-customers a convenience fee to withdraw cash from its ATMs. Appendix 8

11.    In 2003, Sovereign charged an average of 93.8% of non-customers a convenience fee to withdraw cash from its ATMs.  Appendix 8

12.    In 2002, Sovereign charged an average of 94.6% of non-customers a convenience fee to withdraw cash from its ATMs.  Appendix 8

13.    In 2001, Sovereign charged an average of 94.4% of non-customers a convenience fee to withdraw cash from its ATMs.  Appendix 8

14.    Appendix 8 is a chart prepared by Sovereign which lists the percentage of cash withdrawal transactions from ATMs on which Sovereign imposed a convenience fee from January 2001 through March 2006.  Appendix 8

15.    The percentage figures in Appendix 8 in which convenience fees were not charged include all transactions by holders of cards issued by foreign banks (non-U.S.).  Appendix 8

16.    Rhiannon Hernandez is the branch manager of the Sovereign Seekonk branch, and has

used the ATMs at that location over 50 times.  Hernandez Dep. pp. 15, 25, 42, Appendix 5

17.     Stephanie Comeau is the branch manager of the Sovereign Plainville branch and has used

the walk-up  ATMs at that location over 50 times, and the drive-up ATM numerous times.

Comeau Dep. pp. 50, 54-55, 59-60  (Appendix 5)

18.     Neither Stephanie Comeau nor Rhiannon Hernandez were interviewed prior to the

drafting of their affidavits by a third party, and neither Comeau nor Hernandez requested that

any changes be made to the affidavits prior to signing them.  Hernandez Dep. pp. 13-14, Comeau

Dep. p. 54 (Appendix 5)

19.     The Community Banker's Association stated in September, 2005 that "Currently, the

regulation [EFTA] provides that an ATM operator that charges a fee for initiating an electronic

fund transfer or balance inquiry must post notices at ATMs that a fee will be imposed. Appendix

9

20.     On October 7, 2005, America's Community Bankers submitted comments on the

proposed EFTA amendments to the Federal Reserve Board in which it stated, "The Federal

Reserve's Regulation E implements the EFTA.  Regulation E currently requires an ATM

operator that charges any consumer a fee for initiating an EFT or a balance inquiry to post a

notice stating that a fee will be imposed."  Appendix 10

21.     If called to testify, Marc Green, Ph.D will testify in accordance with the declaration

attached as Appendix 6.

22.     Dr. Marc Green is qualified as an expert on visual perception and conspicuity. Appendix

7

Respectfully submitted,


s/Cathleen M.Combs
Cathleen M. Combs (pro hac vice)
Tara L. Goodwin
EDELMAN COMBS, LATTURNER, LLC
120 South LaSalle Street, 18th Floor
Chicago, Illinois 6603
(312) 739-4200
(312) 419-0379 (FAX)


Christopher M. Lefebvre
LAW OFFICES OF CLAUDE
      LEFEBVRE & SONS
P.O. Box 479
Pawtucket, RI 02862
(401) 728-6060
(401) 728-6534 (FAX)
      B.B.O. # 629056


## CERTIFICATE OF SERVICE

I, Cathleen M. Combs, hereby certify that on May 15, 2006, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


s/Cathleen M. Combs
Cathleen M. Combs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| MAUREEN E. DELORETO and | ) | |
| DIANE E. HORTON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 05 CV 10712 RCL |
| v. | ) | |
| | ) | |
| SOVEREIGN BANK, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDICES TO PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF**
**UNDISPUTED MATERIAL FACTS SUBMITTED IN SUPPORT OF ITS MOTION FOR**
**SUMMARY JUDGMENT**

Appendix 1          Affidavit of Neville Bedford

       Exhibit 1          Plainville Drive-Up Photo
       Exhibit 2          Plainville Drive-Up Photo
       Exhibit 3          Plainville Drive-Up Photo
       Exhibit 4          Seekond Drive-Up Photo
       Exhibit 5          Seekond Drive-Up Photo
       Exhibit 6          Seekond Drive-Up Photo

Appendix 2          Affidavit of Diane E. Horton

Appendix 3          Affidavit of Maureen Deloreto

Appendix 4          Transcript of Deposition of Maureen Deloreto

Appendix 5          Transcript of Depositions of Rhiannon E. Hernandez and Stephanie K.
Comeau

Appendix 6          Declaration and Report of expert Marc A. Green

Appendix 7          Curriculum Vitae of expert Marc A. Green

Appendix 8          Table of Percentage of Cash Withdrawal Transactions on Which
Sovereign Imposes a Convenience Fee

Appendix 9            Community Banker's Association September 2005 Statement on EFTA
                      Proposed Amendments

Appendix 10           America's Community Bankers October 7, 2005 Comments on Proposed
                      EFTA Amendments

Appendix 11           Transcript of Deposition of Diane E. Horton

# Appendix 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MAUREEN E. DELORETO and | ) |
| DIANE E. HORTON, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) C.A. No. 05 CV 10712 RCL |
| v. | ) |
| | ) |
| SOVEREIGN BANK, | ) |
| | ) |
| Defendant. | ) |

**<u>AFFIDAVIT OF NEVILLE BEDFORD</u>**

1.　　I am over eighteen (18) years of age, am competent to testify, and have personal knowledge of the facts set forth in this Affidavit.

2.　　I am a part time amateur photographer.

3.　　 On Saturday, February 25, 2006 I appeared at both the Plainville and Seekonk branches of Sovereign Bank located at 62 Messenger Street, Plainville, MA and 21 Central Avenue, Seekonk, MA.

4.　　The attached pictures were taken by me on February 25, 2006 as I personally observed both Ms. Deloreto and Mrs. Horton attempt to withdraw monies from the drive thru ATM's of the two locations referenced above.

5.　　The attached pictures are accurate, fair, true and good depictions of both plaintiffs attempting to withdraw money from the Sovereign ATM's referenced above.

**SWORN AND SUBSCRIBED TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS 6TH  DAY OF MARCH, 2006.**

s/Neville Bedford_____
3/6/2006

1



Exhibit 1
Plainville Drive-Up



Exhibit 2
Plainville Drive-Up



Exhibit 3

Plainville Drive-Up



Exhibit 4
Seekonk Drive-Up



Exhibit 5

Seekonk Drive-Up



Exhibit 6

Seekonk Drive-Up

# Appendix 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MAUREEN E. DELORETO and | ) |
| DIANE E. HORTON, | ) |
| | ) |
| Plaintiffs, | ) |
| | )    C.A. No. 05 CV 10712 RCL |
| v. | ) |
| | ) |
| SOVEREIGN BANK, | ) |
| | ) |
| Defendant. | ) |

**<u>AFFIDAVIT OF DIANE E. HORTON</u>**

1.      I am over eighteen (18) years of age, am competent to testify, and have personal knowledge of the facts set forth in this Affidavit.  I have no vision problems.

2.      I am one of the named plaintiff's who filed a class action lawsuit against Sovereign Bank alleging that their ATM notices violate Federal Law.

3.       I have read the four page affidavit of Stephanie K. Comeau dated January 28, 2006.  I totally disagree with her conclusions referenced in paragraphs 15, and 25 of her affidavit.

4.      On Wednesday, February 22, 2006 at approximately 11:00 a.m. I returned to the Plainville Sovereign Bank branch located at 62 Messenger Street and attempted to make a cash withdrawal from the drive thru ATM.

5.      I drive a 2005 Kia Sedona 7 passenger van. This is the same vehicle I drove when I made the withdrawal referenced in the class action complaint.  After bringing my vehicle to a complete stop, I rolled  down the window on the driver's side and attempted to insert my card

into the ATM receptacle.  There was absolutely no visible notice in the immediate vicinity

warning me that Sovereign was going to charge a convenience fee for use of its ATM machine.

6.      While inserting my card into the ATM , it is virtually impossible to read the

convenience fee notice referenced in paragraph 10 of Ms.Comeau's Affidavit. In order to read

this notice from this vantage point, I would have to place my vehicle in reverse mode and move

backwards approximately two and a half feet and look downwards.  Or in the alternative, I could

simply stay put, turn my head and body 100 degrees to the left, stick my head out my car

window and lean forward focusing towards the rear of my vehicle.  At this awkward and

cumbersome position, I could still not read each word of the Convenience Fee notice.

7.      On Saturday afternoon, February 25, 2006, I once again attempted to use the drive

thru ATM referenced above.  As I approached the ATM, I did notice the various ATM network

card advertisements referenced in paragraph 8 of Ms. Comeau's Affidavit.  I also noticed that

there was a small white block with black lettering in the bottom right hand corner of the sign.

This block was much less noticeable than the many other advertisements contained on the

placard. However in my opinion it is impossible to read the tiny print contained thereon as you

are driving past the sign approaching the ATM machine.

8.      In my opinion, the convenience fee notice is placed in a location that is difficult

for any consumer to see whom might chose to use the drive thru ATM at the Plainville branch

referenced above.

9.      On Saturday, February 25, 2006, I entered the vestibule room referenced in

paragraph 16 of Ms. Comeau's Affidavit.  I inserted my card into the ATM and attempted to

make a cash withdrawal.  While I attempted to use the ATM, it was impossible for me to see the

sign that was facing my back.  I vehemently disagree with Ms. Comeau's statement in her

Affidavit that the location of this convenience fee notice located on the opposite wall is

"reasonably calculated to impart its information to non-Sovereign customers who might use the

walk-up ATM at Sovereign's Plainville Branch."

**SWORN AND SUBSCRIBED TO UNDER THE PAINS AND PENALTIES OF PERJURY**

**THIS 25TH  DAY OF FEBRUARY, 2006.**

s/Diane Horton_____
2/25/06

# Appendix 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MAUREEN E. DELORETO and          )
DIANE E. HORTON,                 )
                                 )
                Plaintiffs,      )
                                 )    C.A. No. 05 CV 10712 RCL
        v.                       )
                                 )
SOVEREIGN BANK,                  )
                                 )
                Defendant.       )

## AFFIDAVIT OF MAUREEN DELORETO

1.      I am over eighteen (18) years of age, am competent to testify, and have personal

knowledge of the facts set forth in this Affidavit.

2.      I am one of the named plaintiff's who filed a class action lawsuit against

Sovereign Bank alleging that their ATM notices violate Federal Law.

3.      I have read the four page affidavit of Rhiannon E. Hernandez dated January 27,

2006.  I totally disagree with his conclusions referenced in paragraphs 15, and 23 of his

affidavit.

4.      I returned to the Seekonk Sovereign Bank branch located at 21 Central Avenue

 Seekonk MA at approximately 3:30 pm on Saturday February 25, 2006 and attempted to make a

cash withdrawal from both the drive thru ATM and the one located in the vestibule room

referenced in paragraph 16 of Mr. Hernandez's affidavit. I did not even notice the sign/panel

until it was pointed out to me.

5.      I drive a 2000 Oldsmobile Intrigue. This is the same vehicle I drove when I made

the withdrawal referenced in the class action complaint. It was impossible to read the sign about the convenience fee as I drove pass it approaching the actual ATM machine. After bringing my vehicle to a complete stop, I rolled down the window on the driver's side and attempted to insert my card into the ATM receptacle. There was absolutely no visible notice in the immediate vicinity warning me that Sovereign was going to charge a convenience fee for use of its ATM machine.

6.      While inserting my card into the ATM , it is virtually impossible to read the convenience fee notice referenced in paragraph 10 of Mr. Hernandez's Affidavit. In order to read this notice from this vantage point, I would have to place my vehicle in reverse mode and move backwards approximately four feet and look downwards. Or in the alternative, I could simply stay put, turn my head and body 100 degrees to the left, try to stick my head out my car window and lean forward focusing towards the rear of my vehicle. At this awkward and cumbersome position, I could still not read each word of the Convenience Fee notice. I would have to be a contortionist to read the notice.

7.      In my opinion, the drive up convenience fee notice is placed in a location that is difficult for any consumer to see whom might chose to use the drive thru ATM at the Seekonk branch referenced above.

8.      While I attempted to use the ATM in the vestibule, I did see the notice panel referenced in paragraph 16 of Mr. Hanandez's affidavit as I walked toward the ATM. However once I approached the machine and was standing right in front of the machine about to insert my card to obtain a cash withdrawal, the panel referenced above virtually disappears from your

eyesight. I disagree with Mr. Hernandez's statement in his Affidavit that the location of this

convenience fee notice is "reasonably calculated to impart its information to non-Sovereign

customers who might use the walk-up ATM at Sovereign's Seekonk Branch."


**SWORN AND SUBSCRIBED TO UNDER THE PAINS AND PENALTIES OF PERJURY**

**THIS 2ND  DAY OF MARCH, 2006.**


                                                    s/Maureen DeLoreto

Appendix 4

May 5, 2006                          Maureen E. Deloreto

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


MAUREEN E. DELORETO
and DIANE E. HORTON

    VS.                    C.A. NO.:05-CV-10712RCL

SOVEREIGN BANK


      DEPOSITION OF MAUREEN E. DELORETO,

plaintiff in the above-entitled cause, taken on

behalf of the Defendant, pursuant to notice,

before Sally Brassard, CSR, a Notary Public in and

for the State of Rhode Island and Providence

Plantations, at the office of Edwards Angell

Palmer & Dodge LLP, 2800 Financial Plaza,

Providence, Rhode Island, on May 5, 2006, at 12:30

p.m.


      ALLIED COURT REPORTERS
      115 PHENIX AVENUE
      CRANSTON, RI  02920
      (401) 946-5500

May 5, 2006                                    Maureen E. Deloreto

## Page 2

1  APPEARANCES:
2
   FOR THE PLAINTIFFS: CLAUDE LEFEBVRE, P C
3        BY: CHRISTOPHER M. LEFEBVRE, ESQ.
4
   FOR THE DEFENDANT:  EDWARDS ANGELL PALMER & DODGE
5        LLP
         BY:  DONALD E FRECHETTE, ESQUIRE
6
7  ALSO PRESENT:     EDELMAN, COMBS, LATTURNER
                     & GOODWIN, LLC
8        BY: TARA GOODWIN, ESQUIRE
              (By Telephone)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1              I-N-D-E-X
2
3
   MAUREEN E DELORETO          PAGE
4
   Examination by Mr. Frechette . . . . .    4
5
6
7
8
9         E-X-H-I-B-I-T-S
10
   DEFENDANT'S    DESCRIPTION      PAGE
11 NO
12 A     Complaint - Class Action       9
13 B     Second Amended Complaint -
         Class Action      10
14
   C     Third Amended Complaint -
15       Class Action      11
16 D     Laser - Photo       22
17 E     Laser - Photo       22
18 F     Laser - Photo       22
19 G     Appendix of Exhibits     24
20 H     Affidavit of Maureen DeLoreto   26
21
22
23
24
25

## Page 4

1        (DEPOSITION COMMENCED AT 12:56 P.M.)
2        MAUREEN E. DELORETO,
3  having first been duly sworn by the Notary Public,
4  testified as follows:
5        THE COURT REPORTER:  Please state your
6  full name and spell it for the record.
7        THE WITNESS:  Maureen Elizabeth DeLoreto
8  (D-e-L-o-r-e-t-o).
9        EXAMINATION BY MR. FRECHETTE:
10 Q.  Ms. DeLoreto, how are you presently employed?
11 A.  I work for Meals on Wheels and I'm on total
12     disability.
13 Q.  Total disability from a prior --
14 A.  Yes.
15 Q.  -- employment?
16 A.  Yes, I'm on SSDI.
17 Q.  Okay. Let me try to give you a couple of ground
18     rules because I think we already actually saw one
19     of them right there which is -- I'm going to try
20     to, when you provide a response, not walk over
21     your response, not interrupt you because the court
22     reporter here is taking everything down and we
23     need to have a nice clean transcript, if you could
24     do your best to let me finish a question. If for
25     some reason I cut you off on something that you

## Page 5

1      wanted to say, just say I wasn't finished and I
2      will be happy to let you finish your statement;
3      okay?
4  A.  Okay.
5  Q.  Have you ever been deposed before by the way?
6  A.  Yes.
7  Q.  In connection with what?
8  A.  It was in connection with an auto accident.
9  Q.  Okay. So you've been involved in litigation
10     previously?
11 A.  Previously.
12 Q.  How many lawsuits have you been involved in
13     previously?
14 A.  One.
15 Q.  And the lawsuit that you were involved in, were
16     you a plaintiff or a defendant?
17 A.  I was the plaintiff.
18 Q.  Now, was that auto accident also the result of the
19     disability that you mentioned earlier?
20 A.  It possibly could be.
21 Q.  All right. How old are you, ma'am?
22 A.  59.
23 Q.  When you -- you graduated high school; correct?
24 A.  Yes.
25 Q.  After you got out of high school, did you attend

May 5, 2006                                    Maureen E. Deloreto

**Page 6**

1    any college or university?
2    A. I attended Rhode Island College. I have a
3    year there and also I have six months at CCRI.
4    Q. And what did you study while at Rhode Island
5    College?
6    A. At Rhode Island College was business.
7    Q. And at CCRI?
8    A. At CCRI I was going to take a law class but I
9    never got to start it.
10   Q. All right. Why not? Because of the disability?
11   A. Actually I became very sick and I wound up
12   having to drop out after the first week.
13   Q. All right. Now, could you describe for me
14   subsequent to your graduation from high school
15   your work history. I'll try to save some time
16   here, ma'am, by saying that, you know, it was
17   obviously a while ago. So, if you could give me a
18   brief overview, and if there is something I need
19   to ask you further about it, then we'll go back to
20   that.
21   A. Okay. I worked in the auto industry from 1971
22   through 1989. Then I worked from 1991 to the year
23   2002, I worked for MetLife.
24       MR. LEFEBVRE: Tara, can you hear okay?
25       MS. GOODWIN: Yeah, I can hear fine.

**Page 7**

1    Q. What year did you graduate high school?
2    A. 1965.
3    Q. What did you do from 1965 to 1971?
4    A. I was in the military.
5    Q. What branch?
6    A. United States Air Force.
7    Q. And what did you do in the --
8    A. I actually got out of the military in '69.
9    Q. Okay. What did you do in the Air Force from '65
10   to '69?
11   A. I was a medical technician.
12   Q. And from '69 to '71, what did you do?
13   A. I worked for Eagle Finance Corporation. I was
14   a collector.
15   Q. All right. Now, when you say a collector, what
16   did that entail?
17   A. I collected the bad debts that they had.
18   Q. All right. '71 to '89 you were in the auto
19   industry you said?
20   A. That's correct.
21   Q. Who were you employed by?
22   A. I was employed by Scungia Chevrolet, John Ford
23   and Menard Ford.
24   Q. And what did you do for them?
25   A. I was a salesperson, then I moved into sales

**Page 8**

1    management and then finally just management.
2    Q. And what did you do for MetLife from '91 to 2002?
3    A. I was an agent. I was an executive account
4    assistant.
5    Q. What product lines did you sell for MetLife?
6    A. I sold life insurance, auto insurance, mutual
7    funds, annuities.
8    Q. Did you have to take any particular training or
9    classes in order to be able to do that?
10   A. Yes.
11   Q. What did you take?
12   A. I had to take a -- I had to have a Rhode
13   Island license for life insurance and I also had
14   to have a Series 6 license and a 63 license.
15   Q. And those are through the SEC?
16   A. Yes.
17   Q. Now, do you have any professional designations?
18   By that I mean, are you a certified life
19   underwriter?
20   A. No, I wasn't a certified life underwriter.
21   Q. Do you have any designations?
22   A. No, no designations.
23   Q. All right. How many times have you been deposed
24   previously?
25   A. Once.

**Page 9**

1    Q. And that was just in connection with the auto case
2    that you told me about; right?
3    A. That's correct.
4    Q. Have you ever testified in court?
5    A. Once I testified in court on a -- on the value
6    of an automobile that was -- on the value of a
7    truck that was stolen. I was called in as an
8    expert witness as to what the value of it was.
9    Q. How do you know Attorney Lefebvre?
10   A. We are members of the same church and he has
11   done some legal work for me.
12   Q. Now, are you familiar with the allegations in the
13   complaint in this particular case?
14   A. Yes.
15   Q. Did you read the complaint before it was filed?
16   A. Yes, I did.
17   Q. Did you agree with the statements that were
18   contained in the complaint before it was filed?
19   A. Yes, I did.
20       MR. FRECHETTE: Why don't we go ahead and
21   mark this as Exhibit A if we could.
22       (Defendant's Exhibit A marked for ID.)
23   Q. Is that a copy of the complaint filed by your
24   attorney in federal court, ma'am?
25   A. Yes, it is.

3 (Pages 6 to 9)

May 5, 2006                                    Maureen E. Deloreto

---

Page 10

1   Q.  And, as I understand it, you read this document
2       before it was filed and you agreed with what it
3       said about the factual aspects of this case;
4       correct?
5       A.  That's correct.
6   Q.  Now, were you aware that there had been an amended
7       complaint filed in this case?
8       A.  Yes.
9           MR. FRECHETTE:  Why don't we get this
10      marked as B, please.
11          (Defendant's Exhibit B marked for ID.)
12          MR. FRECHETTE:  By the way, ma'am, I note
13      that it says Second Amended Complaint.  There may
14      be a First Amended Complaint as well.  I'm not
15      trying to trick you.
16          THE WITNESS:  I'm not sure I read both of
17      them but I'm pretty sure that I did.
18  Q.  Let me ask you this, do you recall reading what
19      we've marked as Exhibit B before it was filed?
20      A.  Yes.
21  Q.  Did you agree with the statements that are
22      contained in Exhibit B?
23      A.  Yes, I did to my statements, yes.
24  Q.  Do you agree with the factual statements made in
25      Exhibit B?

---

Page 11

1       A.  Yes, I did.
2   Q.  You're not a lawyer?
3       A.  No, I'm not a lawyer.
4   Q.  Let me --
5           MR. FRECHETTE:  We'll mark that as Exhibit
6       C, please.
7           (Defendant's Exhibit C marked for ID.)
8   Q.  Now, Exhibit C is a Third Amended Complaint.  Were
9       you aware that there had been a Third Amended
10      Complaint filed in this case?
11      A.  I'm not sure.
12  Q.  Why don't you take a look at Exhibit C and let me
13      know whether or not you saw that before it got
14      filed.
15      A.  It looks like it.  Yes, I read it.  I believe
16      I read that.
17  Q.  All right.  And did you agree with the factual
18      statements made in Exhibit C before it was filed?
19      A.  Yes, I did.
20  Q.  Now, when did you get your first ATM card?
21      A.  2000.
22  Q.  And through what bank?
23      A.  Fleet.
24  Q.  Are you presently a Fleet customer?
25      A.  No, I am not.

---

Page 12

1   Q.  All right.  Since the time that you got your first
2       ATM card in 2000, how many different banks have
3       you held ATM cards with?
4       A.  Just one bank, one credit union.
5   Q.  And Fleet is the bank; right?
6       A.  Fleet is the bank.
7   Q.  Who's the credit union?
8       A.  The Credit Union is Central Falls.
9   Q.  And is that who you have an ATM card with now?
10      A.  Yes.
11  Q.  Is that the ATM card that you used to access
12      Sovereign ATMs in connection with the materials
13      that have been pled in the complaints in this
14      case?
15      A.  Yes, I did.
16  Q.  That being the credit union card?
17      A.  Credit union.
18  Q.  All right.  Now, how many times a year do you
19      believe that you use your ATM card?
20      A.  Not very often.  I don't use it very much as
21      far as bank withdrawals.  I try to carry cash with
22      me.
23  Q.  And why do you try to carry cash?
24      A.  Because I have to watch my expenditures.  So
25      it's pretty basically -- the card was given to me

---

Page 13

1       because, you know, they have a card with your bank
2       account.  So I use it for emergency, you know.
3   Q.  Well, when you say you have to watch your
4       expenditures, are you suggesting that you don't
5       use the card because you don't like to pay the ATM
6       surcharges?
7       A.  No, I watch what I spend, period.  I watch how
8       much money I can spend.  I don't have a lot of
9       money, so.
10  Q.  Within the last year, the last twelve months
11      looking backwards from today, how many times would
12      you say you've used your ATM card?
13      A.  Maybe three.
14  Q.  When you say maybe three, do you have a specific
15      recollection of the three times in the last twelve
16      months that you've used your ATM card?
17      A.  I have -- the one at Sovereign, I have a
18      specific recollection and I do remember using my
19      one for Central Falls Credit Union on a Sunday a
20      couple of times at Central Falls Credit Union.
21  Q.  At Central Falls Credit Union?
22      A.  Right.
23  Q.  Now, in fact -- withdrawn.  In the last twelve
24      months, how many times have you used your ATM card
25      at a bank other than the Central Falls Credit

---

4  (Pages 10 to 13)

d4f2ed2c-8252-4e3f-8cc9-10e9cff9e4e0

May 5, 2006                                        Maureen E. Deloreto

Page 14

1      Union?
2      A. Once at Sovereign.
3   Q. That's it, just one time?
4      A. One time.
5   Q. How about in the twelve months preceding?
6      A. I'm not sure if I did use it at any particular
7      bank.
8   Q. When did you get your Central Falls ATM card?
9      A. 2001. Yeah, I would think it's 2001.
10  Q. And when you got your Central Falls ATM card, did
11     you get rid of your Fleet card or did you have
12     them both at the same time?
13     A. No, I got rid of my Fleet card.
14  Q. Okay. With respect to the Fleet card, did you
15     ever use that at an ATM other than a Fleet ATM?
16     A. No.
17  Q. With respect to the Central Falls ATM card, other
18     than the allegations of this complaint and your
19     use of the ATM card at Sovereign Bank, have you
20     ever used the Central Falls ATM card at any other
21     bank other than your own?
22     A. I might have once.
23  Q. When you say you might have once, do you have a
24     specific recollection of having done so or are you
25     speculating?

Page 15

1      A. I have a recollection of it and the reason
2      being is that my golf course was putting in a new
3      computer system and they were only taking cash and
4      that's when I used it; because I needed to have
5      cash to play the round because they couldn't take
6      credit cards that week.
7   Q. And what bank would you have gone to, ma'am?
8      A. I had gone to -- I believe it might have been
9      -- I don't remember the name of the bank but I
10     believe it was Bank of America, it could have
11     been.
12  Q. So, to summarize, you got your Fleet card in 2000
13     and you held it until you got your Central Falls
14     card in 2001; right?
15     A. Right.
16  Q. And during the whole time that you had your Fleet
17     card, you never used it at a bank other than
18     Fleet; correct?
19     A. That's correct.
20  Q. You've had your Central Falls card since 2001;
21     correct?
22     A. Right.
23  Q. And with the exception of the times that you used
24     it at Sovereign and which are referred to in this
25     case, the only other time that you used it at a

Page 16

1      bank other than Central Falls Credit Union is the
2      one time that you've described to me in connection
3      with your need to get cash to go to the golf
4      course; correct?
5      A. That is correct.
6   Q. All right. Is there any particular reason that
7      you don't -- withdrawn. Is there any particular
8      reason that you refrain from using your ATM card
9      at banks other than Central Falls Credit Union?
10     A. I don't carry a lot of cash. I don't spend a
11     lot of money during the day. I don't -- I take a
12     certain allowance per week to run what I need to
13     run and that's pretty basically how it works out.
14     I have enough money every week pretty basically.
15  Q. Were you aware prior to using -- withdrawn. When
16     you used your card at the Bank of America in order
17     to get money to golf on that one occasion -- first
18     of all, when was that? Start with a year if you
19     can.
20     A. It could have been 2005. It could have been
21     early in 2005, early spring.
22  Q. Was it before or after your use of the Sovereign
23     ATMs that are referenced --
24     A. It was --
25  Q. You've got to let me finish, ma'am. Was it before

Page 17

1      or after your use of the Sovereign ATMs that are
2      referenced in this case?
3      A. It was before.
4   Q. Were you charged an ATM convenience fee?
5      A. I'm not sure.
6   Q. Were you aware at the time that you used the Bank
7      of America ATM that the possibility existed that
8      if you used an ATM other than the Central Falls
9      Credit Union ATM that you might be charged a
10     convenience fee?
11     A. No, I realistically wasn't.
12  Q. Is the -- withdrawn. Do you recall whether the
13     ATM machine at Bank of America had any notices on
14     it with respect to convenience fees?
15     A. I'm not sure. I really just needed to have
16     the cash that day and that was only the simple
17     reason I called the golf course before I went
18     there, is your computer fixed? They said no. So,
19     I needed to bring cash.
20         MR. LEFEBVRE: Just stay focused on
21     answering his question. His question was not what
22     you answered. Just listen to his question.
23         THE WITNESS: Okay.
24  Q. Now, other than -- well, so you called from your
25     home before you went golfing that day?

May 5, 2006                                    Maureen E. Deloreto

Page 18

1    A. No, I called from my car. I had my cellphone.
2  Q. Any particular reason why you stopped at the Bank
3    of America as opposed to -- you've got to let me
4    finish, ma'am.
5    A. Okay.
6  Q. I'm not trying to chastise you.
7    A. Okay, I'm sorry.
8  Q. Any particular reason why having called and heard
9    that you were going to have to get cash, you
10   didn't go to the Central Falls Credit Union?
11   A. The one -- that one bank happened to be right
12   on the way to the golf course.
13 Q. Do you know whether when you got the money from
14   the Bank of America ATM you were prompted by an
15   on-screen notice that you were going to be charged
16   a convenience fee?
17   A. Yes.
18 Q. And when you say yes, you know, are you telling me
19   that you recall that there was such a notice on
20   the screen?
21   A. I'm pretty sure there was a notice on the
22   screen. My total recollection of that would not
23   be -- you know, I couldn't swear to it.
24 Q. Okay. Now, you came to use the Bank of America
25   ATM because you needed money to go golfing;

Page 19

1    correct?
2    A. That's correct.
3  Q. Why was it that you came to use the Sovereign
4    ATMs?
5    A. I don't remember exactly why I needed the
6    money that particular day but I did need some
7    cash.
8  Q. Did anybody tell you to go use a Sovereign ATM?
9    A. No.
10 Q. Did you use the Sovereign ATM with an eye to the
11   commencement of litigation?
12   A. No.
13 Q. So your use of the Sovereign ATM on -- let's see
14   -- on April 4, 2005 was just in the ordinary
15   course of your affairs?
16   A. That's correct.
17 Q. And you know why I said April 4, 2005, right,
18   ma'am?
19   A. That's correct. It's stated on the date of
20   the receipt.
21 Q. And it's the date in your complaint; right?
22   A. That's correct.
23 Q. Now, on the particular date in question -- and you
24   mentioned it's the date on the receipt -- that's
25   the date on Exhibit A attached to the various

Page 20

1    versions of the complaint; right?
2    A. Yes.
3  Q. Now, is that the -- did you use on April 4, 2005,
4    did you use the walk-up or the drive-thru ATM?
5    A. I used the drive-thru.
6  Q. Had you ever used the walk-up ATM at this
7    location?
8    A. No, I hadn't until it was pointed out in the
9    complaint I walked up to -- when we went back to
10   do the pictures, then they brought me inside to
11   use the -- to look at the one inside also.
12 Q. Who's they?
13   A. My attorney Chris Lefebvre and a photographer
14   that he had hired.
15 Q. So, on April 4, 2005 and before, the only
16   Sovereign ATM that you had ever used was the
17   drive-thru ATM; correct?
18   A. That's correct.
19 Q. And that's the one that generated the receipt
20   that's attached as Exhibit A to the various
21   versions of the complaint; correct?
22   A. That's correct.
23 Q. All right. And sitting here today, you don't have
24   any recollection as to why you needed the $40
25   that's referred to in Exhibit A; correct?

Page 21

1    A. That's correct.
2  Q. Did you have to wait in line at all when you used
3    the Sovereign drive-up ATM on April 4, 2005?
4    A. No, I did not. There was nobody at the
5    location.
6  Q. What made you decide to use the drive-thru as
7    opposed to the walk-up?
8    A. I knew where it was and I didn't -- you know,
9    I thought maybe the building was locked, you know.
10 Q. What time of day was it?
11   A. It was 6:45 in the evening.
12 Q. Now, you say that because you just looked at the
13   receipt; right?
14   A. Right.
15 Q. Do you have a recollection?
16   A. I knew it was evening but that's pretty
17   basically what it was.
18 Q. All right. Had you ever been in this Sovereign
19   branch before, the Sovereign branch that -- this
20   is the Seekonk branch; right?
21   A. That's correct.
22 Q. Had you ever been in the Seekonk branch before?
23   A. No, I had not.
24 Q. When you said a minute ago that you knew where it
25   was, how did you know where it was?

