## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                                          )
MAUREEN E. DELORETO and                   )
DIANE E. HORTON,                          )
            Plaintiffs,                   )
        v.                                )          C. A. NO. 05-CV-10712 RCL
                                          )
SOVEREIGN BANK,                           )
            Defendant.                    )
_____   )

### SUPPLEMENT TO DEFENDANT SOVEREIGN BANK'S STATEMENT
### OF UNDISPUTED MATERIAL FACTS SUBMITTED IN SUPPORT
### OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to this Court's Order entered March 28, 2006, the Parties took limited

deposition testimony from Rhiannon Hernandez, Stephanie K. Comeau, Maureen E. Deloreto

and Diane E. Horton.  Defendant Sovereign Bank took the depositions of Ms. Deloreto and

Ms. Horton on May 5 and 8, respectively.  This supplement to Defendant's Statement of

Undisputed Facts submitted in support of its Motion for Summary Judgment contains undisputed

material facts established during the course of those depositions which were unavailable to

Sovereign Bank when it filed its original Statement of Undisputed Material Facts on January 31,

2006.

### V.  ADDITIONAL FACTS RELATING TO PLAINTIFF'S TRANSACTIONS

74.     Ms. Horton cannot recall ever using the walk-up ATM at Sovereign's Plainville

branch prior to the commencement of this litigation.  *See,* Plaintiffs' Appendix Ex. 11, *Horton*

*Trans.* at 26/lines 7 through 27/line 10.

75.     The Placard Notice is located "near" the drive-up ATM at Sovereign's Plainville

branch.  *See, Id.,* at 34/lines 2-17.

76.     In order to access the Plainville drive-up ATM, a consumer must drive past

Sovereign's Placard Notice.  *See, Id.*, at 35/lines 6-16; and 49/lines 3-6.

77.     Nothing prevented Ms. Horton from stopping and examining the Placard Notice before proceeding to Sovereign's Plainville drive-up ATM.  *See, Id.* at 35/lines 17-19.

78.     Ms. Horton is able to read print of the size utilized in the Sovereign Placard Notice.  *See, Id.*, at 46/lines 25 through 47/line 8.

79.     Although Ms. Horton stated in paragraph 6 of her affidavit that "[t]here was absolutely no visible notice in the immediate vicinity" of the Plainville drive-up ATM when she went to take photographs for use in her opposition filings, (*See,* Plaintiffs' Appendix Ex. 2, *Affidavit of Diane E. Horton*, February 25, 2006 ("*Horton Aff.*") ¶ 5) her statement was meant only to convey the notion that, when she was parked directly in front of the drive-up ATM at Sovereign's Plainville branch, the convenience fee notice was not visible to her.  *See,* Plaintiffs' Appendix Ex. 11, *Horton Trans.,* at 47/lines 21 through 49/line 2.

80.     Although Ms. Horton stated in her affidavit that it is "virtually impossible" to read the convenience fee notice, (*See,* Plaintiffs' Appendix Ex. 2, *Horton Aff.* ¶ 6), when she made this statement, she meant that she could not read when she was "parked directly in front of the ATM."  *See,* Plaintiffs' Appendix Ex. 11, *Horton Trans.*, at 49/lines 7-23.

81.     While Ms. Horton stated in her affidavit that "it is impossible to read the tiny print contained [in the notice] as you are driving past the [notice]," (*See,* Plaintiffs' Appendix Ex. 2, *Horton Aff.* ¶ 7) this statement was intended to convey that the fee notice cannot safely be read by an approaching ATM customer whose vehicle is in motion.  *See,* Plaintiffs' Appendix Ex. 11, *Horton Trans.* at 52/lines 7-25.

82.     Ms. Horton's opinion that "the convenience fee notice is placed in a location that is difficult for any consumer to see," (*See,* Plaintiffs' Appendix Ex. 2, *Horton Aff.* ¶ 8), was intended to convey the notion that the fee notice is difficult to see when the customer is parked

directly in front of the Plainville drive-up ATM.  *See,* Plaintiffs' Appendix Ex. 11, *Horton Trans.* at 53/lines 22 through 54/line 5.

83.    The Placard Notice at the Plainville walk-up ATM is visible when you enter the vestibule.  *See, Id.*, at 58/lines 18 through 59/line 13.

84.    In asserting that the Placard Notice at the Plainville walk-up ATM is not "reasonably calculated to impart its information to non-Sovereign customers," (*See,* Plaintiffs' Appendix Ex. 2, *Horton Aff.* ¶ 9), Ms. Horton intended to convey the notion that, "when standing at the [Plainville walk-up] ATM machine looking at the screen, you can't see what's behind you . . . ."  *See,* Plaintiffs' Appendix Ex. 11, Horton Trans. at 58/line 24 through 59/line 25.

85.    Ms. Deloreto has never used the walk-up ATM at Sovereign's Seekonk branch. *See,* Defendant's Appendix Ex. Y (attached), *Deloreto Trans.* at 20/lines 3-22; and 33/lines 2-7.

86.    The Placard Notice is located "near" the Seekonk drive-up ATM.  *See, Id.* at 35/lines 12 through 36/line 9.

87.    In order to utilize Sovereign's Seekonk drive-up ATM, it is necessary to drive past the Placard Notice.  *See, Id.*, at 34/lines 17-24.

88.    Ms. Deloreto saw the Placard Notice at Sovereign's Seekonk drive-up ATM.  *See, Id.* at 35/lines 6 through 36/line 12.

89.    Nothing prevents a consumer from stopping their vehicle in front of the Seekonk Placard Notice in order to read the notices contained on the placard before proceeding to the ATM.  *See, Id.* at 37/lines 3-7.

90.    Ms. Deloreto's opinion that "the convenience fee notice is placed in a location that is difficult for any consumer to see," (*See,* Plaintiffs' Appendix Ex. 3, *Deloreto Affidavit* ("*Deloreto Aff.*") ¶ 7), was intended to convey the notion that the notice is difficult to see when

the customer is parked directly in front of the Seekonk drive-up ATM.  *See,* Defendant's

Appendix Ex. Y (attached), *Deloreto Trans.* at 45/lines 8 through 46/line 4.

91.     With respect to the Seekonk walk-up ATM, Ms. Deloreto conceded she did <u>not</u>, in

paragraph 8 of her affidavit, mean to suggest the placard containing the convenience fee notice is

not visible; rather, only to suggest "the placard isn't visible when you're standing *directly in*

*front of* the [ATM]."  *Id.*

**SOVEREIGN BANK**
By its attorneys,


/s/ John A. Houlihan
Dated:  June 8, 2006          /s/ Donald E. Frechette
                             John A. Houlihan (B.B.O. #542038)
                             Donald E. Frechette (B.B.O. #547293)
                             Joshua W. Gardner (B.B.O. #657347)
                             EDWARDS ANGELL PALMER & DODGE LLP
                             111 Huntington Avenue
                             Boston, MA  02199-7613
                             (617) 239-0100  Telephone
                             (617) 227-4420  Telecopy

# APPENDIX EXHIBIT Y

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS
2

3

4

5
     MAUREEN E. DELORETO
6    and DIANE E. HORTON

7    VS.            C.A. NO.:05-CV-10712RCL

8    SOVEREIGN BANK

9

10

11          DEPOSITION OF MAUREEN E. DELORETO,

12    plaintiff in the above-entitled cause, taken on

13    behalf of the Defendant, pursuant to notice,

14    before Sally Brassard, CSR, a Notary Public in and

15    for the State of Rhode Island and Providence

16    Plantations, at the office of Edwards Angell

17    Palmer & Dodge LLP, 2800 Financial Plaza,

18    Providence, Rhode Island, on May 5, 2006, at 12:30

19    p.m.