6 (Pages 18 to 21)

d4f2ed2c-8252-4e3f-8cc9-10e9cff9e4e0

May 5, 2006                                      Maureen E. Deloreto

Page 22

1    A. I knew there was a Benny's there and I
2    happened to be going by and knew that there was a
3    bank there. As convenience, that's where I
4    stopped and that was pretty basically -- I must
5    have been headed out that way to go do something
6    and that's why I used that machine.
7  Q.  Now, your attorney gave me some photographs this
8    morning; correct?
9    A. That's correct.
10       MR. FRECHETTE: Why don't we go ahead and
11   mark these as D, E and F.
12       (Defendant's Exhibits D, E and F marked
13   for ID.)
14       MR. LEFEBVRE: Tara, these are the
15   pictures that we took of Ms. DeLoreto in
16   accordance with her affidavit. Just so you know
17   which ones we're talking about.
18       MS. GOODWIN: Okay.
19 Q.  All right. Let me just show you D, E and F,
20   ma'am, and ask you if you can tell me when those
21   were taken?
22   A. Those were taken -- those were taken on a
23   Sunday, I believe. Exactly which day, I don't
24   remember. But it was --
25 Q.  In fairness to you, ma'am, why don't you take a

Page 23

1    look at your affidavit, paragraph 3, and that says
2    that they were taken at 3:30 on Saturday,
3    February --
4    A. Oh, yes, I'm sorry, it's a Saturday. I knew
5    it was a weekend day.
6  Q.  And who was present when those were taken?
7    A. There was a photographer and my attorney.
8  Q.  All right. Now, those are accurate depictions of
9    the drive-up ATM at the Seekonk branch of
10   Sovereign; right?
11   A. That's correct.
12 Q.  And do those look any different -- withdrawn. Did
13   the Seekonk ATM at Sovereign look any different on
14   the date that you took those pictures than it did
15   on April 4, 2005?
16   A. They look identical.
17 Q.  So, what I see in the pictures that we've marked
18   as D, E and F is an accurate representation not
19   only of what the ATM at the Seekonk drive-thru
20   branch -- the drive-thru of Sovereign looked like
21   on February 25th but it's also an accurate
22   representation of what the drive-thru ATM at the
23   Seekonk branch of Sovereign looked like on April
24   4th, 2005; right?
25   A. That's correct.

Page 24

1  Q.  Now, let me just show you some other photographs
2    and I am going to hand you the whole set, ma'am.
3    We won't work with everything.
4    A. Okay.
5        MR. FRECHETTE: We'll just mark this whole
6    packet as G.
7        (Defendant's Exhibit G marked for ID.)
8        MR. LEFEBVRE: Tara, this is the appendix
9    of the exhibits referenced of all the pictures in
10   the motion to dismiss.
11       MS. GOODWIN: Okay.
12 Q.  Okay. Would you turn to Tab A. Do you recognize
13   the picture in Tab A? Do you recognize what it
14   shows?
15   A. Yes.
16 Q.  What does it show?
17   A. It shows an ATM and a bank deposit machine and
18   it shows an advertising sign.
19 Q.  All right. And do you recognize this as being the
20   lobby of the Seekonk branch of Sovereign and the
21   ATM machine that's situated in that lobby?
22   A. Yes.
23 Q.  Would you agree with me that this is a fair and
24   accurate representation of that lobby?
25   A. Yes.

Page 25

1  Q.  All right. Let me show you Exhibit B and by
2    Exhibit B, I mean, Tab B of Exhibit G. Now,
3    recognizing, ma'am, obviously that this is a
4    picture just of the red placard that's on Tab A of
5    Exhibit G situated between the two machines, do
6    you agree with me that is a fair and accurate
7    depiction of that placard?
8    A. Yes.
9  Q.  All right. And if you look at Tab C and
10   realizing, again, obviously this is just a
11   photograph only of that and that it is obviously
12   not to scale, which I concede; do you agree with
13   me that Tab C of Exhibit G is a fair and accurate
14   depiction of that portion of the red placard that
15   contains the convenience fee notice?
16   A. Yes, I do.
17 Q.  All right. Would you look at Tab D, please. Is
18   Tab D a fair and accurate depiction of the
19   drive-up ATM at the Seekonk branch of the
20   Sovereign Bank?
21   A. That's correct.
22 Q.  All right. Would you take a look at Tab E. Is
23   Tab E a fair and accurate depiction of the Seekonk
24   branch drive-up ATM at Sovereign?
25   A. That's correct.

7 (Pages 22 to 25)

d4f2ed2c-8252-4e3f-8cc9-10e9cff9e4e0

May 5, 2006                                          Maureen E. Deloreto

| Page 26 |
|---|
| 1  Q.  Would you take a look at Tab F of Exhibit G. Now |
| 2       you'll notice on Tab E that to the left of the ATM |
| 3       itself there's a red placard; right? |

Page 26

1   Q.   Would you take a look at Tab F of Exhibit G. Now
2        you'll notice on Tab E that to the left of the ATM
3        itself there's a red placard; right?
4        A.   That's correct.
5   Q.   All right. Is Tab F a fair and accurate depiction
6        of that placard?
7        A.   That's correct.
8   Q.   All right. And is Tab G a fair and accurate
9        depiction of among other things the convenience
10       fee portion of that red placard?
11       A.   That's correct.
12  Q.   Okay. Now, let me have marked as Exhibit H your
13       affidavit.
14           (Defendant's Exhibit H marked for ID.)
15  Q.   I'll show you that. Oh, before we get to that --
16       and I want to caution you here, I'm going to ask
17       you some questions but you should not tell me
18       anything that you've discussed with your attorney
19       or that your attorney told you. How is it that
20       you came to go to Mr. Lefebvre about the issue of
21       being charged an ATM fee and the concept that the
22       notices weren't sufficient?
23       A.   He was doing some legal work on some papers
24       that I needed to have signed and it came up in a
25       conversation --

Page 27

1           MR. LEFEBVRE: You don't have to say what
2        was said, who said what.
3        A.   -- but I don't remember exactly what was said
4        and how it was said.
5   Q.   All right. And how long after you had used the
6        ATM at the Seekonk drive-up did this conversation
7        take place?
8        A.   I'm not exactly sure how long it was but it
9        was -- it wasn't very long after.
10  Q.   Now, when you went -- withdrawn. All right.
11       Let's start by going back to Exhibit G, if we
12       could for a second. That's the packet of tabbed
13       exhibits.
14       A.   Okay.
15  Q.   All right. How do you define the word prominent,
16       ma'am?
17           MR. LEFEBVRE: Are you asking her to look
18       at a particular picture?
19           MR. FRECHETTE: No.
20           MR. LEFEBVRE: Okay.
21  Q.   How do you define the word prominent?
22       A.   I don't know exactly how to define --
23           MR. LEFEBVRE: You can't mumble.
24       A.   I don't know exactly how I would define the
25       word prominent.

Page 28

1   Q.   Do you know generally how you would define it?
2        A.   It's something that could happen or most
3        likely would happen.
4   Q.   Can you use it in a sentence?
5        A.   No, I can't.
6   Q.   How do you define the word conspicuous?
7        A.   That needs to be something very much in the
8        open.
9   Q.   And when you say conspicuous in the context of
10       this case, you don't believe that the notices that
11       are posted at or near the ATM machines are
12       conspicuous; correct?
13       A.   That's correct.
14  Q.   Now, what is it about the notices that you feel
15       makes them not conspicuous?
16           MR. LEFEBVRE: Just so we're clear, I
17       don't mean to interrupt. I don't know
18       unintentionally or intentionally, you used the
19       word notices, plural.
20           MR. FRECHETTE: I'll withdraw the
21       question.
22  Q.   With respect to the walk-up at the Seekonk branch
23       of Sovereign and without looking at the picture,
24       please, could you tell me what it is you feel
25       renders the convenience fee placard not

Page 29

1   conspicuous?
2        A.   When you walk in to a strange place, you're
3        looking for the ATM machine and you're looking
4        right at the machine, not looking to the left or
5        to the right or to any other particular spot.
6        You're looking at the machine and at the machine
7        is a very -- would be a very conspicuous place.
8        To the left of the machine or somewhere off to the
9        side of the machine is not what I was looking for.
10  Q.   So, is it your testimony that when you recently
11       utilized the ATM walk-up at the Seekonk branch of
12       Sovereign, you did not see the red placard that is
13       to the left of the ATM and that is depicted in Tab
14       A of Exhibit G?
15       A.   I did not exactly notice what it was. In
16       other words, I may have seen a sign there but I
17       saw, you know, I might have seen STAR, NYC or
18       whatever it was, but I didn't actually look at the
19       whole placard and read it all.
20  Q.   All right. Well, putting aside the content of the
21       individual squares that's depicted in Tab A of the
22       that's depicted in Tab A of Exhibit G, I presume
23       that you would concede that you saw the red
24       placard itself?
25       A.   I saw the red placard itself, yes.

8 (Pages 26 to 29)

May 5, 2006                                    Maureen E. Deloreto

---

Page 30

1  Q.  Now, and there was nothing that prevented you from
2      walking up to the red placard and reading it;
3      correct?
4      A.  No, but I wasn't there to read the red
5      placard, I was there to use the ATM machine.
6  Q.  Well, truth be told, you were actually there to
7      take photos of the ATM machine to use in this
8      litigation; correct?
9      A.  That's correct.
10 Q.  Now, am I to understand that one of the essential
11     claims that you're making in your litigation is
12     that the information that's described in the box
13     that is shown in its entirety in Tab C of Exhibit
14     G, that that should appear right on the machine
15     itself?
16     A.  That's correct.
17 Q.  All right.  Is it your contention, ma'am, that if
18     that information, and by that information I mean
19     the information that says:  "Sovereign Bank may
20     charge a fee to U.S. cardholders for withdrawing
21     cash.  This fee is added to the amount of your
22     withdrawal by Sovereign Bank and is in addition to
23     any fees that may be charged by your financial
24     institution.  This convenience fee does not apply
25     to Sovereign Bank cardholders."  Is it your

---

Page 31

1      contention, ma'am, that if that information isn't
2      actually on the machine itself, then Sovereign
3      Bank has not fulfilled its responsibilities under
4      the Electronic Funds Transfer Act?
5          MR. LEFEBVRE:  I'm going to object.
6      That's not what the complaint says but you can
7      answer.
8      A.  Yes.
9  Q.  All right.  Your view is that if it's not on the
10     machine itself, it is perforce not prominent and
11     not conspicuous; correct?
12     A.  That's correct.
13 Q.  All right.  Now, and by the way, when I said if
14     it's not on the machine, it's not prominent and
15     conspicuous, I'm referring to that language that I
16     just quoted a second ago.  You understood that;
17     right?
18     A.  I understood that.
19 Q.  The language that's described in Tab C of Exhibit
20     G and depicted there; correct?
21     A.  That's correct.
22 Q.  All right.  Are there any other aspects of the
23     placard that is depicted, and by that I mean the
24     red placard that is depicted in Tabs A and B of
25     Exhibit G, that you believe render it not

---

Page 32

1      prominent and not conspicuous?
2          MR. LEFEBVRE:  Now, I don't mean to be
3      difficult.  Let's not, let's not.
4          MR. FRECHETTE:  No, wait a minute, wait a
5      minute.  If we're going to have a speaking
6      objection, this one I want to not have in the
7      presence of the witness.
8          MR. LEFEBVRE:  Okay.  I'm going to object.
9      You keep saying prominent and conspicuous as to --
10     I want to make sure we're talking about the
11     placard or the notice.
12         MR. FRECHETTE:  This is a speaking
13     objection.  If you want to just say objection as
14     to form then I'll rephrase.
15         MR. LEFEBVRE:  Objection to form, fine.
16 Q.  Now, I'll withdraw that question.  Ma'am, in your
17     case and specifically if you look at the Third
18     Amended Complaint, paragraph 16, you've said that
19     the notices at Sovereign ATMs are not prominent
20     and conspicuous for various reasons; right?
21     A.  Yes.
22 Q.  All right.  Now, other than than what's set forth
23     in 16 A, B and C, are there any other reasons that
24     you believe that "The notices are not prominent
25     and conspicuous"?

---

Page 33

1      A.  No.
2  Q.  Now, you would agree with me, would you not, that
3      -- withdrawn.  Did you recently actually use the
4      walk-up ATM at Sovereign?
5      A.  No, I did not.
6  Q.  You just went down there and took pictures?
7      A.  That's correct.
8  Q.  All right.  Did you actually walk up and read the
9      red placard that's depicted in Tabs A and B of
10     Exhibit G when you recently went and took
11     pictures?
12     A.  Yes, after they had pointed out where the
13     notice was.
14 Q.  And who's they?
15     A.  Mr. Hernandez pointed it out to me.
16 Q.  Who's Mr. Hernandez?
17     A.  He was the gentleman who took the pictures.
18 Q.  Did you have conversations at the time when these
19     pictures were being taken with anyone?
20     A.  No.
21 Q.  You didn't have any conversations with your
22     attorney at that time?
23     A.  Other than just noticing where the placard
24     was.
25 Q.  And you're not testifying that when you recently

---

9  (Pages 30 to 33)

May 5, 2006                                        Maureen E. Deloreto

---

Page 34

1    walked into the Seekonk branch of Sovereign in
2    order to take these pictures, that you couldn't
3    see the red placard; correct?
4        A.  That's correct.
5    Q.  Now, let's take a look if we could at Tab D of
6        Exhibit G.  Do you see that?
7        A.  Yes.
8    Q.  All right.  Now, I'm going to refer to left and
9        right and by left I'm actually orienting myself
10       right of the picture as it exists.  The left of
11       the picture would be the part where the Sovereign
12       drive-thru teller sign is.  Do you see that?
13       A.  That's correct.
14   Q.  And the right would be the part where on this
15       photo there's a bush at the far right; correct?
16       A.  That's correct.
17   Q.  All right.  Now, which way do you drive your car
18       into the ATM, left to right or right to left?
19       A.  From left to right.
20   Q.  So you would agree with me, ma'am, that in order
21       to get to the ATM machine itself, you actually
22       have to drive past the red placard that's depicted
23       in Tabs D and Tab E; correct?
24       A.  That's correct.
25   Q.  Now, on -- and we've already established that the

Page 35

1    red placard that's depicted in Tab D and Tab E of
2    Exhibit G actually was present on April 4, 2005
3    when you first used the drive-up ATM at the
4    Seekonk branch of Sovereign; correct?
5        A.  That's correct.
6    Q.  Now, when you used the drive-up ATM at the Seekonk
7        branch of Sovereign on April 4, 2005, you're not
8        suggesting that you couldn't see the actual
9        placard itself; correct?
10       A.  No, I would have to say that I could see the
11       placard
12   Q.  All right.  And how far is the placard away from
13       the machine itself?
14       A.  Probably -- I'd have to say about a foot and a
15       half.
16           MR. LEFEBVRE:  If you're not sure on
17       something, you don't have to guess.
18       A.  I'm not actually dead sure.
19   Q.  But based on your recollection and having used the
20       machine and having recently visited it within the
21       last couple of weeks, and based upon your own
22       observation of the photos that you've already
23       acknowledged are fair and accurate depictions of
24       the ATM
25       A.  Roughly around two feet, yes, about two feet.

Page 36

1    Q.  Now, is it your testimony that something that's
2        two feet away from something else is not "near"
3        that object, that second object?
4        A.  It could be near it but it may not be
5        conspicuous to see it.
6    Q.  I understand.  But my question is, would you agree
7        with me that if something is two feet away from
8        something else, it's "near" it?
9        A.  It is near it, yes.
10   Q.  And you've already told me that you agree that you
11       saw the placard itself?
12       A.  That's correct.
13   Q.  And that you would have to drive by the placard
14       itself in order to actually reach the ATM;
15       correct?
16       A.  Had to drive by it, yes.
17   Q.  Because, of course, you're not going to back into
18       the ATM?
19       A.  That's correct.
20   Q.  All right.  And I trust, ma'am, that you would
21       also agree with me that there was nothing that
22       would prevent you from stopping at the placard
23       before you got to the ATM machine and reviewing
24       anything that was on it?
25       A.  I had no reason to be reading an advertisement

Page 37

1    and that's basically what I felt that was, was an
2    advertisement.  It wasn't for any other purposes.
3    Q.  Okay.  I understand that but my question actually
4        was, you would agree with me, would you not, that
5        there was nothing that would have prevented you
6        from stopping and examining the placard; correct?
7        A.  No, nothing would stop me.
8    Q.  Now, on April 25th, 2005 when you used the ATM
9        drive-up at the Seekonk branch of Sovereign, are
10       you testifying that you were unaware that you were
11       going to be charged an ATM fee?
12       A.  That was correct.
13   Q.  All right.  Was there not a prompt on the screen
14       that caused you -- that advised you that before
15       you press this button, you should be aware that
16       you're going to be charged an ATM fee?
17       A.  That is correct.  I knew that at that
18       particular point and I was already almost done so
19       I continued to do that.
20   Q.  So you would agree with me that before you
21       finalized the transaction, you did know that
22       you were going to be charged an ATM fee?
23       A.  That's correct.
24   Q.  Now, am I to understand that your position is that
25       the notice that's described in Exhibit E and D --

10  (Pages 34 to 37)

May 5, 2006                                      Maureen E. Deloreto

---

Page 38

1    and by that I mean the placard, the red placard
2    that is to the left of the ATM -- that in order
3    for that to be "prominent and conspicuous in
4    location," it must be actually on the machine?
5    A. That's correct.
6    Q. And that in your view if it is not actually on the
7    machine itself, it is by definition not in a
8    prominent and conspicuous location; correct?
9    A. That's correct.
10   Q. And you hold that view irrespective of how "near"
11   the placard may be to the machine because as far
12   as you're concerned, it's not an issue how near it
13   is, it has to be on the machine; correct?
14   A. That's correct.
15   Q. Now, let's take a look at your affidavit, which I
16   think we marked as Exhibit H.
17   A. Okay.
18   Q. Now, first of all, before you completed this
19   affidavit, you read the affidavit of Ms. Rhiannon
20   Hernandez; correct?
21   A. That's correct.
22   Q. And you stated in your affidavit that you're in
23   complete disagreement with certain conclusions
24   that Ms. Hernandez reached and stated in her
25   affidavit; correct?

---

Page 39

1    A. I believe that's correct.
2    Q. Well, if you take a look at paragraph 3, you
3    indicate that you completely disagree with --
4    A. I totally disagree.
5    Q. Well, I didn't quote it but you don't dispute that
6    the words completely and totally have the same
7    meaning in this context; right?
8    A. That's correct.
9    Q. But in fairness to you, you say that you totally
10   disagree with Mrs. Hernandez's conclusions in
11   paragraphs 15 and 23 of her affidavit; right?
12   A. That's correct.
13   Q. And you also on the last page of your affidavit
14   indicate that you disagree with Mrs. Hernandez's
15   statements that the location of the convenience
16   fee notice is reasonably calculated to impart its
17   information to non-Sovereign customers; correct?
18   A. That's correct.
19   Q. And, as I understand it, the reasons why you
20   disagree with Mrs. Hernandez's various
21   observations in paragraphs 15 and 23 and the
22   specific one about being reasonably calculated to
23   impart its information, the reasons why you
24   disagree with that are all set forth in your
25   affidavit; correct?

---

Page 40

1    A. That's correct.
2    Q. Other than what's in your affidavit, are there any
3    other reasons why you disagree with what Mrs.
4    Hernandez had to say?
5    A. No.
6    Q. All right. Would you take a look at your
7    affidavit, please.
8    A. Yes.
9    Q. Now, I note that you state that you drive a 2000
10   Oldsmobile Intrigue; right?
11   A. That's correct.
12   Q. And that is the picture -- that is the vehicle
13   that's referenced in what we've marked -- and you
14   don't mind if I look over here because we only
15   have one copy. Actually, well, you know what,
16   those are the marked ones so let's work with
17   those. That's the vehicle that we see depicted in
18   Exhibits E, F and D; correct?
19   A. That's correct.
20   Q. Now, you are not testifying are you, ma'am, that
21   if you were to stop your 2000 Oldsmobile Intrigue
22   directly in front of the placard that is depicted
23   in Tabs D and E of Exhibit G, that that placard
24   would not be visible to you; correct?
25   A. That's correct.

---

Page 41

1    Q. All right. So, when you say that in order to see
2    that placard, you would have to turn and look
3    backwards or put your car into reverse, that's
4    only when the car is situated in front of the ATM
5    machine; right?
6    A. That's correct.
7    Q. But, of course, by the time you'd gotten to the
8    ATM machine, you'd already passed by the placard;
9    right?
10   A. That's correct.
11   Q. And nothing prevents you from stopping and
12   examining the placard; correct?
13   A. No.
14   Q. Now, would you look at the last sentence of
15   paragraph 5 where you say, "There was absolutely
16   no visible notice in the immediate vicinity
17   warning me that Sovereign was going to charge a
18   convenience fee for use of its ATM machine." Do
19   you see that?
20   A. Yes.
21   Q. First of all, obviously you're not referring to
22   the notice that's actually on the screen itself;
23   right?
24   A. That's correct.
25   Q. That notice you acknowledge receiving?

---

11 (Pages 38 to 41)

May 5, 2006                                        Maureen E. Deloreto

Page 42

1    A. I see.
2    Q. Is that correct?
3    A. That's correct then.
4    Q. When you say there's absolutely no visible notice
5       in the immediate vicinity, is it your view, ma'am,
6       that the red placard depicted in exhibits -- in
7       Tabs D and E of Exhibit G is not in the immediate
8       vicinity of the machine?
9    A. That's correct
10   Q. Even though you've already acknowledged a moment
11      ago that it's approximately a foot and a half to
12      two feet away and acknowledged that is "near" the
13      ATM?
14   A. That's correct.
15   Q. Paragraph 6 of your affidavit -- now you talk
16      about in that paragraph either reversing your car
17      or turning your body and looking backwards in
18      order to read the convenience fee notice; right?
19   A. That's correct.
20   Q. And you say that at this awkward and cumbersome
21      position I could still not read each word of the
22      convenience fee notice; correct?
23   A. That's correct.
24   Q. What words could you read?
25   A. In actuality from this --

Page 43

1       MR. LEFEBVRE: Now, when you say this,
2    what are you referring to?
3       THE WITNESS: From this picture.
4       MR. LEFEBVRE: Exhibit E, she's referring
5    to.
6       THE WITNESS: Actually it's Exhibit F.
7       MR. LEFEBVRE: I'm sorry.
8    A. In Exhibit F, if you notice that there's a
9       little jut-out of this which also actually
10      prevents you from looking this way to see it, to
11      notice that portion of the sign, because it's on
12      the right-hand side of that sign and not on the
13      left-hand side of that sign. And if you notice,
14      you can barely see beyond that.
15   Q. Okay. I understand, ma'am, but my question
16      actually to you was, you said you could not read
17      each word of the convenience fee notice. What
18      words could you read?
19   A. I don't remember exactly if I read any of the
20      words because I didn't notice it at the time.
21   Q. Well, I'm just working off of your statements,
22      ma'am, and this says you could still not read each
23      word of the convenience fee notice. I take it
24      that you would agree with me that it's fair for me
25      to infer from that that there were some words you

Page 44

1       could read.
2    A. In actuality, there were no words that I could
3       read.
4    Q. Okay. So this statement in your affidavit --
5       withdrawn. You understand that an affidavit is a
6       document offered under pains and penalties of
7       perjury; right?
8    A. That's correct.
9    Q. And you certainly wanted to be as careful and
10      precise in putting this affidavit together;
11      correct?
12   A. That's correct.
13   Q. Because you understood that it's important to your
14      case; right?
15   A. That's correct
16   Q. Am I to now understand that this section where you
17      said, I could still not read each word of the
18      convenience fee notice, is not correct and that
19      this really should read, I could not read any of
20      the convenience fee notice?
21   A. That's correct
22   Q. All right. Did you read this affidavit before you
23      signed it?
24   A. I did read it and I may not have actually
25      thought that might have been a difference of what

Page 45

1       I was trying to say.
2    Q. Who drafted this affidavit?
3    A. I gave it to my attorney, Mr. Lefebvre, and
4       then he typed it in.
5    Q. Are these your words or are these words that were
6       given to you by somebody else?
7    A. These are my words.
8    Q. Now, when you write in paragraph 7, in your
9       opinion the drive-up convenience fee notice is
10      placed in a location -- my copy is cut off so I
11      can't -- it says --
12   A. Location that is difficult for any consumer to
13      see who might choose to use the drive-thru ATM at
14      the Seekonk branch referenced above.
15   Q. When you say that, you mean when that consumer is
16      parked directly in front of the ATM machine;
17      right?
18   A. That's correct.
19   Q. You don't mean that the consumer wouldn't be able
20      to see that the placard exists to the left of the
21      machine as he drives up; correct?
22   A. That's correct.
23   Q. Just as in paragraph 8, you're not suggesting that
24      the placard that exists in the lobby of the
25      walk-up isn't visible. You're only suggesting

                                        12  (Pages 42 to 45)

d4f2ed2c-8252-4e3f-8cc9-10e9cff9e4e0

May 5, 2006                                    Maureen E. Deloreto

Page 46

1    that the placard isn't visible when you're
2    standing directly in front of the machine;
3    correct?
4    A. That's correct.
5  Q.  Have you ever met the other plaintiff
6    in this case?
7    A. No, I have not.
8  Q.  You don't know her?
9    A. No, I do not.
10  Q.  Now, you also are of the belief that the typeface
11    on the convenience fee notice itself is too small;
12    correct?
13    A. That's correct.
14  Q.  What typeface do you contend should be used?
15    A. I would believe that it needs to be larger
16    typeface only because -- if you notice that the
17    words on the sign, STAR and all of those, are all
18    used in bigger type and I would think that
19    something that small, okay, or something that
20    important should be of the same quality of being
21    able to read it.
22  Q.  All right. So you think that the letters should
23    be as big as the letters used by STAR; right?
24    A. That's correct.
25  Q.  How big would the notice be if all of the letters

Page 47

1    were made to be the same size as the letters that
2    are in the word STAR?
3    A. It would have to be pretty big.
4  Q.  Would it fit on the machine?
5    A. If it was on the machine, I would think that
6    those letters there, okay, those letters there
7    would be perfect if it was on the machine.
8  Q.  So, if it was on the machine, then the existing
9    notice and the existing typeface would be fine?
10    A. That's correct. It's very readable under that
11    portion if you were sitting right there, yes.
12  Q.  How far are you typically -- when it's on the
13    machine, how far are you away from the machine
14    when you typically use it?
15    A. Maybe a foot.
16  Q.  And I take it that you would agree with me that
17    since the machine is recessed into the wall, if
18    you were standing in front of the placard itself
19    you'd be something less than a foot away from the
20    placard; correct?
21       MR. LEFEBVRE: I'm going to object to the
22    form.
23  Q.  All right. Let me ask you this. The machine
24    itself is recessed into the wall; correct?
25    A. That's correct.

Page 48

1  Q.  So you've already told me that you think you're
2    about a foot away from it when you use it; right?
3    A. That's correct.
4  Q.  All right. The placard is not recessed into the
5    wall; correct?
6    A. That's correct.
7  Q.  So, would you agree with me that if you were
8    standing in the exact same spot in terms of your
9    distance from the wall as you were from the
10    distance of the face of the machine, where it not
11    -- that's a poor question. I'm going to have to
12    try to rephrase that.
13       MR. LEFEBVRE: Gee, I was looking forward
14    to objecting.
15       MR. FRECHETTE: Yeah.
16  Q.  If the machine is recessed and the wall is not
17    recessed, if you were standing the exact same
18    distance away, you would agree with me that you're
19    actually closer to the placard than you are to the
20    machine; correct?
21    A. That's correct.
22  Q.  And you've already told me that on the machine if
23    this notice existed using the same type font as is
24    depicted in Tabs B and F of Exhibit G, you would
25    consider it to be prominent and conspicuous;

Page 49

1    correct?
2    A. Correct.
3  Q.  And when you say that you would consider the fee
4    notice as it presently exists to be prominent and
5    conspicuous if it were posted on the machine,
6    you're not just talking about typeface but you're
7    talking about the color and the language itself;
8    correct?
9    A. That's correct.
10  Q.  All right. And so, again, if this notice that was
11    on -- withdrawn.
12       MR. FRECHETTE: The record should reflect
13    that counsel is conferring with the witness.
14  Q.  Other than what you've identified in your
15    affidavit, are there any other aspects of Mrs.
16    Hernandez's Affidavit that you disagree with?
17    A. No.
18       MR. FRECHETTE: I have nothing further.
19       MR. LEFEBVRE: Tara, do you have any
20    questions?
21       MS. GOODWIN: Okay. I have no further
22    questions.
23       MR. LEFEBVRE: We definitely want to read
24    and sign so we'd ask that you send the transcript
25    so she has an opportunity to review her testimony

13  (Pages 46 to 49)

d4f2ed2c-8252-4e3f-8cc9-10e9cff9e4e0

May 5, 2006                                         Maureen E. Deloreto

Page 50

1   and make any necessary corrections or additions if
2   appropriate.
3           MR. FRECHETTE: You know, I forgot to ask
4   at the beginning. We're working on the basis of
5   usual stips other than read and sign?
6           MR. LEFEBVRE: Yeah, no problem with that.
7           MR. FRECHETTE: Thank you.
8           (Deposition concluded at 2:07 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 51

1                C-E-R-T-I-F-I-C-A-T-E
2           I. SALLY BRASSARD. a Notary Public in and
    for the State of Rhode Island. duly commissioned
3   and qualified to administer oaths, do hereby
    certify that the foregoing deposition of MAUREEN
4   E DELORETO. the Plaintiff in the above-entitled
    cause. was taken before me on behalf of the
5   Defendant at the offices of EDWARDS ANGELL PALMER
    & DODGE. 2800 Financial Plaza, Providence. Rhode
6   Island. on May 5th, 2006. at 12:30 P.M.. that
    previous to examination of said witness, who was
7   of lawful age, she was first sworn by me and duly
    cautioned and sworn to testify the truth. the
8   whole truth. and nothing but the truth. and that
    she thereupon testified as in the foregoing manner
9   as set out in the aforesaid transcript
10          I further certify that the foregoing
    deposition was taken down by me in machine
11  shorthand and was later transcribed by computer
    and that the foregoing deposition is a true and
12  accurate record of the testimony of said witness
13          Pursuant to Rule 5 (d) and 30 (f) of the
    Federal Rules of Civil Procedure. original
14  transcripts shall not be filed in court;
    therefore. the original is delivered and retained
15  by Defendant's attorney
16          I have enclosed with a copy of the deposition
    a correction and signature page. which must be
17  signed before a Notary Public.
18          IN WITNESS WHEREOF I have hereunto set my hand
    this 6th day of May. 2006
19
20  _____
    SALLY BRASSARD. NOTARY PUBLIC/CSR-RPR
21  (MY COMMISSION EXPIRES JANUARY 16. 2009)
22
23
24
25

14 (Pages 50 to 51)

d4f2ed2c-8252-4e3f-8cc9-10e9cff9e4e0

Appendix 5

Page 1

IN THE UNSITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MAUREEN E. DELORETO
and DIANE E. HORTON

    VS.                    C.A. NO.:05-CV-10712RCL

SOVEREIGN BANK


    DEPOSITIONS OF RHIANNON E. HERNANDEZ and

STEPHANIE K. COMEAU, witnesses in the

above-entitled cause, taken on behalf of the

Plaintiffs, pursuant to notice, before Sally

Brassard, CSR, a Notary Public in and for the

State of Rhode Island and Providence Plantations,

at the office of Edwards Angell Palmer & Dodge

LLP, 2800 Financial Plaza, Providence, Rhode

Island, on April 18, 2006, at 11:35 a.m.