20

21

22

23
                ALLIED COURT REPORTERS
24               115 PHENIX AVENUE
               CRANSTON, RI  02920
25               (401) 946-5500

2

1    APPEARANCES:

2

FOR THE PLAINTIFFS:  CLAUDE LEFEBVRE, P.C.
3            BY:  CHRISTOPHER M. LEFEBVRE, ESQ.

4

FOR THE DEFENDANT:  EDWARDS ANGELL PALMER & DODGE
5            LLP
            BY:  DONALD E. FRECHETTE, ESQUIRE
6

7    ALSO PRESENT:    EDELMAN, COMBS, LATTURNER
                & GOODWIN, LLC
8            BY:  TARA GOODWIN, ESQUIRE
                (By Telephone)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1              I-N-D-E-X

2

3
       MAUREEN E. DELORETO                    PAGE
4
       Examination by Mr. Frechette . . . . . . . .    4
5

6

7

8

9              E-X-H-I-B-I-T-S

10
       DEFENDANT'S      DESCRIPTION           PAGE
11       NO.

12     A       Complaint - Class Action        9

13     B       Second Amended Complaint -
               Class Action           10
14
       C       Third Amended Complaint -
15             Class Action           11

16     D       Laser - Photo          22

17     E       Laser - Photo          22

18     F       Laser - Photo          22

19     G       Appendix of Exhibits        24

20     H       Affidavit of Maureen DeLoreto    26

21

22

23

24

25

4

1      (DEPOSITION COMMENCED AT 12:56 P.M.)

2          MAUREEN E. DELORETO,

3   having first been duly sworn by the Notary Public,

4   testified as follows:

5          THE COURT REPORTER:  Please state your

6   full name and spell it for the record.

7          THE WITNESS:  Maureen Elizabeth DeLoreto

8   (D-e-L-o-r-e-t-o).

9          EXAMINATION BY MR. FRECHETTE:

10  Q.   Ms. DeLoreto, how are you presently employed?

11       A.  I work for Meals on Wheels and I'm on total

12       disability.

13  Q.   Total disability from a prior --

14       A.  Yes.

15  Q.   -- employment?

16       A.  Yes, I'm on SSDI.

17  Q.   Okay.  Let me try to give you a couple of ground

18       rules because I think we already actually saw one

19       of them right there which is -- I'm going to try

20       to, when you provide a response, not walk over

21       your response, not interrupt you because the court

22       reporter here is taking everything down and we

23       need to have a nice clean transcript, if you could

24       do your best to let me finish a question.  If for

25       some reason I cut you off on something that you

5

1    wanted to say, just say I wasn't finished and I

2    will be happy to let you finish your statement;

3    okay?

4    A. Okay.

5    Q.  Have you ever been deposed before by the way?

6    A. Yes.

7    Q.  In connection with what?

8    A. It was in connection with an auto accident.

9    Q.  Okay. So you've been involved in litigation

10    previously?

11    A. Previously.

12    Q.  How many lawsuits have you been involved in

13    previously?

14    A. One.

15    Q.  And the lawsuit that you were involved in, were

16    you a plaintiff or a defendant?

17    A. I was the plaintiff.

18    Q.  Now, was that auto accident also the result of the

19    disability that you mentioned earlier?

20    A. It possibly could be.

21    Q.  All right. How old are you, ma'am?

22    A. 59.

23    Q.  When you -- you graduated high school; correct?

24    A. Yes.

25    Q.  After you got out of high school, did you attend

6

1    any college or university?

2    A. I attended Rhode Island College. I have a

3    year there and also I have six months at CCRI.

4  Q.   And what did you study while at Rhode Island

5    College?

6    A. At Rhode Island College was business.

7  Q.   And at CCRI?

8    A. At CCRI I was going to take a law class but I

9    never got to start it.

10  Q.   All right. Why not? Because of the disability?

11    A. Actually I became very sick and I wound up

12    having to drop out after the first week.

13  Q.   All right. Now, could you describe for me

14    subsequent to your graduation from high school

15    your work history. I'll try to save some time

16    here, ma'am, by saying that, you know, it was

17    obviously a while ago. So, if you could give me a

18    brief overview, and if there is something I need

19    to ask you further about it, then we'll go back to

20    that.

21    A. Okay. I worked in the auto industry from 1971

22    through 1989. Then I worked from 1991 to the year

23    2002, I worked for MetLife.

24        MR. LEFEBVRE: Tara, can you hear okay?

25        MS. GOODWIN: Yeah, I can hear fine.

7

1  Q.   What year did you graduate high school?

2       A.  1965.

3  Q.   What did you do from 1965 to 1971?

4       A.  I was in the military.

5  Q.   What branch?

6       A.  United States Air Force.

7  Q.   And what did you do in the --

8       A.  I actually got out of the military in '69.

9  Q.   Okay.  What did you do in the Air Force from '65

10      to '69?

11      A.  I was a medical technician.

12 Q.   And from '69 to '71, what did you do?

13      A.  I worked for Eagle Finance Corporation.  I was

14      a collector.

15 Q.   All right.  Now, when you say a collector, what

16      did that entail?

17      A.  I collected the bad debts that they had.

18 Q.   All right.  '71 to '89 you were in the auto

19      industry you said?

20      A.  That's correct.

21 Q.   Who were you employed by?

22      A.  I was employed by Scungia Chevrolet, John Ford

23      and Menard Ford.

24 Q.   And what did you do for them?

25      A.  I was a salesperson, then I moved into sales

8

1    management and then finally just management.

2  Q.    And what did you do for MetLife from '91 to 2002?

3    A.  I was an agent.  I was an executive account

4    assistant.

5  Q.    What product lines did you sell for MetLife?

6    A.  I sold life insurance, auto insurance, mutual

7    funds, annuities.

8  Q.    Did you have to take any particular training or

9    classes in order to be able to do that?

10    A.  Yes.

11  Q.    What did you take?

12    A.  I had to take a -- I had to have a Rhode

13    Island license for life insurance and I also had

14    to have a Series 6 license and a 63 license.

15  Q.    And those are through the SEC?

16    A.  Yes.

17  Q.    Now, do you have any professional designations?

18    By that I mean, are you a certified life

19    underwriter?

20    A.  No, I wasn't a certified life underwriter.

21  Q.    Do you have any designations?

22    A.  No, no designations.

23  Q.    All right.  How many times have you been deposed

24    previously?

25    A.  Once.

9

1   Q.   And that was just in connection with the auto case

2        that you told me about; right?

3        A.   That's correct.

4   Q.   Have you ever testified in court?

5        A.   Once I testified in court on a -- on the value

6        of an automobile that was -- on the value of a

7        truck that was stolen.  I was called in as an

8        expert witness as to what the value of it was.