                ALLIED COURT REPORTERS
                115 PHENIX AVENUE
                CRANSTON, RI  02920
                (401) 946-5500

April 18, 2006                                    Rhiannon E. Hernandez and Stephanie K. Comeau

---

Page 2

```
 1  APPEARANCES:
 2
    FOR THE PLAINTIFFS: CLAUDE LEFEBVRE, P.C.
 3        BY: CHRISTOPHER M. LEFEBVRE, ESQ.
 4
    FOR THE DEFENDANT: EDWARDS ANGELL PALMER & DODGE
 5        LLP
          BY: DONALD E. FRECHETTE, ESQUIRE
 6
 7  ALSO PRESENT:    EDELMAN, COMBS, LATTURNER
                     & GOODWIN, LLC
 8        BY: TARA GOODWIN, ESQUIRE
              (By Telephone)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1            I-N-D-E-X
 2
 3
    RHIANNON E. HERNANDEZ              PAGE
 4
    Examination by Mr. Lefebvre        4
 5
    Examination by Mr. Frechette       44
 6
 7
    STEPHANIE K. COMEAU               PAGE
 8
    Examination by Mr. Lefebvre        45
 9
    Examination by Mr. Frechette       73
10
11
12  REPORTER'S NOTE: Plaintiffs' Exhibits 1 and 2
    premarked for identification
13
14
            E-X-H-I-B-I-T-S
15
16  PLAINTIFF'S      DESCRIPTION
    NO.
17
      1      Affidavit of Rhiannon
18           E. Hernandez
19    2      Affidavit of Stephanie
             K. Comeau
20
21
22
23
24
25
```

---

Page 4

```
 1         (DEPOSITION COMMENCED AT 12:06 P.M.)
 2             RHIANNON E. HERNANDEZ,
 3  having first been duly sworn by the Notary Public,
 4  testified as follows:
 5         THE COURT REPORTER:  Please state your
 6  full name and spell it for the record.
 7         THE WITNESS:  Rhiannon E. Hernandez
 8  (H-e-r-n-a-n-d-e-z).
 9         EXAMINATION BY MR. LEFEBVRE:
10  Q.   Is it Rhianna?
11  A.   Rhiannon.
12  Q.   Rhiannon, okay.  Well, it's now afternoon.  Good
13  afternoon.  I'm Christopher Lefebvre and with me
14  is Tara Goodwin in Chicago who is participating
15  via teleconference.  Both of us represent Maureen
16  DeLoreto and Diane Horton in a class action
17  lawsuit that was filed in the Massachusetts
18  Federal District Court against Sovereign Bank and.
19  I am here to ask you certain questions regarding
20  an affidavit that you prepared as part of this
21  litigation.
22         If during the deposition, if I ask you a
23  question that you don't understand, please let me
24  know.  I will do my best to rephrase the question
25  in a more intelligent fashion.  I'm going to
```

---

Page 5

```
 1  assume that if you answer my questions, that you
 2  understood them and that your response is true and
 3  accurate in accordance with the oath.
 4  A.   Okay.
 5  Q.   And I just ask that you keep your voice up and
 6  that we not interrupt each other so that we have
 7  an adequate stenographic record; okay?
 8  A.   Okay.
 9         MR. LEFEBVRE:  Tara, can you hear us okay?
10         MS. GOODWIN:  Yes, I can.
11  Q.   Okay.  First of all, can you state your present
12  address, where you reside.
13  A.   I live at 26 Perry Avenue, Taunton,
14  Massachusetts.
15  Q.   And how long have you lived there?
16  A.   About five or six months.
17  Q.   Okay.  Are you married or single?
18  A.   Single.
19  Q.   Do you have children?
20  A.   No, I do not.
21  Q.   Can you tell me a little bit about your
22  educational background.
23  A.   I have a bachelor's in marketing from Johnson
24  & Wales.
25  Q.   And when did you get your degree from Johnson &
```

2  (Pages 2 to 5)

48d70ccd-283f-4952-baf7-5c8823f8b7a1

April 18, 2006                          Rhiannon E. Hernandez and Stephanie K. Comeau

---

### Page 6

1      Wales?
2      A. 2001.
3   Q.  Do you have any other college or secondary
4      education?
5      A. No.
6   Q.  Okay. Do you have any background in advertising
7      or conspicuity and display issues? Do you
8      understand what I mean by --
9      A. No, could you be a little bit clearer.
10  Q.  When I use the word conspicuity, it's a tongue
11     twister, I'm talking about issues regarding
12     whether something, a sign, a picture, might be
13     conspicuous to someone.
14     A. No, I don't have any educational background in
15     determining.
16  Q.  Okay. Can you tell me briefly what you did in
17     preparation for this deposition today?
18     A. My regional property manager had come to our
19     site and taken measurements and we had talked
20     about that. I had received an affidavit via
21     e-mail and reviewed it, agreed with it, and signed
22     it.
23  Q.  Okay. Now, regional property manager, could you
24     identify that person's name?
25     A. Robert Cazzone.

---

### Page 7

1   Q.  And what does Robert Cazzone -- (C-a-r-)
2      A. It's (C-a-z-z-o-n-e).
3   Q.  Okay. I would have never guessed that. What does
4      Robert do for the bank, what is his position?
5      A. I don't know his full job description. I know
6      that he handles the maintenance and site of our
7      location in terms of snow removal, lighting,
8      things of that nature.
9   Q.  So, if I understand you correctly, Robert was the
10     person who contacted you?
11     A. He -- we were notified via e-mail that someone
12     would be out to take measurements and it turned
13     out to be him.
14  Q.  So, Robert came out to take measurements. Did
15     Robert send you an e-mail or was it someone else?
16     A. Someone else.
17  Q.  Do you know the name of that person who sent you
18     the e-mail?
19     A. I would have to double-check. I'm sure I have
20     a record of the e-mail but I don't know offhand.
21  Q.  Did you review any documents in preparation for
22     today's testimony?
23     A. Just my affidavit.
24  Q.  Okay. Did you look at any pictures?
25     A. Oh, and photographs, yes, the exhibits.

---

### Page 8

1   Q.  Now, when you're talking about the exhibits, are
2      you referring to the ten or twelve pictures that
3      were taken by a photographer and filed in the
4      Federal Court in Boston?
5      A. I believe so.
6   Q.  Okay. And how did you get the pictures, who gave
7      them to you?
8      A. Sent via e-mail.
9   Q.  Okay. All right. When you say they were sent via
10     e-mail, I assume you printed them?
11     A. I looked at them on my computer screen.
12  Q.  Okay. So, your computer system allows you to --
13     A. View
14  Q.  -- view the documents, I assume, in color?
15     A. Yes.
16  Q.  Do you know who sent you those pictures?
17     A. They came through, I believe --
18         MR. FRECHETTE: Time frame, because there
19     may have been --
20         MR. LEFEBVRE: Sure, I understand. Fair.
21  Q.  When did you first receive any pictures that you
22     would have looked at in support of your testimony
23     today?
24     A. Perhaps a month or so after the measurements
25     were taken.

---

### Page 9

1   Q.  Do you remember when the measurements were taken?
2      A. Not offhand, in January perhaps, but I
3      wouldn't be exact, I'm sorry.
4   Q.  Okay. Were you at the Seekonk branch when these
5      measurements were taken?
6      A. I was.
7   Q.  Were you with the individual or next to him when
8      he actually measured the --
9      A. No, I was not.
10  Q.  Okay. How many ATMs does the Seekonk branch have?
11     A. Two.
12  Q.  And for purposes of this deposition, when I use
13     the word loosely, Seekonk branch, I'm referring to
14     the branch in the Benny's parking lot where Ms.
15     DeLoreto went to make a withdrawal from an ATM.
16     A. Okay.
17  Q.  So, we're on the same page.
18     A. Yes.
19  Q.  In fact, there are more than one Sovereign branch
20     in Seekonk, Mass.; is that correct?
21     A. That is correct.
22  Q.  In preparation of your testimony, did you inspect
23     the ATM in the lobby or take a look at the one
24     through the drive-thru?
25     A. Yes.

3  (Pages 6 to 9)

April 18, 2006                          Rhiannon E. Hernandez and Stephanie K. Comeau

---

Page 10

1  Q.  When did you do that?
2  A.  Earlier this past week, Thursday; Thursday and
3      Friday.
4  Q.  Thursday and Friday?
5  A.  Yes.
6  Q.  Okay. Can you walk me through what you did at
7      each of the ATMs or one of them, whatever?
8  A.  I reviewed the measurements that were placed
9      on the desk -- the affidavit, as I had done once
10     prior. After the measurements were taken, I had
11     gone out and, you know, inspected the vestibule
12     and the drive-up ATM, agreed with the
13     measurements. This past week had gone out with an
14     actual tape measure and measured them myself to be
15     sure that they were accurate.
16 Q.  Okay. Now, was this -- when you went out with the
17     tape measure to verify the measurements referenced
18     in the affidavit, this was done after you had
19     signed the affidavit; is that correct?
20 A.  That's correct.
21 Q.  So, when you signed the affidavit, you did not
22     previously verify if the measurements were
23     correct, is that a fair statement?
24     MR. FRECHETTE: Objection. That's not
25 what she said.

---

Page 11

1  Q.  Did you go out and measure the ATM notices prior
2      to signing your affidavit, yes or no?
3      MR. FRECHETTE: Objection.
4  A.  No.
5  Q.  Okay. Did you look at any videos in preparation
6      for your testimony today?
7  A.  No, I did not.
8  Q.  And forgive me if I asked this, were you present
9      when the actual photographs were taken and I am
10     talking about the photographs that have been
11     provided in this lawsuit?
12 A.  Can you be a little more specific in terms of
13     -- I was present at the branch.
14 Q.  Okay. But were you at the location of the ATM
15     either at the drive-thru or in the vestibule when
16     the pictures were being taken?
17 A.  I was not.
18 Q.  Did you meet with anyone in person to prepare for
19     today's deposition?
20 A.  Just Mr. Frechette.
21 Q.  Okay. And just time frame, when was the first
22     time that you actually met with him to prepare for
23     this deposition?
24 A.  Thursday.
25 Q.  Of last week?

---

Page 12

1  A.  That's correct.
2  Q.  Okay. Do you have any idea why you were chosen
3      to?
4      THE WITNESS: Excuse me, was it Thursday
5  or was it Wednesday now that I think about it?
6      MR. FRECHETTE: I can't answer questions
7  but if counsel would let me, I'll be happy to
8  respond.
9      MR. LEFEBVRE: Sure, so we have an
10 accurate record.
11     MR. FRECHETTE: It was Thursday.
12     THE WITNESS: Thank you.
13     MR. LEFEBVRE: See, you always wanted to
14 be a witness, I'll bet.
15     MR. FRECHETTE: I've been a witness many
16 times.
17 Q.  I don't know if you answered the question, I'll
18     ask it again. Forgive me if you did answer it, do
19     you have any idea why you were chosen to submit an
20     affidavit as part of this litigation?
21 A.  Because I'm a representative of Sovereign that
22     works at the location.
23     MR. FRECHETTE: Off the record.
24     (Discussion was held off the record.)
25 Q.  Okay. Now, who actually asked you to sign the

---

Page 13

1  affidavit? Was there a person who asked you to
2  sign the affidavit?
3  A.  Bob actually showed up with the affidavits and
4      I had made a phone call to -- I believe his name
5      is Josh, I cannot remember the last name. I may
6      not even be right on the first name to be honest
7      with you to review it, to talk about it as to why
8      I was signing the affidavit.
9  Q.  Now, was this person, Josh, someone who worked at
10     the bank or was he someone at a lawyer's office?
11 A.  I believe a lawyer's office.
12 Q.  Okay. Now, is this Robert --
13 A.  Cazzone.
14 Q.  Thank you. Is he a superior of yours?
15 A.  No.
16 Q.  He is not, okay. Now, if I understand correctly,
17     the affidavit was sent to you via e-mail, is that
18     right, for you to first look at?
19 A.  That's correct.
20 Q.  Did you make any changes to the affidavit when you
21     first received it?
22 A.  No, I did not.
23 Q.  Okay. So, it's fair for me to assume since you
24     received it via e-mail, that you did not draft the
25     affidavit?

---

48d70ccd-283f-4952-baf7-5c8823f8b7a1

April 18, 2006                                    Rhiannon E. Hernandez and Stephanie K. Comeau

Page 14

1    A. That's correct.
2  Q.  So, you didn't choose the precise words that were
3    referenced in your affidavit?
4    A. That's correct.
5  Q.  Okay. Now, did you go through each line of the
6    affidavit with someone at Sovereign Bank, one of
7    your superiors or just this Josh person?
8    A. Just Josh.
9        MR. FRECHETTE: Objection. We're not
10   going to get into discussions that she had with
11   Mr. Gardner, right, who we've established was an
12   attorney?
13       MR. LEFEBVRE: Right. I'm just asking.
14   I'm not asking what was said.
15       MR. FRECHETTE: Okay.
16 Q.  Now, do you know if anyone at Sovereign spoke to
17   other people at your branch regarding the content
18   of this affidavit before it was sent to you?
19   A. No.
20 Q.  Okay. Can you walk me just briefly through what
21   I'm going to call the chain of command as far as
22   the branch. I'm talking about the branch where
23   you work. You are the community banking manager;
24   is that right?
25   A. Yes.

Page 15

1  Q.  Can you tell me what community banking manager is
2    and what your job functions are?
3    A. I handle the day-to-day opening operations,
4    integrity of the bank of central plaza.
5  Q.  All right. Is it fair to say that you're the
6    branch manager?
7    A. That's correct.
8  Q.  And how many other people work at your branch?
9    A. Total, nine of us.
10 Q.  And can you just walk me through briefly the
11   various titles of the other people that work there
12   and what they actually do?
13   A. I have a community banking assistant manager.
14 Q.  And who was that person?
15   A. Her name is Darlene Chestnut.
16 Q.  And is it fair to say that -- well, strike that.
17   What does Darlene do?
18   A. She's my assistant manager.
19 Q.  How long has Darlene been at the bank?
20   A. With Sovereign?
21 Q.  With Sovereign Bank, yes.
22   A. I'm not too sure in total years served. I
23   believe her years of service are probably close to
24   fifteen.
25 Q.  So, she's a fairly knowledgeable person?

Page 16

1        MR. FRECHETTE: Objection.
2    A. Yes.
3  Q.  Who else is in the branch?
4    A. I have a personal banking representative, her
5    name is Lisa Lamoureux.
6  Q.  And what does a personal banking representative
7    do?
8    A. Sales and assistance with customer inquiries.
9  Q.  Now, is the assistant manager and also the
10   personal banking representative full-time
11   positions?
12   A. Yes.
13 Q.  Okay. And are there any other individuals that
14   work at the bank?
15   A. Yes.
16 Q.  And what are their titles?
17   A. Customer service manager.
18 Q.  And do you have more than one?
19   A. No, I do not.
20 Q.  And what is his or her name?
21   A. Her name is Claudia Austin St. Pierre.
22 Q.  And how long has Claudia worked at the bank, if
23   you know?
24   A. Eighteen years.
25 Q.  And what does the customer service representative

Page 17

1    do?
2    A. She handles the operations in the teller line
3    of the bank.
4  Q.  And is there any other category of workers at your
5    branch?
6    A. Customer service representatives.
7  Q.  And how many of those do you have?
8    A. I have Kimberly Drape. I have Ryan McKinnon.
9    I have Beth Flinkfelt.
10 Q.  Okay. And what is their job description?
11   A. They work on the teller line.
12 Q.  Okay. Anyone else or have we pretty much
13   covered --
14   A. That's who I have currently on my staff.
15 Q.  Now, who do you report to?
16   A. Minnie Saleh.
17 Q.  And who is Minnie Saleh?
18   A. She is my regional vice-president.
19 Q.  Is that a female?
20   A. That's correct.
21 Q.  And where is she physically located? Does she
22   have an office?
23   A. New Bedford.
24 Q.  New Bedford, okay. And do you know who Minnie
25   reports to, if you know?

5 (Pages 14 to 17)

48d70ccd-283f-4952-baf7-5c8823f8b7a1

Page 18

1    A. I do. I'm drawing a blank right now. I don't
2    know. It used to be Trish Rose, I believe, during
3    this time frame. It was Trish Rose and I'm
4    drawing a blank right now.
5    Q.   So, is it fair to say that Minnie is in charge of
6    the various community banking managers in her
7    select region?
8    A. Yes.
9    Q.   And do you know how many community banking
10   managers report to Minnie?
11   A. Twenty-six.
12   Q.   And are they all located in a certain geographical
13   area?
14   A. Bristol County for the most part, all the way
15   up into New Bedford.
16   Q.   Okay. Do you have any -- as a community banking
17   manager, do you have any responsibility for ATM
18   notices, signs?
19   A. No.
20   Q.   Who does? Whose responsibility is it to, first of
21   all, maintain signs located on or at the ATM at
22   the Seekonk branch where you work?
23   A. Can you be a little more specific, I'm sorry?
24   Q.   Well, let's say a sign needs to be replaced, it's
25   getting old, you know, replacing signs, where

Page 19

1    signs are actually located, who makes those
2    decisions relative to your branch? I'm referring
3    just to ATM signs.
4    A. As far as hanging them, it wouldn't be someone
5    in the branch. I believe it would be somebody
6    from the property management company who would
7    actually come in and install those signs.
8    Q.   Do you know if Sovereign uses the same property
9    management company for all its various branches?
10   A. I believe so.
11   Q.   Okay. Who would know that?
12   A. Bob, actually, the gentleman I mentioned who
13   works for Trammell Crowe.
14   Q.   Could you spell Trammell for me?
15   A. (T-r-a-m-m-e-l-l).
16   Q.   And Crow?
17   A. Crow (C-r-o-w).
18   Q.   And that's the name of the property management
19   company?
20   A. That's correct.
21   Q.   Okay. Now, do you know what the acronym EFTA
22   stands for? First of all, do you know what I mean
23   when I used the word acronym?
24   A. Yes.
25   Q.   And I say that respectfully. I just want to make

Page 20

1    sure we're on the same page. Do you know what the
2    acronym EFTA stands for?
3    A. No.
4    Q.   Are you familiar with the Electronic Funds
5    Transfer Act?
6    A. I know what EFT means. I wasn't familiar with
7    the act itself, no.
8    Q.   Just so I'm clear, have you ever read any portion
9    of the Electronic Funds Transfer Act?
10   A. I possibly have. In my memory bank I'm sure
11   there may be something but I wouldn't be able to
12   recite anything with regard to regulations off the
13   top of my head, no.
14   Q.   Well, what can you tell me about your
15   understanding of regulations that involve
16   placement of notices on or at an ATM?
17      MR. FRECHETTE: Objection. I'm just going
18   to state so that the record is clear on this that
19   the witness is not being offered as any type of an
20   expert nor is she being offered as any form of
21   30(b)(6) or authorized representative of the bank
22   but rather solely as a fact affiant. So, that
23   having been said, you can go ahead and tell him
24   whatever he needs to know.
25      THE WITNESS: Okay. Go ahead, I'm sorry.

Page 21

1       MR. LEFEBVRE: Can you read back the
2    question.
3       (Question read back as requested.)
4    A. I'm not an expert in terms of where the
5    location of signage needs to be placed, if that's
6    what you're asking.
7    Q.   Okay. So, is it fair to say that you're not
8    familiar with the laws that regulate the location
9    of ATM notices?
10   A. That's correct.
11   Q.   Okay. Now, referring to the Seekonk branch, do
12   you know when the signs were actually posted, and
13   I am first going to refer to the lobby ATM, the
14   vestibule ATM? Do you know when the signage was
15   first posted? I'm referring to the big placard.
16   A. No, I have no idea.
17   Q.   Was it there when you first started to work at
18   that branch?
19   A. Yes, it was.
20   Q.   Now, how about the signage located near the
21   drive-thru ATM, do you know when that was first
22   put on the building?
23   A. No, I do not.
24   Q.   Okay. Now, do you know how it was that -- well,
25   let me withdraw that. Do you know how or who

6  (Pages 18 to 21)

April 18, 2006                                    Rhiannon E. Hernandez and Stephanie K. Comeau

Page 22

1    chose the precise location of the ATM sign at the
2    drive-thru?
3    A. No, I do not.
4    Q. Do you know who chose the precise location of the
5    ATM sign in the lobby vestibule?
6    A. No, I did not.
7    Q. Okay. What kind of car do you drive?
8    A. Currently I have a Lexus ES300.
9    Q. Four-door?
10   A. Yes.
11   Q. And how long have you had use of that vehicle?
12   A. Two months.
13   Q. And what kind car did you drive beforehand?
14   A. Mitsubishi Eclipse, two-door.
15   Q. And how long did you have use of the Mitsubishi
16   Eclipse?
17   A. Three years.
18   Q. Now, in your affidavit you reference that you had
19   used the drive-thru in Seekonk on a few occasions;
20   correct?
21   A. Yes.
22   Q. Do you remember which car did you use when you
23   have used it at the Seekonk drive-thru?
24   A. I've used both cars.
25   Q. You have, okay. How tall are you?

Page 23

1    A. 5'1.
2    Q. And how old are you?
3    A. 28.
4    Q. Do you have any physical impairments that would
5    make it difficult for you to turn your head or
6    move?
7    A. No.
8    Q. Okay. You're fairly healthy?
9    A. Yes.
10   Q. Do you have any vision problems?
11   A. I'm nearsighted.
12   Q. Okay. And can you explain to me what that means
13   when you say nearsighted?
14   A. I can't see things in far distance without use
15   of contacts or glasses.
16   Q. Okay. Do you wear glasses?
17   A. Yes.
18   Q. Okay. Now, I notice that you do not have glasses
19   on now. Do you have contacts on?
20   A. Yes, I do.
21   Q. And when you were using the ATM through the
22   drive-thru in Seekonk, do you know if you were
23   wearing glasses or using contacts?
24   A. My contacts.
25   Q. Do you generally use contacts more often than

Page 24

1    glasses?
2    A. Yes.
3        MR. LEFEBVRE: What I thought I'd do just
4    for the record, I'm not a big fan of having a lot
5    of exhibits attached to a transcript when they're
6    already duplicated in another pleading. These are
7    just -- so we're on the same page -- this is a set
8    of the exhibits that you have given me with your
9    motion for summary judgment. What I'd like to do
10   is, I'll let the witness look at the exhibits when
11   I refer to them and then she can answer by
12   actually looking at the exhibits. I can represent
13   to you that I believe they're in the same order
14   that they were given to me in accordance with the
15   appendix that you're looking at now.
16       MR. FRECHETTE: Well, if we're talking
17   about the appendix that bears at the bottom
18   document Bos_521500_1.doc/JHoulihan --
19       MR. LEFEBVRE: Yes.
20       MR. FRECHETTE: -- then, that's fine.
21       MR. LEFEBVRE: Okay. Great.
22       MR. FRECHETTE: The record can reflect
23   that the witness has been given a copy of the
24   document referenced moments ago which is entitled
25   Appendix of Exhibits along with a series of

Page 25

1    photographs which are tabbed seriatim Exhibits A
2    through O.
3        MR. LEFEBVRE: Thank you.
4    Q. I'd like you to take a look at Exhibit A.
5        MR. FRECHETTE: In that respect, I guess
6    the record should also reflect that not as part of
7    this packet are Exhibits P through X.
8        MR. LEFEBVRE: Right, because they're
9    irrelevant for this deposition, that's correct.
10   Q. Take a moment and return to Exhibit A. Now, I can
11   tell you that it has been represented to me, not
12   only via the picture but I personally went to the
13   branch with one of your attorneys. This is a
14   picture of the -- what I'll call the lobby or
15   vestibule ATM in Seekonk; is that correct?
16   A. Yes.
17   Q. Now, how many times have you used this particular
18   ATM?
19   A. Numerous.
20   Q. And I am not trying to be difficult, can you give
21   me a ballpark, more than ten times?
22   A. Yes.
23   Q. More than fifty times?
24   A. Possibly, yes.
25   Q. Now, is it your testimony -- strike that. When

7 (Pages 22 to 25)

48d70ccd-283f-4952-baf7-5c8823f8b7a1

| Page 26 | Page 28 |
|---|---|
| 1   you've used this ATM and you are standing in front | 1   Q.   How often? |
| 2   of the ATM and inserting your card into the little | 2   A.   Quite a bit, more often than my Sovereign ATM. |
| 3   slot, can you see the notice to the left? And I | 3   Q.   And why is that? |
| 4   am referring to the notice that warns a consumer | 4   A.   Because I use that checking account for most |
| 5   that a fee might be charged. | 5   of my bills. |
| 6         MR. FRECHETTE: Objection. | 6   Q.   And are you charged a fee when you use another |
| 7   A. I can see the sign, yes. | 7   ATM? |
| 8   Q.   Okay. Now, when we're talking about the sign, I'm | 8   A.   I am. |
| 9   not referring to the whole big sign. I'm asking, | 9   Q.   And typically how much does that -- |
| 10   when you are at the point when you're putting your | 10   A.   $2 or 2.50. |
| 11   card in the machine, you've punched in your secret | 11   Q.   Okay. Can you tell me what banks you've used your |
| 12   code, you're focusing, I assume, on the screen; is | 12   Sovereign -- or where you've been charged a fee |
| 13   that a fair statement? | 13   for use of an ATM? |
| 14   A. Yes. | 14   A.   Sovereign, Citizens, Bank of America, |
| 15   Q.   When you're at that point in the transaction, | 15   previously Fleet. |
| 16   are you able to read the notice that appears on | 16   Q.   Have you noticed another bank's, what we'll call |
| 17   the right-hand side? You know what I'm referring | 17   it, ATM fee notice? |
| 18   to that says, Sovereign may charge a non-U.S. | 18         MR. FRECHETTE: Objection. |
| 19   cardholder a fee. Are you able to see that from | 19   A.   Yes. |
| 20   that vantage point? | 20   Q.   Which bank do you recall -- what notice do you |
| 21   A. No, I am not. | 21   recall seeing? Non-Sovereign notice, I'm talking |
| 22         MR. FRECHETTE: Objection to the form of | 22   about. |
| 23   the question. | 23   A.   Citizens Bank. |
| 24   Q.   Okay. Do you think it would be easier for a | 24   Q.   What do you remember about Citizens Bank's notice |
| 25   person to see the sign about the possible | 25   about fee assessment? |

| Page 27 | Page 29 |
|---|---|
| 1   assessment of a fee if the notice were actually | 1   A.   That there would be a fee assessed probably. |
| 2   put on the ATM, maybe near the keypad or where you | 2   Q.   And do you remember where their notice was placed? |
| 3   put your card in? | 3   A.   I believe it's in a placard next to the ATM. |
| 4         MR. FRECHETTE: Objection. | 4         MR. FRECHETTE: Objection to the prior |
| 5   Q.   I'm just asking your opinion. | 5   question. |
| 6   A. I guess so. | 6   Q.   I'd like you to take a look at Exhibit B, Tab B, |
| 7   Q.   So, would you agree with me that it would be | 7   and this has been represented to me as the notice |
| 8   easier for a consumer to read and see the notice | 8   regarding the vestibule -- I'm having a brain |
| 9   about a fee if it were actually on the machine | 9   freeze -- the inside branch ATM. Are you familiar |
| 10   even -- | 10   with this notice? |
| 11   A. It's on the screen. | 11   A.   Yes. |
| 12   Q.   No, I'm talking about before the screen. I'm just | 12   Q.   Okay. Looking at this -- strike that. Is it fair |
| 13   asking about this notice on the sign. Do you know | 13   to say that this notice is virtually identical to |
| 14   what I'm referring to? | 14   the notice that's near the drive-thru? |
| 15   A. I do. | 15   A.   Yes. |
| 16   Q.   Okay. Sovereign may charge a fee, I'm just asking | 16   Q.   Okay. Do you know if this type of notice -- now, |
| 17   if you think it would be easier if that little | 17   I just want so the record is clear -- I note in |
| 18   block, that little 2x4 square -- which I believe | 18   the bottom there's a -- of Exhibit B -- there's a |
| 19   you told me in your affidavit -- were actually on | 19   little block that says, Sovereign Bank and it |
| 20   the machine, would it be easier for someone to | 20   says: Voiceguided ATM provides -- do you see what |
| 21   read? | 21   I'm referring to? |
| 22         MR. FRECHETTE: Objection. | 22   A.   Yes. |
| 23   A. I guess. | 23   Q   Now that little square is a separate notice; is |
| 24   Q.   Okay. Do you ever use a non-Sovereign ATM? | 24   that correct? Is it actually attached to the -- |
| 25   A. I do. | 25   A.   No, it is not. |

48d70ccd-283f-4952-baf7-5c8823f8b7a1

April 18, 2006                                    Rhiannon E. Hernandez and Stephanie K. Comeau

Page 30

1        MR. FRECHETTE: Objection.
2   Q.   I'm just referring to the larger notice, so we're
3        on the same page, okay?
4   A.   Okay.
5   Q.   Is the word Sovereign Bank, in your opinion,
6        prominent and conspicuous on this sign?
7        MR. FRECHETTE: Objection.
8   A.   You can see the whole sign, I mean --
9   Q.   I'm just asking you in your opinion?
10       MR. FRECHETTE: I don't think she was done
11       responding to your question.
12       MR. LEFEBVRE: I'm sorry.
13  A.   Sovereign is at the top. I mean, if you're
14       reading like any other person from top to bottom,
15       you know, left to right, I suppose that's what you
16       would see first.
17  Q.   Okay. Do you know why it is that the actual
18       notice that's really the subject of this lawsuit,
19       and I am referring to the box below, maestro,
20       (m-a-e-s-t-r-o), do you know why that notice is
21       located down in the corner rather than somewhere
22       else on the placard?
23  A.   No, I do not.
24       MR. FRECHETTE: Objection.
25  Q.   Do you believe that the notice that I just

Page 31

1        referred to, and I am referring to what I'm going
2        to call the fee notice that starts with:
3        Sovereign Bank may charge a fee, do you think that
4        is in a prominent and conspicuous location on this
5        sign?
6        MR. FRECHETTE: Objection.
7   A.   I'm not an expert.
8   Q.   I'm just asking your opinion.
9   A.   I think so.
10  Q.   Do you think that block, the fee block I'm going
11       to call it, is more or less prominent and
12       conspicuous than the block that contains the
13       phrase NYCE located in the upper right-hand
14       corner?
15       MR. FRECHETTE: Objection.
16  A.   It's a totally different type of branch.
17  Q.   Which one do you think is easier for you to see
18       and read?
19  A.   I think that as a consumer you should stand
20       there and read the whole thing.
21  Q.   And I am not trying to be difficult. I'm just
22       asking, between the NYCE block on the right and
23       the fee notice down at the bottom on the right,
24       which one is easier for you to read and see? I'm
25       asking you, personally?

Page 32

1   A.   I can read both of them and can see both of
2        them equally as well.
3   Q.   You can?
4   A.   Yes.
5        MR. FRECHETTE: Please note my objection
6        to the prior question.
7   Q.   Can you take a look at Exhibit F. Excuse me, E,
8        I'm sorry. Is it your testimony that a person
9        using the Sovereign drive-thru ATM in Seekonk,
10       while they're putting their card in the machine to
11       withdraw some money from the ATM, is able to read
12       the fee notice contained on the signage to the
13       left of the ATM as referenced and outlined in this
14       exhibit?
15       MR. FRECHETTE: Objection.
16  A.   Can you be a little more specific?
17  Q.   Well, I'm asking you, if someone is at the point
18       where they insert their card into the ATM,
19       obviously they're in their vehicle, it's a
20       drive-thru; correct?
21  A.   Yes.
22  Q.   And they're doing their business to punch in their
23       code and looking at the screen, et cetera, about
24       to do a withdrawal, I assume, or deposit, whatever
25       their business may be. At that focal point, are

Page 33

1        you able to read the fee notice that we've talked
2        about, that is, the notice that's contained on the
3        sign at the bottom right-hand corner?
4   A.   No.
5        MR. LEFEBVRE: Why don't we mark -- I'm
6        going to just mark the exhibit. Why don't we mark
7        the affidavit.
8        MR. FRECHETTE: Sure.
9        (Plaintiffs' Exhibit 1 marked for ID.)
10       MR. FRECHETTE: Do you want her to take a
11       look at it?
12       MR. LEFEBVRE: Yes.
13  Q.   I've just presented you the exhibit which we've
14       marked as an affidavit. First of all, could you
15       turn to page 4. Is it fair to say that your
16       signature is contained at the bottom of page 4?
17  A.   Yes.
18  Q.   And were you in the Seekonk branch when you signed
19       this affidavit?
20  A.   I was.
21  Q.   Okay. And you read the affidavit before you
22       signed it?
23  A.   Yes.
24  Q.   And is the information and the assertions made in
25       this affidavit true and accurate to the best of

                                    9  (Pages 30 to 33)

48d70ccd-283f-4952-baf7-5c8823f8b7a1

Page 34

1    your knowledge and belief?
2    A. Yes.
3  Q.  Now, I believe you told me that the various
4    measurements contained in this affidavit, and I
5    don't want to waste a lot of time going through
6    them about the signage and the location, that you
7    personally verified the accuracy of these numbers
8    relative to the location and the actual size of
9    the signs?
10   A. Yes.
11 Q.  And you did that after you signed the affidavit?
12   A. With the tape measure in hand, yes.
13 Q.  Okay. Now, I'd like to just have you focus your
14   attention to paragraph 14 which is on page 3 of
15   the affidavit. After you've read that, let me
16   know and I am just going to ask you a couple of
17   questions.
18   A. Okay.
19 Q.  As a matter of fact, why don't you read also 15 so
20   that I can ask you some combined questions about
21   paragraphs 14 and 15.
22   A. Yes.
23 Q.  Okay. Paragraph 14, when you were talking about
24   parking the car at the ATM, the drive-thru ATM,
25   which vehicle were you referring to, both vehicles

Page 35

1    or one in particular?
2    A. At the time the Mitsubishi Eclipse.
3  Q.  Okay. So, paragraph 14 would refer to the
4    Mitsubishi Eclipse?
5    A. Yes.
6  Q.  Okay. And forgive me if I've asked this before,
7    how many times approximately since you've been a
8    branch manager have you used the drive-thru ATM in
9    Seekonk, your branch, with the Mitsubishi Eclipse
10   vehicle?
11   A. Fifteen, twenty.
12 Q.  Okay. Now, can you walk me through your normal
13   process when you withdraw money from the Seekonk
14   drive-thru ATM? I know that sounds rather -- it
15   might sound ridiculous but I just want to
16   understand what you do.
17   A. I drive up, I put in my card, I do whatever
18   transaction it is that I'm doing, take my receipt
19   and leave.
20 Q.  Okay. When you're sitting in your car in front of
21   the point where you are going to insert the card
22   into the ATM machine, do you have to lean forward
23   out of the car window or are you able to just do
24   it without any motion? Do you understand what I'm
25   asking?