9   Q.   How do you know Attorney Lefebvre?

10       A.   We are members of the same church and he has

11       done some legal work for me.

12  Q.   Now, are you familiar with the allegations in the

13       complaint in this particular case?

14       A.   Yes.

15  Q.   Did you read the complaint before it was filed?

16       A.   Yes, I did.

17  Q.   Did you agree with the statements that were

18       contained in the complaint before it was filed?

19       A.   Yes, I did.

20            MR. FRECHETTE:  Why don't we go ahead and

21       mark this as Exhibit A if we could.

22            (Defendant's Exhibit A marked for ID.)

23  Q.   Is that a copy of the complaint filed by your

24       attorney in federal court, ma'am?

25       A.   Yes, it is.

10

1  Q.   And, as I understand it, you read this document

2      before it was filed and you agreed with what it

3      said about the factual aspects of this case;

4      correct?

5      A.  That's correct.

6  Q.   Now, were you aware that there had been an amended

7      complaint filed in this case?

8      A.  Yes.

9          MR. FRECHETTE:  Why don't we get this

10      marked as B, please.

11          (Defendant's Exhibit B marked for ID.)

12          MR. FRECHETTE:  By the way, ma'am, I note

13      that it says Second Amended Complaint.  There may

14      be a First Amended Complaint as well.  I'm not

15      trying to trick you.

16          THE WITNESS:  I'm not sure I read both of

17      them but I'm pretty sure that I did.

18  Q.   Let me ask you this, do you recall reading what

19      we've marked as Exhibit B before it was filed?

20      A.  Yes.

21  Q.   Did you agree with the statements that are

22      contained in Exhibit B?

23      A.  Yes, I did to my statements, yes.

24  Q.   Do you agree with the factual statements made in

25      Exhibit B?

11

1    A.  Yes, I did.

2  Q.  You're not a lawyer?

3    A.  No, I'm not a lawyer.

4  Q.  Let me --

5      MR. FRECHETTE:  We'll mark that as Exhibit

6    C, please.

7      (Defendant's Exhibit C marked for ID.)

8  Q.  Now, Exhibit C is a Third Amended Complaint.  Were

9    you aware that there had been a Third Amended

10    Complaint filed in this case?

11    A.  I'm not sure.

12  Q.  Why don't you take a look at Exhibit C and let me

13    know whether or not you saw that before it got

14    filed.

15    A.  It looks like it.  Yes, I read it.  I believe

16    I read that.

17  Q.  All right.  And did you agree with the factual

18    statements made in Exhibit C before it was filed?

19    A.  Yes, I did.

20  Q.  Now, when did you get your first ATM card?

21    A.  2000.

22  Q.  And through what bank?

23    A.  Fleet.

24  Q.  Are you presently a Fleet customer?

25    A.  No, I am not.

12

1  Q.   All right.  Since the time that you got your first

2       ATM card in 2000, how many different banks have

3       you held ATM cards with?

4       A.  Just one bank, one credit union.

5  Q.   And Fleet is the bank; right?

6       A.  Fleet is the bank.

7  Q.   Who's the credit union?

8       A.  The Credit Union is Central Falls.

9  Q.   And is that who you have an ATM card with now?

10      A.  Yes.

11 Q.   Is that the ATM card that you used to access

12      Sovereign ATMs in connection with the materials

13      that have been pled in the complaints in this

14      case?

15      A.  Yes, I did.

16 Q.   That being the credit union card?

17      A.  Credit union.

18 Q.   All right.  Now, how many times a year do you

19      believe that you use your ATM card?

20      A.  Not very often.  I don't use it very much as

21      far as bank withdrawals.  I try to carry cash with

22      me.

23 Q.   And why do you try to carry cash?

24      A.  Because I have to watch my expenditures.  So

25      it's pretty basically -- the card was given to me

13

1      because, you know, they have a card with your bank

2      account.  So I use it for emergency, you know.

3  Q.   Well, when you say you have to watch your

4      expenditures, are you suggesting that you don't

5      use the card because you don't like to pay the ATM

6      surcharges?

7      A.  No, I watch what I spend, period.  I watch how

8      much money I can spend.  I don't have a lot of

9      money, so.

10  Q.   Within the last year, the last twelve months

11      looking backwards from today, how many times would

12      you say you've used your ATM card?

13      A.  Maybe three.

14  Q.   When you say maybe three, do you have a specific

15      recollection of the three times in the last twelve

16      months that you've used your ATM card?

17      A.  I have -- the one at Sovereign, I have a

18      specific recollection and I do remember using my

19      one for Central Falls Credit Union on a Sunday a

20      couple of times at Central Falls Credit Union.

21  Q.   At Central Falls Credit Union?

22      A.  Right.

23  Q.   Now, in fact -- withdrawn.  In the last twelve

24      months, how many times have you used your ATM card

25      at a bank other than the Central Falls Credit

14

1    Union?

2    A. Once at Sovereign.

3  Q.  That's it, just one time?

4    A. One time.

5  Q.  How about in the twelve months preceding?

6    A. I'm not sure if I did use it at any particular

7    bank.

8  Q.  When did you get your Central Falls ATM card?

9    A. 2001. Yeah, I would think it's 2001.

10  Q.  And when you got your Central Falls ATM card, did

11    you get rid of your Fleet card or did you have

12    them both at the same time?

13    A. No, I got rid of my Fleet card.

14  Q.  Okay. With respect to the Fleet card, did you

15    ever use that at an ATM other than a Fleet ATM?

16    A. No.

17  Q.  With respect to the Central Falls ATM card, other

18    than the allegations of this complaint and your

19    use of the ATM card at Sovereign Bank, have you

20    ever used the Central Falls ATM card at any other

21    bank other than your own?

22    A. I might have once.

23  Q.  When you say you might have once, do you have a

24    specific recollection of having done so or are you

25    speculating?

15

1   A.  I have a recollection of it and the reason

2       being is that my golf course was putting in a new

3       computer system and they were only taking cash and

4       that's when I used it; because I needed to have

5       cash to play the round because they couldn't take

6       credit cards that week.

7   Q.  And what bank would you have gone to, ma'am?

8   A.  I had gone to -- I believe it might have been

9       -- I don't remember the name of the bank but I

10      believe it was Bank of America, it could have

11      been.

12  Q.  So, to summarize, you got your Fleet card in 2000

13      and you held it until you got your Central Falls

14      card in 2001; right?

15  A.  Right.

16  Q.  And during the whole time that you had your Fleet

17      card, you never used it at a bank other than

18      Fleet; correct?

19  A.  That's correct.

20  Q.  You've had your Central Falls card since 2001;

21      correct?

22  A.  Right.

23  Q.  And with the exception of the times that you used

24      it at Sovereign and which are referred to in this

25      case, the only other time that you used it at a

16

1       bank other than Central Falls Credit Union is the

2       one time that you've described to me in connection

3       with your need to get cash to go to the golf

4       course; correct?

5       A.  That is correct.

6   Q.  All right.  Is there any particular reason that

7       you don't -- withdrawn.  Is there any particular

8       reason that you refrain from using your ATM card

9       at banks other than Central Falls Credit Union?

10      A.  I don't carry a lot of cash.  I don't spend a

11      lot of money during the day.  I don't -- I take a

12      certain allowance per week to run what I need to

13      run and that's pretty basically how it works out.