Page 36

1    A. I have to lean forward.
2  Q.  You have to lean forward?
3    A. I do.
4  Q.  Okay. And when you lean forward, is it fair to
5    say that you're leaning towards the ATM where you
6    put your -- at the point where you put the card
7    in?
8    A. Yes.
9  Q.  Okay. As you're leaning forward, are you able to
10   see the notice referenced in Exhibit E?
11   A. Yes.
12 Q.  Okay. Now, when you're talking about see the
13   notice, can you tell me what you mean by that
14   response?
15   A. I can see the physical plaque.
16 Q.  Okay. So, you're able to see that there is some
17   notice to the left of the ATM?
18   A. That's correct.
19 Q.  Okay. Are you able to read the part of that
20   notice that contains the fee notice, bottom
21   right-hand corner?
22   A. Not from that point.
23 Q.  Okay. Now, in paragraph 14 you say when you're
24   approaching the ATM in my vehicle, the convenience
25   fee notice appears at roughly the same level as

Page 37

1    the ATM facade?
2    A. Yes.
3  Q.  Okay. Now, did you do any independent
4    measurements to verify the accuracy of that
5    statement?
6    A. Yes.
7  Q.  Tell me what you did.
8    A. I took a tape measure and I measured it from
9    the ATM, the facade, the grayish/beige colored
10   metal portion of the machine to the middle of the
11   sign, also from the height
12 Q.  All right. Bear with me. Tell me again what you
13   did because -- maybe it would help so I can follow
14   through and not have to ask you a lot of questions
15   -- I'm looking at Exhibit E. Maybe you could
16   explain to me what you did in relation to on
17   Exhibit E.
18   A. Same as I did in number 13. I measured from
19   the protective portion of the ATM.
20 Q.  So what looks like kind of a bluish gray piece of
21   metal that needs some paint?
22   A. Yes.
23 Q.  Okay. Now, when you say the middle, what are you
24   referring to? From the top of the Sovereign Bank
25   sign or middle of the blue portion of the ATM?

48d70ccd-283f-4952-baf7-5c8823f8b7a1

April 18, 2006                    Rhiannon E. Hernandez and Stephanie K. Comeau

Page 38

1     A. The middle of this sign, the placard.
2     Q.  So you found the middle of the placard sign and
3     you compared it to --
4     A. To the metal.
5     Q.  -- the metal of the ATM machine?
6     A. Yes.
7     Q.  Okay. And your testimony is that the sign notice
8     is at the same level as what?
9         MR. FRECHETTE: Objection. That's not
10    what her affidavit says.
11    Q.  I want to understand what your conclusions were
12    when you did this measurement that you just
13    testified to.
14        MR. FRECHETTE: Are you withdrawing the
15    other question?
16        MR. LEFEBVRE: Yes.
17        THE WITNESS: I'm sorry. Can you repeat
18    it again?
19    Q.  Okay. You were just telling me that you did some
20    independent measurements to compare the location
21    of the fee notice in relation to the ATM, the
22    actual ATM machine, and I just want you to tell me
23    after you did those measurements what conclusion
24    you reached?
25        MR. FRECHETTE: Objection.

Page 39

1     A. It appears to be, to me, in the middle of the
2     actual ATM in terms of its view.
3         MR. FRECHETTE: The record should reflect
4     that the witness took her two index fingers,
5     placing her right index finger at the top of the
6     ATM facade on Exhibit E and her left index finger
7     at the bottom of the ATM facade on Exhibit E and
8     then moved her index fingers to the left, placing
9     her right index finger at the top of the red
10    Sovereign placard reflected on Exhibit E and her
11    left index finger at the bottom of the red placard
12    reflected on the left of Exhibit E.
13    Q.  But when you were actually doing measurements, you
14    didn't use your index figure to come up with the
15    conclusion that you just referenced in paragraph
16    14?
17    A. No, I did not.
18    Q.  What type of tool did you use, a ruler?
19    A. A measuring tape.
20    Q.  A flexible?
21    A. That's correct.
22    Q.  Who was with you when you did this?
23    A. My CSM, Claudia Austin St. Pierre.
24    Q.  And why did you do this?
25    A. To be sure that the measurements in the

Page 40

1     affidavit were accurate.
2     Q.  Did Claudia ask you to do that?
3     A. No.
4     Q.  Did anyone at the bank ask you to do that?
5         MR. FRECHETTE: Other than counsel.
6     A. No.
7     Q.  Focusing on paragraph 15 of your affidavit, what
8     do you mean by the phrase reasonably calculated to
9     impart information to non-Sovereign customers?
10    Those are not your own words; is that right?
11    A. That's correct.
12    Q.  Those are the words of the person or persons that
13    drafted this affidavit?
14    A. That's correct.
15    Q.  Okay. Can you tell me in your own words what that
16    means, that phrase?
17    A. That it's in a reasonable spot and you can see
18    it, it's visible.
19    Q.  What did you mean by the word impart?
20    A. I don't know.
21    Q.  Did you ask any of your co-workers -- strike that
22    Did you discuss the fee notices with any of your
23    -- I'll call them co-workers -- the people that
24    you testified that work with you in the branch?
25    A. Just Claudia.

Page 41

1     Q.  And tell me about the discussions you had with
2     Claudia about the fee notices?
3     A. Do you really want me to?
4     Q.  Yes.
5     A. That I think that this is totally ridiculous.
6     Q.  Who said that?
7     A. I did.
8     Q.  What is totally ridiculous?
9     A. The fact that somebody says that they can't
10    see the sign when, in fact, when you use the ATM
11    it says -- there's a fee sign on the screen which
12    asks for you to agree or disagree, and should you
13    disagree, the card is then released back to you
14    and your transaction is cancelled.
15    Q.  So, you're talking about the fee notice that's
16    actually on this screen that warns people that a
17    fee is going to be charged or not charged?
18    A. Uh-hum, yes.
19    Q.  And what did Claudia say?
20    A. She agreed.
21    Q.  Okay. Did you ask Claudia if she had ever used
22    the drive-thru ATM?
23    A. No.
24    Q.  Did Claudia read this affidavit?
25    A. No.

11 (Pages 38 to 41)

48d70ccd-283f-4952-baf7-5c8823f8b7a1

Page 42

1  Q.  Now, in paragraph 15 you say that the Convenience
2      Fee notice, and we're on the same page, that's the
3      little square that tells people that a fee may be
4      charged and it's on the big placard. You say that
5      the Convenience Fee notice is placed in a location
6      reasonably calculated to impart the information.
7      Tell me how you formed the basis that the location
8      of the notice was in such a place that a
9      non-customer would be able to see it?
10 A.  Because it's the first thing you see as you
11     approach the ATMs.
12 Q.  But you have no idea why the sign was placed in
13     the precise location in relation to the actual
14     physical ATM?
15         MR. FRECHETTE: Objection.
16 A.  No.
17 Q.  Now, you're pretty familiar with the various ATM
18     signage and the content because you work for the
19     bank; correct?
20         MR. FRECHETTE: Objection.
21 A.  Yes.
22 Q.  Okay. Now, could you take a look at paragraph 23
23     of your affidavit, it's on page 4.
24 A.  Yes.
25 Q.  Okay. Do you think it's easier to see the fee

Page 43

1      notice when you're using the vestibule ATM versus
2      someone using the drive-thru ATM, in your opinion?
3         MR. FRECHETTE: Objection.
4  A.  No.
5  Q.  No. So, what's easier to see, which notice? The
6      one at the vestibule or the one for the
7      drive-thru, in your opinion?
8         MR. FRECHETTE: Objection.
9  A.  You see them both before you approach the ATM.
10 Q.  So, in your opinion, they're what? Let me
11     withdraw the question. So, you think, in your
12     opinion, you can see both signs with the same
13     relative ease?
14         MR. FRECHETTE: Objection.
15 A.  Yes.
16         MR. LEFEBVRE: Okay. Tara, do you have
17     any questions?
18         MS. GOODWIN: No, I don't think so. I
19     don't believe so.
20         MR. LEFEBVRE: Give me two minutes. What
21     time do you have?
22         MR. FRECHETTE: I've got twelve to 1:00.
23         MR. LEFEBVRE: Okay. If you have no
24     questions, Tara, I think I'm done.
25         MR. FRECHETTE: I've got a couple of

Page 44

1      questions.
2         EXAMINATION BY MR. FRECHETTE:
3  Q.  Has the signage at the drive-thru ATM changed in
4      any way since you've been there?
5  A.  No.
6  Q.  Is your driver's license restricted in any way?
7  A.  No.
8  Q.  For vision?
9  A.  For vision, yeah, I'm sorry.
10 Q.  You're required to wear your glasses in order to
11     lawfully operate a motor vehicle?
12 A.  At all times, yes.
13 Q.  What, if anything, prevents someone approaching
14     the drive-thru ATM that we've been discussing from
15     stopping in front of the red placard sign and
16     reviewing its terms or contents?
17 A.  Negligence of their own but nothing -- I mean,
18     nothing physically obstructs them.
19 Q.  I'm talking about before driving up to the ATM.
20 A.  Nothing.
21 Q.  All right. That fact, i.e., that nothing stops
22     them from stopping in front of the placard and
23     reading it before approaching the ATM itself, the
24     drive-thru, what if any role did that play in your
25     -- in the formation of your testimony as reflected

Page 45

1      in paragraph 15 of your affidavit?
2  A.  What do you mean?
3  Q.  Read paragraph 15 of your affidavit.
4  A.  Okay.
5  Q.  What importance, if any, did you attach to the
6      fact that a person approaching the drive-thru ATM
7      is not impeded in any way from first stopping at
8      the notice before driving onto the ATM in making
9      the statements contained in paragraph 15?
10 A.  There's nothing stopping you physically in
11     front of the ATM that would prevent you from
12     seeing the sign as you drive up.
13         MR. FRECHETTE: I have nothing further.
14         MR. LEFEBVRE: I have nothing.
15         STEPHANIE K. COMEAU,
16     having first been duly sworn by the Notary Public,
17     testified as follows:
18         THE COURT REPORTER: Please state your
19     full name and spell it for the record.
20         THE WITNESS: Stephanie K. Comeau
21     (C-o-m-e-a-u).
22         EXAMINATION BY MR. LEFEBVRE:
23 Q.  Good afternoon, I'm Chris Lefebvre and I represent
24     Maureen DeLoreto and Diane Horton in a class
25     action lawsuit that they filed in the Federal

48d70ccd-283f-4952-baf7-5c8823f8b7a1

Page 46

1    Court in Massachusetts against Sovereign Bank.
2    We're here this afternoon to take your deposition
3    in response to an affidavit that you signed during
4    the course of this litigation.
5         I'm going to ask you some questions. If I
6    ask a question that you don't understand, please
7    let me know, it wouldn't be the first time, and I
8    will try to ask it in a more intelligent fashion;
9    okay?
10   A.  Uh-hum.
11   Q.   The other thing I'm going to ask is that you make
12   an audible response, no shaking of the head or
13   uh-hum. Please speak so that we have an accurate
14   record. And then the final ground rule, I'm going
15   to assume that if you answer a question, number
16   one, that you understood it and, number two, that
17   you are honoring the oath that you took and that
18   your answer will be true and accurate to the best
19   of your knowledge and belief; okay?
20        MR. FRECHETTE: Objection.
21   A.  Okay.
22   Q.   Can you please state your present address?
23   A.  My home address?
24   Q.   Yes, please.
25   A.  35 Cumberland Street and that's in South

Page 47

1    Attleboro, Mass.
2    Q.   And can you tell me a little bit about your
3    educational background?
4    A.  I have an undergraduate in business from
5    Northeastern University.
6    Q.   And when did you graduate from Northeastern?
7    A.  Probably in 2000.
8    Q.   And your degree is in what?
9    A.  Management, business management.
10   Q.   Are you married?
11   A.  Yes.
12   Q.   Do you have children?
13   A.  Yes.
14   Q.   And how many children?
15   A.  Two.
16   Q.   And how old are they?
17   A.  Six months and two and a half years old, two
18   years, ten months.
19   Q.   Now, can you tell me a little bit about your
20   degree in management. Can you tell me some of the
21   courses that you took as part of that degree. You
22   know, in relation to -- well, strike that. Tell
23   me a little bit about the courses you took?
24   A.  Just a lot of management courses, human
25   resource management, dealing with people. Worked

Page 48

1    a lot in a lot of focus groups, things like that
2    as far as managing people.
3    Q.   Okay. Did you take any advertising courses?
4    A.  Marketing.
5    Q.   General marketing?
6    A.  Yes.
7    Q.   Do you have any background in advertising or
8    conspicuity relative to signs and displays?
9    A.  No.
10   Q.   Do you understand what I meant by the word
11   conspicuity?
12   A.  Not really.
13        MR. FRECHETTE: Can we just stipulate to
14   the same objection I made earlier regarding why
15   she's being offered and what she's here for?
16        MR. LEFEBVRE: Absolutely.
17   Q.   When I'm talking about conspicuity, I'm referring
18   to whether or not something might be conspicuous;
19   okay?
20   A.  Yes.
21   Q.   All right. Tell me what you did to prepare for
22   today's deposition?
23   A.  What are you looking for?
24   Q.   Well, you tell me. What did you do to prepare to
25   come here? I am not asking about getting dressed

Page 49

1    and driving, I'm talking about did you look at any
2    documents?
3    A.  I reviewed the affidavit that I signed.
4    Q.   Okay. Did you speak to anyone?
5    A.  Yes.
6    Q.   Who?
7    A.  I spoke to the gentleman next to me.
8    Q.   Anyone else?
9    A.  No.
10   Q.   Okay. So, other than the affidavit, did you look
11   at anything else?
12   A.  I looked at the photos, I reviewed my drive-up
13   ATM and my walk-up ATM.
14   Q.   Now, when you say you looked at the photos, just
15   take a look at the packet that's sitting in front
16   of you. You're referring to the photos that are
17   compiled here?
18   A.  Yes.
19   Q.   And that's the Appendix of Exhibits we referenced
20   earlier?
21   A.  Yes.
22   Q.   In the other deposition. Now, when you say you
23   reviewed your ATMs, tell me what you actually did
24        MR. FRECHETTE: Objection.
25   Q.   You said in preparation -- I thought you said you

48d70ccd-283f-4952-baf7-5c8823f8b7a1

April 18, 2006                                    Rhiannon E. Hernandez and Stephanie K. Comeau

---

Page 50

1   actually looked at the ATMs at your branch?
2   A. Yes.
3   Q. When did you do that?
4   A. I look at them every day.
5   Q. Okay. So, was there anything special about
6   viewing the ATMs that you did in preparation of
7   this deposition?
8   A. No.
9   Q. Okay. Now, you work at the Plainville branch?
10  A. Yes.
11  Q. Is there more than one Sovereign branch in
12  Plainville, Massachusetts?
13  A. No.
14  Q. The photographs that you reviewed that you just
15  perused that are in front of you, were you present
16  at the Plainville branch when someone came to take
17  pictures of the two ATMs?
18  A. Yes.
19  Q. Okay. Now, were you actually with the person at
20  the precise location of the ATM when the pictures
21  were taken?
22  A. No.
23  Q. So, is it fair to say you were just working inside
24  of the branch while the pictures were being taken?
25  A. Yes.

Page 51

1   Q. Okay. Do you know why you were chosen to submit
2   an affidavit in this litigation?
3   A. No.
4   Q. Who asked you to sign the affidavit and, you know,
5   just so we're all on the same page, we've
6   premarked Exhibit 2 and when I talk about an
7   affidavit, I'm referring to the document that's in
8   front of you. First of all, would you please take
9   a look at Exhibit 2 and just verify that, in fact,
10  your signature does appear on page 4 of the
11  affidavit?
12  A. Yes.
13  Q. Okay. So, getting back to my question, who asked
14  you to sign the affidavit?
15  A. My immediate supervisor.
16  Q. Okay. Tell me who your immediate supervisor is?
17  A. Minnie Saleh.
18  Q. Now, tell me what Minnie Saleh does for the bank?
19  A. She is the regional vice-president for the
20  bank and she manages commercial and retail
21  branches.
22  Q. And is she the same regional manager for the
23  Seekonk branch where Ms. Hernandez works?
24  A. Yes.
25  Q. Do you know if Minnie asked Ms. Hernandez to sign

Page 52

1   an affidavit in relation to this litigation, if
2   you know?
3   A. Yes.
4   Q. And how do you know that?
5   A. Through the e-mail.
6   Q. Tell me about the e-mail. What e-mail are you
7   referring to?
8   A. The e-mail of the actual affidavit.
9   Q. Okay. And I am not trying to be picky but when
10  you say the e-mail of the actual affidavit, are
11  you referring to your affidavit or Ms. Hernandez'
12  affidavit?
13  A. My affidavit that was on the e-mail.
14  Q. Okay. And based on what was in your e-mail, you
15  believe that Minnie asked Ms. Hernandez to sign a
16  similar affidavit?
17  A. Yes
18  Q. Okay. So Minnie is definitely your superior;
19  correct?
20      MR. FRECHETTE: Objection.
21  A. We're actually a different structure now. So,
22  it's changed recently within the past month or two
23  where we have another level of area managers
24  between us and Minnie.
25  Q. Oh, okay. When did that change take place?

Page 53

1   A. A month ago.
2   Q. All right. And why don't you tell me what the
3   structure was before the change. Minnie was your,
4   we'll call superior?
5   A. Yes.
6   Q. And now there's a change?
7   A. Yes.
8   Q. And just tell me briefly what change has been
9   made?
10  A. Now I report to an area manager who oversees
11  five offices.
12  Q. Okay. And is the Seekonk branch where Ms.
13  Hernandez works one of the offices that your area
14  manager oversees?
15  A. No.
16  Q. And that area manager reports to Minnie?
17  A. Correct.
18  Q. Okay. Now, you said that you received the
19  affidavit, Exhibit 2, via e-mail.
20  A. Yes
21  Q. Okay. Do you remember when you first received the
22  affidavit?
23  A. No.
24  Q. Now, I notice we're looking at your signature on
25  page 4 of Exhibit 2, that you signed the affidavit

14 (Pages 50 to 53)

48d70ccd-283f-4952-baf7-5c8823f8b7a1

1   on January 28th, 2006?
2   A.  Yes
3   Q.  Where were you when you signed this affidavit?
4   A.  In the Plainville office.
5   Q.  Okay.  And how long after you originally received
6   -- the first time that you received an affidavit,
7   did you sign this document?  I mean, how long was
8   there?  Was there a period of time?
9   A.  I'm not sure.
10  Q.  Okay.  Did anyone interview you or ask you
11  questions before this affidavit was prepared and
12  ultimately sent to you?
13  A.  No.
14  Q.  Okay.  So, were you surprised when you received
15  this e-mail asking that you sign an affidavit?
16  A.  No.
17  Q.  Why weren't you surprised?
18  A.  Because I was aware that something was going
19  on.
20  Q.  How were you aware that "something was going on"?
21  A.  From the pictures, and they had taken pictures
22  previous, you know, before that.
23  Q.  Okay.  Tell me a little bit about your current
24  position at Sovereign.  What does a community
25  branch manager do?

1   A.  I oversee the operations and sales for the
2   Plainville office.  So I have a team of people
3   that report to me directly.
4   Q.  How many individuals comprise that team of people
5   in the Plainville branch?
6   A.  Nine.
7   Q.  Can you just walk me through briefly the
8   categories of people and what their job titles
9   are, that work with you?
10  A.  I have an assistant manager who runs the
11  office in my absence.
12  Q.  What is his or her name?
13  A.  Kimberly Kiff (K-i-f-f).
14  Q.  How long has Kimberly been at the bank?
15  A.  Probably twenty years.
16  Q.  And how long have you been with Sovereign?
17  A.  Four and a half.
18  Q.  Is Kimberly fairly knowledgeable about the general
19  operations of the branch?
20      MR. FRECHETTE:  Objection.
21  A.  Yes.
22  Q.  Would she be "your right-hand person," if you had
23  to turn to someone for an issue?
24  A.  Yes.
25  Q.  Okay.  Other than Kimberly, who else is there?

1   A.  Our financial relationship specialist.
2   Q.  And what is his or her name?
3   A.  Nella Cloud.
4   Q.  It's (N-e) --
5   A.  It's actually Manuella Cloud (C-l-o-u-d).
6   Q.  How long has Manuella been there?
7   A.  Four years.
8   Q.  And her job description generally is?
9   A.  Responsible for the top 250 customers in the
10  office.
11  Q.  What is the top 250 customers?
12  A.  High balance customers in the office.
13  Q.  Okay.  Who else?
14  A.  Personal banking representative, Kimberly
15  Lambert.
16  Q.  How long has Kimberly worked at Sovereign?
17  A.  About four years.
18  Q.  What does she do?
19  A.  She's a sales and service representative on
20  the desk.
21  Q.  Okay.  Next?
22  A.  Customer service supervisor.
23  Q.  And what is his or her name?
24  A.  Debbie Tamborelli.
25  Q.  And how long has Debbie been with the bank?

1   A.  About a year and a half
2   Q.  And what does she do?
3   A.  She's responsible for the operations, the
4   teller line and the audits.
5   Q.  And who else?
6   A.  Jennifer Brothers.
7   Q.  What does Jennifer do?
8   A.  She's a lead teller.
9   Q.  How long has she been there?
10  A.  Sixteen years.
11  Q.  And I assume you have some other tellers.
12  A.  Yeah, Theresa Becker.  Vivienne Liang.
13  Q.  Both tellers?
14  A.  Yeah.  Mary Kate Mitchell.
15  Q.  So, pretty much you've outlined the various
16  positions.  The rest of the people in the bank are
17  tellers that --
18  A.  Yes.
19  Q.  Okay.  Now, what if any responsibility do you have
20  for maintenance of the ATM signs at the Plainville
21  branch?
22  A.  I don't think I understand the question.
23  Q.  Okay.  Well, that was not a good question.  You're
24  familiar with the location of the ATM placards
25  located both at the drive-thru ATM and the one

April 18, 2006                                    Rhiannon E. Hernandez and Stephanie K. Comeau

Page 58

1      inside of the -- we'll call it the vestibule?
2             MR. FRECHETTE: Objection.
3      A. Yes.
4   Q. Were you -- who was responsible for the actual
5      placement of the sign, where it's located, either
6      on or at the ATM?
7             MR. FRECHETTE: Objection.
8      A. I don't know.
9   Q. Was it you?
10     A. No.
11  Q. Okay. Do you know what the acronym EFTA stands
12     for? Do you know what I mean when I say the word
13     acronym?
14     A. Electronic Funds Transfer Agreement.
15  Q. Can you tell me what your understanding is of the
16     Electronic Funds Transfer Agreement?
17     A. I don't know what you're looking for.
18  Q. Well, I mean, tell me what you know about it
19     A. There's a lot that goes with it. What
20     specifically are you looking for?
21  Q. Just give me a general understanding of what you
22     know. What does it regulate? What does it do?
23     What does it apply to?
24     A. It is just such a general term, I'm not sure
25     what you're looking for.

Page 59

1   Q. Okay. Do you know when the ATM signs both at the
2      -- in the branch and the drive-thru were actually
3      posted?
4      A. No.
5   Q. Okay. Have the same signs been there in the same
6      location since you've been at that branch for four
7      and a half years?
8      A. Yes.
9   Q. What kind of car do you drive?
10     A. Chrysler Pacifica.
11  Q. And how long have you driven that car?
12     A. Six months.
13  Q. And prior to driving the Pacifica, what kind of
14     automobile did you --
15     A. Volkswagen Passat.
16  Q. Okay. How long did you have that?
17     A. Two years.
18  Q. Have you ever used the ATM that's located, what
19     I'll call in the branch?
20     A. Yes.
21  Q. How many times have you used that ATM within the
22     last year, if you know? More than twelve times?
23     A. Yes.
24  Q. More than fifty times?
25     A. Yes.

Page 60

1   Q. Okay. How about the -- we'll call it the
2      drive-thru ATM, in the last year how many times
3      have you used the drive-thru ATM?
4      A. Less than twelve.
5   Q. Less than twelve. Okay. Now, how tall are you?
6      A. 5'6.
7   Q. Okay. And how old are you?
8      A. 34.
9   Q. Do you wear glasses?
10     A. No.
11  Q. How about contacts?
12     A. No.
13  Q. Do you have any physical infirmities that may make
14     it difficult for you to turn your body?
15     A. No.
16  Q. So, you're in good health?
17     A. Yeah.
18  Q. I'd like you to take a look at the pictures, I'll
19     just get my index. I want you to take a look at
20     Exhibit H, which is Tab H.
21     A. Yes.
22  Q. Also, take a look at Exhibit I, just maybe flip to
23     it. I am going to ask you a couple of questions.
24     Now, it's fair to say that Exhibit H and I depict
25     what I'll call the vestibule ATM at the Plainville

Page 61

1      branch?
2      A. Yes
3   Q. Okay. And Exhibit I, excuse me, Exhibit H. There
4      is a blue -- I don't know --
5             MR. FRECHETTE: Kiosk.
6             MR. LEFEBVRE: Kiosk, thank you.
7   Q. Then there's a fire alarm switch and then there is
8      what I'm going to call a Sovereign Bank signage.
9      Do you see what I'm referring to?
10     A. Yes.
11            MR. FRECHETTE: You're talking about the
12     mechanical assembly to the left of Exhibit H? The
13     physical structure that's on the left of the
14     photograph?
15            MR. LEFEBVRE: Yes.
16            MR. FRECHETTE: Okay.
17  Q. And then on the other side of the wall where this
18     signage and this kiosk and the little fire alarm
19     tab we've referenced is where the ATM is?
20     A. Yes.
21  Q. Okay. Now, will you take a look at Exhibit J.
22     Now, is it fair to say that Exhibit J is a
23     close-up photo, a depiction of the signage
24     contained or referenced in Exhibit I in the blue
25     kiosk? Take your time to make sure we're on the

16 (Pages 58 to 61)

48d70ccd-283f-4952-baf7-5c8823f8b7a1

April 18, 2006                                Rhiannon E. Hernandez and Stephanie K. Comeau

Page 62

1   same page.
2   A  Yes.
3   Q   Okay.  Looking at Exhibit J -- which is the blowup
4   of the sign -- and I am just asking, in your
5   opinion, do you think that the words Sovereign
6   Bank on the top of this sign are prominent and
7   conspicuous?
8        MR. FRECHETTE: Objection. You can
9   answer.
10  A  Yes.
11  Q   Okay.  Do you think the words on the left-hand
12  side of the sign, that's like the third block down
13  it says, Visa.  Do you think that word Visa is
14  prominent and conspicuous in relation to this
15  sign?
16  A  Yes.
17  Q   Do you think the word NYCE up in the right-hand
18  corner is prominent and conspicuous?
19  A  Yes.
20  Q   Now, at the -- towards the bottom of the
21  right-hand column there is a fee notice.  Are you
22  familiar with the fee notice?
23  A  Yes.
24  Q   Okay.  Do you think the wording contained in this
25  little square about the fee notice is prominent

Page 63

1   and conspicuous?
2        MR. FRECHETTE: Objection.
3   Q   I'm just asking your opinion.
4   A  Yes.
5   Q   Can you read the fee notice you just referenced as
6   easy as you can read the word NYCE?
7   A  Yes.
8   Q   Can you read the fee notice as easy as the word
9   Visa?
10       MR. FRECHETTE: Objection. Objection to
11  the prior question as well but that's fine.  You
12  understand when I object you can still go ahead
13  and answer?
14       THE WITNESS: Okay.
15       MR. LEFEBVRE: Unless I say something
16  grossly inappropriate which will not happen
17  hopefully.
18  A  Yes.
19  Q   Is it your testimony that when someone uses the
20  ATM in the vestibule that they are able to easily
21  read the fee notice referenced on Exhibit J?
22       MR. FRECHETTE: Objection.
23  A  Yes.
24  Q   And it's on the opposite wall of the ATM; correct?
25  A  Yes.

Page 64

1   Q   So, are you telling me that if someone walks into
2   the vestibule is standing at the ATM, puts their
3   card in the ATM, is punching their password, from
4   that vantage point they can see the notice
5   referenced in Exhibit J?
6        MR. FRECHETTE: Objection. You know
7   that's not what she said.
8   Q   I'm just asking, can they?
9   A  It's impossible not to see it.  When you walk
10  through the door, the sign is right in front of
11  you before you even hit the ATM.  So --
12       MR. FRECHETTE: Listen to his question.
13       THE WITNESS: Okay.
14  Q   My question is from the vantage point when a
15  consumer is inserting his or her ATM card into the
16  Sovereign machine, punching their little code,
17  deciding whether they're going to withdraw from
18  checking or savings, from that vantage point, I'm
19  asking your opinion, is a consumer able to see the
20  notices referenced on Exhibit J?
21  A  No.
22       MR. FRECHETTE: Objection.
23  Q   Now, can you turn to your affidavit, Exhibit 2.  I
24  would like you to focus on paragraph 25.  After
25  you've read 25, let me know and I am just going to

Page 65

1   ask you a couple of questions.
2   A  Okay.
3   Q   You state that the convenience fee notice is
4   placed in a location reasonably calculated to
5   impart its information to non-Sovereign customers.
6   First of all, those are not your exact words;
7   correct?
8   A  No.
9   Q   In fact, those are the words of the person or
10  persons who drafted this affidavit; correct?
11  A  Yes.
12  Q   I want you to tell me, in your own words, what
13  paragraph 25 means.
14       MR. FRECHETTE: Objection.
15  Q   Or what did you intend it to mean when you signed
16  the affidavit?
17  A  That I believed that it's impossible not to
18  notice the convenience fee placard on the wall.
19  Q   Okay.  The general placard itself?
20  A  Yes.
21  Q   Would you agree with me that it might impart
22  clearer notice to a consumer if the convenience
23  fee square were placed on the ATM rather than on
24  the opposite wall?
25       MR. FRECHETTE: Objection.

17 (Pages 62 to 65)

April 18, 2006

Page 66

1    A. I don't understand what you're asking me.
2  Q. Okay. You said that placing, and I am
3    interpreting what it says here. If I'm
4    misinterpreting, please tell me. I'm reading this
5    to say that you believe that putting this notice
6    on the opposite wall of the ATM, because that's
7    where it is, what you told me, was placed in a
8    location reasonably calculated to tell a
9    non-customer about the possibility of a fee. Do
10   you stand by that statement today?
11   A. Yes.
12 Q. Do you think it would be easier for a consumer to
13   be aware of the possibility of a fee being
14   assessed if the little notice were located on the
15   actual ATM? Just asking in your opinion.
16      MR. FRECHETTE: Objection.
17   A. Can you rephrase the question.
18      MR. LEFEBVRE: Could you read the question
19   back?
20      (Question read back as requested.)
21   A. No.
22 Q. Going back to Exhibit J -- no, you don't have to
23   go back, I'm sorry. Well, you would agree with me
24   that if the sign, the fee notice sign, the little
25   bottom right-hand notice on Exhibit J, if it were

Page 67

1    actually on the ATM, it would be easier for a
2    non-customer to read? You would agree with that
3    statement?
4       MR. FRECHETTE: Objection.
5    A. No, I think it's easy to read where it is.
6  Q. I used the word easier.
7    A. It's easy to read where it is.
8  Q. All right. So, you disagree with my statement
9    that it would be easier to read the notice if it
10   were located on the actual ATM?
11      MR. FRECHETTE: Three times so far.
12 Q. Right? You disagree with that? You're nodding
13   your head, I just want to have an answer.
14      MR. FRECHETTE: You have to answer
15   audibly, yes or no.
16   A. Yes.
17      MR. FRECHETTE: Yes, you disagree.
18   A. Yes, I disagree.
19 Q. Now, you said that -- and I am just paraphrasing.
20   When you walk into the vestibule, it's difficult
21   not to notice the sign referenced in Exhibit J,
22   the entire sign that you have in front of you?
23   A. Yes.
24 Q. Now, are you referring -- I want to make sure
25   we're on the same page here. When you made that

Page 68

1    statement, you're talking about someone walking
2    into the ATM and being able to see this entire
3    large placard; correct?
4    A. Correct.
5  Q. Are you saying that it is also impossible for
6    someone to walk into the vestibule and not be able
7    to notice the little -- the fee notice contained
8    in the bottom right-hand corner?
9       MR. FRECHETTE: Objection.
10   A. Correct.
11 Q. Now, have you ever examined the actual ATM in the
12   vestibule to see if there is any room on it to
13   actually put a fee notice on the ATM?
14   A. No.
15 Q. You never have, okay. Do you regularly use
16   non-Sovereign Bank ATMs?
17   A. No.
18 Q. Okay. Have you used a non-Sovereign ATM where you
19   were assessed a fee?
20   A. Yes.
21 Q. How many times within the last year, ballpark? Is
22   it a rare occasion?
23   A. Rare.
24 Q. Okay. I'd like you to take a look at Exhibit --
25   let's take a look at Exhibit L, L and M. So,

Page 69

1    we're moving along to the actual ATM, drive-thru
2    ATM. Now, you'd agree with me that looking at
3    Exhibit M that the sign to the left of the actual
4    ATM machine, you know, the gray part of the ATM is
5    identical to the sign that's in the vestibule?
6    A. Yes.
7  Q. Okay. And that's the same logos and content?
8    A. Yes.
9  Q. Now, you said you've used this drive-thru, I
10   think, less than a dozen times?
11   A. Yes.
12 Q. Now, take a look at your affidavit again. I want
13   to just go back, just some brief questions about
14   the affidavit. You'll notice on page 2,
15   paragraphs 7, 8, 11, and 13, that there are
16   certain calculations about the precise location of
17   the signage both in the vestibule and the
18   drive-thru. These calculations, did you verify
19   the accuracy of these calculations?
20   A. Yes.
21 Q. Okay. And when did you verify the accuracy,
22   before or after you signed this affidavit?
23   A. After I signed the affidavit.
24 Q. And why did you verify the accuracy of the numbers
25   contained in the affidavit after you signed it

48d70ccd-283f-4952-baf7-5c8823f8b7a1

Page 70

1  rather than before?
2      A.  Because before they reasonably looked pretty
3  accurate and I just, like I said, after coming
4  here today, I did go out and verified the
5  measurements today to make sure they were exactly
6  accurate.
7      Q.  Okay.  Did someone ask you to do that or did you
8  just do it on your own?
9          MR. FRECHETTE:  Objection.  Before you
10  answer that question, when he says someone, he
11  means other than conversations you may have had
12  with lawyers.
13          MR. LEFEBVRE:  Well, let me just, so the
14  record is clear, I think I can ask if someone did
15  and if the answer happens to be a lawyer, I don't
16  think that's a privileged response.  I'm not going
17  to go any further but I think I'm entitled to know
18  if it was the lawyers that asked her.
19          MR. FRECHETTE:  I don't think you are.
20      Q.  Well, let me ask the question so we're on the same
21  page.  Did someone ask you to verify the accuracy
22  of these measurements or did you do it on your
23  own?
24          MR. FRECHETTE:  Other than lawyers.
25      A.  I did it on my own.