14      I have enough money every week pretty basically.

15  Q.  Were you aware prior to using -- withdrawn.  When

16      you used your card at the Bank of America in order

17      to get money to golf on that one occasion -- first

18      of all, when was that?  Start with a year if you

19      can.

20      A.  It could have been 2005.  It could have been

21      early in 2005, early spring.

22  Q.  Was it before or after your use of the Sovereign

23      ATMs that are referenced --

24      A.  It was --

25  Q.  You've got to let me finish, ma'am.  Was it before

17

1     or after your use of the Sovereign ATMs that are

2     referenced in this case?

3     A. It was before.

4  Q.  Were you charged an ATM convenience fee?

5     A. I'm not sure.

6  Q.  Were you aware at the time that you used the Bank

7     of America ATM that the possibility existed that

8     if you used an ATM other than the Central Falls

9     Credit Union ATM that you might be charged a

10    convenience fee?

11    A. No, I realistically wasn't.

12  Q.  Is the -- withdrawn. Do you recall whether the

13    ATM machine at Bank of America had any notices on

14    it with respect to convenience fees?

15    A. I'm not sure. I really just needed to have

16    the cash that day and that was only the simple

17    reason I called the golf course before I went

18    there, is your computer fixed? They said no. So,

19    I needed to bring cash.

20        MR. LEFEBVRE:  Just stay focused on

21    answering his question. His question was not what

22    you answered. Just listen to his question.

23        THE WITNESS:  Okay.

24  Q.  Now, other than -- well, so you called from your

25    home before you went golfing that day?

18

1    A. No, I called from my car. I had my cellphone.

2  Q.   Any particular reason why you stopped at the Bank

3       of America as opposed to -- you've got to let me

4       finish, ma'am.

5    A. Okay.

6  Q.   I'm not trying to chastise you.

7    A. Okay, I'm sorry.

8  Q.   Any particular reason why having called and heard

9       that you were going to have to get cash, you

10      didn't go to the Central Falls Credit Union?

11     A. The one -- that one bank happened to be right

12      on the way to the golf course.

13 Q.   Do you know whether when you got the money from

14      the Bank of America ATM you were prompted by an

15      on-screen notice that you were going to be charged

16      a convenience fee?

17     A. Yes.

18 Q.   And when you say yes, you know, are you telling me

19      that you recall that there was such a notice on

20      the screen?

21     A. I'm pretty sure there was a notice on the

22      screen. My total recollection of that would not

23      be -- you know, I couldn't swear to it.

24 Q.   Okay. Now, you came to use the Bank of America

25      ATM because you needed money to go golfing;

19

1     correct?

2     A.  That's correct.

3  Q.   Why was it that you came to use the Sovereign

4     ATMs?

5     A.  I don't remember exactly why I needed the

6     money that particular day but I did need some

7     cash.

8  Q.   Did anybody tell you to go use a Sovereign ATM?

9     A.  No.

10 Q.   Did you use the Sovereign ATM with an eye to the

11     commencement of litigation?

12     A.  No.

13 Q.   So your use of the Sovereign ATM on -- let's see

14     -- on April 4, 2005 was just in the ordinary

15     course of your affairs?

16     A.  That's correct.

17 Q.   And you know why I said April 4, 2005, right,

18     ma'am?

19     A.  That's correct.  It's stated on the date of

20     the receipt.

21 Q.   And it's the date in your complaint; right?

22     A.  That's correct.

23 Q.   Now, on the particular date in question -- and you

24     mentioned it's the date on the receipt -- that's

25     the date on Exhibit A attached to the various

20

1   versions of the complaint; right?

2       A.  Yes.

3   Q.   Now, is that the -- did you use on April 4, 2005,

4       did you use the walk-up or the drive-thru ATM?

5       A.  I used the drive-thru.

6   Q.   Had you ever used the walk-up ATM at this

7       location?

8       A.  No, I hadn't until it was pointed out in the

9       complaint I walked up to -- when we went back to

10      do the pictures, then they brought me inside to

11      use the -- to look at the one inside also.

12  Q.   Who's they?

13      A.  My attorney Chris Lefebvre and a photographer

14      that he had hired.

15  Q.   So, on April 4, 2005 and before, the only

16      Sovereign ATM that you had ever used was the

17      drive-thru ATM; correct?

18      A.  That's correct.

19  Q.   And that's the one that generated the receipt

20      that's attached as Exhibit A to the various

21      versions of the complaint; correct?

22      A.  That's correct.

23  Q.   All right.  And sitting here today, you don't have

24      any recollection as to why you needed the $40

25      that's referred to in Exhibit A; correct?

21

1  A. That's correct.

2 Q.  Did you have to wait in line at all when you used

3  the Sovereign drive-up ATM on April 4, 2005?

4  A. No, I did not. There was nobody at the

5  location.

6 Q.  What made you decide to use the drive-thru as

7  opposed to the walk-up?

8  A. I knew where it was and I didn't -- you know,

9  I thought maybe the building was locked, you know.

10 Q.  What time of day was it?

11  A. It was 6:45 in the evening.

12 Q.  Now, you say that because you just looked at the

13  receipt; right?

14  A. Right.

15 Q.  Do you have a recollection?

16  A. I knew it was evening but that's pretty

17  basically what it was.

18 Q.  All right. Had you ever been in this Sovereign

19  branch before, the Sovereign branch that -- this

20  is the Seekonk branch; right?

21  A. That's correct.

22 Q.  Had you ever been in the Seekonk branch before?

23  A. No, I had not.

24 Q.  When you said a minute ago that you knew where it

25  was, how did you know where it was?

22

1    A. I knew there was a Benny's there and I

2    happened to be going by and knew that there was a

3    bank there. As convenience, that's where I

4    stopped and that was pretty basically -- I must

5    have been headed out that way to go do something

6    and that's why I used that machine.

7  Q.   Now, your attorney gave me some photographs this

8    morning; correct?

9    A. That's correct.

10    MR. FRECHETTE:  Why don't we go ahead and

11    mark these as D, E and F.

12    (Defendant's Exhibits D, E and F marked

13    for ID.)

14    MR. LEFEBVRE:  Tara, these are the

15    pictures that we took of Ms. DeLoreto in

16    accordance with her affidavit.  Just so you know

17    which ones we're talking about.

18    MS. GOODWIN:  Okay.

19  Q.   All right.  Let me just show you D, E and F,

20    ma'am, and ask you if you can tell me when those

21    were taken?

22    A. Those were taken -- those were taken on a

23    Sunday, I believe.  Exactly which day, I don't

24    remember.  But it was --

25  Q.   In fairness to you, ma'am, why don't you take a

23

1     look at your affidavit, paragraph 3, and that says

2     that they were taken at 3:30 on Saturday,

3     February --

4     A. Oh, yes, I'm sorry, it's a Saturday. I knew

5     it was a weekend day.

6  Q.  And who was present when those were taken?

7     A. There was a photographer and my attorney.

8  Q.  All right. Now, those are accurate depictions of

9     the drive-up ATM at the Seekonk branch of

10    Sovereign; right?

11    A. That's correct.

12  Q.  And do those look any different -- withdrawn. Did

13    the Seekonk ATM at Sovereign look any different on

14    the date that you took those pictures than it did

15    on April 4, 2005?