Page 71

1      Q.  On your own?
2      A.  Correct.
3      Q.  And when did you do this verification in relation
4  to signing the affidavit?  And I believe you
5  signed it on January 28th, 2006.
6      A.  Last week.
7      Q.  Did you do it in preparation of your deposition
8  testimony today?
9      A.  Yes.
10      Q.  Okay.  Now, is it -- when you've used the
11  drive-thru ATM, can you -- I know this sounds
12  ridiculous but bear with me -- can you walk me
13  through the process, what you do when you've used
14  the drive-thru ATM?
15      A.  I drive my car up to the machine and I put my
16  card in.
17      Q.  Okay.  When you're putting your card in the
18  machine and punching your code and making a
19  decision, you know, whether you're going to
20  withdraw from checking, savings, whatever, are you
21  able to from that vantage point, are you able to
22  read the fee notice contained on the placard to
23  the left of the ATM?
24      A.  Yes, if I turn my head and look behind me.
25      Q.  So you have to turn your head, look behind you and

Page 72

1  then you'd be able to read the fee notice?
2      A.  Yes.
3      Q.  Okay.  And you have no problem turning your head?
4      A.  No.
5      Q.  Do you have to bend down a little bit or -- to see
6  it or just --
7      A.  No, just turn your head.
8      Q.  Okay.  How far do you have to turn your head?
9      A.  90 degrees.
10      Q.  Okay.  Now, are you able from the vantage point of
11  putting your card into the machine and you're
12  punching your code and deciding whether to
13  withdraw from checking or savings, are you able to
14  see the other notices on the placard?  When I'm
15  referring to the other notices, I'm talking about
16  the NYCE notice, the Sirrius notice, the Visa, or
17  do you still have to turn your head to see those?
18      A.  I'm able to see those.
19      Q.  Without turning your head?
20      A.  Correct.
21      Q.  If you wanted a non-customer to be able to easily
22  read the fee notice, wouldn't it be best to put it
23  right on the ATM somewhere near where you insert
24  your card?
25          MR. FRECHETTE:  Objection.

Page 73

1      Q.  In your opinion?
2      A.  Yes.
3      Q.  And you believe that the fee notice located at the
4  drive-thru ATM, the exhibit that you have in front
5  of you, Exhibit L and M, is placed in a location
6  that's easy for the consumer to know that a fee
7  might be charged?
8      A.  Yes.
9      Q.  Now, when I -- strike that.  Did you have any
10  discussions during that four or five-minute break
11  from the time that I ended the deposition of
12  Rhiannon Hernandez, did you discuss with her
13  anything about her deposition testimony?
14      A.  No.
15      Q.  You had no discussions at all?
16      A.  No.
17          MR. LEFEBVRE:  Tara, do you have any
18  questions?
19          MS. GOODWIN:  No, I don't have any.
20          MR. LEFEBVRE:  I am done.
21          MR. FRECHETTE:  I have one.
22          EXAMINATION BY MR. FRECHETTE:
23      Q.  What, if anything, based upon your knowledge of
24  the drive-thru ATM machine at your branch prevents
25  somebody from stopping before they get to the

19  (Pages 70 to 73)

April 18, 2006

Rhiannon E. Hernandez and Stephanie K. Comeau

Page 74

```
1    actual ATM machine itself to read the notice?
2    A. Nothing
3         MR. FRECHETTE: I have nothing further.
4         MR. LEFEBVRE: Okay. Tara, thanks.
5         (Deposition concluded at 1:47 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 75

```
1    STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
     PROVIDENCE, SC.
2
3         I do hereby certify that I am expressly
4    approved as a person qualified and authorized to
5    take depositions pursuant to the Rules of Civil
6    Procedure of this Court, especially, but without
7    restriction thereto, under Rule 30 of said Rules;
8    that the witness was first sworn by me; that the
9    transcript contains a true record of the
10   proceedings.
11        I further certify that neither the
12   deponent nor any party requested a review of the
13   transcript.
14        IN WITNESS WHEREOF I have hereunto set my
15   hand this 19th day of April, 2006.
16
17
18        _____
19        SALLY BRASSARD, CSR/RPR
          NOTARY PUBLIC
          MY COMMISSION EXPIRES: 1/16/09
20
21
22
23
24
25
```

20 (Pages 74 to 75)

www.AlliedCourtReporters.com    ALLIED COURT REPORTERS, INC. (401)946-5500 or (888)443-3767
48d70ccd-283f-4952-baf7-5c8823f8b7a1

# Appendix 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| MAUREEN E. DELORETO and<br>DIANE E. HORTON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 05 CV 10712 RCL |
| v. | ) | |
| | ) | |
| SOVEREIGN BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF MARC A. GREEN

I, Marc A. Green, make the following declarations under penalty of perjury:

1.    If called to testify in this case, I would testify in accordance with the

opinions set forth in the Report of Marc A. Green, dated May 11, 2006.

SWORN AND SUBSCRIBED TO UNDER THE PAINS AND PENALTIES OF PERJURY
THIS 11TH DAY OF MAY, 2006.

s/Marc A. Green, Ph. D._____
Marc A. Green, Ph.D

I, Marc A. Green, Ph. D. of the City of Toronto, Ontario present the following declaration.

I am presently a consultant employed by 2057949, Ontario, Inc. (Visual Expert), a firm in the City of Toronto, Ontario, Canada. I am also adjunct professor in Ophthalmology at the University of West Virginia Medical School.

My professional qualifications are detailed in the curriculum vitae, but I will recite them briefly here. I hold the B. A. degree in psychology from the University of Pittsburgh and the Ph.D. in experimental psychology from Northeastern University, Boston, Massachusetts. I have been engaged in research, teaching and consulting in the behavioral sciences since 1971 and have held faculty positions in psychology and optometry at several universities, including University of Toronto, University California Berkeley and Indiana University. I have frequently taught courses on experimental psychology, perception, cognition and vision to both graduate and undergraduate students and have presented over numerous lectures and seminars to scientific meetings, professional organizations and industry. I have published 90 articles and abstracts and have received grants and contracts from the National Institute of Health, the National Science Foundation, the National Science Engineering Research Committee and the U. S. Air Force Armstrong Aerospace Medical Laboratory. I have frequently designed and carried out experiments and assessments of human vision, perception, cognition and behavior. As a result of my professional qualifications and experience, I am competent to give the opinions contained in this declaration.

## Purpose

I will address three issues raised by the defense's motion for summary judgment in the matter of: *MAUREEN D. DELORETO and DIANE E. HORTON, Plaintiffs, v. SOVEREIGN BANK, defendant.* First, the defendant asserts that the fee notices were in a "prominent and conspicuous" location. Second, it states that there is a distinction between location and style/presentation when considering conspicuity. Lastly, the defendants assert that the plaintiffs have failed to produce positive evidence.

To help form an opinion, I examined the documents listed in Exhibit A. I conclude that the defendant presents no meaningful evidence that the fee notices were in a prominent and conspicuous location. I further conclude that any attempt to draw a strict distinction between location and style/presentation is impossible since the two factors are inextricably intertwined in determining whether a notice is prominent and conspicuous.

## The defendant's assertion that the fee notices resided in a "prominent and conspicuous" location is unfounded.

The defendant states that the fee notices were situated in "prominent and conspicuous" locations as required by law. For example, it states that "even the most cursory view of this undisputed evidence reveals that Sovereign posted the Placard Notices in prominent and conspicuous

locations" (p 12 of *Memorandum in Support of Motion For Summary Judgment*) and that the notice was "located where no reasonable person could fail to observe it" (p 13 of *Memorandum in Support of Motion For Summary Judgment*). However, the defendant provides no compelling evidence to prove either statement. Rather, it supports its opinion by: 1) simply stating its own casual, non-expert observations, 2) supplying two bank employee affidavits and 3) providing measurements of placard and notice distances from various points on or at the ATMs.

<u>Defendant's non-expert introspections should carry no scientific weight.</u>  The defendant apparently believes that the prominence and conspicuity of a notice is simply a matter of casual observation and introspection. In fact, conspicuity is not a matter for uninformed, non-expert opinion but rather for scientific inquiry based on well-established scientific principles of human perception and attention.

The creation of conspicuity and control of attention has been an intense topic of study for both the basic scientific and the applied worlds for many years. A search of the PSYCHINFO research database, for example, revealed 2956 hits for the search "attention and (conspicuous or conspicuity or pop out or search or salience)." There are also many hundreds, and possibly thousands, of research studies on specific topics such as making road signs (e. g., Cole & Hughes, 1984) and product warnings (e .g., Rogers, Lamson & Rousseau, 2000) conspicuous. This research has been necessary precisely because it is difficult to predict degree of conspicuity based on casual observation and introspection.

Only experts with extensive experience and knowledge of the research literature are qualified to render an opinion about what is and what is not a prominent and conspicuous location. The defendant's documents, for example, reflect a lack of the most basic knowledge when they state that "the Placard Notices are visible to customers who access Sovereign's Seekonk and Plainville drive-up ATMs" *(p 12 of* Memorandum in Support of Motion For Summary Judgment.*)* In fact, visibility is a different issue from conspicuity.  In technical use, the term "visibility" refers to whether an object is capable of being seen while conspicuity refers to whether an object is likely to be seen.  These are two fundamentally different perceptual judgments because even highly visible objects can be very inconspicuous.

<u>The bank employee affidavits are irrelevant to the determination of conspicuous and prominent location.</u> The defendants offer the affidavits of two bank employees, Rhiannon Hernandez and Stephanie Comeau. These affidavits have no scientific significance. Conspicuity refers to an object's ability to attract attention, especially *when the viewer does not know in advance* that the object is there. In fact, the notices presumably exist to alert people who have not used a Sovereign ATM previously. Since, Ms. Hernandez and Ms. Comeau worked at the bank and were likely highly familiar with the notices in advance of their ATM use, their opinions on the notice's conspicuity and prominence cannot be taken as representative of the average, naïve ATM user – the people for whom the notices are intended. Of course, the defendant's own assertions about conspicuity expressed in the motion for summary judgment are similarly compromised by advanced knowledge of where the notices were and what they said.

Moreover, the production of two bank managers who claim that the placard notices were in conspicuous and prominent locations hardly proves that "no reasonable person would fail to observe it." A sample of two from hundreds or thousands of people who use the ATMs is insufficient to draw any conclusion. The affidavits reveal nothing about the number of people who may have used the ATMs but who failed to see and to read the notices.

The distance measurements say little about prominence and conspicuity of location. The defendant also attempts to support its conclusions by providing measurements of the placard and notice distances from various points on the ATM – the edge and the middle of the screen. These measurements are, I presume, supposed to demonstrate the close proximity of the notices to the ATM. In fact, the measurements by themselves reveal little.

The concept of "prominent and conspicuous" is inherently perceptual, not physical. By definition, an object is in a prominent and conspicuous location if and only if people actually attend it. This is determined by location in the visual field, not location defined by a set of physical measurements. A location's prominence and conspicuousness is a function of where the viewer is likely to be looking.

An object is more conspicuous if it is located in the center of the visual field near the viewer's direct sightline. The eye is like a camera, forming images on a "film" called the "retina." Unlike camera film, the retina is not uniform, having a central area called the "fovea" where vision is sharpest. Objects on the sightline cast images on the fovea and are seen best while objects located off the sightline in peripheral vision are blurred. Moreover, attention is often conceptualized as a spotlight that is centered in the fovea and that moves with the eyes. A viewer will attend objects near the sightline and within the spotlight, but will not likely attend objects outside the spotlight (e. g., Treisman & Gelade, 1980; Green 2001).

For a viewer approaching an ATM and looking at the screen or keyboard, for example, a printed notice located 46 inches from the screen center would be located in the far visual periphery, outside the spotlight. It is outside the area of focused attention and good spatial resolution and would appear blurred and illegible. This effect would be magnified if the viewer were driving a car and attempting to stop at a point aligned with the ATM screen and keypad. Her attention would be focused on her driving and on the ATM center, so that she would be unlikely to see or to read a fee notice 46 inches away.

In sum, prominence and conspicuity are determined by location in the visual field and not directly by location on the building. Any statement about whether a location is prominent and conspicuous must take into account, among other things, likely viewer behavior and sightlines. This critical analysis is absent from the defendant's motion. It is not possible to make any convincing assertion about location prominence and conspicuousness based on physical measurements alone.

**The distinction between location and style/presentation is not meaningful.**

The defendant also claims that the only matter in dispute is prominence and conspicuity of location and that the fee notice's style and presentation are irrelevant. The defendant is drawing a meaningless distinction because it is impossible to disentangle location from style/presentation when evaluating conspicuity.

Even proximity to the viewer's sightline does not entirely specify conspicuity. A prominent location for one presentation may not be a prominent location for another. Some objects, like flashing lights and large colored symbols, attract attention so well that their position might be considered prominent and conspicuous if it were merely within the central 20-30° of the visual field. In contrast, small print, which requires high-resolution foveal vision, would not be in a prominent position unless it were almost directly in the viewer's sightline. Even then, other factors could affect conspicuity.

The intimate connection between location and content/presentation is obvious from a simple thought experiment. Suppose you put up a notice, but concluded that too few people saw it. Is this failure due to location or to size of the notice? The answer is both. You could likely increase the percent of people who see and read the notice by either doubling its size or moving it closer to the ATM and viewer's sightline. The concept of prominence and conspicuity cannot logically be a factor of only one variable, because there is an inherent tradeoff between location and size (and color, contrast, etc.). Presentation and location are inextricably tied together.

Moreover, prominence and conspicuousness of location cannot be defined without regard to other factors. If the visual field is cluttered with other objects that could mask the notice and capture attention, then requirements for prominent conspicuous location are different than if the visual field is otherwise empty. People are far less likely, for example, to see a printed notice when there are other objects, shapes, words, etc. in the visual field and competing for attention. This is particularly true when the competing objects are more salient, like large colored bank symbols, that are more likely to attract attention. In sum, a location is "prominent and conspicuous" both if it falls near the sightline and if it has little else to compete for attention.

**There is positive evidence that the fee notices were not in a prominent and conspicuous location.**

A person seeking an ATM compatible with a specific bankcard would be looking for a machine having the appropriate colored symbol. This judgment could be made from a relatively great distance owing to the high visibility and conspicuity of colored shapes. (In fact, that is doubtless why this bankcard information is displayed as a colored symbol rather than simply as a printed word.) The colored symbol would capture attention away from the fee notice, which in any event would not be legible at a distance. Once the person has decided to use the ATM, she would approach but would have no need to further look at the placard, having already extracted the relevant information. Rather, people moving through the environment tend to focus attention at

their point of destination. A person approaching the ATM would be looking at the screen and keyboard (or perhaps taking the card out of her purse/wallet) and not at the placard. The closer the person approaches, the further placard falls from the viewer's sightline.

As I have already explained, objects further from the viewer's likely sightline are located outside the attentional spotlight and in low-resolution portion of the visual periphery. Moreover, a person approaching the ATM in a vehicle would be especially unlikely to see and to read the notices. First, I have explained that the task of bringing the car into proper alignment with the ATM would require close attention to the screen/keyboard as well as to controlling the vehicle's position. The driver is unlikely to have the time or inclination to spend attention on reading small print on the building wall. Second, the driver would be moving relative to the placard, causing the notice's image to move across the eye and resulting in further blurring and legibility reduction. Third, legibility is best when the print lies on a surface perpendicular to the viewer's eye. For a person using a drive-through ATM, however, the print would appear at a slant on the building wall. Hence, the legibility will be further reduced. Lastly, if the viewer did make an eye movement in the placard's direction, then she would likely attend the more salient colored symbols than the small print.

It is also unrealistic to expect that most users will take the trouble to carefully scrutinize and to read small print that is located several feet from the goal – the ATM keyboard and the screen. Most people have learned some general rules about the world in order to help them unconsciously decide when and where to expend their limited attentional resources. One rule is that important information will be displayed in a highly salient manner, I .e., it will be big, bold and often colored. Second, important information will be displayed in close proximity to the objects to which it refers. Instead, the fee notices were rendered in small print next to far more conspicuous colored symbols and located several feet from the screen/keyboard - the part of the ATM that they needed to attend in order to complete the task. Lastly, people are bombarded daily by the proverbial "small print," warnings, disclaimers, instructions, etc. that are generally irrelevant. They learn to tune out most of this irrelevant information, especially when it has no obvious connection to their tasks and goals at the time. Under these conditions, naïve ATM users will not likely see and read the notices unless they are made highly conspicuous and are located near the user's sightline. Sovereign's fee notices located on the placards fail to meet these requirements.

**Conclusion**

The determination of whether a location is prominent and conspicuous is a matter of science and not of casual introspection. It is impossible to say what is and what is not a prominent and conspicuous location without considering, among several other factors, presentation of the information, existence of other objects competing for attention, and the viewer's likely behavior and eye position. The defendant's motion presents no scientific analysis or evidence to support their assertion that the fee notices were in a prominent and conspicuous location. Because they fail to appreciate underlying visual science, moreover, they attempt to make a meaningless

argument that location can be evaluated independently of style/presentation.

Lastly, there is strong positive evidence that the fee notices are not displayed in a prominent and conspicuous location. After reviewing the material listed in EXHIBIT A,

> I conclude *within a reasonable degree of scientific certainty that*
> *most naïve users of the Sovereign ATMs will not attend and read*
> *the fee notice*

This declaration is based on the information currently in my possession and is subject to change should new facts become available.

## References

Green, M. (2001). The science of conspicuity, *Brand Packaging*, Nov/Dec, 38–42.

Hughes, P K and Cole, B L (1984). Search and attention conspicuity of road traffic control devices, *Australian Road Research*, 14, 1-9

Rogers, W., Lamson, N., & Rousseau, G. (2000). Warning research: An integrative perspective. *Human Factors*, **42**, 102-139.

Tresiman, A., & Gelade, G. (1980). A feature-integration theory of attention. *Cognitive Psychology,* **12**, 97-136.

EXHIBIT A: MATERIALS REVIEWED

- Defendant placard photos;
- Undisputed Facts Support for motion for Summary Judgment;
- Motion for Summary Judgment;
- Memorandum of Law in Support of motion for Summary Judgment;
- Complaint;
- Affidavit of Rhiannon Hernandez;
- Affidavit of Stephanie Comeau;
- Color photos of driver and ATM;
- Deposition of Maureen DeLoreto;
- Deposition of Affidavit of Diane E. Horton;
- Affidavit of Maureen DeLoreto;
- Affidavit of Diane E. Horton; and
- ATM Site Inspection Video 6 Jan 06.

# Appendix 7

**Visual Expert**
235 Empress Avenue
Toronto, Ont. M2N 3V1

Phone: (416)730-0785
Fax: (206)3382786
Email: magphd@visualexpert.com

# Marc Green, Ph. D.

Dr. Marc Green is from Pittsburgh, Pennsylvania and has an experimental psychology Ph. D. and 34 years of experience in basic and applied research in perception, attention, reaction time, memory, man-machine interfaces and related areas. He has also served as an expert on matters related to road accidents, warnings, falls, police shootings, product design and intellectual property as well as cases involving other human factors issues.

Dr. Green was a Co-Principle at Visual Expert Human Factors Science and also serves as adjunct professor of ophthalmology at West Virginia Medical School. He was previously a faculty member and research associate in psychology, physiological optics, and computer science at several universities including U.C. Berkeley, University of Toronto, and Carnegie-Mellon, and has been a guest lecturer in "Intellectual Property Law and Cognitive Science" at Osgoode Law School of York University. Dr. Green was also formerly at *Exponent Failure Analysis*.

His research background includes 87 articles, abstracts and book chapters and grants and contracts from the National Eye Institute, the U.S. Air Force and the National Science Engineering and Research Committee. He has been interviewed by *The New Yorker*, CTV National TV Network in Canada, the *National Post* of Canada (twice), Canadian Broadcasting Company Radio, US National Public Radio and the Los Angeles Times. He has also served as a consultant to NBC Dateline.

## Education

| | |
|---|---|
| 1978–81 | Postdoctoral Fellow/ Research Faculty University of California, Berkeley |
| 1977-78 | Postdoctoral Fellow Brown University |
| 1971-77 | Ph.D., Experimental Psychology, Northeastern University |
| 1965-69 | B.A., Psychology, University of Pittsburgh |

Ph. D. Dissertation: "Comparison of Two Models of Visual Coding"
Master's Thesis: "Signal Detection Theory Analysis of Reaction Times"

## Experience

| | |
|---|---|
| 1995-curr | Principal, Visual Expert Human Factors |
| 1994-curr | Adjunct Faculty, Univ. West Virginia Medical School (Ophthalmology) |
| 2002-03 | Managing Scientist, Exponent Failure Analysis |
| 1997-98 | Human Factors Consultant, IBM. |
| 1989-94 | Faculty Member Trent Univ. (Computer science) |
| 1988-90 | Group Leader R&D, Spar Aerospace (Computer science) |
| 1987-88 | Visiting Research Scientist Carnegie Mellon Univ. (Computer science) |

| | |
|---|---|
| 1986-87 | Associate Professor University of Louisville  (Psychology) |
| 1984-86 | Visiting Faculty York University Canada  (Psychology) |
| 1983-84 | Visiting Faculty Member Indiana University (Physiological optics) |
| 1981-83 | Visiting Faculty Univ. of Toronto Canada  (Psychology) |
| 1978-81 | Research Associate/Research Faculty Univ. Cal., Berkeley (Physiological optics) |
| 1977-78 | Postdoctoral Fellow Brown University (Psychology) |

## Memberships

Human Factors and Ergonomic Society:  Transportation Technical Group, Aging Technical Group, Safety Technical Group, Forensic Professional Technical Group; Society Risk Analysis: Risk Science and Law Specialty Group; Toronto Chapter of the ACM Special Interest Group on Computer Human Interaction; Canadian Association of Road Safety Professionals.

## Research Awards

1. U. S. Air Force: "Spatial and Visual Effects Illumination on Pilot Performance: Linear Systems Analysis." (Brooks AFB). 1996
2. U. S. Air Force: "Ideal Observer Theory Applied to Aging Pilot and Situational Awareness." (Brooks AFB). 1994
3. National Science and Engineering Research Committee (NSERC): "Feature-Space Architectures." 1990
4. Trent Research Competition (NSERC): "Acquiring and Representing Metric Knowledge." 1989
5. National Institute of Health Research Grant (NIH): "Visual Interpolation in Spatiotemporal Channels." 1984.
6. Connaught Research Grant: "Studies of Apparent Motion." 1981.
7. National Science Foundation Research Grant (NSF): "Mechanisms of Flicker, Motion and Pattern Detection." (author) 1978.
8. National Eye Institute Postdoctoral Fellowship (NIH):" Spatial Properties of Chromatic Mechanisms." 1977.
9. Biomedical Sciences Research Grant: "Luminance Summation in Sinusoidal Gratings." 1975.
10. Biomedical Sciences Research Grant: "Effects of Luminance the Detection of Vertical and Oblique Stimuli." 1974.
11. National Defense Administration Predoctoral Fellowship. 1971.

## Publications

1. "Reaction Time," *Institute of Transportation Engineers Expert Witness Council Newsletter*, Summer, 2-6, 2005.
2. "'Is It A Gun? Or Is It A Wallet?'" Perceptual Factors In Police Shootings of Unarmed Suspects," *Police Marksman*, July/August, pp 52-54, 2005.
3. "Nursing Error and Human Nature," *Journal of Nursing Law*, Vol. 9, pp 37-44, 2004.
4. "Aging Vision in Visual Clutter," *Proceedings of The Human Factors & Ergonomic Society*, *in press* 2004. (with W. Huang and J. V. Odom)
5. "Why Warnings Fail," *Occupational Health & Safety*, February, 2004.

6. "Proper Eyewitness Identification Procedures," *Law and Order*, pp. 195-198, October, 2003.
7. "Skewed View: Accident Investigation," *Occupational Health & Safety Canada,* pp 24-29, June, 2003.
8. "Why Do Humans Cause So Many Accidents?" *Without Prejudice (Journal of the Ontario Insurance Adjusters Association)*, pp 44-48, May, 2003.
9. "Accidents, 'Inattentional Blindness' And Human Nature," *Claims People*, pp 6-7, Vol. 12 first Quarter, 2002.
10. "The Invisible Pedestrian," *Occupational Health & Safety Canada*, pp44-50, October, 2002.
11. "Railroad Crossing Accidents," *Occupational Health & Safety*, June 2002. (Reprinted in Safety Engineers (ASSE) Transportation Practice Specialty Newsletter.)
12. "Inattentional Blindness," *Occupational Health & Safety Canada*, pp. 23–29, Jan/Feb 2002.
13. "Aging Eyes on the Rise," *Point of Purchase Magazine*, p. 40, April 2002.
14. "Safe Environments for the Older Worker," *Occupational Health & Safety*, January 2002.
15. "On Warning Research and the 'Real World,'" *Safety News* (Human Factors & Ergonomics Safety Technical Group Newsletter), pp. 8–10, October 2001.
16. "Do Mobile Phones Pose an Unacceptable Risk? A Complete Look at the Adequacy of the Evidence?" *Risk Management*, pp. 40–48, November 2001.
17. "Lies, Damned Lies and . . . Controls," *Risk Management*, pp. 8–9, November 2001.
18. "The Science of Conspicuity," *Brand Packaging*, pp. 38–42, Nov/Dec 2001.
19. "Caution! Warning literature May Be Misguided," *Occupational Health & Safety*, pp. 16–18, Dec 2001.
20. "Human Factors of Diving Accidents in Pools," *Parks & Recreation,* Vol. 36, pp. 52–57, 2001
21. "Psychology of Warnings," *Occupational Health and Safety Canada*, pp. 30–38, Oct/Nov 2001. (with D. Low).
22. "How Long Does it Take to Stop? Methodological Analysis of Driver Perception Brake Times," *Transportation Human Factors*, Vol. 2, pp. 195–216, 2000.
23. "Human Error in Road Accidents," *Swiss Reinsurance Canada Newsletter*, pp 1-4/11-12, September, 2000.
24. "Commentary Reply," *Transportation Human Factors*, Vol. 2, pp. 227–228, 2000.
25. "Parallele Bahnen, Maskierung Durch Rauschen und Glaukomfruherkennung: Eine Ubersicht," *Search on Glaucoma*, Vol. 8, pp. 75–80, 2000 (with J. Odom, M. Leys, T. Yates, & J. Charlton).
26. "Designing Displays for the Aging Population," *Display and Design Ideas*, July 1999.
27. "Parallel Pathways, Noise Masking and Glaucoma Detection: Behavioral and electrophysiological Measures," *Documenta Ophthalmologica*, Vol. 95, pp. 283–293, 1999 (with T. Yates, M. Leys, W. Huang, J. Charlton, J. Reed, B-Z. Di, & J.V. Odom).
28. "Effects of External Noise on Contrast Thresholds in Normal Patients and Patients with Early Glaucoma," *Investigative Ophthalmology and Visual Science*, Vol. 39 (supplement), p. S24, 1998 (with J.V. Odom, T. Yates, M. Leys, W. Huang, B-Z. Di, J. Charlton, & J. Reed).
29. "Influences of Noise on Adult Age Differences in Dot Numerosity and Orientation Discrimination Thresholds," *Investigative Ophthalmology and Visual Science*, Vol. 38 (supplement), p. S67, 1997 (with M. Leys, T. Yates, & J. V. Odom).
30. "Using the 'Ideal Observer' to Measure Situational Awareness," In: *Experimental Analysis and Measurement of Situational Awareness,* D. Garland and M. Endsley (Eds), pp. 351–357, 1997 (with J.V. Odom & T. Yates).

31. "Dot Numerosity and Orientation Discrimination Thresholds:  Normals and Patients with Early Glaucoma Compared," *Investigative Ophthalmology and Visual Science* Vol. 37 (supplement), p. s512, 1996 (with T. Yates, M. Leys, W. Huang, B. Di, J. Charlton, J. Reed, & J.V. Odom).

32. "Effects of External Noise on Contrast Thresholds:  A Comparison of Normals and Patients with Early Glaucoma," *Investigative Ophthalmology and Visual Science,* Vol. 37 (supp), p. s511, 1996 (with M. Leys, T. Yates, W. Huang, J. Charlton, J. Reed, & J.V. Odom).

33. "Effects of External Noise on VEP Contrast Thresholds:  Normal Patients and Patients with Early Glaucoma," *Vision Research*, Vol. 36, p. s70, 1996 (with J.V. Odom, M. Leys, T. Yates, W. Huang, J. Charlton, J. Reed, & B-Z. Di).

34. "Relative Phase Discrimination:  Maturation of Hemispheric Asymmetry Continues into Adulthood," *Neuroscience Abstracts*, Vol. 21, p. 126, 1995 (with J.V. Odom).

35. "Hemispheric Asymmetry for Relative Phase Discrimination Reverses over the Lifespan," *Investigative Ophthalmology and Visual Science,* Vol. 35 (supplement), p. 78, 1995 (with M. Leys, C. Cutlip, & J.V. Odom).

36. "Familiarity and Pop-out in Visual Search," *Perception & Psychophysics*, Vol. 56, pp. 495–500, 1994 (with Q. Wang & P. Cavanagh).

37. "The Visual Psychophysics of Data Visualization," Second IEEE Conference on Visualization (Visualization '91) Workshop on Multivariate, Multiparameter, Multidimensional Systems, San Diego, October 21–25, 1993.

38. "Aging Impairs Spatial Discrimination of Phase But Not of Orientation," *Neuroscience Society Abstracts*, p. 384, 1993 (with J.V. Odom, C. Cutlip, G. Chao, K. Yao, & J.F. Charlton).

39. "Visual Search:  Detection, Identification and Localization," *Perception*, Vol. 21, pp. 765–777, 1992.

40. "The Perceptual Basis of Temporal Aliasing and anti-Aliasing," *Human Vision, Visual Processing and Digital Display III*, pp. 84–93, J. Merritt and S. Fisher (eds.), IEEE Press, 1992.

41. "Temporal Sampling Requirements for Stereoscopic Displays," *Stereoscopic Displays and Applications III*, pp. 101–111, J.O. Merritt and S. Fisher (eds.), 1992.

42. "Conceptions and Misconceptions of Design," *Knowledge Aided Design*, M. Green (ed.), Academic Press, London, 1992.

43. "Visual Search, Visual Streams and Visual Architectures," *Perception and Psychophysics*, Vol. 50, pp. 388–403, 1991.

44. "Occlusion, Segmentation and the Aperture Problem," *Investigative Ophthalmology and Visual Science,* Vol. 32 (supplement), p. 273, 1991 (with J. V. Odom).

45. "Architectures for Visual Search," *Investigative Ophthalmology and Visual Science,* Vol. 31 (supplement), p. 78, 1990 (with M. Ohmi).

46. "Color Correspondence in Apparent Motion," *Perception and Psychophysics*, Vol. 62, pp. 15–20, 1989.

47. "Knowledge Acquisition for Causal Reasoning," International Joint Conference on Artificial Intelligence Workshop on Knowledge Acquisition, pp. 68–70, 1989 (with L. Eshelman).

48. "What Determines Correspondence Strength in Apparent Motion?" *Vision Research*, Vol. 26, pp. 599–608, 1986.

49. "Real and Apparent Motion," *Motion: Representation and Perception*, pp. 99-104, N. Badler & J. Tsotsos (eds.), Elsevier Science Publishers, New York, 1986 (with M. von Grunau).

50. "Correspondence Matching in Apparent Motion: Evidence for Three Dimensional Spatial Representation," *Science*, Vol. 233, pp. 1427–1429, 1986 (with J.V. Odom).

51. "Correspondence Matching in Apparent Motion: Defining the Heuristics," Proceedings, Vision Interface '86, Vancouver, B. C., pp. 337–342, May 26-30 1986.

52. "Visually Evoked Potential VEP Acuity: Testability in a Clinical Pediatric Population," *Acta Ophthalmologica*, Vol. 62, pp. 993–998, 1984 (with J.V. Odom).

53. "Developmental Physiological Optics: A Brief Review," *Experientia*, Vol. 40, pp. 1187–1181, 1984 (with J.V. Odom).

54. "Color Logic in Apparent Motion," *Perception*, Vol. 13, pp. 249–254, 1984 (with P. Kolers).

55. "Masking by Light and the Sustained-Transient Dichotomy," *Perception and Psychophysics*, Vol. 34, pp. 617–635, 1984.

56. "Real and Apparent Motion: Two Mechanisms or One?" *Computer Graphics*, Vol. 18, p. 23, 1984 (with M. von Grunau).

57. "Comparison of Monoptic and Dichoptic Masking by Light," *Perception and Psychophysics*, Vol. 34, pp. 291-296, 1984 (with J. Odom).

58. "Cortical and Retinal Potentials: Effects of Spatial Adaptation," *Journal of the Optical Society of America*, Vol. 73, pp. 1939–1943, 1983 (with V. Odom).

59. "Rapid Motion Aftereffects Seen Within Uniform Flickering Fields," *Nature*, Vol. 304, pp. 61–62, 1983 (with M. Chilcoat & C. Stromeyer).

60. "Visual Masking by Flickering Surrounds," *Vision Research*, Vol. 23, pp. 735–744, 1983.

61. "Inhibition and Facilitation of Apparent Motion by Real Motion," *Vision Research*, Vol. 23, pp. 861–866, 1983.

62. "Dichoptic Flicker Detection," *J. of the Optical Society of America*, Vol. 73, p. 1873, 1983.

63. "Contrast Detection and Direction Discrimination of Drifting Gratings," *Vision Research*, Vol. 23, pp. 281–289, 1983.

64. "Direction Selective Interactions Between Real and Apparent Motion," *Perception*, Vol. 11, p. A15, 1982 (with M. von Grunau).

65. "Spatiotemporal Variations in the Square/Sine Ratio: Evidence of Independent Mechanisms at Low Spatial Frequencies," *Vision Research*, Vol. 21, pp. 365-372, 1981 (with T. Corwin & C. Schor).

66. "Spatial Frequency Effects in Masking by Light," *Vision Research*, Vol. 21, pp. 801–806, 1981.

67. "Psychophysical Relationships Among Mechanisms Sensitive to Pattern, Motion and Flicker," *Vision Research*, Vol. 21, pp. 971–1084, 1981.

68. "Contrast Detection and Direction Discrimination. *Investigative Ophthalmology and Visual Science,* Vol. 23 (supplement), p. 143, 1981 (with K. White).

69. "Masking of Drifting Gratings by Flickering and Drifting Surrounds," *Investigative Ophthalmology and Visual Science*, Vol. 22, p. 78, 1981 (with C. Schor).

70. "Monoptic and Dichoptic Temporal Integration: Flicker and Motion Detection," *Vision Research*, Vol. 21, pp. 972–985, 1981 (with R. Blake).

71. "Detection and Discrimination of Drifting Gratings Masked by Flicker," *Journal of the Optical Society of America*, Vol. 70, p. 1623, 1980.

72. "Motion Aftereffects in Uniform Flickering Fields," *Journal of the Optical Society of America*, Vol. 70, p. 1598, 1980 (with M. Chilcoat).

73. "Monoptic and Dichoptic Temporal Integration," Optical Society Technical Workshop: Recent Advances in Vision, p. 76, 1980 (with R. Blake).

74. "Orientation-Specific Adaptation: Effects of Checkerboards on the Delectability of Gratings," *Perception*, Vol. 9, pp. 369-377, 1980.

75. "Contrast Sensitivity and Binocular Brightness: Dichoptic and Dioptic Conditions," *Perception and Psychophysics*, Vol. 27, pp. 343–349, 1980 (with R. Blake & B. Breitmeyer).

76. "Comparison of Yes-No and Latency Measures of Auditory Intensity Discrimination," *Journal of the Experimental Analysis of Behavior*, Vol. 33, pp. 363-372, 1979 (with M. Terman & J. Terman).

77. "Effects of Flicker Adaptation on Grating Detection," *Investigative Ophthalmology and Visual Science*, Vol. 18, p. 91, 1979.

78. "Monoptic and Dichoptic Temporal Masking," *Journal of the Optical Society of America*, Vol. 69, p. 1445, 1979 (with C. Schor).

79. "Contrast Effects in Two-Pulse Resolution," *Bulletin of the Psychonomic Society*, Vol. 14, p. 229, 1979 (with T. Corwin).

80. "Changes in the Relative Delectability of Sine and Square Wave Gratings as a Function of Duration," *Investigative Ophthalmology and Visual Science*, Vol. 17, p, 122, 1978 (with T. Corwin & J. Madsen).

81. "The Broca-Sulzer Effect in a Ganzfeld," *Vision Research*, Vol. 18, pp. 1675–1678, 1978 (with T. Corwin).

82. "Adaptation Effects on the Brightness and Darkness of Brief Luminance Changes," *Bulletin of the Psychonomic Society*, Vol. 12, p. 282, 1978 (with T. Corwin).

83. "Checkerboards and Color Aftereffects," *Science*, Vol. 198, p. 206, 1977 (with T. Corwin & V. Zemon).

84. "'Crawford' Masking of Sine-Wave Gratings," *Journal of the Optical Society of America*, Vol. 67, p. 1408, 1977 (with T. Corwin).

85. "The Oblique Effect in a Vernier Acuity Situation," *Perception and Psychophysics*, Vol. 22, pp. 445–449, 1977 (with T. Corwin & A. Moskowitz-Cook).

86. "Comparison of Fourier and Feature Analysis in Pattern-Specific Color Aftereffects," *Science*, Vol. 192, pp. 147–148, 1976 (with T. Corwin & V. Zemon).

87. "Two-Dimensional Fourier Analysis and Orientation-Specific Masking," *Investigative Ophthalmology and Visual Science*, Vol. 15, p. 18, 1976 (with T. Corwin & V. Zemon).

88. "Ethology," *Interact With Psychology*, Chapter 8, pp. 8-1 – 8-94, Kendall-Hunt, New York, 1976 (with M. Sidman & R. Goncz).

89. "The Broca-Sulzer Effect in a Ganzfeld," *Journal of the Optical Society of America*, Vol. 66, p. 1078, 1976 (with T. Corwin).

90. A Two-Dimensional Color-Contingent Aftereffect," *Bulletin of the Psychonomic Society*, Vol. 6, p. 417, 1975 (with T. Corwin).

**Edited Books**

1. *Knowledge Aided Design*, Academic Press, London, 1992.

**Presentations: Professional**

1. "What Error Drives Our Eyes And Ears Amiss?" National Injury Prevention Committee of Ireland Conference, May 2005. (Invited.)

2. "Using The Human Factors Expert," Continuing education seminar, Erie County Bar Association, March, 2004.
3. "The Laws of Accident & Stupid Behavior Prevention." Saskatchewan Safety Council Conference, October, 2003. (Invited.)
4. "Color: Use and Misuse." Toronto Chapter of the Usability Professionals Association, May, 2003. (Invited.)
5. "Learning The Right Lessons From Accidents." Keynote Address at the Manitoba Safety Council Road Safety Conference, February, 2003. (Invited.)
6. "Inattentional Blindness." Keynote Address at the Manitoba Safety Council Road Transportation Safety Conference, December, 2002. (Invited.)
7. "The Truth About Cell Phones and Accidents." Address at the Manitoba Safety Council Road Safety Conference, December, 2002. (Invited.)
8. "Eyewitness Perception & Memory." Ontario Police College, November, 2002. (Invited.)
9. "The Role of Human Factors in Litigation." Continuing Legal Education Seminar, Phoenix, Arizona, October, 2002.
10. "Memory." Ohio Association of Civil Trial Attorneys, September, 2002. (Invited.)
11. "The Rat Is Always Right & Other Principles of The Digital TV Interface. Society of Motion Picture & Television Engineers, March, 2002. (Invited.)
12. Served as "expert" in seminar on cross-examining the human factors expert. Ontario Trial Lawyers Association, 2000.
13. "Everything You Wanted To Know About Color But Were Afraid To Ask" Toronto Region Computer Human Interaction SIG, March 2000.

**Presentations: Scientific**

1. "Aging Vision in Visual Clutter," The Human Factors & Ergonomic Society Meeting, 2004. (with W. Huang and J. V. Odom)
2. "Effects of External Noise on Contrast Thresholds in Normal Patients and Patients with Early Glaucoma: A Comparison of Behavioral and Electrophysiological Thresholds," Presentation to the Association for Research in Vision and Ophthalmology Meeting, 1998 (with J.V. Odom, M. Leys, T. Yates, W. Huang, J. Charlton, J. Reed, J. & B-Z. Di.).
3. "Effects of External Noise on Contrast Thresholds in Normal Patients and Patients with Early Glaucoma: Comparison of Behavioral and Electrophysiological Thresholds," Presentation at the International Society for Clinical Electrophysiology of Vision, Hradec Kralove, Czech Republic, 1998 (with J.V. Odom, M. Leys, T. Yates, W. Huang, J. Charlton, J. Reed, J. & B-Z. Di.)
4. "Effects of Noise on Age Differences in Contrast Thresholds," Presentation to the American Psychological Association, 1997 (with W. Huang, J.V. Odom, & A. Colvin).
5. "Parallel Pathways, Noise Masking and Glaucoma Detection," Presentation to Parallel Visual Processes in Health and Disease: Foreign Interuniversity Francqui Chair in Biomedical Sciences Symposium, Leuven, Belgium, 1997 (with T. Yates, M. Leys, W. Huang, J. Charlton, J. Reed, B-Z. Di, B-Z. & J.V. Odom).
6. "Influences of Noise on Adult Age Differences in Dot Numerosity and Orientation Discrimination Thresholds," Presentation to the Association for Research in Vision and Ophthalmology Meeting, 1997 (with W. Huang, M. Leys, J. Yates, & J.V. Odom).

7.  "Dot Numerosity and Orientation Thresholds: Comparison of Normals and Patients With Early Glaucoma," Poster presented at the Association for Research in Vision and Ophthalmology Meeting, 1996 (with T. Yates, M. Leys, W. Huang, B. Di, J. Charlton, J. Reed, & J.V. Odom).

8.  "Effects of External Noise on Contrast Thresholds: A Comparison of Normals and Patients With Early Glaucoma," Poster presented at the Association for Research in Vision and Ophthalmology Meeting, 1996 (with M. Leys, T. Yates, W. Huang, J. Charlton, J. Reed, & J.V. Odom).

9.  "Effects of External Noise on VEP Contrast Thresholds: Normal Patients and Patients With Early Glaucoma," Presentation to the Joint European Research Meetings in Ophthalmology and Vision Meeting, 1996 (with J.V. Odom, M. Leys, T. Yates, W. Huang, J. Charlton, & J. Reed).

10. "Hemispheric Asymmetry for Relative Phase Discrimination Reverses During the Lifespan," Poster presented to the Association for Research in Vision and Ophthalmology Meeting, 1995 (with M. Leys, C. Cutlip, & J.V. Odom).

11. "Relative Phase Discrimination: Maturation of Hemispheric Asymmetry Continues into Adulthood," Neuroscience Society Meeting, San Diego, CA, 1995 (with J.V. Odom).

12. "Hemispheric Asymmetry for Relative Phase Discrimination Reverses Over the Lifespan," Presentation to the Association for Research in Vision and Ophthalmology Meeting, 1994 (with M. Leys, C. Cutlip, & J.V. Odom).

13. "Aging Impairs Spatial Discrimination of Phase but Not of Orientation," Poster presented Neuroscience Society Meeting, Washington, D.C., 1993 (with J.V. Odom, C. Cutlip, G. Chao, K. Yao, & J.F. Charlton).

14. "Spatial Discrimination in Young and Elderly Observers," Poster presented at the Human Factors and Ergonomics Society Meeting, Seattle, 1993 (with J.V. Odom & G. Chao).

15. "The Perceptual Basis of Temporal Aliasing and Anti-Aliasing," Presentation to the SPIE/IS&T Symposium on Electronic Imaging Science and Technology, 1992.

16. "Temporal Sampling Requirements for Stereoscopic Displays," Presentation to the SPIE/IS&T Symposium on Electronic Imaging Science and Technology, 1992.

17. "Familiarity and Pop-Out in Visual Search. Presentation to the Association for Research in Vision and Ophthalmology, 1992 (with Q. Wang & P. Cavanagh).

18. "Occlusion, Segmentation and the Aperture Problem," Presentation to the Association for Research in Vision and Ophthalmology Meeting, 1991 (with J. Odom).

19. "The Visual Psychophysics of Data Visualization," Presentation to the Visualization '91 Workshop on Multivariate, Multiparameter, Multidimensional Systems, 1991.

20. "Expert Systems: Theory, Practice and Limitations," Presentation to the Canadian Weizman Institute, Toronto, Canada, 1990.

21. "Architectures for Visual Search," Presentation to the Association for Research in Vision and Ophthalmology Meeting, Sarasota, 1990.

22. "Representing Design Knowledge," Presentation to the Canadian Workshop on AI in Engineering Design, Toronto, Canada, 1989.

23. "Knowledge Acquisition for Causal Reasoning," Presentation to IJCAI Workshop on Knowledge Acquisition, Detroit, MI, 1989 (with L. Eshelman).

24. "Motion Path Selection by Achromatic and Chromatic Color," Presentation to the Association for Research in Vision and Ophthalmology Meeting, 1987.

25. "Dynamic Stereo Acuity: Effects of Cyclopean Spatial Frequency," Presentation to the Association for Research in Vision and Ophthalmology Meeting, 1987 (with J. Odom).
26. "Visual Search: Detection, Identification and Localization," Presentation to the Psychonomic Society Meeting, Seattle, WA, 1987 (with D. Ash).
27. "Correspondence in Apparent Motion: Defining the Heuristics," Presentation to the Vision Interface '86, Vancouver, 1986.
28. "What Determines Correspondence in Apparent Motion?" Presentation to the Psychonomic Society Meeting, Boston, MA, 1985.
29. "A Filtering Approach to Understanding Apparent Motion," Presentation to the APA Symposium: Recent Advances in Understanding Apparent Motion, Toronto, Canada, 1984.
30. "Real and Apparent Motion: One Mechanism or Two?" Paper presented at the American Computing Society SIG ART/GRAPH Conference on Motion, Toronto, 1983 (With M. von Grunau).
31. "Dichoptic Flicker Detection," Presentation to the Optical Society of America Meeting, New Orleans, LA, 1983.
32. "Cortical and Retinal Potentials: Effects of Spatial Adaptation," Presentation to the Optical Society of America Meeting, New Orleans, LA, 1983 (with J. Odom).
33. "Determinants of Binocular Summation," Presentation to the Optical Society of America Meeting, 1983 (with J. V. Odom).
34. "Contrast Detection and Direction Discrimination," Presentation to the Association for Research in Vision and Ophthalmology Meeting, 1982 (with K. White).
35. "Direction Selective Interactions Between Real and Apparent Motion," Presentation to the European Conference on Visual Perception, Leuven, 1982 (with M. von Grunau).
36. "Masking of Drifting Gratings by Flickering and Drifting Surrounds," Presentation to the Association for Research in Vision in Res. and Ophthalmology Meeting, 1981 (with C. Schor).
37. "Real Motion Can Facilitate or Inhibit Apparent Motion," Presentation to the American Academy of Optometry Meeting, Orlando, FL, 1981.
38. "Monoptic and Dichoptic Temporal Integration: Flicker and Motion Detection," Presentation to the Optical Society of America Technical Group Meeting, Sarasota, 1980 (with R. Blake).
39. "Direction and Nondirectional Mechanisms in Human Vision," Presentation to the NATO Symposium on the Study of Motion Perception, Veldhoven, 1980.
40. "Detection and Discrimination of Drifting Gratings Masked by Flicker," Presentation to the Optical Society of America Meeting, Chicago, IL, 1980.
41. "Motion Aftereffects in Uniform Flickering Fields," Presentation to the Optical Society of America Meeting, Chicago, IL, 1980 (with M. Chilcoat).
42. "Monoptic and Dichoptic Temporal Masking," Presentation to the Optical Society of America Meeting, Rochester, NY, 1979 (with C. Schor).
43. "Contrast Effects in Two-Pulse Resolution," Presentation to the Psychonomic Society Meeting, Phoenix, AZ, 1979 (with T. Corwin).
44. "Effects of Flicker Adaptation on Grating Detection," Presentation to the Association for Research in Vision and Ophthalmology Meeting, 1979.
45. "Adaptation Effects in the Brightness and Darkness of Brief Luminance Changes," Presentation to the Psychonomic Society Meeting, San Antonio, TX, 1978 (with T. Corwin).

46. "Changes in the Relative Delectability of Sine- and Square-Wave Gratings as a Function of Duration," Presentation to the Association for Research in Vision and Ophthalmology Meeting, 1978 (with T. Corwin and J. Madsen).

47. "'Crawford' Masking of Sine-Wave Gratings," Presentation to the Optical Society of America Meeting, Toronto, Canada, 1977 (with T. Corwin).

48. "The Broca-Sulzer Effect in a Ganzfeld," Presentation to the Psychonomic Society Meeting, Tucson, AZ, 1977 (with T. Corwin).

49. "Two-Dimensional Fourier Analysis and Orientation Specific Adaptation," Presentation to the Association for Research in Vision and Ophthalmology Meeting, 1976 (with T. Corwin & V. Zemon).

50. "A Luminance Dependent Shift in the Oblique Effect," Presentation to the Eastern Psychological Association Meeting, 1975 (with A. Moskowitz-Cook & T. Corwin).

51. "A Two-Dimensional Color-Contingent Aftereffect," Presentation to the Psychonomic Society Meeting, Denver, CO, 1975 (with T. Corwin).

52. "Latency Differentiation of Hits and False Alarms in Rat Auditory Intensity Discrimination," Presentation to the Eastern Psychological Association Meeting, Philadelphia, PA, 1974 (with M. Terman, & J. Terman)

# Appendix 8

| PERCENTAGE OF CASH WITHDRAWAL TRANSACTIONS ON WHICH SOVEREIGN IMPOSES A CONVENIENCE FEE | |
|---|---|
| **2006** | |
| Jan | 92.3% |
| Feb | 92.5% |
| Mar | 92.7% |
| April | |
| May | |
| Jun | |
| Jul | |
| Aug | |
| Sep | |
| Oct | |
| Nov | |
| Dec | |
| **Average** | **92.5%** |

| **2005** | |
|---|---|
| Jan | 92.3% |
| Feb | 91.4% |
| Mar | 93.1% |
| April | 93.4% |
| May | 93.1% |
| Jun | 93.1% |
| Jul | 93.0% |
| Aug | 92.3% |
| Sep | 91.9% |
| Oct | 92.7% |
| Nov | 92.6% |
| Dec | 92.6% |
| **Average** | **92.6%** |

| 2004 | |
|---|---|
| Jan | 93.3% |
| Feb | 93.0% |
| Mar | 93.3% |
| April | 92.9% |
| May | 93.1% |
| *Jun* | *N/A* |
| *Jul* | *N/A* |
| *Aug* | *N/A* |
| *Sep* | *N/A* |
| *Oct* | *N/A* |
| Nov | 92.6% |
| Dec | 93.0% |
| **Average** | **93.0%** |

| 2003 | |
|---|---|
| Jan | 94.0% |
| Feb | 94.2% |
| Mar | 94.1% |
| April | 94.1% |
| May | 94.2% |
| Jun | 94.1% |
| Jul | 93.7% |
| Aug | 93.2% |
| Sep | 93.2% |
| Oct | 93.4% |
| Nov | 93.5% |
| Dec | 93.2% |
| **Average** | **93.8%** |

| 2002 | |
|------|------|
| Jan | 95.3% |
| Feb | 95.1% |
| Mar | 94.5% |
| April | 95.3% |
| May | 95.7% |
| Jun | 94.8% |
| Jul | 94.3% |
| Aug | 93.9% |
| Sep | 93.9% |
| Oct | 94.1% |
| Nov | 94.1% |
| Dec | 94.2% |
| **Average** | **94.6%** |

| 2001 | |
|------|------|
| Jan | 93.5% |
| Feb | 93.2% |
| Mar | 93.1% |
| April | 93.4% |
| May | 93.7% |
| Jun | 94.2% |
| Jul | 95.1% |
| Aug | 95.0% |
| Sep | 95.2% |
| Oct | 95.1% |
| Nov | 95.4% |
| Dec | 95.7% |
| **Average** | **94.4%** |

# Appendix 9



*Leaders In Retail Banking*

*September 2005 Table of Contents*

## Fed Proposes Rule on ATM Fee Disclosure

The Federal Reserve Board on Aug. 19 published proposed amendments that clarify the disclosure obligations of automated teller machine (ATM) operators with respect to fees imposed on a consumer for initiating an electronic fund transfer or a balance inquiry at an ATM.

Currently, the regulation provides that an ATM operator that charges a fee for initiating an electronic fund transfer or balance inquiry must post notices at ATMs that a fee will be imposed. The proposed revisions would clarify the intent of the rule that ATM operators can satisfy the requirement by providing a notice that a fee "may" be imposed if there are circumstances under which some consumers would not be charged for services.

ATM operators must continue to provide the consumer with a separate notice, either on the screen of the ATM or on paper, that a fee will be imposed and the amount of the fee, before the consumer is committed to paying a fee.

The Board is continuing to consider other issues that were addressed in its proposed September 2004 update to Regulation E.

Comments are due on or before October 7, 2005. A copy of the notice is available at the following link:

Attachment (176 KB PDF)

go to top

---

# Appendix 10

America's Community Bankers is the national trade association committed to shaping the future of banking by being the innovative industry leader strengthening the competitive position of community banks.

October 7, 2005

Ms. Jennifer Johnson
Secretary
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551

Docket No. R-1234

Re: Electronic Funds Transfers
     70 FR 49891 (August 25, 2005)

Dear Sir or Madam:

America's Community Bankers (ACB) is pleased to comment on the proposal issued by the Board of Governors for the Federal Reserve System (Federal Reserve) that would amend Regulation E and its official staff commentary to provide more flexibility in the disclosure of automated teller machine (ATM) fees.

**ACB Position**

ACB supports the proposal. We believe the proposed amendment to Regulation E and its official staff commentary would enable community banks and consumers to more fully benefit from surcharge free ATM networks and other arrangements whereby the institution has elected not to impose a surcharge on all ATM users. We do not believe that the proposed amendment will weaken consumer protections because other disclosure provisions in Regulation E require more comprehensive fee disclosures.

**Proposal**

Section 904(d) of the Electronic Fund Transfer Act (EFTA), as amended by the Gramm-Leach-Bliley Act, requires an ATM operator that imposes a fee on any consumer for electronic funds transfer (EFT) services to be required to provide notice of the fee in a prominent and conspicuous location on or at the ATM. Furthermore, before the consumer has committed to completing the transaction, the ATM operator must disclose the amount of the fee either on the screen on the ATM or on a paper notice.

The Federal Reserve's Regulation E implements the EFTA. Regulation E currently requires an ATM operator that charges any consumer a fee for initiating an EFT or a balance inquiry to post a notice stating that a fee will be imposed. The proposed amendment would revise the ATM signage rules to provide that ATM operators may provide a notice that a fee may be imposed if there are circumstances under which some consumers would be charged for services while others would not.

**Surcharge Free Transactions**

Section 205.16(b) of Regulation E requires community banks to make ATM fee disclosures that are not always accurate. Many community banks do not impose an ATM fee for every transaction that is conducted via ATMs the bank operates. Specifically, financial institutions do not charge ATM fees when:

- The institution owning the ATM and the cardholder's bank participate in a surcharge free or privilege status ATM network.

- The ATM user receives financial assistance from the state and federal government in the form of electronic benefits transfer (EBT) cards and the financial institution chooses not to impose ATM fees on EBT transactions in exchange for Community Reinvestment Act credit.

- The institution's competitors do not charge for ATM transactions.

- The institution has an agreement with a third party independent service offerer (ISO) that deploys ATMs in grocery stores, shopping malls, highway rest areas, etc.

Because ATM operators often do not impose ATM fees, the existing regulation forces financial institutions to provide disclosures that are arguably misleading by implying that all non-customer ATM users will be charged a fee. Therefore, we urge the Federal Reserve to adopt the proposed amendment to Regulation E and allow institutions to satisfy the EFTA's disclosure requirement by posting a notice that a transaction fee "may" be imposed as opposed to "will" be imposed.

**Disclosure of Surcharges**

Many community banks impose ATM fees on all non-customer transactions. Consistent with the EFTA and Regulation E's existing requirements, institutions post a notice on the machine stating that a surcharge will be applied to non-customers and provide the cardholder with an option to cancel the transaction once customer views the ATM screen containing the message that the transaction will be assessed a fee.

Community banks that participate in a surcharge free ATM network will impose ATM fees on some, but not all cardholders. As long as a consumer's bank is a member of the network, no ATM fees will be levied. The disclosure practices of surcharge free ATM networks may vary, depending on the telecommunications technology that a particular machine uses. Generally speaking, if the ATM uses a lease line or similar telecommunications protocol, the ATM operator will program the machine so that the "surcharge screen" will be bypassed entirely for those cardholders. However, if the ATM uses dial-up telecommunications, the cardholder will still see the surcharge screen and will have to press the "Yes" button to accept the surcharge, even though no fee will actually be assessed.

**Possible Impact on Consumers**

ACB believes that the proposed amendments to Regulation E and the staff commentary will have a negligible effect on consumers. We believe existing on-screen notices adequately inform consumers by stating the precise fee associated with a particular transaction.

Under Section 205.16(b)(1) of Regulation E, an ATM operator that charges a transaction fee must notify consumers that a surcharge will be imposed for such services. This notice must be posted in a prominent and conspicuous location, either on or at the ATM and serves as an alert to the consumer that a fee may be imposed. In addition, before the consumer is committed to paying such a fee, the ATM operator must provide an additional notice that includes the amount of the surcharge, either on the ATM screen or on paper. Only after the consumer is provided these required notices and affirmatively elects to continue with the transaction or balance inquiry may the ATM operator impose a fee.

ACB believes that the screen/paper disclosure that details any fees prior to completing the transaction does more to protect consumers than the "may/must" language being debated. If any consumer confusion results, it would more likely be a result of the differences in telecommunications capabilities used by various ATMs that are part of a surcharge free ATM network. There may be consumer confusion in situations where the consumer must indicate that he or she will accept ATM surcharges when, in fact, no fee will actually be assessed. We believe that this issue will correct itself over time as telecommunications protocols become more streamlined as dial-up telecommunications are replaced with more modern technology.

**Implementation Issues**

We urge the Federal Reserve to clarify that ATM signs stating "a fee will be imposed" and "a fee may be imposed" both comply with the EFTA and Regulation E. The deletion of the word "will" should not be construed to make the use of this term inappropriate, even if a fee is not charged in all cases. The choice of "may" versus "will" should be a customer relations issue that is left to the institution.

In the event financial institutions are required to change their signage, the Federal Reserve should give institutions one year from the adoption of the final rule to implement such changes.

**Conclusion**

Thank you for the opportunity to comment on this matter. Should you have any questions, please contact Krista Shonk at 202-857-3187 or kshonk@acbankers.org.

Sincerely,

Charlotte M. Bahin
Senior Vice President
Regulatory Affairs

About ACB | Government Relations | Products & Services | Affiliates | Members Area
| ACB News Bank | In The Community | Tools & Resources | Contact Us |

America's Community Bankers
900 Nineteenth Street, NW, Suite 400, Washington, D.C. 20006
phone 202-857-3100 | fax 202-296-8716 | Contact Us
Copyright 1996-2005 © America's Community Bankers  All Rights Reserved
Important Legal Notice | Privacy Statement.

America's Community Bankers is the national trade association committed to shaping the future of banking by being the innovative industry leader strengthening the competitive position of community banks. To learn more about ACB, visit www.AmericasCommunityBankers.com

Appendix 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


MAUREEN E. DELORETO
and DIANE E. HORTON

      VS.                    C.A. NO.:05-CV-10712RCL

SOVEREIGN BANK



        DEPOSITION OF DIANE E. HORTON, witness in

the above-entitled cause, taken on behalf of the

Defendant, pursuant to notice, before Sally

Brassard, CSR, a Notary Public in and for the

State of Rhode Island and Providence Plantations,

at the office of Edwards Angell Palmer & Dodge

LLP, 2800 Financial Plaza, Providence, Rhode

Island, on May 8, 2006, at 9:30 a.m.




                ALLIED COURT REPORTERS
                  115 PHENIX AVENUE
                 CRANSTON, RI  02920
                   (401) 946-5500

May 8, 2006                                    Diane E. Horton

---

Page 2