16    A. They look identical.

17  Q.  So, what I see in the pictures that we've marked

18    as D, E and F is an accurate representation not

19    only of what the ATM at the Seekonk drive-thru

20    branch -- the drive-thru of Sovereign looked like

21    on February 25th but it's also an accurate

22    representation of what the drive-thru ATM at the

23    Seekonk branch of Sovereign looked like on April

24    4th, 2005; right?

25    A. That's correct.

24

1    Q.    Now, let me just show you some other photographs

2          and I am going to hand you the whole set, ma'am.

3          We won't work with everything.

4    A.    Okay.

5              MR. FRECHETTE:  We'll just mark this whole

6          packet as G.

7              (Defendant's Exhibit G marked for ID.)

8              MR. LEFEBVRE:  Tara, this is the appendix

9          of the exhibits referenced of all the pictures in

10         the motion to dismiss.

11             MS. GOODWIN:  Okay.

12   Q.    Okay.  Would you turn to Tab A.  Do you recognize

13         the picture in Tab A?  Do you recognize what it

14         shows?

15   A.    Yes.

16   Q.    What does it show?

17   A.    It shows an ATM and a bank deposit machine and

18         it shows an advertising sign.

19   Q.    All right.  And do you recognize this as being the

20         lobby of the Seekonk branch of Sovereign and the

21         ATM machine that's situated in that lobby?

22   A.    Yes.

23   Q.    Would you agree with me that this is a fair and

24         accurate representation of that lobby?

25   A.    Yes.

25

1  Q.   All right.  Let me show you Exhibit B and by

2       Exhibit B, I mean, Tab B of Exhibit G.  Now,

3       recognizing, ma'am, obviously that this is a

4       picture just of the red placard that's on Tab A of

5       Exhibit G situated between the two machines, do

6       you agree with me that that is a fair and accurate

7       depiction of that placard?

8       A.  Yes.

9  Q.   All right.  And if you look at Tab C and

10      realizing, again, obviously this is just a

11      photograph only of that and that it is obviously

12      not to scale, which I concede; do you agree with

13      me that Tab C of Exhibit G is a fair and accurate

14      depiction of that portion of the red placard that

15      contains the convenience fee notice?

16      A.  Yes, I do.

17  Q.   All right.  Would you look at Tab D, please.  Is

18      Tab D a fair and accurate depiction of the

19      drive-up ATM at the Seekonk branch of the

20      Sovereign Bank?

21      A.  That's correct.

22  Q.   All right.  Would you take a look at Tab E.  Is

23      Tab E a fair and accurate depiction of the Seekonk

24      branch drive-up ATM at Sovereign?

25      A.  That's correct.

26

1  Q.  Would you take a look at Tab F of Exhibit G.  Now

2      you'll notice on Tab E that to the left of the ATM

3      itself there's a red placard; right?

4      A.  That's correct.

5  Q.  All right.  Is Tab F a fair and accurate depiction

6      of that placard?

7      A.  That's correct.

8  Q.  All right.  And is Tab G a fair and accurate

9      depiction of among other things the convenience

10     fee portion of that red placard?

11     A.  That's correct.

12 Q.  Okay.  Now, let me have marked as Exhibit H your

13     affidavit.

14         (Defendant's Exhibit H marked for ID.)

15 Q.  I'll show you that.  Oh, before we get to that --

16     and I want to caution you here, I'm going to ask

17     you some questions but you should not tell me

18     anything that you've discussed with your attorney

19     or that your attorney told you.  How is it that

20     you came to go to Mr. Lefebvre about the issue of

21     being charged an ATM fee and the concept that the

22     notices weren't sufficient?

23     A.  He was doing some legal work on some papers

24     that I needed to have signed and it came up in a

25     conversation --

27

1       MR. LEFEBVRE:  You don't have to say what

2    was said, who said what.

3    A.  -- but I don't remember exactly what was said

4    and how it was said.

5  Q.   All right.  And how long after you had used the

6    ATM at the Seekonk drive-up did this conversation

7    take place?

8    A.  I'm not exactly sure how long it was but it

9    was -- it wasn't very long after.

10  Q.   Now, when you went -- withdrawn.  All right.

11    Let's start by going back to Exhibit G, if we

12    could for a second.  That's the packet of tabbed

13    exhibits.

14    A.  Okay.

15  Q.   All right.  How do you define the word prominent,

16    ma'am?

17       MR. LEFEBVRE:  Are you asking her to look

18    at a particular picture?

19       MR. FRECHETTE:  No.

20       MR. LEFEBVRE:  Okay.

21  Q.   How do you define the word prominent?

22    A.  I don't know exactly how to define --

23       MR. LEFEBVRE:  You can't mumble.

24    A.  I don't know exactly how I would define the

25    word prominent.

28

1  Q.   Do you know generally how you would define it?

2     A.  It's something that could happen or most

3     likely would happen.

4  Q.   Can you use it in a sentence?

5     A.  No, I can't.

6  Q.   How do you define the word conspicuous?

7     A.  That needs to be something very much in the

8     open.

9  Q.   And when you say conspicuous in the context of

10    this case, you don't believe that the notices that

11    are posted at or near the ATM machines are

12    conspicuous; correct?

13    A.  That's correct.

14  Q.   Now, what is it about the notices that you feel

15    makes them not conspicuous?

16         MR. LEFEBVRE:  Just so we're clear, I

17    don't mean to interrupt.  I don't know

18    unintentionally or intentionally, you used the

19    word notices, plural.

20         MR. FRECHETTE:  I'll withdraw the

21    question.

22  Q.   With respect to the walk-up at the Seekonk branch

23    of Sovereign and without looking at the picture,

24    please, could you tell me what it is you feel

25    renders the convenience fee placard not

29

1    conspicuous?

2    A.  When you walk in to a strange place, you're

3    looking for the ATM machine and you're looking

4    right at the machine, not looking to the left or

5    to the right or to any other particular spot.

6    You're looking at the machine and at the machine

7    is a very -- would be a very conspicuous place.

8    To the left of the machine or somewhere off to the

9    side of the machine is not what I was looking for.

10   Q.   So, is it your testimony that when you recently

11   utilized the ATM walk-up at the Seekonk branch of

12   Sovereign, you did not see the red placard that is

13   to the left of the ATM and that is depicted in Tab

14   A of Exhibit G?

15   A.  I did not exactly notice what it was.  In

16   other words, I may have seen a sign there but I

17   saw, you know, I might have seen STAR, NYC or

18   whatever it was, but I didn't actually look at the

19   whole placard and read it all.

20   Q.   All right.  Well, putting aside the content of the

21   individual squares that are on that red placard

22   that's depicted in Tab A of Exhibit G, I presume

23   that you would concede that you saw the red

24   placard itself?

25   A.  I saw the red placard itself, yes.

30

1  Q.   Now, and there was nothing that prevented you from

2       walking up to the red placard and reading it;

3       correct?

4   A.  No, but I wasn't there to read the red

5       placard, I was there to use the ATM machine.

6  Q.   Well, truth be told, you were actually there to

7       take photos of the ATM machine to use in this

8       litigation; correct?