```
 1  APPEARANCES:
 2
    FOR THE PLAINTIFFS: CLAUDE LEFEBVRE, P.C.
 3       BY: CHRISTOPHER M. LEFEBVRE, ESQ.
 4
    FOR THE DEFENDANT: EDWARDS ANGELL PALMER & DODGE
 5       LLP
         BY: DONALD E. FRECHETTE, ESQUIRE
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1           I-N-D-E-X
 2    DEPOSITION OF DIANE E. HORTON
 3
                PAGE
 4
    Examination by Mr. Frechette        5
 5
 6
 7
 8
 9
           E-X-H-I-B-I-T-S
10
11  DEFENDANT'S    DESCRIPTION    PAGE
    NO.
12
    A     Complaint - Class Action    4
13
    B     Second Amended Complaint
14        Class Action               4
15  C     Third Amended Complaint
          Class Action               4
16
    D     Laser Photo                4
17
    E     Laser Photo                4
18
    F     Affidavit of Stephanie
19        K. Comeau                  4
20  G     Appendix of Exhibits       4
21  H     Affidavit of Diane E.
          Horton                     24
22
23
24
25
```

Page 4

```
 1        (DEPOSITION COMMENCED AT 9:45 A.M.)
 2        MR. FRECHETTE: Why don't we go ahead and
 3  premark this right now.
 4        Attorney Lefebvre and I have conferred and
 5  in the interest of saving some time and maybe a
 6  few trees along the way, we've agreed that Exhibit
 7  A from the DeLoreto deposition, which is the
 8  complaint, will be Exhibit A in this deposition.
 9  Exhibit B from the DeLoreto deposition, which is
10  the Second Amended Complaint, will be Exhibit B in
11  this deposition. Exhibit C, which is the Third
12  Amended Complaint Class Action in the DeLoreto
13  deposition, will be Exhibit C in this case.
14        We will be marking new exhibits D, E and
15  F. However, Exhibit G from the DeLoreto case will
16  also be Exhibit G in this case and Exhibit G
17  consists of the Appendix of Exhibits with Tabs A
18  through O. Is that agreed?
19        MR. LEFEBVRE: That is agreed, yes.
20        MR. FRECHETTE: Okay. Great. We'll be
21  marking, as a matter of fact, an Exhibit H as
22  well.
23        (Defendant's Exhibit A through G marked
24  for ID.)
25              DIANE E. HORTON,
```

Page 5