9   A.  That's correct.

10 Q.   Now, am I to understand that one of the essential

11      claims that you're making in your litigation is

12      that the information that's described in the box

13      that is shown in its entirety in Tab C of Exhibit

14      G, that that should appear right on the machine

15      itself?

16  A.  That's correct.

17 Q.   All right. Is it your contention, ma'am, that if

18      that information, and by that information I mean

19      the information that says: "Sovereign Bank may

20      charge a fee to U.S. cardholders for withdrawing

21      cash.  This fee is added to the amount of your

22      withdrawal by Sovereign Bank and is in addition to

23      any fees that may be charged by your financial

24      institution.  This convenience fee does not apply

25      to Sovereign Bank cardholders."  Is it your

31

1    contention, ma'am, that if that information isn't

2    actually on the machine itself, then Sovereign

3    Bank has not fulfilled its responsibilities under

4    the Electronic Funds Transfer Act?

5         MR. LEFEBVRE:  I'm going to object.

6    That's not what the complaint says but you can

7    answer.

8    A.  Yes.

9  Q.   All right.  Your view is that if it's not on the

10   machine itself, it is perforce not prominent and

11   not conspicuous; correct?

12   A.  That's correct.

13 Q.   All right.  Now, and by the way, when I said if

14   it's not on the machine, it's not prominent and

15   conspicuous, I'm referring to that language that I

16   just quoted a second ago.  You understood that;

17   right?

18   A.  I understood that.

19 Q.   The language that's described in Tab C of Exhibit

20   G and depicted there; correct?

21   A.  That's correct.

22 Q.   All right.  Are there any other aspects of the

23   placard that is depicted, and by that I mean the

24   red placard that is depicted in Tabs A and B of

25   Exhibit G, that you believe render it not

32

1    prominent and not conspicuous?

2        MR. LEFEBVRE:  Now, I don't mean to be

3    difficult.  Let's not, let's not.

4        MR. FRECHETTE:  No, wait a minute, wait a

5    minute.  If we're going to have a speaking

6    objection, this one I want to not have in the

7    presence of the witness.

8        MR. LEFEBVRE:  Okay.  I'm going to object.

9    You keep saying prominent and conspicuous as to --

10    I want to make sure we're talking about the

11    placard or the notice.

12        MR. FRECHETTE:  This is a speaking

13    objection.  If you want to just say objection as

14    to form then I'll rephrase.

15        MR. LEFEBVRE:  Objection to form, fine.

16  Q.   Now, I'll withdraw that question.  Ma'am, in your

17    case and specifically if you look at the Third

18    Amended Complaint, paragraph 16, you've said that

19    the notices at Sovereign ATMs are not prominent

20    and conspicuous for various reasons; right?

21    A.  Yes.

22  Q.   All right.  Now, other than than what's set forth

23    in 16 A, B and C, are there any other reasons that

24    you believe that "The notices are not prominent

25    and conspicuous"?

33

1    A.  No.

2  Q.   Now, you would agree with me, would you not, that

3    -- withdrawn.  Did you recently actually use the

4    walk-up ATM at Sovereign?

5    A.  No, I did not.

6  Q.   You just went down there and took pictures?

7    A.  That's correct.

8  Q.   All right.  Did you actually walk up and read the

9    red placard that's depicted in Tabs A and B of

10    Exhibit G when you recently went and took

11    pictures?

12    A.  Yes, after they had pointed out where the

13    notice was.

14  Q.   And who's they?

15    A.  Mr. Hernandez pointed it out to me.

16  Q.   Who's Mr. Hernandez?

17    A.  He was the gentleman who took the pictures.

18  Q.   Did you have conversations at the time when these

19    pictures were being taken with anyone?

20    A.  No.

21  Q.   You didn't have any conversations with your

22    attorney at that time?

23    A.  Other than just noticing where the placard

24    was.

25  Q.   And you're not testifying that when you recently

34

1    walked into the Seekonk branch of Sovereign in

2    order to take these pictures, that you couldn't

3    see the red placard; correct?

4    A. That's correct.

5 Q.   Now, let's take a look if we could at Tab D of

6    Exhibit G. Do you see that?

7    A. Yes.

8 Q.   All right. Now, I'm going to refer to left and

9    right and by left I'm actually orienting myself

10    right of the picture as it exists. The left of

11    the picture would be the part where the Sovereign

12    drive-thru teller sign is. Do you see that?

13    A. That's correct.

14 Q.   And the right would be the part where on this

15    photo there's a bush at the far right; correct?

16    A. That's correct.

17 Q.   All right. Now, which way do you drive your car

18    into the ATM, left to right or right to left?

19    A. From left to right.

20 Q.   So you would agree with me, ma'am, that in order

21    to get to the ATM machine itself, you actually

22    have to drive past the red placard that's depicted

23    in Tabs D and Tab E; correct?

24    A. That's correct.

25 Q.   Now, on -- and we've already established that the

35

1    red placard that's depicted in Tab D and Tab E of

2    Exhibit G actually was present on April 4, 2005

3    when you first used the drive-up ATM at the

4    Seekonk branch of Sovereign; correct?

5    A.  That's correct.

6  Q.    Now, when you used the drive-up ATM at the Seekonk

7    branch of Sovereign on April 4, 2005, you're not

8    suggesting that you couldn't see the actual

9    placard itself; correct?

10    A.  No, I would have to say that I could see the

11    placard.

12  Q.    All right.  And how far is the placard away from

13    the machine itself?

14    A.  Probably -- I'd have to say about a foot and a

15    half.

16        MR. LEFEBVRE:  If you're not sure on

17    something, you don't have to guess.

18    A.  I'm not actually dead sure.

19  Q.    But based on your recollection and having used the

20    machine and having recently visited it within the

21    last couple of weeks, and based upon your own

22    observation of the photos that you've already

23    acknowledged are fair and accurate depictions of

24    the ATM.

25    A.  Roughly around two feet, yes, about two feet.

36

1    Q.    Now, is it your testimony that something that's

2          two feet away from something else is not "near"

3          that object, that second object?

4          A.  It could be near it but it may not be

5          conspicuous to see it.

6    Q.    I understand.  But my question is, would you agree

7          with me that if something is two feet away from

8          something else, it's "near" it?

9          A.  It is near it, yes.

10   Q.    And you've already told me that you agree that you

11         saw the placard itself?

12         A.  That's correct.

13   Q.    And that you would have to drive by the placard

14         itself in order to actually reach the ATM;

15         correct?

16         A.  Had to drive by it, yes.

17   Q.    Because, of course, you're not going to back into

18         the ATM?

19         A.  That's correct.

20   Q.    All right.  And I trust, ma'am, that you would

21         also agree with me that there was nothing that

22         would prevent you from stopping at the placard

23         before you got to the ATM machine and reviewing

24         anything that was on it?

25         A.  I had no reason to be reading an advertisement

37

1      and that's basically what I felt that was, was an

2      advertisement. It wasn't for any other purposes.

3  Q.   Okay. I understand that but my question actually

4      was, you would agree with me, would you not, that

5      there was nothing that would have prevented you

6      from stopping and examining the placard; correct?

7      A. No, nothing would stop me.

8  Q.   Now, on April 25th, 2005 when you used the ATM

9      drive-up at the Seekonk branch of Sovereign, are

10     you testifying that you were unaware that you were

11     going to be charged an ATM fee?