```
 1  having first been duly sworn by the Notary Public,
 2  testified as follows:
 3        THE COURT REPORTER: Please state your
 4  full name and spell it for the record.
 5        THE WITNESS: Diane Horton (H-o-r-t-o-n).
 6        EXAMINATION BY MR. FRECHETTE:
 7  Q.  Hello, Mrs. Horton, how are you?
 8  A.  Good, thank you.
 9  Q.  Good. A couple of ground rules. I'm going to try
10      to let you finish anything that you're saying and
11      you have to let me finish my questions before you
12      start to answer; all right?
13  A.  Uh-hum. Yes.
14  Q.  That's one of the other ground rules. You have
15      to say yes or no, not uh-hum or shakes of the
16      head; okay?
17  A.  I understand.
18  Q.  All right. If for some reason -- because, of
19      course, this is a transcript and so we really need
20      to have a stopping point and a starting point for
21      each one of us talking.
22  A.  I understand.
23  Q.  So, if I stop you for some reason and you weren't
24      done, you just let me know and I will be happy to
25      let you finish what you were saying.
```

May 8, 2006                                          Diane E. Horton

---

Page 6

1    A.  Okay.  I understand.
2   Q.   All right.  How old are you, ma'am?
3    A.  I am 41.
4   Q.   All right.
5    A.  I'm sorry, 42, excuse me.
6   Q.   When did you graduate high school?
7    A.  1981.
8   Q.   What is your Social Security number?
9    A.  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.
10  Q.   Okay.  Do you have your ATM card with you today?
11   A.  Yes, I do.
12  Q.   Can we take a look at that, please?
13   A.  You certainly can.
14  Q.   Okay.  Great.  Oh, and this is also a debit Master
15      Card?
16   A.  Yes, it is.
17  Q.   All right.  Is this the same card that you used in
18      order to conduct the transaction that's referred
19      to in the complaint?
20   A.  Yes, it is.
21  Q.   Okay.  That's fine, thanks.  Now, when did you
22      graduate high school?
23   A.  1981.
24  Q.   What did you do after that?
25   A.  I went to college.

---

Page 7

1   Q.   Where did you go to college?
2    A.  Providence College.
3   Q.   Did you get your degree?
4    A.  Yes, I did.
5   Q.   What did you get your degree in?
6    A.  1985 in health service administration.
7   Q.   And so you obviously went to school for four years
8      at Providence College?
9    A.  Yes, I did.
10  Q.   Is that a bachelor's of science?
11   A.  Yes, it is
12  Q.   And did you graduate with any honors or special
13      mentions?
14   A.  I don't recall.
15          MR. FRECHETTE:  This will be D and E.
16  Q.   What was the name of your degree again, ma'am?
17   A.  It's a bachelor of science in health service
18      administration.
19  Q.   Is that -- is health service administration the
20      business administration of health-related
21      industry?
22   A.  Yes, I would believe that would be a good
23      description, yes
24  Q.   So I take it that you took some business courses
25      in order to achieve this degree?

---

Page 8

1    A.  I guess you could clarify that, clarify them
2      as that, yes
3   Q.   For example, did you take any finance courses?
4    A.  That was quite some time ago.  I'm trying to
5      think of the different classes that I took.  I
6      took accounting, I do recall that.  Mostly
7      health-related courses they were.
8   Q.   Did you take any business law courses?
9    A.  No.
10  Q.   Any courses dealing with the regulatory issues
11      affecting healthcare?
12   A.  No, I do not believe so.
13  Q.   What did you do after you got your degree in 1985?
14   A.  I went to work for Blue Cross/Blue Shield of
15      Rhode Island.
16  Q.   And how long -- are you still employed with them?
17   A.  No, I am not.
18  Q.   How long did you work with Blue Cross/Blue Shield
19      of Rhode Island?
20   A.  I'm trying to think -- approximately two
21      years, I believe.
22  Q.   And how were you employed with them?
23   A.  I worked in the claims department.
24  Q.   What did you do in claims?
25   A.  We went through a training course where we

---

Page 9

1      learned how to approve claims, whether they were
2      appropriately coded.  And once we went through the
3      -- I'm not sure how many week course it was then,
4      we worked in the building right in the center of
5      Providence okaying claims, whether they were
6      appropriately reported on the forms.
7   Q.   Okay.  And you worked there for about two years
8      you said; right?
9    A.  I think it was about two years.  I'm trying to
10      -- I graduated in '85.  I went to work, I want to
11      say the end of '85 I started there.
12  Q.   Okay.  Where did you go after that?
13   A.  I worked for the North Attleboro YMCA doing
14      daycare.
15  Q.   And how long did you hold that job?
16   A.  I think that was probably -- no, I'm sorry, I
17      have to stop and think.  I went -- no, when I left
18      Blue Cross/Blue Shield, I went to work for RIGHA
19      which was a health care office in Plainville,
20      Massachusetts.  I worked there for, I believe, it
21      was approximately one -- perhaps two years and
22      then I left when I had my first son in 1989.  He
23      was born in October of 1989.
24  Q.   What did you do at RIGHA?
25   A.  I was a receptionist.

---

3  (Pages 6 to 9)

b73e02f3-778f-4ec2-b8bf-703d0e32681e

May 8, 2006                                              Diane E. Horton

---

**Page 10**

1  Q.  Why did you leave your first job at Blue Cross and
2      go to RIGHA?
3      A.  Because it was in Providence and it was much
4      more accessible for me to work right in the area
5      where I lived.
6  Q.  Now, when you took the job at the YMCA in daycare,
7      how long did you hold that job?
8      A.  It was not an extended period of time. I want
9      to say it was only about a year.
10 Q.  What did you do after that?
11     A.  I stayed home. I had my second child and I
12     was home with him for a while and I then procured
13     a part-time position at the Vision Care Department
14     of -- it had now become Harvard Healthcare and I
15     worked there until I had my third son and I
16     actually switched departments before that. I went
17     from the Vision Care Department to the Physical
18     Therapy Department and then I left that job as it
19     became too difficult with three children and my
20     husband and his job to continue.
21 Q.  And when did you leave that job?
22     A.  Right before my third son was born, I believe
23     -- let's see, he was born in April. Actually it
24     was the preceding, I believe August, but I'm not
25     positive.

---

**Page 11**

1  Q.  Of what year?
2      A.  He was born in 1997 so I believe it was 1996.
3  Q.  Now, have you returned to the workplace since then
4      or are you still at home?
5      A.  I did baby-sitting.
6  Q.  Wait a minute, let me finish.
7      A.  I'm sorry, I interrupted you.
8  Q.  Are you still at home or in that workplace?
9      A.  I am at my home and I do baby-sitting for a
10     friend of mine.
11 Q.  All right. But other than your home environment,
12     which I would never presuppose to call anything
13     other than a workplace on its own right, you
14     haven't been employed doing anything else other
15     than the baby-sitting you've just discussed?
16     A.  That is correct.
17 Q.  Okay.
18         MR. FRECHETTE:  Off the record.
19         (Discussion was held off the record.)
20         MR. FRECHETTE:  Okay. Back on.
21 Q.  When did you get your first ATM card?
22     A.  Oh, gosh, I don't know for certainty but I
23     would assume it was when I graduated from college.
24 Q.  And when was the first time that you are aware of
25     being charged an ATM convenience fee?

---

**Page 12**

1      A.  I could not say that with certainty.
2  Q.  Can you give me an idea?
3      A.  The first thing that would enter my mind would
4      be many years ago when I had an account with Fleet
5      Bank and they had charges for many, many things
6      and that's one of the reasons why I left the bank
7      because the fees were just insurmountable.
8  Q.  Sitting here today, you're aware of the fact that
9      some banks charge for the use of an ATM machine by
10     other than their own customers; right?
11     A.  Yes, I am.
12 Q.  Within the last twelve months, how many times
13     would you say you've used your ATM for any reason?
14     A.  I could not count. I use it frequently.
15 Q.  In an average week how many times would you say
16     you use it?
17     A.  Fifteen to twenty perhaps.
18 Q.  Now, noting that your ATM card is also a credit
19     card, a debit card; right?
20     A.  Yes.
21 Q.  How many times in the last twelve months have you
22     used your ATM card at an ATM?
23     A.  I would say an average of at least twice a
24     week.
25 Q.  In the last twelve months how many times have you

---

**Page 13**

1      used your ATM card at an ATM other than your bank
2      or a branch of your bank?
3      A.  I would say on average three to four times a
4      month.
5  Q.  Now, which bank are you with?
6      A.  Bristol County Savings Bank.
7  Q.  All right. When you use your ATM card at an ATM
8      other than one owned by Bristol County Savings
9      Bank, are you charged an ATM convenience fee to
10     your knowledge?
11     A.  Not recently that I am aware of, no.
12 Q.  Does Bristol County Savings Bank have some program
13     where they don't pass along charges to you for
14     using their particular ATM -- their ATM card at
15     other ATMs?
16     A.  I'm not quite sure I understand your question.
17 Q.  All right. Some banks have a program where if you
18     use their ATM card at any other bank, they absorb
19     the fees. Are you aware of whether Bristol County
20     Federal Savings has such a program?
21     A.  I am not aware of that, no.
22 Q.  Do you -- I'm trying to focus then on your
23     statement that you use your ATM card three to four
24     times a month at ATMs other than those owned by
25     Bristol County Savings Bank and yet aren't

---

b73e02f3-778f-4ec2-b8bf-703d0e32681e

May 8, 2006                                          Diane E. Horton

Page 14

1   charged?
2       A.  Well, it is my understanding that there are
3   several networks that you can use your ATM card at
4   so you will not be charged a fee if you go to that
5   particular network.
6   Q.    So, do you look to use ATMs that are either (a)
7   owned by Bristol County Savings Bank or (b) within
8   your network so that you won't have to pay a
9   convenience fee?
10      A.  Yes, that would be my goal, yes.
11  Q.    When did that become your goal?
12      A.  Well, as I stated before, the fees that we
13  incurred when we belonged to Fleet were so
14  insurmountable that obviously you want to try to
15  not incure these fees because it just adds to the
16  expenses that you have every day.
17  Q.    When did you switch away from Fleet?
18      A.  I could not tell you with certainty but it was
19  quite some time ago.
20  Q.    More than five years ago?
21      A.  It very possibly could be more than five years
22  ago, yes.
23  Q.    After you left Fleet, did you go right to Bristol
24  County or were there other banks --
25      A.  No, we did not.  There were other banks.

Page 15

1   Q.    You've got to let me finish, ma'am.
2       A.  I'm sorry.
3   Q.    That's okay.  Were there other banks in between?
4       A.  Yes, there were other banks in between.
5   Q.    Please tell me after you left Fleet, what bank do
6   you think you went to next?
7       A.  The first one that comes to my mind would be
8   the North Attleboro Federal Credit Union.
9   Q.    And did you have an ATM card with them?
10      A.  No, they did not have an ATM card.
11  Q.    So, did you go to another bank -- well, obviously.
12  What was the next bank you went to after North
13  Attleboro?
14      A.  I would say that in my mind -- I'm trying to
15  think -- I want to say we went to Bristol County
16  Savings Bank from there but I am not positive.
17  Q.    All right.  And your concern and awareness about
18  convenience fees, that occurred when you left
19  Fleet, correct?  In fact, that's one of reasons
20  you left Fleet?
21      A.  Yes, that would be correct.
22  Q.    Now, we have agreed that we're going to use
23  certain exhibits from the last deposition and I am
24  just going to ask you, ma'am, these are copies of
25  the three -- well, there's actually four, there's

Page 16

1   a First Amended Complaint -- I don't have a copy
2   of that with me -- but these are copies of the
3   Complaint, the Second Amended Complaint and the
4   Third Amended Complaint in this lawsuit.  Would
5   you take a quick look at those, please, and I'm
6   going to tell you what I'm going to ask you so
7   that you can read them as much as you need to to
8   be able to answer the question.  I'm going to ask
9   you (a) whether you've seen them before; (b)
10  whether you read them before they were filed and
11  (c) whether you agree with what's stated in these
12  documents.  That's what I'm going to ask you.
13      A.  Okay.
14  Q.    Are you able to answer those questions now?
15      A.  Yes, I am.
16  Q.    Have you seen them before?
17      A.  Yes, I have.
18  Q.    All right.  Did you read them before they were
19  filed?
20      A.  I received a copy from my attorney of them.
21  Q.    Do you agree with what's stated in them?
22      A.  Yes, I do.
23  Q.    So, therefore, even though you may not have read
24  them before they were filed, if there was
25  something in them that you felt was incorrect or

Page 17

1   wrong, I presume you would have called your
2   attorney and said, hey, this isn't right?
3       A.  Yes.  That is correct.
4   Q.    So you adopted the statements that are contained
5   within those documents as your own; correct?
6       A.  These statements correctly confer what I
7   believe to be true, yes.
8   Q.    When you say these statements, you mean the
9   statements contained in Exhibits A, B, and C;
10  correct?
11      A.  That is correct.
12  Q.    All right.  Thank you.
13      A.  You're welcome.
14  Q.    Now, as I understand it, your particular
15  allegations relate to an ATM situated in
16  Plainville, Massachusetts; correct?
17      A.  That is correct.
18  Q.    And that's an ATM located at the Plainville,
19  Massachusetts branch of Sovereign Bank; right?
20      A.  That is correct.
21  Q.    Now, is a drive-up or a walk-up ATM?
22      A.  It has both at that location.
23  Q.    Prior to April 6, 2005, had you ever used the ATM,
24  either ATM, either the walk-up or the drive-up, at
25  the Sovereign branch in Plainville, Massachusetts?

5  (Pages 14 to 17)

May 8, 2006                                          Diane E. Horton

Page 18

1    A.  I don't recall a particular time but it's very
2    possible that I did.
3    Q.   On or about April 6, 2005, which ATM device at the
4    Plainville branch of Sovereign did you use?
5    A.  I used the drive-up ATM.
6    Q.   And why did you go to that drive-up ATM on that
7    date?
8    A.  Because it had a drive-up location and it was
9    easier for me to access.
10   Q.   Now, when you went there, did you know that you
11   would be charged a convenience fee for using --
12   A.  No, I did not.
13   Q.   You've got to let me finish.
14   A.  I'm sorry.
15   Q.   Did you know that you would be charged a
16   convenience fee for using that ATM?
17   A.  No, I did not.
18   Q   You stated a minute ago that it's possible that
19   you've used ATMs at the Plainville branch of
20   Sovereign National on prior occasions; right?
21   A.  That is correct.
22   Q.   Is it your testimony that on no prior occasion
23   were you ever charged an ATM convenience fee at or
24   for your use of the ATMs at the Plainville branch
25   of Sovereign?

Page 19

1    A.  It was not my recollection that I had been
2    charged a fee.
3    Q.   Okay.  You understand, however, sitting here today
4    that one of the last things that happens before
5    you actually complete your transaction is that
6    something appears on the screen telling you you're
7    going to be charged for that particular
8    transaction; right?
9    A.  Yes, I do.
10   Q.   So, you're not testifying that if in fact you did
11   previously use an ATM at the Plainville branch of
12   Sovereign, that that on-the-screen notice didn't
13   tell you you were going to be charged; right?
14   A.  I'm sorry, can you say that again?
15   Q.   Okay.  You're not sitting here today telling me
16   that on prior occasions -- and by prior I mean on
17   occasions prior to April 6, 2005 -- when you might
18   have used either one of the ATMs at the Plainville
19   branch of Sovereign, that you didn't receive that
20   on-screen notice telling you that you were going
21   to be charged; correct?
22        MR. LEFEBVRE:  If you don't understand --
23        THE WITNESS:  I don't understand.  I need
24   you to -- I'm getting very confused as to what
25   you're saying.

Page 20

1    Q.   Okay.  First of all, let me just clarify.  When I
2    say Plainville branch, can we agree that that
3    means the Plainville branch of Sovereign?
4    A.  That's fine.
5    Q.   Okay.  You're not testifying that if you used
6    either one of the ATMs at the Plainville branch on
7    dates prior to April 6th, that you didn't get the
8    little on-screen notice telling you that you were
9    going to be charged, are you?
10   A.  Okay.  So, what you're trying to say to me is
11   I am not telling you that had I used it
12   previously, I did not see a notification on the
13   screen saying there would be a charge?
14        THE WITNESS:  I'm glad to see that he's as
15   confused as I am.  I'm confused as to how you're
16   phrasing it.
17   Q.   All right.
18   A.  Are you asking me to state that had I used the
19   ATM machine prior, that I did see a notification
20   that there may be a charge incurred for using that
21   machine?
22   Q.   That's one way to say it but when I -- all right,
23   let's start with that question.  On prior
24   occasions when you used the ATM at the Plainville
25   branch and prior, I mean before April 6th.

Page 21

1    A.  Before April 6th, I understand that.
2    Q.   Did you get an on-screen notification that you
3    were going to be charged?
4    A.  It is not my exact memory that that would
5    occur -- that that had occurred.
6    Q.   Okay.  Now, because you've said it's not your
7    memory --
8    A.  Yes.
9    Q.   -- now I have to flip the question around and ask
10   you this:  You're not saying that you didn't get
11   it, you're only saying that you don't remember?
12   A.  Okay.  That would be correct.  Now I
13   understand then.
14   Q.   How is it -- withdrawn.  Did anybody tell you to
15   go and use the ATM at the Plainville branch for
16   purposes other than in the routine course of your
17   business affairs?
18   A.  No.
19   Q.   How is it that you came to get involved in this
20   lawsuit?
21   A.  Mr. Lefebvre and I have had other legal
22   business and during the course of our conversation
23   my ATM habits were discussed.
24   Q.   Have you ever been a plaintiff in any other
25   lawsuits?

6 (Pages 18 to 21)

May 8, 2006                                                    Diane E. Horton

Page 22

1     A. No, I have not.
2  Q. All right. Have you ever been involved in any
3     other lawsuits at all?
4     A. No, I have not.
5  Q. Have you ever been a defendant -- withdrawn. Have
6     you ever been deposed previously?
7     A. No, I have not.
8  Q. All right. Now, when you conduct an ATM
9     transaction, do you review the receipt that's
10    generated?
11    A. Do I look at my receipt at the end?
12 Q. Yes.
13    A. Yes.
14 Q. So, if you had been charged on a prior occasion at
15    the Plainville branch -- again, when I say prior I
16    mean before the allegations of your complaint,
17    April 6th, 2005, isn't that something you would
18    have expected to notice at the time of the
19    transaction?
20    A. Would I have noticed that I was charged a fee
21    at the time of the transaction?
22 Q. Yes.
23    A. I would most definitely think so. Obviously
24    if I look at my receipt, I would see there would
25    be a fee on there.

Page 23

1  Q. And you have already stated previously that you
2     try to avoid ATMs where you know you're going to
3     be charged a fee; correct?
4     A. That is correct.
5  Q. And sitting here today, you don't have any
6     recollection one way or the other as to whether or
7     not you were charged a convenience fee at the
8     Plainville branch for any ATM used prior to April
9     6th, 2005; right?
10    A. No, I do not have a memory of that.
11 Q. All right. What other ATMs have you used in the
12    last twelve months that resulted in a charge of a
13    convenience fee?
14    A. There are none that I remember.
15 Q. Is that something you would expect to remember?
16    A. I would think so.
17 Q. Because you're careful about which ATMs you use;
18    correct?
19    A. That would be correct.
20 Q. So, just to be clear, your understanding and your
21    best recollection sitting here today is that the
22    only ATM that you've used in the last twelve
23    months that resulted in the charging of the
24    convenience fee is the Plainville branch ATM
25    referenced in your complaint?

Page 24

1     A. That would be correct.
2  Q. Okay. Let me show you what has been marked as
3     Exhibits D and E and ask you if you can tell me
4     what those two photographs are?
5     A. Exhibit D is a photograph of myself in my
6     vehicle putting my card into the ATM machine at
7     the Plainville branch of the Sovereign Bank.
8  Q. And Exhibit E?
9     A. Exhibit E, may I make an addition?
10 Q. Uh-hum.
11    A. Exhibit D is a photo from the front end of my
12    vehicle. Exhibit E would be a photo from the rear
13    end, the side view of my vehicle with myself
14    putting my ATM card into the ATM machine.
15 Q. When were those photos taken?
16    A. I don't recollect the date.
17    MR. FRECHETTE: This is Exhibit H.
18    (Defendant's Exhibit H marked for ID.)
19 Q. Let me show you Exhibit H and ask you -- take a
20    look at paragraph 4, Exhibit H is your affidavit;
21    correct?
22    A. Uh-hum, that is correct.
23 Q. Does paragraph 4 refresh your recollection as to
24    the date when you went there?
25    A. Yes, it does.

Page 25

1  Q. Okay. What's the date?
2     A. Wednesday, February 22nd, 2006 at
3     approximately 11:00 a.m.
4  Q. Okay. And why is it that you came to go back to
5     the ATM in the Plainville branch?
6     A. I had received a copy of -- I'm not sure the
7     correct term for it.
8  Q. Ms. Comeau's affidavit?
9     A. Thank you. Ms. Comeau's affidavit and it was
10    -- I felt that I needed to go back for myself and
11    with her information and refresh my memory as to
12    where things were located and how they were
13    displayed.
14 Q. Let me just show you Exhibit F and ask you, is
15    that the affidavit of Ms. Comeau that you saw that
16    prompted you to go back --
17    A. Yes, it is.
18 Q. -- and visit the ATM at the Plainville branch?
19    A. Yes, it is and I apologize for interrupting
20    you again.
21 Q. That's okay. It's going to happen. Now, do you
22    have any complaints about the walk-up ATM?
23    A. The display of information at the walk-up --
24 Q. Can I stop you for a second?
25    A. You certainly can.

                                              7 (Pages 22 to 25)

b73e02f3-778f-4ec2-b8bf-703d0e32681e

May 8, 2006                                              Diane E. Horton

Page 26

1    Q.   And I will let you finish if you want to but my
2         question really was a yes/no.  I'm just asking you
3         whether you have any complaints about the walk-up
4         ATM because that will tell me whether I need to
5         just go to the drive-thru or whether I need to --
6    A.   Yes, I do have a complaint.
7    Q.   Have you ever used the walk-up ATM?
8    A.   Yes, I went into the bank to use it on
9         purpose.
10   Q.   And when was that?
11   A.   I don't recollect that date either, I'm sorry.
12   Q.   And when you say on purpose, what do you mean?
13   A.   Well, I had read her affidavit, her statement,
14        and my memory disagreed with her comments and her
15        statements and I wanted to see for myself if my
16        memory and my recollection were correct.
17   Q.   But just to be clear, at the time -- withdrawn.
18        Up until February -- what's the date?
19   A.   Wednesday, February 22nd.
20   Q.   Up until Wednesday, February 22nd, had you ever
21        used the ATM at the Sovereign --
22   A.   I don't remember.
23   Q.   You've got to let me finish.
24   A.   I'm sorry.
25   Q.   -- at the Sovereign branch in Plainville?

Page 27

1    A.   I do not remember.
2    Q.   So, you're not prepared to testify sitting here
3         today that prior to February 22, 2006 you'd ever
4         previously used the Plainville branch walk-up?
5    A.   Not to my memory, no.
6    Q.   And the only reason that you used it was because
7         of what you read in Ms. Comeau's -- the only
8         reason you used it on February 22nd is because of
9         what you read in Ms. Comeau's affidavit; correct?
10   A.   That would be correct.
11   Q.   All right.  Let's start, if we could, with the
12        drive-up and -- let me just ask you, Exhibits D
13        and E, do you believe that they accurately and
14        fairly depict the drive-up ATM at the Plainville
15        branch as shown in the case of Exhibit D from the
16        front of your car and as shown in Exhibit E from
17        the rear of your car?
18   A.   Yes, I do.
19   Q.   All right.  And that's as of February 22; correct?
20   A.   Yes, that would be correct.
21   Q.   Do you know of any reason to suggest that Exhibits
22        D and E also do not accurately reflect the way the
23        drive-up ATM at the Plainville branch looked on
24        April 6, 2005?
25   A.   No, I believe they would be the same.

Page 28

1    Q.   All right.  Let me show you what we've previously
2         marked as Exhibit G and let me see if I have an
3         additional --
4              MR. LEFEBVRE:  I brought mine.
5              MR. FRECHETTE:  Good.  Can we just use
6    yours?
7              MR. LEFEBVRE:  Yeah.
8    Q.   Would you turn to Tab H.  Now, do you recognize
9         what Tab H is?
10   A.   Yes, that would be the walk-up ATM at the
11        Plainville branch of the Sovereign Bank.
12   Q.   And do you believe that Tab H fairly and
13        accurately depicts the entryway to the lobby of
14        the walk-up ATM at the Plainville branch?
15   A.   Yes, it does.
16   Q.   And you know of nothing to suggest that it doesn't
17        fairly and accurately represent what also existed
18        on April 6th of 2005; correct?
19   A.   I believe it would be the same, yes.
20   Q.   Now, if you take a look at Exhibit I (sic), what
21        does Exhibit I (sic) show?
22   A.   Exhibit I (sic) looks to be a more interior
23        photo of the walk-up ATM at the Plainville branch
24        of the Sovereign Bank.
25   Q.   And do you believe that Exhibit I (sic) fairly and

Page 29

1         accurately depicts the interior of the ATM
2         vestibule at the Plainville branch both as of
3         February 22nd, 2006 and as of April 6th, 2005?
4    A.   Yes, I do.
5    Q.   All right.  Would you take a look at Exhibit J,
6         please.  Excuse me, Tab J of Exhibit G.  Now, do
7         you recognize Exhibit J?  Tab J, excuse me.
8    A.   Yes, I do.
9    Q.   Is Tab J the placard that is depicted in the
10        left-hand portion of Tab I?
11   A.   Yes, it is.
12   Q.   All right.  Do you believe that -- and recognizing
13        that it's not to scale and we don't suggest that
14        it is to scale -- do you believe that Tab J
15        accurately and fairly depicts the placard that is
16        on the left-hand side of Tab I?
17   A.   Yes, I do.
18   Q.   Okay.  Take a look at Tab K.  Oh, actually before
19        we do that -- you know of nothing to suggest that
20        the depiction contained in Tab J doesn't
21        accurately and fairly describe what existed on
22        both April 6th, 2005 and on February 22, 2006;
23        correct?
24   A.   Yes, that is correct.
25   Q.   Now, take a look at Tab K.  Recognizing again,

8  (Pages 26 to 29)

b73e02f3-778f-4ec2-b8bf-703d0e32681e

May 8, 2006                                    Diane E. Horton

Page 30

1    ma'am, that it's not to scale, do you recognize
2    Tab K to be a fair and accurate depiction of the
3    convenience fee notice that's located within the
4    placard that is described in Tab J of Exhibit G?
5    A.  Yes, I recognize that.
6    Q.  All right.  And do you believe that to be a fair
7    and accurate representation of the convenience fee
8    notice as it existed both on April 6th, 2005 and
9    February 22, 2006?
10   A.  Yes.
11   Q.  All right.  Take a look at Exhibit L, if you
12   would, please.  What is Exhibit -- excuse me, Tab
13   L.  What is Tab L of Exhibit G?
14   A.  That would be an accurate picture of the
15   drive-up ATM location at the Plainville branch of
16   the Sovereign Bank.
17   Q.  And you believe that it fairly and accurately
18   depicts that drive-up as it existed both on April
19   6th, 2005 and February 22, 2006; correct?
20   A.  Yes, that would be correct.
21   Q.  Could you look at Tab M of Exhibit G.  Is Tab M a
22   fair and accurate depiction of the drive-up from a
23   different angle of the Plainville branch ATM?
24   A.  Yes, that is.
25   Q.  And do you believe it to be a fair and accurate

Page 31

1    depiction of that ATM both as it existed on April
2    22 of 2006 -- excuse me, February 22 of 2006 and
3    April 6th of 2005?
4    A.  Yes.
5    Q.  Take a look at Tab N of Exhibit G.  Do you
6    recognize Tab N to be a fair and accurate
7    representation of the ATM drive-up at the
8    Plainville branch as well as the placard that is
9    located to the left of it?
10   A.  Yes, I do.
11   Q.  Do you believe that to be a fair and accurate
12   representation of that placard as it existed on
13   April 6, 2005 and February 22, 2006?
14   A.  Yes, I do.
15   Q.  All right.  Take a look at Tab O, please.  Do you
16   recognize Tab O as a fair and accurate
17   representation of the convenience fee notice
18   contained within the red placard that is depicted
19   in Tab N?
20   A.  Yes, I do.
21   Q.  Do you believe that to be a fair and accurate
22   representation of that convenience fee notice --
23   again, it's not to scale -- of that convenience
24   fee notice as it existed on both February 22, 2006
25   and April 6th, 2005?

Page 32

1    A.  Yes, I do.
2    Q.  All right.  Now, in your complaint you allege that
3    the convenience fee notice at the drive-up ATM is
4    not "prominent or conspicuous."
5    A.  That is correct.
6    Q.  How do you define prominent, ma'am?
7    A.  Prominent would be something that is bold and
8    brings your eye to it.
9    Q.  And how do you define conspicuous?
10   A.  Conspicuous would be something that would
11   immediately bring your attention to it and very
12   obvious for you to notice.
13   Q.  Do you believe the words prominent and conspicuous
14   have different meanings?
15   A.  I believe they have similar meanings.
16   Q.  How would you contrast one to the other?
17   A.  Prominent would be something that would be
18   first and most important.  Conspicuous would be
19   something that would be very hard not to notice,
20   something that was very bright and alluring.
21   Q.  Would you agree with me that the color red is
22   conspicuous?
23   A.  Yes, I would.
24   Q.  Now, in the case of the ATM drive-up at the
25   Plainville branch, based upon your own

Page 33

1    observations and looking at the photos if you need
2    to, can you tell me approximately how far away
3    from the ATM itself the red placard is that
4    contains the convenience fee notice?
5    A.  I'm not very good with distance but I would
6    say it is more than three arm's lengths away.
7        MR. LEFEBVRE:  Excuse me, she's actually
8    looking at Tab E as she's testifying.
9        MR. FRECHETTE:  At Tab E or Exhibit E?
10       MR. LEFEBVRE:  Tab E which I thought.
11       MR. FRECHETTE:  The problem is that Tab E
12   would be the Seekonk drive-up.  I think she needs
13   to look at Tab M.
14       MR. LEFEBVRE:  I apologize, you're
15   correct.  I'm glad someone is awake.
16   Q.  I believe that document may refresh your
17   recollection, ma'am, and you may want to change
18   your answer.
19   A.  Yes, I would.  I would say it is approximately
20   two arm's lengths away.
21   Q.  Two arm's lengths away from what, ma'am?
22   A.  Away from where you would enter your ATM card.
23   Q.  Okay.  And how far away would you say it is from
24   the metal border of the ATM machine itself?
25   A.  The metal border, approximately one arm's

9  (Pages 30 to 33)

May 8, 2006                                          Diane E. Horton

Page 34

1    length.
2  Q.    Would you in your mind consider something that's
3    one arm's length away to be "near"?
4    A.  I would consider it near but the problem that
5    I would have is that if you are in a vehicle, it
6    is not near at all.
7  Q.    And why is that?
8    A.  Because if you are -- if we can refer to
9    Exhibit E where I'm putting my card in the ATM,
10   you cannot even see the placard from my position
11   with my arm out my driver's side window of my
12   vehicle.
13 Q.    Would you consider something that's -- well, for
14   example, would you consider the red placard that's
15   depicted in Tab M of Exhibit G to be "near" the
16   ATM machine?
17   A.  This is M.  Yes, it is near.
18 Q.    All right.  Now, you mentioned a moment ago that
19   you can't see it when you're parked directly in
20   front of the ATM machine; right?
21   A.  That is correct.
22 Q.    Now, look at Tab M and orienting it so that you
23   see it has a yellow post in it?
24   A.  Yes
25 Q.    If we can call that the left side of the photo and

Page 35

1    if we can call the other side of the photo the
2    right portion.  By that, I mean it looks like
3    there might be a tiny window frame, a sliver of a
4    window frame or something on it, do you see that?
5    A.  Yes, I do.
6  Q.    When you approached this ATM, which way did you
7    approach?  From left to right or from right to
8    left?
9    A.  I was coming from the left driving forward.
10 Q.    Right, because you wouldn't back into the ATM?
11   A.  Correct.
12 Q.    So, when you came up to the ATM and parked
13   directly in front of it and couldn't see the red
14   placard, you'd already driven past the red
15   placard; right?
16   A.  That is correct.
17 Q.    And nothing would have prevented you from stopping
18   at the red placard and reading it; correct?
19   A.  That is correct.
20 Q.    Now, besides the fact that you don't believe the
21   placard is located close enough to the ATM machine
22   itself, are there any other complaints that you
23   have about the ATM notice itself on the drive-up
24   at the Plainville branch?
25   A.  Which notice are you referring to?  The one on

Page 36

1    the placard?
2  Q.    The convenience fee notice, yes.
3    A.  On the placard?
4  Q.    Yes.
5    A.  It is -- I believe it is small and it is not
6    conspicuous in my opinion.
7  Q.    And on what do you premise your opinion?
8    A.  I believe that if it is to be of importance,
9    it should be more prominently displayed and
10   perhaps more exact in its description that it is
11   something that needs to be read.
12 Q.    Which you say exact in its description, how so?
13   A.  It's very -- I feel it's very -- what's the
14   word that I'm looking for -- ambiguous
15 Q.    How do you feel it's ambiguous?
16   A.  Because of the word may.
17 Q.    You think it should say will?
18   A.  Yes, I do.  Or will or will not or -- more
19   specific as to who will be charged and who will
20   not be charged.
21 Q.    So, as I understand it, you don't (a) like where
22   the placard is posted; right?
23   A.  I don't like the word like.  It's not that I
24   don't like it, I just don't feel it is
25   appropriately displayed.

Page 37

1  Q.    All right.  Let me try to rephrase that because
2    it's a fair statement.  You take issue with where
3    the placard itself is posted; correct?
4    A.  That would be a better description, yes.
5  Q.    And you take issue with the fact that the placard
6    says may versus will?
7    A.  That is correct.
8  Q.    And you take issue with the type size, the font
9    size of the convenience fee portion of the
10   placard; correct?
11   A.  That would be an appropriate description.
12 Q.    All right.  Are there any other aspects of the
13   convenience fee notice that you take issue with
14   and believe are violative of the federal law that
15   exists in this case?
16   A.  I believe the previous conditions are
17   sufficient to explain the problems that I have.
18 Q.    Okay.  I understand that they're sufficient.  I'm
19   asking you if there are any others.
20   A.  Not that I can think of at this time, no.
21 Q.    Well, is there anything preventing you from
22   thinking of additional issues that you have?
23   A.  No, there is not.
24 Q.    All right.  Have you ever been aware of any other
25   issues with the convenience fee notice other than

b73e02f3-778f-4ec2-b8bf-703d0e32681e

May 8, 2006                                                      Diane E. Horton

Page 38

1    what you've described here today?
2    A. No.
3  Q.  By the way, before your deposition, did you meet
4    with anybody to discuss your testimony?
5    A. I've consulted with my attorney, yes.
6  Q.  And how long was that meeting?
7    A. Fifteen or twenty minutes perhaps.
8  Q.  All right. Do you know the other plaintiff
9    in this case?
10   A. No, I do not.
11 Q.  Did any discussion occur with anybody with respect
12   to the testimony that the other plaintiff gave in
13   this case in her deposition?
14   A. No, it did not.
15 Q.  Now, is it fair to say, ma'am, that you think the
16   letters in the convenience fee portion of the
17   placard should be of a size comparable to, for
18   example, the letters STAR or NYCE that are also in
19   the placard?
20   A. I'm sorry, I don't see where you're referring
21   to.
22 Q.  Tab N, ma'am, of Exhibit G. Fair to say that
23   you think that the letters that are in the
24   convenience portion should be a size comparable
25   to the NYCE or STAR or Plus or Cirrus letters?

Page 39

1    A. I think they would be more noticeable if they
2    were of that size, yes.
3  Q.  Well, what size do you think they should be of to
4    satisfy your particular issue concerning their
5    conspicuity?
6    A. I would say that they need to be at least as
7    large as the letters in availability of funds.
8  Q.  And am I to understand that you believe that the
9    notice that says availability of funds was
10   prominent and conspicuous?
11   A. Just the sentence availability of funds. The
12   notice underneath that is, again, as small as the
13   convenience fee notice.
14 Q.  Now, do you have any idea -- withdrawn. Am I to
15   understand, ma'am, that you believe -- let's go to
16   the location issue -- that you believe in order to
17   be appropriate under federal law, the convenience
18   fee notice should actually be posted on the
19   machine itself?
20   A. Yes, I believe that would be a better
21   position.
22 Q.  I understand you think it would be better. I'm
23   asking you whether you're of the opinion that
24   that's what must occur?
25   A. Yes, I am of that opinion.

Page 40

1  Q.  All right. Do you have any idea how large the
2    notice would be if all of the letters were placed
3    into a font that was similar to the font used for
4    the words "availability of funds"?
5    A. Yes, it would be very large.
6  Q.  Wouldn't it cover the machine?
7    A. It very well could be.
8  Q.  Are you of the opinion that if the fee notice as
9    it actually exists on Exhibit N and as depicted --
10   excuse me, on Tab N and Tab O, are you of the
11   opinion that if that notice was placed right on
12   the machine in its existing size, then that would
13   be sufficient?
14   A. I think it would be better than the way that
15   it stands now.
16 Q.  All right. Well, I understand better. I'm asking
17   you whether -- if Sovereign had placed the fee --
18   the convenience fee notice that's depicted in Tab
19   N on the machine itself right next to the
20   keyboard, would we be sitting here today?
21   A. I would still be of the opinion that it is not
22   extremely conspicuous. It does not draw your eye
23   to it, no.
24 Q.  All right. So you disagree -- if I represented to
25   you that your fellow plaintiff has testified that

Page 41

1    if the existing notice were placed on the
2    keyboard, it would be conspicuous. You disagree
3    with her?
4    A. That is not my opinion, that is correct.
5  Q.  All right. So, if, ma'am, that's not sufficient,
6    i.e, the existing fee notice isn't sufficient, and
7    if, as you stated a moment ago, we enlarged all
8    the letters to be the same size as availability of
9    funds, if in that instance the notice would likely
10   cover the machine, how exactly would you have
11   Sovereign Bank post this notice?
12   A. I believe perhaps something other than a plain
13   black-and-white print and something that perhaps
14   stated -- perhaps the statement should be "read
15   before use" something that is going to make you
16   stop and read that information before you actually
17   use the machine would be a better way of
18   presenting that notice.
19 Q.  Okay. I probably did a poor job at phrasing the
20   question. I think you stated a moment ago that if
21   all of the letters in the convenience fee notice
22   were enlarged so that they would be the same size
23   as the letters availability of funds, the notice
24   would likely cover the machine?
25   A. I understand that.

11 (Pages 38 to 41)

May 8, 2006                                         Diane E. Horton

Page 42

1   Q.   Right?
2   A.   Yes, I understand that.
3   Q.   Not just you understand it, that was your
4        statement; right?
5   A.   Yes, that is correct.
6   Q.   So that would be too big; right?
7   A.   That is correct.
8   Q.   Because you can't obviously cover the machine and
9        still use the machine?
10  A.   That is correct.
11  Q.   And then you stated that the existing fee notice
12       is if it was placed right next to the keyboard,
13       your opinion is that's too small; correct?
14  A.   That is correct.
15  Q.   All right. So, I'm asking you, what is it in
16       terms of size -- if the existing fee notice is too
17       small and if the enlargement to availability of
18       funds would overwhelm or cover the machine, what
19       is it that you would have the bank do in terms of
20       posting a notice on the machine in terms of the
21       size of the letters?
22  A.   I don't understand what you're saying, I'm
23       sorry.
24  Q.   Well, you've already told me that posting the
25       existing notice with the existing font would be

Page 43

1        insufficient to address your concerns; right?
2   A.   That would be correct.
3   Q.   And you have also told me that you believe that
4        there should be a notice posted right on the
5        machine; right?
6   A.   That would be correct.
7   Q.   And you have also told me that if all the letters
8        were enlarged to the availability of funds, the
9        notice would be too big to use the machine; right?
10  A.   I understand that.
11  Q.   Okay. So, if I take those three statements -- if
12       I have to have something on the machine --
13  A.   Yes.
14  Q.   -- and the existing notice is too small and the
15       notice that you think would be of the right size
16       is too big to use on the machine, what would you
17       have Sovereign do in terms of posting a notice
18       that satisfies your concerns in terms of the type
19       size?
20  A.   Perhaps the machine area would need to be
21       enlarged.
22  Q.   Okay. So, if you enlarge the machine area though,
23       doesn't that then start to reduce the conspicuity
24       of the letters that you've said should be used?
25  A.   Not if you match the size of the lettering and

Page 44

1        the size of the machine so they equally are
2        displayed on your line of vision.
3   Q.   Well, how about on the existing machine, ma'am,
4        what would you have the bank do? Assuming this is
5        the machine they've got to use, this is the
6        machine that they've purchased, how would they
7        post a notice that would satisfy you?
8   A.   The notice should be within your line of
9        vision of where you insert your card, perhaps an
10       area -- I'm not a machine consultant so I could
11       not tell you how to do it.
12  Q.   I'm asking just sizewise, ma'am. Forget the
13       location. If this is the machine they've got and
14       if you are saying they have to place a notice on
15       the machine --
16  A.   Yes.
17  Q.   -- what size notice would satisfy you that could
18       be physically placed on this machine?
19  A.   One that is conspicuous and draws your eye to
20       it. I don't know how else you want me to describe
21       it.
22  Q.   Well, I'm having a hard time because you've told
23       me that we physically couldn't put a notice on the
24       machine using letters the size of "availability of
25       funds"; right?

Page 45

1   A.   I don't believe you have the room for it, no.
2   Q.   And you've told me that the existing size letters,
3        if those were placed right next to the keyboard on
4        a white background with black letters, you would
5        not find those to be conspicuous. Is that what
6        you're saying?
7   A.   That is correct.
8   Q.   All right. So I guess I'm asking you, ma'am, then
9        if they have to place something on the keyboard --
10  A.   On the keyboard itself.
11  Q.   Excuse me, if they have to place something on the
12       machine, on the machine itself, and they can't use
13       the availability of funds letters because they're
14       too big and they can't use the existing fee notice
15       because it's too small, what would your solution
16       be other than get a bigger machine?
17  A.   They would need to find a way or figure out a
18       way to somehow be able to put that notice on your
19       line of vision displayed in a way where your eye
20       will immediately be drawn to it and the wording
21       would be something that expresses to you that it
22       is important for you to read it before you use the
23       machine.
24  Q.   Okay. Well, I'm not focused on the wording right
25       now, I'm just focused on the size. And as I

b73e02f3-778f-4ec2-b8bf-703d0e32681e

May 8, 2006                                    Diane E. Horton

Page 46

1    understand, you say they would need to find a way
2    Sitting here today, can you think of any such way
3    other than getting a bigger machine?
4    A.  I don't believe that that should be my
5    concern.
6    Q.   So, is that a no?  You can't think of any way?
7    A.  No, I cannot think of any way.
8    Q.   All right.  And obviously if you can't think of
9    any way to do it other than getting a bigger
10   machine, if I tell you that we're going to have to
11   use as part of my question the existing machine, I
12   take it you would agree with me that you can't
13   think of any way to do it that way either?
14   A.  I cannot think of any way but that is not my
15   -- that's the bank's business to figure out a way
16   to properly display their notices to the people
17   who use them.
18   Q.   By the way, what eyesight do you have?
19   A.  I have perfect vision.  I just went to the eye
20   doctor within the last month, I believe.
21   Q.   When letters appear on the screen at the ATM at
22   the drive-up, are they bigger or smaller than the
23   letters that are on the convenience fee notice?
24   A.  I really do not recollect that.
25   Q.   By the way, are you able to -- do you see on Tab N

Page 47

1    of Exhibit G, do you see how each one of the keys
2    has above it just like a telephone A, B, C, D, E,
3    F?  Do you see that?
4    A.  Yes, I can see that.
5    Q.   When you're standing or when you've driven up to
6    the ATM, I trust that you are able to read those
7    letters?
8    A.  Yes, I am.
9    Q.   Would you agree with me that those letters are
10   approximately the same size as the letters in the
11   convenience fee notice?
12   A.  I would say that would be a good presumption,
13   yes.
14   Q.   All right.  Now, would you take a look at your
15   affidavit, please, which I believe we've marked as
16   Exhibit H.
17   A.  Yes, I have it.
18   Q.   Would you look at the last sentence in paragraph
19   5.
20   A.  Yeah.
21   Q.   Do you see that last sentence where you say,
22   "There is absolutely no visible notice in the
23   immediate vicinity warning me that Sovereign was
24   going to charge a convenience fee for use of its
25   ATM machine."  Do you see that?

Page 48

1    A.  Yes, I do see that.
2    Q.   You've already told me that you've considered the
3    convenience fee notice that is depicted in Tab O
4    and N of Exhibit G to be "near" the ATM; correct?
5    A.  That is correct.
6    Q.   So, when you said here there's absolutely no
7    visible notice in the immediate vicinity warning
8    me that Sovereign was going to charge a
9    convenience fee for use of its ATM machine, why
10   didn't you include the convenience fee notice
11   that's described in Tabs N and O of Exhibit G?
12   A.  Because if you look at Exhibit E, the picture
13   of myself in my van making my withdrawal, you will
14   see that the placard is not even in the
15   photograph.  So, to me, it is not at all visible
16   to a person at the ATM withdrawal.
17   Q.   You mean when the person is parked directly in
18   front of the ATM?
19   A.  Which would be the only place that a person
20   would park in order to withdraw money from this
21   ATM.
22   Q.   Again, ma'am, my question was, you mean when you
23   are parked directly in front of the ATM machine,
24   your opinion is that there is nothing in the
25   immediate vicinity of the ATM warning you about

Page 49

1    the convenience fee; correct?
2    A.  That would be correct.
3    Q.   But, of course, to get to the ATM machine, you've
4    already driven by the red placard that's depicted
5    in Tabs N and O; correct?
6    A.  That is correct.
7    Q.   Now, in paragraph 6 you say, "While inserting your
8    card in the ATM, it's impossible to read the
9    convenience fee -- excuse me -- its virtually
10   impossible to read the convenience fee notice
11   referred to in paragraph 10 of Ms. Comeau's
12   affidavit."  Do you see that?
13   A.  Yes, I do see that.
14   Q.   That's because you're parked directly in front of
15   the ATM and you would have to either back up or
16   turn your head at some angle in order to see it;
17   correct?
18   A.  That would be correct.
19   Q.   But, again, prior to the point in time when you'd
20   be inserting your ATM card and you either have to
21   back up or turn your head, you've already driven
22   by the notice; correct?
23   A.  That would be correct.
24   Q.   By the way, whose words are this affidavit?
25   A.  They would be mine.

13  (Pages 46 to 49)

b73e02f3-778f-4ec2-b8bf-703d0e32681e

May 8, 2006                                    Diane E. Horton

Page 50

1   Q.   So, this is your choice of language?
2   A.   Yes, it would be.
3   Q.   You drafted this?
4   A.   I'm sorry?
5   Q.   You drafted this?
6   A.   I sat with Mr. Lefebvre and we did it
7        together, yes.
8   Q.   Okay. And when you say you did it together, did
9        you dictate it or did you provide the language to
10       Mr. Lefebvre?
11  A.   I explained my opinion and what my description
12       was and it was written down.
13  Q.   Who chose the actual words that are in the
14       affidavit?
15  A.   I would say the majority of them are mine.
16  Q.   Okay. Now, take a look at paragraph 7. When you
17       went back on February 25th, 2006 -- by the way,
18       why is it -- oh, you actually went back on two
19       different occasions; is that correct?
20  A.   Yes, that is correct.
21  Q.   Why did you go back twice?
22  A.   I don't recall.
23  Q.   All the questions that I asked you that referred
24       to the date, February 22, 2006, are they equally
25       true if I substitute the word February 25, 2006?

Page 51

1   A.   I don't recall all the statements that you've
2        made but I would assume that that would be a
3        correct statement.
4   Q.   Well, there are questions asking you about the
5        accuracy of the photos and whether they were fair
6        and accurate representations?
7   A.   Yes, now that you've refreshed my memory, yes,
8        that would be appropriate to say that.
9   Q.   Now, on February 25 when you attempted to use the
10       drive-up, you actually noticed the red placard;
11       correct?
12  A.   That is correct.
13  Q.   Did you stop to look at?
14  A.   I think I attempted to look behind me to see
15       how difficult it would be to read it.
16  Q.   Okay. Did you attempt to actually stop in front
17       of the placard itself in order to read the
18       material set forth therein without reading your
19       affidavit, ma'am?
20  A.   I don't recall.
21  Q.   Okay. You can read your affidavit and see if that
22       refreshes your recollection in any way.
23  A.   I have reread my affidavit.
24  Q.   Okay. Specifically, did you read paragraph 7?
25  A.   Yes, I did.

Page 52

1   Q.   All right. It's not entirely clear to me from
2        that, did you or did you not stop in front of the
3        notice itself, the placard itself, and attempt to
4        read the material set forth therein?
5   A.   No, I don't believe I actually stopped
6        precisely in front of the placard, no.
7   Q.   So, when you wrote that, in your opinion it's
8        impossible to read the tiny print, you meant when
9        you're parked in front of the ATM?
10  A.   Yes, it says as I'm driving past.
11  Q.   All right. So that last sentence of paragraph 7
12       is actually referring to the point in time when
13       your vehicle is parked directly in front of the
14       keyboard; correct?
15  A.   No, that is not what that sentence says.
16  Q.   Okay.
17  A.   That sentence says, however, in my opinion, it
18       is impossible to read the tiny print contained
19       thereon as you are driving past the sign
20       approaching the ATM.
21  Q.   Oh, you mean while your vehicle is actually
22       moving?
23  A.   Yes, as you are driving past it. As you are
24       approaching at a slow amount of speed to get up to
25       the ATM.

Page 53

1   Q.   So, when you made the statement contained in the
2        last sentence of paragraph 7 of your affidavit
3        that we've marked as Exhibit H, that was based
4        upon your vehicle being in motion?
5   A.   Yes. As I would believe any vehicle would be
6        as it approaches the ATM.
7   Q.   But, of course, you've already agreed with me that
8        nothing precludes you or precludes anybody from
9        stopping at the notice in order to read what's
10       contained therein; correct?
11  A.   That would be correct but in my opinion I do
12       not see any reason why anyone would feel the need
13       to stop before they reach the ATM to read that
14       notice.
15  Q.   I understand your opinion but my question was,
16       nothing physically prevents any person from
17       stopping to read the content of what's in the
18       placard described and depicted in Exhibit N --
19       excuse me, in Tab N of Exhibit G; correct?
20  A.   That is correct, there is no obstacle stopping
21       me from stopping at that placard, that is correct.
22  Q.   Now, in paragraph 8 when you say, The convenience
23       fee notice is placed in a location that's
24       difficult for any consumer to see who might choose
25       -- chose, but I'm sure you meant choose -- to use

14 (Pages 50 to 53)

b73e02f3-778f-4ec2-b8bf-703d0e32681e

May 8, 2006                                          Diane E. Horton

Page 54

1    the drive-thru ATM at the Plainville branch,
2    referenced above, you were there referring to the
3    point in time when the consumer is parked in front
4    of the ATM itself; correct?
5    A. That would be correct.
6    Q. Okay. Let's try to address the walk-up ATM. Now,
7    as I understand your earlier testimony prior to --
8    as it turns out February 25 -- you had never used
9    the walk-up at the Plainville branch; correct?
10   A. I would not say never. There is not a time
11   that I recollect in my memory immediately.
12   Q. Okay. All right. Now, by the way, in any of the
13   workplaces that you've ever been in, have you ever
14   noticed in the lunchroom or anyplace like the
15   employee breakroom placards or notices talking
16   about things like minimum wage or occupational
17   safety and health or overtime or any Workers'
18   Comp., anything that the government requires to be
19   posted in the breakroom -- to be posted?
20   A. To my memory, all of those items are pointed
21   out to you on your orientation when you begin
22   working at any kind of establishment like that.
23   Q. Well, I understand that you'd like me to know that
24   but my question was actually whether or not you've
25   ever noticed any of those things in those various

Page 55

1    locations?
2    A. It's not something that I would look for but
3    because they were pointed out to me at a time of
4    orientation, I am aware that they were there, yes.
5    Q. And where were they located?
6    A. The memory that I would have back how many
7    years ago when I worked at RIGHA where they were
8    up on a wall on a corkboard type of display.
9    Q. In the lunchroom?
10   A. I would say, yes, that would be a good
11   description of where they were located.
12   Q. Did you consider where they were posted to be a
13   prominent location? And, by the way, I'm going to
14   give you a chance to answer that question just so
15   you don't think I'm trying to trick you. I'm
16   going to give you a chance to ask you both because
17   you were told where they were and without being
18   told where they were. Did you consider where they
19   were posted in the employee breakroom or lunchroom
20   to be a prominent location?
21   A. I don't know if I would use the word
22   prominent. I think they were very visible and
23   accessible to people who entered the lunchroom.
24   Q. And is that irrespective of the fact that they had
25   been pointed out to you?

Page 56

1    A. I'm sorry, could you better --
2    Q. In other words, did you think that they were very
3    visible and capable of being seen even though you
4    had -- let me try this a different way. If
5    somebody hadn't pointed out to you where they
6    were, would you still believe that they were in a
7    prominent location?
8    A. Can I ask you what you are trying to say to
9    me? Do you -- in my opinion, would I have noticed
10   them had they not been pointed out to me? Is that
11   correct what you're trying to ask me?
12   Q. Well, I'm asking you using the language prominent;
13   whether or not they had been pointed out to you,
14   would you have considered them prominent having
15   them posted in the employee lunchroom on a
16   corkboard?
17   A. Again, as I said, I would not necessarily call
18   it prominent. I would call them accessible and
19   visible but I would not necessarily walk in and
20   immediately notice them, no.
21   Q. Okay. Would you consider them conspicuous?
22   A. Not necessarily, not the way that they were
23   displayed, no.
24   Q. And exactly how were these displayed?
25   A. As I stated, they were on a corkboard type

Page 57

1    display board hanging on the wall.
2    Q. And how big was the employee lunchroom?
3    A. How big was the room?
4    Q. Yes.
5    A. Perhaps somewhat larger than this room that we
6    are in now.
7    Q. Well, let's see.
8        MR. FRECHETTE: Attorney Lefebvre, can we
9    agree on the measurement of about 16x20?
10       MR. LEFEBVRE: I was going to say 15x20.
11   So, I think that's a fair representation of this
12   conference room that we're in.
13   Q. Now, when you say it might have been slightly
14   larger, slightly wider or slightly longer?
15   A. Slightly longer this way.
16   Q. I would have thought that was wider.
17   A. Oh, I'm sorry. Again, I am not real good
18   with --
19   Q. So, you think it might have been more like 18 or
20   19x20?
21   A. I would say that would be a good description.
22   Q. All right. How big was the corkboard that they
23   were on?
24   A. Approximately that size.
25   Q. Approximately --

15 (Pages 54 to 57)

May 8, 2006                                          Diane E. Horton

Page 58

1    A. I'm sorry, the size of four.
2    Q.  Four 8 1/2x11 sheets of paper configured in
3    roughly a square?
4    A.  That would be an appropriate description, yes.
5    Q.  All right. And how big were the notices
6    themselves?
7    A.  I would say that the best closest description
8    would be this sheet.
9    Q.  An 8 1/2 sheet?
10   A.  An 8 1/2x10 sheet, yes.
11   Q.  Did they cover the entire board?
12   A.  To my recollection, yes, they covered the
13   majority of the board.
14   Q.  And where were they configured -- withdrawn.
15   Where were they situated in the employee breakroom
16   in relationship to the doorway?
17   A.  They were to the left side of the doorway.
18   Q.  When you walked in, even though you didn't
19   necessarily notice what they said, did you notice
20   that there was a bulletin board with something
21   posted on it?
22   A.  Yes, I would say that would be a fair
23   description.
24   Q.  All right. Now, if you take a look at your
25   affidavit, specifically paragraph 9, your

Page 59

1    testimony there about vehemently disagreeing with
2    Ms. Comeau's statement that the location of the
3    fee notice is reasonably calculated to impart its
4    information to non-Sovereign customers, you're
5    referring to the fact that when standing at the
6    ATM machine looking at the screen, you can't see
7    what's behind you; correct?
8    A.  That is correct.
9    Q.  You're not suggesting that when you walked in the
10   door that is actually depicted in Tab H of Exhibit
11   G, that you can't see the ATM placard on the left
12   of that photo; correct?
13   A.  That is correct. You can see the placard.
14   Q.  All right. And you're not suggesting that when
15   you're at the ATM machine and you turn around in
16   order to exit through the door that's depicted in
17   Tab H of Exhibit G, that you won't be staring
18   directly at the red placard; correct?
19   A.  It is visible for you to see when you turn
20   around, that is correct.
21   Q.  And, of course, you're not suggesting that there's
22   any reason why you couldn't walk up and read
23   what's on the placard; correct?
24   A.  You are very able to walk up and read what is
25   on the placard; that is correct.

Page 60

1    Q.  By the way, do you know what that little metal
2    stand is?
3    A.  This right here?
4    Q.  Excuse me, the blue metal stand that is -- that
5    was my fault, I apologize -- the blue metal stand
6    that is on the left of Tab H of Exhibit G which
7    contains the placard?
8    A.  I believe it is supposed to hold necessary
9    slips that you may need to use while you're at the
10   ATM or some kind of a stand for you to lean on
11   should you need to lean and write. I don't know
12   for sure what that is though.
13   Q.  Well, is it your best understanding sitting here
14   today that if you want to make a deposit, that's
15   where the deposit envelopes are located?
16   A.  I would imagine that would be the case. Where
17   that is not my bank, I don't know that for sure.
18   Q.  Sitting here today, is it your best understanding
19   that, for example, if you wanted to make a
20   deposit, the place that you would fill in the
21   envelope in order to do so is this little blue
22   metal stand that's depicted to the left of the
23   photograph that we've marked as Tab H of Exhibit
24   G?
25   A.  I would think that would be a good assumption.

Page 61

1    Q.  So, you would put -- do you see how there's a
2    section of the blue metal stand that juts out and
3    it's got what appears to be a white area in the
4    middle of it?
5    A.  Yes, I see that.
6    Q.  Is that, to your understanding sitting here today,
7    where you would put, for example, a deposit
8    envelope down in order to write in the various
9    information necessary to complete the deposit
10   envelope?
11   A.  I would think that that would be a good
12   assumption that that is what that is for but,
13   again, it is not my bank so I'm not aware of -- I
14   wouldn't be doing something like that at that
15   bank.
16   Q.  Okay. You disagree in your affidavit with
17   paragraph 15 of Ms. Comeau's affidavit; correct?
18   A.  Yes, that is correct.
19   Q.  Am I to understand that the reason that you
20   disagree with what's in Ms. Comeau's affidavit is
21   that because when you were parked down in front in
22   front of the drive-up, you don't believe that the
23   convenience fee notice is placed in a location
24   reasonably calculated to impart its information to
25   non-Sovereign customers who might use it?

16 (Pages 58 to 61)

May 8, 2006                                                    Diane E. Horton

Page 62

1    A. That is correct.
2  Q   Are there any other reasons why you disagree with
3    what Ms. Comeau said in paragraph 15?
4    A. No, there are no other reasons.
5  Q. All right. Now, you also disagree with what Ms.
6    Comeau had to say in paragraph 25; correct?
7    A. I don't agree with her opinion that she states
8    in paragraph 25.
9  Q. Right. You disagree with what she says in
10   paragraph 25?
11   A. That is correct.
12 Q   And you disagree with what she says in paragraph
13   25 for the reasons set forth in paragraph 9 of
14   your affidavit; correct?
15        MR. LEFEBVRE: Read the whole thing before
16   you answer.
17   A. Yes, that is correct.
18 Q   Any other reasons you disagree with what Ms.
19   Comeau's says in paragraph 25?
20   A. No.
21 Q. Other than paragraphs 15 and 25 of Ms. Comeau's
22   affidavit, are there any other aspects of it that
23   you disagree with?
24   A. Any other aspects of her affidavit that I
25   disagree with?

Page 63

1  Q. Yes.
2        MR. LEFEBVRE: Take your time, don't feel
3    rushed.
4        MR. FRECHETTE: Take as much time as you
5    need.
6    A. Can I address you as I read each paragraph?
7  Q. Yes, ma'am.
8    A. Okay. I am up to paragraph 14. I had no
9    disagreement until I reached paragraph 14. I
10   disagree with her statement in paragraph 14. She
11   states that when her automobile is parked so that
12   the driver is directly in front of the ATM screen,
13   she can see and read the convenience fee notice
14   while sitting in the driver's seat in her car. I
15   don't know how that is possible for her to do
16   that. So I would disagree with that paragraph.
17 Q. Well, okay, let's talk about that for a second.
18   Paragraph 14, she doesn't say that she wouldn't
19   have to turn her head; right?
20   A. No, she does not say that.
21 Q. And you acknowledge in your affidavit that you
22   could turn your body 100 degrees to the left,
23   stick your head out the window and lean forward,
24   and that although that's awkward and cumbersome,
25   you could then read the convenience fee notice;

Page 64

1    correct?
2    A. Yes, that is correct.
3  Q. So, you don't necessarily agree with the literal
4    words of paragraph 14. You disagree with the
5    notion that she wouldn't be able to read it unless
6    she performed the acts described in paragraph 6 of
7    your affidavit?
8    A. That would be correct.
9  Q. Okay. All right. Go ahead. Anything else? And
10   we've already covered paragraph 15.
11   A. That is correct. Again, we have discussed
12   paragraph 25 that states she believes that the
13   convenience fee notice is placed in a location
14   reasonably calculated to impart its information.
15 Q. And you disagree with that?
16   A. I disagree with that.
17 Q. Anything else after having reviewed the document?
18   A. Not that I can see, no.
19 Q. Well, in fairness when you say not that you can
20   see --
21   A. No, there is nothing else in the affidavit
22   that I disagree with it.
23 Q. Okay.
24        MR. FRECHETTE: Just give me one second.
25   I think I may be done.

Page 65

1        MR. LEFEBVRE: Just so the record is
2    clear, we want to exercise our right to review the
3    transcript to read and sign.
4        MR. FRECHETTE: And we have usual stips
5    again?
6        MR. LEFEBVRE: Absolutely, no problem.
7  Q. How long after you used the Sovereign ATM on
8    February -- excuse me, on April 6th, 2005, how
9    long after that was it that you had conversations
10   with Attorney Lefebvre about the possibility of
11   bringing this lawsuit?
12   A. I don't remember the exact amount of time.
13 Q. How about generally?
14   A. I couldn't even comfortably give you any kind
15   of an idea.
16 Q. Well, was it more or less than a month?
17   A. I would say it was maybe in a month's time
18   frame, yes.
19 Q. Do you routinely keep all of your receipts?
20   A. Yes, I always keep my receipts.
21 Q. So you still have the original of the receipt
22   that's described in the complaint?
23   A. Yes, I do.
24 Q   And all the other ones from any other ATM --
25   A. Yes, I do.

17 (Pages 62 to 65)

May 8, 2006                                                    Diane E. Horton

Page 66

1  Q.  You've got to let me finish.
2     A.  I'm sorry.
3  Q.  That's all right.  And all the ones from any other
4     ATM transaction that you've been involved in in
5     the last twelve months?
6     A.  Yes, I would say that would be an accurate
7     description.
8  Q.  In fact, maybe even within the last couple of
9     years?
10    A.  I would believe -- I'm very particular about
11    my receipts.  I would say I have at least the last
12    two years.
13 Q.  Okay.
14        MR. LEFEBVRE:  So, you're a packrat?
15        THE WITNESS:  I am.  Ask my husband, he'll
16    tell you.
17 Q.  I'm not entirely sure I asked you this, ma'am, I
18    may have.  If I did, I apologize.  Other than what
19    is stated in paragraphs 16 A, B and C of the Third
20    Amended Complaint, your attorney might want to
21    show you that.  If not, I know I've got a copy.
22        MR. LEFEBVRE:  What paragraphs?
23        MR. FRECHETTE:  I think it's 16 A, B and C
24    and if I'm wrong, correct me.
25        MR. LEFEBVRE:  Okay.  16 A, B and C.

Page 67

1  Q.  Other than what's described in those paragraphs,
2     are there any other issues that you have
3     concerning the convenience fee notice?
4     A.  Other than the items that are pointed out in
5     A, B and C?
6  Q.  Yes.
7     A.  I would say those are the main reasons of my
8     complaint, yes, that is correct.  No, there are no
9     other issues that I would have with this problem.
10 Q.  Okay.  Well, that's actually two answers and I
11    want to make sure that we clarify.  You said those
12    are the main ones, then you said there aren't any.
13    If there are any at all, please tell me now other
14    than what's in paragraph 16 A, B and C.
15    A.  No, there are no other issues that I have.
16 Q.  All right.  And you are not prepared to testify
17    sitting here today that with respect to any
18    Sovereign ATM transaction you were actually
19    surprised that you got charged an ATM convenience
20    fee, are you, given -- well, let me withdraw and
21    restate it.
22    A.  Thank you.
23 Q.  In each of the cases where you were charged a
24    convenience fee at Sovereign, you did get the
25    on-screen notice telling you that you were going

Page 68

1  to be charged a fee; correct?
2     A.  Yes.  To my memory, yes, I did get that
3  notice.
4  Q.  So, you're not prepared to testify today that you
5     were surprised that you got charged a fee;
6     correct?
7     A.  No, I would not say -- I would not testify
8     that I was surprised there was a fee because it
9     was actually on my receipt, that is correct.
10 Q.  Well, in fact, not only was it on your receipt,
11    there was an on-screen notice that prompted you as
12    to whether you wanted to proceed with the
13    transaction or not given that a fee would be
14    charged; correct?
15    A.  Yes, that is correct.
16        MR. FRECHETTE:  I have nothing further.
17        MR. LEFEBVRE:  No questions.  Thank you.
18        MR. FRECHETTE:  Let's go back on the
19    record.  Just for convenience, what Attorney
20    Lefebvre and I have done and agreed to do since we
21    have exhibits from the DeLoreto deposition that
22    we've agreed are going to be exhibits in this case
23    -- excuse me, in this deposition -- specifically
24    Exhibits A, B, and C which are various forms of
25    the Complaint and Exhibit G which are the photos;

Page 69

1  those exhibits from the DeLoreto deposition are
2  going to be retabbed in duplicate form and
3  included with the transcript of this deposition as
4  if they had been marked actually at this
5  deposition.
6        MR. LEFEBVRE:  That makes perfect sense
7  and I agree.
8        MR. FRECHETTE:  Okay.  We're done.  Thank
9  you so much.
10        (Deposition concluded at 11:18 a.m.)

18  (Pages 66 to 69)

May 8, 2006                                          Diane E. Horton

Page 70