12     A. That was correct.

13 Q.   All right. Was there not a prompt on the screen

14     that caused you -- that advised you that before

15     you press this button, you should be aware that

16     you're going to be charged an ATM fee?

17     A. That is correct. I knew that at that

18     particular point and I was already almost done so

19     I continued to do that.

20 Q.   So you would agree with me that before you

21     finalized the transaction, you did know that

22     you were going to be charged an ATM fee?

23     A. That's correct.

24 Q.   Now, am I to understand that your position is that

25     the notice that's described in Exhibit E and D --

38

1     and by that I mean the placard, the red placard

2     that is to the left of the ATM -- that in order

3     for that to be "prominent and conspicuous in

4     location," it must be actually on the machine?

5     A.  That's correct.

6   Q.   And that in your view if it is not actually on the

7     machine itself, it is by definition not in a

8     prominent and conspicuous location; correct?

9     A.  That's correct.

10  Q.   And you hold that view irrespective of how "near"

11    the placard may be to the machine because as far

12    as you're concerned, it's not an issue how near it

13    is, it has to be on the machine; correct?

14    A.  That's correct.

15  Q.   Now, let's take a look at your affidavit, which I

16    think we marked as Exhibit H.

17    A.  Okay.

18  Q.   Now, first of all, before you completed this

19    affidavit, you read the affidavit of Ms. Rhiannon

20    Hernandez; correct?

21    A.  That's correct.

22  Q.   And you stated in your affidavit that you're in

23    complete disagreement with certain conclusions

24    that Ms. Hernandez reached and stated in her

25    affidavit; correct?

39

1    A. I believe that's correct.

2  Q.   Well, if you take a look at paragraph 3, you

3       indicate that you completely disagree with --

4       A. I totally disagree.

5  Q.   Well, I didn't quote it but you don't dispute that

6       the words completely and totally have the same

7       meaning in this context; right?

8       A. That's correct.

9  Q.   But in fairness to you, you say that you totally

10      disagree with Mrs. Hernandez's conclusions in

11      paragraphs 15 and 23 of her affidavit; right?

12      A. That's correct.

13  Q.   And you also on the last page of your affidavit

14      indicate that you disagree with Mrs. Hernandez's

15      statements that the location of the convenience

16      fee notice is reasonably calculated to impart its

17      information to non-Sovereign customers; correct?

18      A. That's correct.

19  Q.   And, as I understand it, the reasons why you

20      disagree with Mrs. Hernandez's various

21      observations in paragraphs 15 and 23 and the

22      specific one about being reasonably calculated to

23      impart its information, the reasons why you

24      disagree with that are all set forth in your

25      affidavit; correct?

40

1     A. That's correct.

2  Q.   Other than what's in your affidavit, are there any

3       other reasons why you disagree with what Mrs.

4       Hernandez had to say?

5     A. No.

6  Q.   All right. Would you take a look at your

7       affidavit, please.

8     A. Yes.

9  Q.   Now, I note that you state that you drive a 2000

10      Oldsmobile Intrigue; right?

11     A. That's correct.

12  Q.   And that is the picture -- that is the vehicle

13      that's referenced in what we've marked -- and you

14      don't mind if I look over here because we only

15      have one copy. Actually, well, you know what,

16      those are the marked ones so let's work with

17      those. That's the vehicle that we see depicted in

18      Exhibits E, F and D; correct?

19     A. That's correct.

20  Q.   Now, you are not testifying are you, ma'am, that

21      if you were to stop your 2000 Oldsmobile Intrigue

22      directly in front of the placard that is depicted

23      in Tabs D and E of Exhibit G, that that placard

24      would not be visible to you; correct?

25     A. That's correct.

41

1  Q.   All right.  So, when you say that in order to see

2        that placard, you would have to turn and look

3        backwards or put your car into reverse, that's

4        only when the car is situated in front of the ATM

5        machine; right?

6     A.  That's correct.

7  Q.   But, of course, by the time you'd gotten to the

8        ATM machine, you'd already passed by the placard;

9        right?

10    A.  That's correct.

11  Q.   And nothing prevents you from stopping and

12        examining the placard; correct?

13    A.  No.

14  Q.   Now, would you look at the last sentence of

15        paragraph 5 where you say, "There was absolutely

16        no visible notice in the immediate vicinity

17        warning me that Sovereign was going to charge a

18        convenience fee for use of its ATM machine." Do

19        you see that?

20    A.  Yes.

21  Q.   First of all, obviously you're not referring to

22        the notice that's actually on the screen itself;

23        right?

24    A.  That's correct.

25  Q.   That notice you acknowledge receiving?

42

1     A. I see.

2   Q.   Is that correct?

3     A. That's correct then.

4   Q.   When you say there's absolutely no visible notice

5       in the immediate vicinity, is it your view, ma'am,

6       that the red placard depicted in exhibits -- in

7       Tabs D and E of Exhibit G is not in the immediate

8       vicinity of the machine?

9     A. That's correct.

10   Q.   Even though you've already acknowledged a moment

11       ago that it's approximately a foot and a half to

12       two feet away and acknowledged that is "near" the

13       ATM?

14     A. That's correct.

15   Q.   Paragraph 6 of your affidavit -- now you talk

16       about in that paragraph either reversing your car

17       or turning your body and looking backwards in

18       order to read the convenience fee notice; right?

19     A. That's correct.

20   Q.   And you say that at this awkward and cumbersome

21       position I could still not read each word of the

22       convenience fee notice; correct?

23     A. That's correct.

24   Q.   What words could you read?

25     A. In actuality from this --

43

1          MR. LEFEBVRE:  Now, when you say this,

2     what are you referring to?

3          THE WITNESS:  From this picture.

4          MR. LEFEBVRE:  Exhibit E, she's referring

5     to.

6          THE WITNESS:  Actually it's Exhibit F.

7          MR. LEFEBVRE:  I'm sorry.

8     A.  In Exhibit F, if you notice that there's a

9     little jut-out of this which also actually

10     prevents you from looking this way to see it, to

11     notice that portion of the sign, because it's on

12     the right-hand side of that sign and not on the

13     left-hand side of that sign.  And if you notice,

14     you can barely see beyond that.

15  Q.   Okay.  I understand, ma'am, but my question

16     actually to you was, you said you could not read

17     each word of the convenience fee notice.  What

18     words could you read?

19     A.  I don't remember exactly if I read any of the

20     words because I didn't notice it at the time.

21  Q.   Well, I'm just working off of your statements,

22     ma'am, and this says you could still not read each

23     word of the convenience fee notice.  I take it

24     that you would agree with me that it's fair for me

25     to infer from that that there were some words you

44

1    could read.

2    A.  In actuality, there were no words that I could

3    read.

4  Q.   Okay.  So this statement in your affidavit --

5    withdrawn.  You understand that an affidavit is a

6    document offered under pains and penalties of

7    perjury; right?

8    A.  That's correct.

9  Q.   And you certainly wanted to be as careful and

10    precise in putting this affidavit together;

11    correct?

12    A.  That's correct.

13  Q.   Because you understood that it's important to your

14    case; right?