```
 1              C-E-R-T-I-F-I-C-A-T-E
 2         I SALLY BRASSARD  a Notary Public in and
     for the State of Rhode Island  duly commissioned
 3   and qualified to administer oaths, do hereby
     certify that the foregoing deposition of DIANE E
 4   HORTON, the Plaintiff in the above-entitled cause,
     was taken before me on behalf of the Defendant at
 5   the offices of Edwards Angell Palmer & Dodge LLP,
     2800 Financial Plaza, Providence  Rhode Island  on
 6   May 8th, 2006, at 9:30 A M , that previous to
     examination of said witness  who was of lawful
 7   age  she was first sworn by me and duly cautioned
     and sworn to testify the truth, the whole truth,
 8   and nothing but the truth  and that she thereupon
     testified as in the foregoing manner as set out in
 9   the aforesaid transcript
10         I further certify that the foregoing
     deposition was taken down by me in machine
11   shorthand and was later transcribed by computer
     and that the foregoing deposition is a true and
12   accurate record of the testimony of said witness
13         Pursuant to Rule 5 (d) and 30 (f) of the
     Federal Rules of Civil Procedure  original
14   transcripts shall not be filed in court;
     therefore  the original is delivered and retained
15   by Defendant's attorney
16         I have enclosed with a copy of the deposition
     a correction and signature page  which must be
17   signed before a Notary Public.
18         IN WITNESS WHEREOF I have hereunto set my hand
     this 11th day of May  2006
19
20   _____
     SALLY BRASSARD  NOTARY PUBLIC/CSR-RPR
21   (MY COMMISSION EXPIRES JANUARY 16  2009)
22
23
24
25
```

19 (Page 70)

b73e02f3-778f-4ec2-b8bf-703d0e32681e