15    A.  That's correct.

16  Q.   Am I to now understand that this section where you

17    said, I could still not read each word of the

18    convenience fee notice, is not correct and that

19    this really should read, I could not read any of

20    the convenience fee notice?

21    A.  That's correct.

22  Q.   All right.  Did you read this affidavit before you

23    signed it?

24    A.  I did read it and I may not have actually

25    thought that might have been a difference of what

45

1    I was trying to say.

2  Q.   Who drafted this affidavit?

3    A.  I gave it to my attorney, Mr. Lefebvre, and

4    then he typed it in.

5  Q.   Are these your words or are these words that were

6    given to you by somebody else?

7    A.  These are my words.

8  Q.   Now, when you write in paragraph 7, in your

9    opinion the drive-up convenience fee notice is

10   placed in a location -- my copy is cut off so I

11   can't -- it says --

12   A.  Location that is difficult for any consumer to

13   see who might choose to use the drive-thru ATM at

14   the Seekonk branch referenced above.

15 Q.   When you say that, you mean when that consumer is

16   parked directly in front of the ATM machine;

17   right?

18   A.  That's correct.

19 Q.   You don't mean that the consumer wouldn't be able

20   to see that the placard exists to the left of the

21   machine as he drives up; correct?

22   A.  That's correct.

23 Q.   Just as in paragraph 8, you're not suggesting that

24   the placard that exists in the lobby of the

25   walk-up isn't visible.  You're only suggesting

46

1       that the placard isn't visible when you're

2       standing directly in front of the machine;

3       correct?

4       A.  That's correct.

5   Q.   Have you ever met the other plaintiff

6       in this case?

7       A.  No, I have not.

8   Q.   You don't know her?

9       A.  No, I do not.

10  Q.   Now, you also are of the belief that the typeface

11      on the convenience fee notice itself is too small;

12      correct?

13      A.  That's correct.

14  Q.   What typeface do you contend should be used?

15      A.  I would believe that it needs to be larger

16      typeface only because -- if you notice that the

17      words on the sign, STAR and all of those, are all

18      used in bigger type and I would think that

19      something that small, okay, or something that

20      important should be of the same quality of being

21      able to read it.

22  Q.   All right.  So you think that the letters should

23      be as big as the letters used by STAR; right?

24      A.  That's correct.

25  Q.   How big would the notice be if all of the letters

47

1       were made to be the same size as the letters that

2       are in the word STAR?

3       A.  It would have to be pretty big.

4   Q.   Would it fit on the machine?

5       A.  If it was on the machine, I would think that

6       those letters there, okay, those letters there

7       would be perfect if it was on the machine.

8   Q.   So, if it was on the machine, then the existing

9       notice and the existing typeface would be fine?

10      A.  That's correct.  It's very readable under that

11      portion if you were sitting right there, yes.

12  Q.   How far are you typically -- when it's on the

13      machine, how far are you away from the machine

14      when you typically use it?

15      A.  Maybe a foot.

16  Q.   And I take it that you would agree with me that

17      since the machine is recessed into the wall, if

18      you were standing in front of the placard itself

19      you'd be something less than a foot away from the

20      placard; correct?

21          MR. LEFEBVRE:  I'm going to object to the

22      form.

23  Q.   All right.  Let me ask you this.  The machine

24      itself is recessed into the wall; correct?

25      A.  That's correct.

48

1  Q.   So you've already told me that you think you're

2       about a foot away from it when you use it; right?

3       A. That's correct.

4  Q.   All right.  The placard is not recessed into the

5       wall; correct?

6       A. That's correct.

7  Q.   So, would you agree with me that if you were

8       standing in the exact same spot in terms of your

9       distance from the wall as you were from the

10      distance of the face of the machine, where it not

11      -- that's a poor question.  I'm going to have to

12      try to rephrase that.

13          MR. LEFEBVRE:  Gee, I was looking forward

14      to objecting.

15          MR. FRECHETTE:  Yeah.

16  Q.   If the machine is recessed and the wall is not

17      recessed, if you were standing the exact same

18      distance away, you would agree with me that you're

19      actually closer to the placard than you are to the

20      machine; correct?

21      A. That's correct.

22  Q.   And you've already told me that on the machine if

23      this notice existed using the same type font as is

24      depicted in Tabs B and F of Exhibit G, you would

25      consider it to be prominent and conspicuous;

49

1    correct?

2    A.  Correct.

3  Q.   And when you say that you would consider the fee

4    notice as it presently exists to be prominent and

5    conspicuous if it were posted on the machine,

6    you're not just talking about typeface but you're

7    talking about the color and the language itself;

8    correct?

9    A.  That's correct.

10  Q.   All right.  And so, again, if this notice that was

11    on -- withdrawn.

12        MR. FRECHETTE:  The record should reflect

13    that counsel is conferring with the witness.

14  Q.   Other than what you've identified in your

15    affidavit, are there any other aspects of Mrs.

16    Hernandez's Affidavit that you disagree with?

17    A.  No.

18        MR. FRECHETTE:  I have nothing further.

19        MR. LEFEBVRE:  Tara, do you have any

20    questions?

21        MS. GOODWIN:  Okay.  I have no further

22    questions.

23        MR. LEFEBVRE:  We definitely want to read

24    and sign so we'd ask that you send the transcript

25    so she has an opportunity to review her testimony

50

1      and make any necessary corrections or additions if

2      appropriate.

3           MR. FRECHETTE:  You know, I forgot to ask

4      at the beginning.  We're working on the basis of

5      usual stips other than read and sign?

6           MR. LEFEBVRE:  Yeah, no problem with that.

7           MR. FRECHETTE:  Thank you.

8           (Deposition concluded at 2:07 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

51

1              C-E-R-T-I-F-I-C-A-T-E

2             I, SALLY BRASSARD, a Notary Public in and
for the State of Rhode Island, duly commissioned
3    and qualified to administer oaths, do hereby
certify that the foregoing deposition of MAUREEN
4    E. DELORETO, the Plaintiff in the above-entitled
cause, was taken before me on behalf of the
5    Defendant at the offices of EDWARDS ANGELL PALMER
& DODGE, 2800 Financial Plaza, Providence, Rhode
6    Island, on May 5th, 2006, at 12:30 P.M., that
previous to examination of said witness, who was
7    of lawful age, she was first sworn by me and duly
cautioned and sworn to testify the truth, the
8    whole truth, and nothing but the truth, and that
she thereupon testified as in the foregoing manner
9    as set out in the aforesaid transcript.

10         I further certify that the foregoing
deposition was taken down by me in machine
11    shorthand and was later transcribed by computer
and that the foregoing deposition is a true and
12    accurate record of the testimony of said witness.

13         Pursuant to Rule 5 (d) and 30 (f) of the
Federal Rules of Civil Procedure, original
14    transcripts shall not be filed in court;
therefore, the original is delivered and retained
15    by Defendant's attorney.

16         I have enclosed with a copy of the deposition
a correction and signature page, which must be
17    signed before a Notary Public.

18         IN WITNESS WHEREOF I have hereunto set my hand
this 6th day of May, 2006.

19

20    _____
SALLY BRASSARD, NOTARY PUBLIC/CSR-RPR
21    (MY COMMISSION EXPIRES JANUARY 16, 2009)

22

23

24

25